**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ROMEO POWER INC. SECURITIES LITIGATION | Case No. 1:21-cv-03362-LGS<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ......................................................................................1

II.     JURISDICTION AND VENUE ..............................................................................10

III.    PARTIES ................................................................................................................10

        A.      Plaintiffs ....................................................................................................10

        B.      Defendant Romeo .......................................................................................11

        C.      Individual Romeo Defendants ...................................................................11

        D.      RMG Defendants ........................................................................................13

IV.     SUBSTANTIVE ALLEGATIONS .........................................................................14

        A.      Romeo's Business Combination With RMG ..............................................14

        B.      Romeo's Background and Business.............................................................17

        C.      Romeo Touts Its Contracted Revenue and Robust Supply Chain to Support
                those Orders, Highlights Four Major Suppliers .........................................18

        D.      Romeo Flounders In the Wake of the Revelation of its Critical Supply
                Constraints, Selwood and Webb Are Replaced ..........................................24

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
        AND OMISSIONS IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE
        ACT.........................................................................................................................30

        A.      Announcement of the Business Combination on October 5, 2020 ............30

        B.      The Registration Statement.........................................................................31

        C.      Fox Business Interview on December 13, 2020 ..........................................37

        D.      SPACs Attack Interview on December 14, 2020..........................................37

        E.      SPACInsider Webinar on December 15, 2020 .............................................38

        F.      Panic with Friends Interview on December 28, 2020...................................41

        G.      January 2021 Prospectus..............................................................................42

        H.      FreightWaves Interview on February 25, 2021 ..........................................47

I.      4Q and Full Year 2020 Financial Results and Earnings Call on March 30, 2021............................................................................................49

J.      2020 Form 10-K..................................................................................50

K.      1Q 2021 Financial Results and Earnings Call on May 13, 2021 ...........53

L.      1Q 2021 Form 10-Q............................................................................54

VI.     ADDITIONAL ALLEGATIONS REGARDING DEFENDANTS' SCIENTER............56

A.      Individual Romeo Defendants' Knowledge and Access to Information ..............56

B.      Corporate Scienter and *Respondeat Superior* ........................................61

VII.    DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS IN THE PROXY STATEMENT IN VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT.................................................................................62

VIII.   LOSS CAUSATION ...............................................................................67

A.      Investors Suffered Significant Losses Due to the Materially Misleading Statements Issued During the Class Period ........................................67

B.      RMG Shareholders Who Were Eligible to Vote at the December 28, 2020 Special Meeting Suffered Damages.......................................................68

IX.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ..............................................................70

X.      PLAINTIFFS' CLASS ACTION ALLEGATIONS.........................................72

XI.     NO SAFE HARBOR ..............................................................................73

XII.    CAUSES OF ACTION ...........................................................................74

XIII.   PRAYER FOR RELIEF ..........................................................................79

XIV.    DEMAND FOR TRIAL BY JURY ...........................................................79

Lead Plaintiff Mike Castleberg and additional plaintiff Joshua Cante ("Plaintiffs"), by and through the undersigned attorneys, on behalf of Plaintiffs and all others similarly situated, allege the following upon information and belief, except as to allegations specifically concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, Lead Counsel's investigation, which includes without limitation: (i) review and analysis of regulatory filings made by Romeo Power, Inc. ("Romeo" or the "Company") (f/k/a RMG Acquisition Corp. ("RMG")) with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (ii) review and analysis of analyst and media reports; (iii) review and analysis of press releases and other public statements issued and disseminated by the Company or its authorized agents, including the Individual Romeo Defendants and the RMG Defendants; (iv) review of other publicly available information concerning Romeo; and (v) interviews with former employees of the Company.

## I.    NATURE OF THE ACTION

1.    Plaintiffs bring this federal securities class action on behalf of a class consisting of all persons and entities other than Defendants (defined below) who or which: (1) purchased or otherwise acquired the publicly traded securities of Romeo during the period October 5, 2020 through August 16, 2021, inclusive (the "Class Period"), and who were damaged thereby, seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; and/or (2) held common stock of RMG as of December 1, 2020, eligible to vote at RMG's December 28, 2020 special meeting, seeking to pursue remedies under Section 14(a) of the Exchange Act.

2.    Romeo was founded in 2016 and went public in December 2020. According to its SEC filings and other public statements, Romeo purports to be an industry leading energy

technology company focused on designing and manufacturing lithium-ion battery modules and packs for commercial electric vehicles.  Romeo asserts that through its industry leading energy dense battery modules and packs, it enables large-scale sustainable transportation by delivering safe, longer lasting batteries with shorter charge times.  Romeo's core product offerings purportedly serve the battery electric vehicle ("BEV") medium duty short haul and heavy duty, long haul trucking markets, as well as specialty trucking and buses.

3.       During the Class Period, Defendants repeatedly represented that Romeo had "secured $300 million in revenue" (a figure that grew to $555 million by December 31, 2020) based on "existing customer contracts" (or "backlog") and had another $2.4 billion worth in contract revenue under "advanced" negotiations.  Defendants further claimed that Romeo expected to recognize approximately $59 million of that backlog revenue by September 30, 2021.  Based in part on that figure, Defendants estimated revenue of $11 million for 2020 and $140 million for 2021.  This massive increase in expected revenue for 2021, with expected recognition of $59 million in backlog revenue to occur in the first three quarters of 2021, signaled to the market that Romeo was ramping up production to begin delivering on a significant portion of its secured revenues in 2021.  Indeed, with 16-week lead times to manufacture and deliver customers' orders, Romeo would need to have component materials secured and production underway by the start of the Class Period in October to be able to deliver scheduled orders on time in 2021.

4.       Indeed, before it could fulfill any orders, Romeo needed to secure sufficient supply of the key components of its products—namely, high quality battery cells, which are "critical to" Romeo's products.  Thus, to engender market confidence in Romeo's ability to convert its backlog orders into actual revenue, Defendants claimed that Romeo obtained its battery cells from four major suppliers—LG Chem, Samsung, Murata, and SK Innovation.  Furthermore, Defendants

represented that Romeo was not beholden "to any level of the value chain", that Romeo's supply chain was "hedged" against potential supply disruptions, and that the Company did not "see any big challenges as [Romeo's] order book continue[d] to grow."

5.      During Romeo's early days as a public company, Romeo's then-President and CEO, Defendant Lionel E. Selwood, Jr. ("Selwood") went on a media blitz, repeatedly touting Romeo's "secured" revenue, assuring that the Company had access to sufficient supply of high-quality battery cells to fulfill those orders, and, with its "Operation Hedge Fund" program, was well-hedged against any potential supply disruptions.  For example, on December 15, 2020, Selwood claimed Romeo had "implemented Operations [*sic*] Hedge Fund program in [Romeo's] supply base that allows [Romeo] to secure products that's needed for the long [term]."  When asked during a February 25, 2021 interview about any "potential chinks in [Romeo's] supply chain," Selwood emphasized Romeo's "daily focus" on ensuring the Company's "continuous access" to battery cells and further assured that Romeo maintained that access to supply by again touting "Operation Hedge Fund, where on a weekly basis [Romeo] looks out on the open market and if there's something…that's 56-week lead time or 72-week lead time, lead time being pushed out, [Romeo] actually grab it on the open market and put it on the shelves."

6.      In the midst of Selwood's media blitz, Romeo stock hit its Class Period (and all time) closing high, closing at *$34.00* per share on December 24, 2020.  The stock hit its intraday trading high on December 28, 2020, the next trading day, peaking at *$38.90* per share.

7.      Unknown to investors, however, Romeo was experiencing a material shortage of high quality battery cells since the beginning of the Class Period.  Contrary to Defendants' representations and specific assurances about Romeo's supply: (i) Selwood eventually admitted that Romeo relied upon at most ***two*** battery cell suppliers, ***not four***, to supply the essential battery

cells necessary to produce its core product offerings; (ii) Romeo did not have sufficient battery cell inventory and/or supply to accommodate end-user demand and ramp up production in 4Q 2020 and into 2021; (iii) Romeo's supply chain for battery cells was not "hedged" as Defendants represented it to be, but in fact, was at material risk of shortages and beholden to just *two* battery cell suppliers and the spot market to fulfill the Company's 2021 inventory needs; (iv) Romeo's supply constraints were a material hindrance to Romeo's business operations and financial performance during the Class Period; and (v) any future "potential" risks that Defendants warned of concerning supply disruption or shortage had in fact already occurred, were continuing to occur, during the Class Period and were already negatively affecting Romeo's business, operations, and prospects when the purported risk warnings were made. Given the supply constraints that Romeo was experiencing during the Class Period, Defendants had no reasonable basis to represent that the Company had the ability to meet customer demand and fulfill orders of existing customer contracts to generate the stated levels of backlog revenue for 2020 and 2021.

8.      On March 30, 2021, after the market closed, Romeo issued a press release and filed a Form 8-K reporting its financial results for 4Q and full year 2020, and held a conference call with investors and analysts. Defendants shocked investors by reporting 2020 revenue of only $8.97 million, falling short by more than $2 million (approximately 18%) of Romeo's $11 million projection—which figure Defendants had touted as late as just three weeks before the end of the year, in the December 10, 2020 Proxy Statement and Prospectus soliciting votes for Romeo's Business Combination with RMG. Significantly, contrary to Defendants' many assurances about Romeo's supply, Defendants disclosed that Romeo's production had been hampered by "a significant shortfall" in supply of battery cells and that its estimated 2021 revenue would thus be reduced by approximately 71-87% (from $140 million down to a range of only $18 to $40 million).

9.     During the March 30, 2021 conference call, Morgan Stanley analyst Adam Jonas pressed Selwood on the timing of the battery cell supply shortage and Defendants' prior claims of having hedged the risk of supply by relying on at least four major cell suppliers:

> I believe in your prepared remarks, you said it was in the last few weeks, did I hear three or four weeks, I just kind of want to hear how that went down when you first realized there was a serious problem with the supply that cut the revenue? ***Because part of the story I thought was, you know, you have four suppliers, four main cell suppliers***,… you had spread out these relationships across the four best cell suppliers in the world, that we could have really managed the risk or at least had visibility on something like this. ***So, I'm curious when did it first come up?  And was it all four cell suppliers at the same time or is there kind of a disproportionate dependency on one or two of them***?

10.     In response, Selwood revealed that Romeo had in fact been relying only on at most *two* suppliers, Samsung and LG Chem, not the four major suppliers Defendants had previously claimed.  Selwood replied: "Hey Adam. Thanks again for joining. So, just a quick clarification, ***four part numbers, not four different cell suppliers***. So, our preferred cell suppliers that we put in the forecasts are LG and Samsung, okay."

11.     When further pressed by Adam Jonas on when the supply constraints arose, asking "how did [it] go down[,]… would have thought you had some bit better visibility than a few weeks on that", Selwood did not answer the question directly but stated that "lead times have been pushed out" and "lead times are continuously being pushed out."  Selwood further stated that "Q2 allocation [of cell supply] specifically for 2021 will be given in April" and assured analysts and investors that Romeo was working to "lock down [supply] allocation from now till 2028."

12.     When Adam Jonas further pressed "one of the natural questions is if it happens so early, right, on your — man, this is ***your very first conference call as a publicly-traded company***, . . . a lot of folks are going to wonder how do we ensure that this doesn't happen again[,]" Selwood responded "I just want to be clear how can you ensure it'll [not] happen again, so one, and I said

and I reiterate, [we are] highly confident in our visibility" and explained that "we'll no longer be spot buying, … It will be a structured long-term agreement from 2021 through 2028."

13.     Selwood also insisted: "I want to emphasize that we see this cell shortage as *temporary* and are confident it ***will not affect our intermediate*** and longer term opportunities." He further stated that "[w]e're confident in the demand outlook that we're seeing which has given us confidence to sign up for a long term agreement with our preferred battery cell providers" and that the supply constraint hit to revenue was "***short term***."   Meanwhile, Romeo's then-CFO, Defendant Lauren Webb ("Webb"), claimed that Romeo had taken steps "to lay the groundwork for more access and more control of the downstream supply chain" and that "[w]e've negotiated long-term agreements with — we are negotiating long-term agreements with existing cell suppliers[.]"   Finally, she assured "I want to reiterate the unexpected limitation on cell availability has not in any way impacted customer interest in our battery technology nor has it impacted our confidence to meet or exceed revenue expectations in the long-term."

14.     On March 31, 2021, Morgan Stanley issued a research report in which it downgraded Romeo's target price per share from $12 to $7.   The report observed the marked departure from Defendants' prior assurances about supply, noting that "[w]hile [Morgan Stanley] expressed concerns about potential industry-wide battery shortages in the next few years, [MS] had not contemplated this risk to hit RMO in its very first quarter as a public company."

15.     In response to the foregoing news, on March 31, 2021, Romeo shares declined from a closing price on March 30, 2021 of $10.37 per share to close at $8.33 per share, a decline of $2.04 per share (nearly 20%), on heavy trading volume.

16.     Romeo announced its 1Q 2020 results on May 13, 2021, reporting revenue of approximately $1 million, of which product revenue was a mere $341,000.   The mere $1 million

in revenue missed Street consensus by 75%.  Defendants tempered the bad news by announcing a new deal with PACCAR, whereby PACCAR would purchase Romeo's battery packs and battery management software for two models of battery-electric Peterbilt trucks in North America.

17.     Despite Defendants' attempts to reassure the market in the wake of Romeo's sobering disclosures made on March 30, 2021, given the disappointing 1Q results, analysts remained understandably wary about supply.  Furthermore, Defendants had failed to provide the promised update on supply allocations in April 2021.

18.     Thus, analyst Gabe Daoud of Cowen asked on the Company's 1Q 2021 earnings call held on May 13, 2021, "Could you just start with the -- on the supply side of the equation? I understand you're still in negotiation. Last quarter, you mentioned maybe you'd have an update to give you maybe a little bit of confidence on hitting the $80 million number for revenue for this year.  Just – there'll be some good visibility into that number and you have sales on hand that could help you achieve that number."  Defendant Webb answered, reassuringly, that "We are not making any changes to the numbers that we provided previously. We are optimistic that we will be in the range of $18 to $40 [million] as communicated."  But she refused to comment further on supply, stating "[u]ntil final allocations are announced and our final agreements are done with the cell supply, we won't provide more specifics, but we are very optimistic in the range that we gave."

19.     Meanwhile, when Selwood was asked "in terms of the [supply] negotiations, . . . can you give us a sense for the ability to close some of these in the current environment?  It seems like your suppliers have a bigger pencil," the CEO assured that "quite frankly battery cell providers want to work with us," and "***What we've been doing*** is just ensuring our long-term outlook, ***locking down the supply***, as we talked about last time, through 2028."

20.     A Cowan research report dated May 13, 2021 observed that "1Q rev missed expectations," that "Revenue of $1mm missed Street by -75%" and that Defendants gave "[n]o definitive update" on supply "as investors had hoped."  Romeo's stock price went down $0.21 per share to close at $6.61 on May 13, 2021, and Cowan lowered its price target from $12.00 to $9.00 per share.

21.     In a May 14, 2021 research report titled "Where Art Thou Cells?" Morgan Stanley lowered its price target for Romeo stock to $7.00 per share, noting that "the primary concern remains a lack of long term cell supply contracts" but noted that "the company expressed high levels of optimism on the conference call and follow up call[.]"

22.     Around the same time, Romeo began the process of vetting replacements for Selwood as CEO.  While the Company did not announce his resignation and replacement until August 6, 2021—stating that he was stepping down as President and CEO and as a member of the Company's Board "***to pursue new opportunities***"—Defendant Webb admitted on Romeo's 2Q 2021 conference call held on August 16, 2021, that the Company had completed a "nearly three months long robust vetting process" of Selwood's replacement.  Selwood was replaced by Susan Brennan, who had previously served on Romeo's Board of Directors since December 2020.

23.     Meanwhile, Romeo announced on June 16, 2021 that it would replace Webb as the Company's CFO, effective on July 6, 2021.  Webb was replaced by Kerry Shiba.

24.     Then, after market hours on August 16, 2021, Defendants announced Romeo's 2Q 2021 results, further revealing the materialization of Romeo's supply shortages, reporting quarterly losses of $(0.22) per share, missing the consensus estimate of losses of $(0.16) per share by 37.5%. Romeo also reported quarterly revenue of $926,000, missing the consensus estimate of $3.05 million by over 69.4%.

25.     In an August 16, 2021 analyst report, Cowen noted Romeo's "EPS miss[]" and further observed that Romeo "importantly reached an agreement with LG but timing and certainty around securing additional cells remain unknown, consequently as does '22 rev[enue] guide[ance]."  The report further stated:

> After announcing the 8GWh agreement with LG Energy last week mgmt stopped short of addressing specifics (timing/counterparts) but indicated its multi-prong/multiyear approach includes Tier 1 suppliers, "up and comers", and supply based in the U.S. More progress is needed to fulfill the expected 7GWh of capacity expected in the CA facility by 2025.

26.     The report concluded that Romeo's "[s]tory remains in a holding pattern as new CEO/CFO acclimate and further cell supply (and customers) crystalize."  Cowan lowered its price target for Romeo stock to $7.00 per share, stating, "On the back of the 2Q results and management commentary we lower estimates reflecting risks to sufficient cell supply, a slower ramp in BMI (software) revenues, and a bleak outlook for the BWA JV.  Our revenue and EBITDA estimates now sit even further below the original projections provided in the SPAC materials."

27.     In response to this news, the price of Romeo's stock fell $1.06 per share, from a closing price of $5.82 per share on August 16, 2021, to close at $4.76 per share on August 17, 2021 (a drop of over 20%), on heavy trading volume.

28.     On August 19, 2021, Morgan Stanley lowered its price target to $4.00 per share. Romeo's market cap, which topped $3.3 billion on December 30, 2020, dropped to a mere $638 million by August 17, 2021, after the truth of Defendants' misrepresentations was fully revealed and/or materialized.  The revelations of Romeo's material supply problems plague the Company to this day, and its stock price has not recovered, closing at $4.75 per share on September 14, 2021.

29.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.      JURISDICTION AND VENUE

30.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.l0b-5), Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

31.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

32.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  During the Class Period, Romeo's predecessor, RMG, resided and conducted business in this Judicial District, Romeo stock is listed and trades on the New York Stock Exchange ("NYSE") in this Judicial District, certain Defendants reside or conduct business in this Judicial District, and wrongful conduct took place in this Judicial District.

33.      In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES

### A.      Plaintiffs

34.      Lead Plaintiff Mike Castleberg, as set forth in the Certification filed at Docket No. 28-2, incorporated by reference herein, acquired Romeo's publicly traded securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

35.      Additional plaintiff Joshua Cante, as set forth in the attached Certification, held shares of RMG common stock as of December 1, 2020 and was eligible to vote at RMG's

December 28, 2020 special meeting and was damaged upon the revelation of the alleged corrective disclosures.

**B.      Defendant Romeo**

36.      Defendant Romeo is incorporated in Delaware.   Romeo's current principal executive offices along with its manufacturing facility are located at 4380 Ayers Avenue, Vernon, California 90058.  Romeo's common stock trades on the NYSE under the symbol "RMO."

**C.      Individual Romeo Defendants**

37.      Defendant Lionel Selwood was the Company's President and Chief Executive Officer ("CEO"), and a member of the Company's board of directors.   According to the Registration Statement, Selwood is a Product Management Leader with expertise in Operations Management, Financial Management, Lean Six Sigma, Supplier Development, Strategic Sourcing and Product Quality Management.  Since around the time of the Company's founding in 2016, Selwood held various roles at Romeo: from December 2016 to June 2018, he served as Vice President of Engineering Operations and Global Procurement; from June 2018 to February 2019, he served as Chief Operating Officer; from February 2019 to September 2020, he served as President and General Manager of North America; and since September 2020 he has served as Chief Executive Officer.  Prior to Romeo, from November 2015 to December 2016, Selwood was Purchasing Manager of Powertrain, Battery & Thermal Systems at Faraday Future.  Selwood has also held various roles at SpaceX and General Electric.  Selwood holds a B.Sc. in Mechanical Engineering from Syracuse University and M.P.S. in Supply Chain Management from The Pennsylvania State University.

38.      As CEO, Selwood signed Romeo's: Registration Statement (defined below); January 2021 Shelf Registration Statement, including the January 2021 Prospectus which forms a part of the January 2021 Shelf Registration Statement (defined below); 2020 Form 10-K (defined

below); and 1Q 2021 Form 10-Q (defined below).  Selwood also solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement and Prospectus.

39.      Defendant Lauren Webb was the Company's CFO from January 2017 until July 6, 2021, when she was replaced as CFO by Kerry Shiba.  Beginning on July 6, 2021, Webb became Romeo's Chief Strategy and Commercial Officer.  In addition to her role as CFO, Webb also served as a member of the Company's board of directors and a member of the Finance and Investment Committee at all relevant times during the Class Period.  Prior to becoming Romeo's CFO, Webb served as a financial consultant to Romeo from January 2016 to January 2017.  Webb has over 14 years' experience in finance and operations for early stage companies.  Prior to Romeo, from January 2009 to July 2015, she was a founder and Vice President of Apollo Services, LLC, a business services company specializing in operations for legal and audit firms.  Webb was the Controller of InAuth, Inc. from February 2011 to May 2015, where she led the company through multiple rounds of financing leading up to a successful exit via acquisition by American Express. Webb started her career at the U.S. Department of Justice and spent ten years from May 2006 to December 2016 with the Ashcroft Group, a venture investment and consulting firm based in Washington D.C.  Webb holds two bachelor's degrees from Texas A&M University.

40.      As CFO, Webb signed Romeo's: Registration Statement (defined below); the January 2021 Shelf Registration Statement, including the January 2021 Prospectus which forms a part of the January 2021 Shelf Registration Statement (defined below); 2020 Form 10-K (defined below); and 1Q 2021 Form 10-Q (defined below).  Webb also solicited and/or permitted the use of her name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement and Prospectus.

41.     Defendants Selwood and Webb are referred to herein as the "Individual Romeo Defendants."  The Individual Romeo Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Romeo's reports to the SEC, press releases and presentations to securities analysts and investors, money and portfolio managers, and institutional investors, *i.e.,* the market.  The Individual Romeo Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of them knew or had reason to know that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

42.     Romeo and the Individual Romeo Defendants are referred to collectively as "Romeo Defendants."

### D.    RMG Defendants

43.     Defendant Robert S. Mancini ("Mancini") was the CEO and a member of the board of RMG and is a member of Romeo's board of directors.  Mancini solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement and Prospectus.

44.     Defendant D. James Carpenter ("Carpenter") was chairman of the board of RMG. Carpenter solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement and Prospectus.

45.     Defendant Philip Kassin ("Kassin") was the President, Chief Operating Officer and member of the board of directors of RMG, as well as a member of Romeo's board of directors.

Kassin solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement and Prospectus.

46.     Defendant Steven P. Buffone ("Buffone") was a member of the board of directors of RMG and solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement and Prospectus.

47.     Defendant W. Grant Gregory ("Gregory") was a member of the board of directors of RMG and solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement and Prospectus.

48.     Defendant W. Thaddeus Miller ("Miller") was a member of the board of directors of RMG and solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement and Prospectus.

49.     Defendant Craig Broderick ("Broderick") was a member of the board of directors of RMG and solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement and Prospectus.

50.     Defendants Mancini, Carpenter, Kassin, Buffone, Gregory, Miller, and Broderick are referred to collectively as the "RMG Defendants."

51.     The Romeo Defendants and RMG Defendants are referred to collectively as "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Romeo's Business Combination With RMG

52.     On February 12, 2019, RMG, a New York City-based special purpose acquisition company (or "SPAC"), announced that it closed its initial public offering of 20 million units at $10 per share, resulting in gross proceeds of $200 million.  The units traded on the NYSE under the ticker symbol "RMG.U".  Each unit consisted of one share of RMG's Class A common stock

and one-third of one warrant, with each whole warrant enabling the holder thereof to purchase one share of Class A common stock at a price of $11.50 per share.  When the shares of Class A common stock and warrants began separate trading, they traded on the NYSE under the symbols "RMG" and "RMG.WS."

53.     Known as a "blank check" company, RMG was formed by Defendants Carpenter, Mancini, and Kassin for the purpose of entering into a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses in the diversified resources and industrial materials sectors.

54.     On October 5, 2020, RMG announced a definitive agreement for a business combination with Defendant Romeo that would result in Romeo becoming a publicly listed company (the "Business Combination").  To affect the Business Combination, RMG Merger Sub Inc., a Delaware corporation and wholly owned subsidiary of RMG ("Merger Sub"), merged with and into Romeo, with Romeo surviving the merger.

55.     On October 15, 2020, Defendants caused RMG to file a registration statement for Romeo on Form S-4 with the SEC (the "Registration Statement").  The Registration Statement was amended on November 20, 2020 and December 4, 2020 on Form S-4/A.  The RMG Defendants signed the Registration Statement.

56.     On December 10, 2020, Defendants caused RMG to file a proxy statement/consent solicitation statement/prospectus with the SEC on Form 424(b)(3) (the "Proxy Statement and Prospectus"), which was incorporated into and formed part of the Registration Statement.  On December 10, 2020, the SEC declared the Registration Statement effective.

57.     The Proxy Statement and Prospectus invited RMG investors to solicit proxies to vote to approve the Business Combination at a special meeting to be held on December 28, 2020.

The record date for the special meeting was December 1, 2020. The Proxy Statement and Prospectus also laid out certain financial data relating to the entities to be combined, including the following financial forecasting metrics for Romeo:

| (USD in millions) | Forecast Year Ended December 31, | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2020E | | 2021E | | 2022E | | 2023E | | 2024E | | 2025E | |
| Revenue | $ | 10.8 | $ | 139.8 | $ | 411.9 | $ | 764.5 | $ | 1,156.1 | $ | 1,649.9 |
| Gross Profit | $ | (3.7) | $ | (10.0) | $ | 39.8 | $ | 182.0 | $ | 330.5 | $ | 534.1 |
| EBITDA | $ | (21.6) | $ | (54.2) | $ | (19.1) | $ | 90.8 | $ | 196.3 | $ | 338.0 |

58. According to the Proxy Statement and Prospectus, the following were key elements of the foregoing forecasts:

- Strong revenue forecast for 2021 – 2025 based on a pipeline of customers;
- Valuation and multiples exclude upside potential of international expansion through the BorgWarner JV;
- ***Landmark and binding contracts of approximately $310 million, including production contracts with Lightning Systems, Nikola and Phoenix Motors***; and
- Estimated run-rate EBITDA margins of +20% by 2025 and beyond.

59. The Proxy Statement and Prospectus also laid out Romeo's contracted revenue (defined as "revenue expected to be received under our existing customer contracts from sales of battery packs, modules, battery management system software and services not yet built and delivered or provided), as of September 30, 2020, of approximately $310 million and represented that "[t]he portion of [Romeo's] backlog as of September 30, 2020, that is expected to be recognized in the twelve-month period following September 30, 2020 is approximately $59 million." Romeo used the word "backlog" as another term for, and interchangeably with, "contracted revenue."

60. Upon closing of the transaction, the combined entity would be named "Romeo Power, Inc." and would remain listed on the NYSE and trade under the new ticker symbol "RMO."

Under the proposed transaction, at closing, Romeo would receive approximately $340 million in cash, which was a combination of RMG cash and cash from a PIPE (private investment in public entity) investment.

61.   The Business Combination was approved by RMG stockholders in a special meeting held on December 28, 2020, and the Business Combination was consummated on December 29, 2020.

62.   On December 29, 2020, Romeo announced that it completed the Business Combination with RMG.  Beginning on December 30, 2020, Romeo's common stock and warrants began trading on the NYSE under the new ticker symbols "RMO" and "RMO.WT".

**B.    Romeo's Background and Business**

63.   Founded in 2016, Romeo is an energy technology company focused on designing and manufacturing lithium-ion battery modules and packs for commercial electric vehicles. Romeo asserts that through its industry leading energy-dense battery modules and packs, it enables large-scale sustainable transportation by delivering safe, longer lasting batteries with shorter charge time.  Romeo's core products are battery packs and modules and battery management systems.  High-quality battery cells are a critical component of Romeo's core products.  During the Class Period, Romeo told investors it had an "industry agnostic portfolio" allowing the Company to take advantage of the estimated $225 billion total addressable market ("TAM") in North America and Europe and $665 billion globally.

64.   Romeo focuses on two key markets in mobility energy technology: North American Class 6-8 commercial trucks and buses, and European commercial and high-performance vehicles through a Joint Venture agreement with BorgWarner ("BorgWarner JV"), in which Romeo owns a 40% interest.

65.     Defendants stated the following regarding the BorgWarner JV, in the Company's October 5, 2020 press release announcing the Business Combination:

> ***Romeo Power is de-risking commercialization through its strategic partnerships with global leaders in vehicle component technologies, including BorgWarner, a global tier one automotive supplier***. In May 2019, BorgWarner made a $50 million strategic investment in Romeo Power and entered into a joint venture, with a goal of amplifying its growing portfolio of alternative propulsion products for hybrid and electric vehicles. ***The investment and partnership reflect significant third party validation of Romeo Power's technology, and allow the company to leverage BorgWarner's customer base, supply chain and manufacturing expertise in order to accelerate growth globally and bolster operational execution in a highly capital efficient manner***.

66.     Romeo's operations consist of two business segments: (1) the design and manufacture of battery modules, battery packs, and battery management system technologies for Romeo's customers in North America; and (2) engineering services provided to the BorgWarner JV.  For the year ended December 31, 2019, the North American design/manufacture business segment accounted for $6.51 million, or 76.7%, of Romeo's total revenue, and the BorgWarner JV business segment accounted for $1.98 million, or 23.3%.

67.     According to the Proxy Statement and Prospectus, Romeo maintained fourteen customers in North America, which included commercial and high-performance electric vehicle manufacturers, fleet operators, and auto companies.  Romeo asserted that its customers collectively held approximately 68% market share of the Class 8 truck market in North America.

**C.     Romeo Touts Its Contracted Revenue and Robust Supply Chain to Support those Orders, Highlights Four Major Suppliers**

68.     Throughout the Class Period, Defendants repeatedly touted Romeo's contracted revenue (a/k/a "backlog"), starting at $300+ million and then increasing to $555 million by the end of December 2020.

69.     Regarding backlog, the Registration Statement stated:

18

We define contracted revenue (or "*backlog*") as revenue expected to be received under our existing customer contracts from sales of battery packs, modules, battery management system software and services not yet built and delivered or provided. *As of September 30, 2020, we had a backlog of approximately $310 million*, of which approximately $240 million represented the minimum revenue that would be received under such contracts to satisfy take or pay minimum order commitments. This compares to our contracted revenue from sales of products and services not yet built and delivered or provided of approximately $2.9 million as of September 30, 2019 (of which approximately $2.9 million represented the minimum revenue that would be received in satisfaction of take or pay minimum order commitments), and does not take into account approximately $234 million in revenue available to be earned under our most recent contract with Lion Buses that was executed subsequent to September 30, 2020 (of which approximately $234 million represents the minimum revenue that will be received in satisfaction of take or pay minimum order commitments). *The portion of our backlog as of September 30, 2020, that is expected to be recognized in the twelve-month period following September 30, 2020 is approximately $59 million*.

\*\*\*

*All contracted revenue amounts also assume continued performance by Romeo of its contractual obligations*….

70.     To engender investor confidence in Romeo's ability to actually generate these levels of revenue by completing the sales on schedule, Defendants repeatedly assured investors that the Company had sufficient access to supply, and actively hedged against supply shortage risks by purchasing extra inventory, and as such, the Company would not be hindered by issues with its supply chain.

71.     For example, the October 5, 2020 press release announcing the Business Combination highlighted Romeo's ability to "leverage [partner] BorgWarner's customer base, supply chain and manufacturing expertise in order to accelerate growth[.]"

72.     During an investor conference call held that same day, Selwood cited the oft-touted claim that Romeo had "*secured more than 300 million dollars in committed revenues*" and an additional $2.4 billion was under advanced negotiation, and explained that Romeo was "cell

supplier agnostic" as one of Romeo's purported competitive advantages that would help to ensure the Company's access to sufficient supply of critical battery cell components.

73.     In Romeo's Registration Statement, and in its December 2020 Proxy Statement and Prospectus, the Company touted its "close relationships with vendors of key components of [Romeo's] battery products, ***in particular battery cells***" and identified four (4) major suppliers:

**Suppliers**

Our products use parts that are sourced from suppliers across the world. We have developed close relationships with vendors of key components of our battery products, in particular battery cells. We also work closely with suppliers to develop novel materials or configurations for specifically desired functionality within our system design. Certain components purchased from suppliers are common across our product lines, allowing us to take advantage of pricing efficiencies from economies of scale.

The price we pay for cells depends on a number of factors, including material grades of chemistry selected for cell recipe, volumes, long-term commitment, logistics and shipping, and tariffs.

***Samsung***

Samsung is a leading global supplier of electrical products and components. Through its supply of power cells to Romeo, Samsung currently supports the EV Program and is a candidate for stationary storage ("*ESS*") applications. Samsung offers cylindrical and prismatic products.

***LG Chem***

LG Chem Ltd., often referred to as LG Chemical, is the largest Korean chemical company headquartered in Seoul, South Korea. LG Chem supplies Romeo with power cells, offers cell selection for non-EV Program and is an ESS candidate. LG Chem offers cylindrical and pouch products.

***Murata***

Murata Manufacturing Co., Ltd. is a Japanese manufacturer of electronic components. Murata is the best in market power cell for sports cars. Murata supplies Romeo with power cells and offers cylindrical and pouch products.

***SK Innovation***

SK innovation is Korea's first and largest energy chemical company. SK supplies Romeo with power cells and offers pouch products.

74.     On October 13, 2020, Selwood was interviewed on Fox Business, during which he claimed that "We are a leading edge battery technology company that's really been focused on putting the most safe, most reliable and most energy dense and configurable battery packs across the industry.... ***Today we have secured 300 million in revenue*** and we have another 2.4 billion under negotiation."

75.    Defendants reiterated Romeo's 2020 revenue guidance of $11 million and 2021 revenue guidance of $140 million in the December 2020 Proxy Statement and Prospectus.  The Proxy Statement and Prospectus also reiterated Defendants' statements about backlog, including that "[t]he ***portion of our backlog as of September 30, 2020, that is expected to be recognized in the twelve-month period following September 30, 2020 is approximately $59 million***."

76.    On December 15, 2020, two weeks before the completion of the Business Combination, SPACInsider hosted an investor webinar attended by Selwood, Webb, Mancini, and Kassin.  When asked if Romeo saw "***any issues with securing enough cells to fulfill [its] large orders***," Selwood assured investors that "there's technical respect between [Romeo] and [its] suppliers from the cell level" and that the focus now was "on securing [Romeo's] capacity ***for the long term***[,]" suggesting that Romeo currently had enough cells to fulfill orders in the near-term.

77.    Selwood further assured that he ***did not see "any big challenges as [Romeo's] order book continue[d] to grow***."  According to Selwood, this assurance was based in part on Romeo's "cell supply agnosticism" which "ensure[d] that [Romeo] ha[d] drop-in replacements…already identified."

78.    During the same webinar Q&A, when asked to speak about Romeo's competitive advantages in its supply chain and material sourcing, Webb emphasized Romeo's relationship with BorgWarner and its access to BorgWarner's global suppliers, which Webb claimed provided Romeo with "more competitive costs on [the] components that [Romeo] use across all of [its] battery modules and packs."  Webb also assured investors that due to "commitments on [] raw materials", Romeo would be "gross margin positive or gross margin neutral or fairly positive at the end of 2021."

21

79. In a December 15, 2020 article by Acuris Capital Intelligence titled, "Fully Charged: Interview with Lionel Selwood, Jr., CEO of Romeo Power," Selwood, when asked about Romeo's main opportunities in the next year, stated "we will also be looking to build upon the contracted revenue that we already have on the books in 2021 and beyond, including a US$234 million contract we just closed with Lion Electric. ***This contract brings our total contracted revenue to US$500+ million***, which makes us unique in the EV space, both from the revenue standpoint and the fact that we already have batteries out on the road and available for purchase."

80. On January 26, 2021, Romeo filed another prospectus on Form 424(b)(3) (the "January 2021 Prospectus"), pursuant to a January 18, 2021 shelf registration statement (the "January 2021 Shelf Registration Statement"), relating to the issuance of up to 62,150,554 shares of common stock and up to 12,266,648 shares of common stock issuable upon the exercise of warrants. Both the January 2021 Shelf Registration Statement and the January 2021 Prospectus repeated Romeo's claims about its purported four major suppliers:

**Suppliers**

Our products use parts that are sourced from suppliers across the world. We have developed close relationships with vendors of key components of our battery products, in particular battery cells. We also work closely with suppliers to develop novel materials or configurations for specifically desired functionality within our system design. Certain components purchased from suppliers are common across our product lines, allowing us to take advantage of pricing efficiencies from economies of scale.

The price we pay for cells depends on a number of factors, including material grades of chemistry selected for cell recipe, volumes, long-term commitment, logistics and shipping, and tariffs.

*Samsung*

Samsung is a leading global supplier of electrical products and components. Through its supply of power cells to Romeo, Samsung currently supports the EV Program and is a candidate for stationary storage ("ESS") applications. Samsung offers cylindrical and prismatic products.

*LG Chem*

LG Chem Ltd., often referred to as LG Chemical, is the largest Korean chemical company headquartered in Seoul, South Korea. LG Chem supplies Romeo with power cells, offers cell selection for non-EV Program and is an ESS candidate. LG Chem offers cylindrical and pouch products.

*Murata*

Murata Manufacturing Co., Ltd. is a Japanese manufacturer of electronic components. Murata is the best in market power cell for sports cars. Murata supplies Romeo with power cells and offers cylindrical and pouch products.

*SK Innovation*

SK Innovation is Korea's first and largest energy chemical company. SK Innovation supplies Romeo with power cells and offers pouch products.

81.     The January 2021 Prospectus also repeated Defendants' statements about Romeo's backlog and the amount of backlog revenue expected to be recognized by the end of 3Q 2021, stating: "***The portion of our backlog as of September 30, 2020, that is expected to be recognized in the twelve-month period following September 30, 2020 is approximately $59 million***."

82.     Similarly, the January 2021 Shelf Registration statement stated that:

Minimum take or pay order commitments related to contracts signed through November of 2020 ***exceed $500 million of backlog***. While the recognition of product revenue related to certain of these module and pack contracts will not commence until after completion of the delivery of engineering and prototype services, ***we expect to recognize greater than 10% of this backlog revenue over the twelve-month period following September 30, 2020***.

83.     In early 2021, analysts and investors remained keenly focused on Romeo's ability to obtain the materials necessary to ramp production and fulfill the orders on the timeline touted in its backlog.  For example, a February 12, 2021 Benzinga article titled, "*Why Morgan Stanley Is Bullish on . . . Romeo Power*" quoted Morgan Stanley analyst Adam Jonas as saying that "the stock performance will boil down to how quickly the company can convert orders to production, scale manufacturing and maintain margins."  For his part, Selwood continued to assure investors throughout February 2021 that the Company indeed could convert orders to production.

84.     Despite the market's focus on this key concern, Defendants did not update or supplement any of the risk factors set forth in the January 2021 Prospectus in either of the prospectus supplements filed on **February 16, 2021 and March 11, 2021** to reflect the "dramatic" cell supply shortage that Selwood would soon claim hit Romeo during the first quarter.  Rather, quite to the contrary, Defendants continued to assure the market about Romeo's access to supply during the first quarter of 2021.

85.     For example, during a February 25, 2021 online interview, when Alan Adler of FreightWaves ***asked about any "potential chinks in [Romeo's] supply chain,"*** Selwood

acknowledged Romeo's need for battery cells and assured that Romeo "will deliver as many batteries from as many cells as we get in the door," while emphasizing Romeo's "daily focus" on ensuring Romeo had "continuous access" to battery cell supply.  According to Selwood, one of the ways Romeo ensured continuous access to battery cells was through a program called "Operation Hedge Fund, where on a weekly basis [Romeo] looks out on the open market and if there's something…that's 56-week lead time or 72-week lead time, lead time being pushed out, [Romeo] actually grab it on the open market and put it on the shelves."  Selwood expanded on the idea of "hedging against supply", stating that "no matter how big your buy was…lead times [were] consistently being push out…so [Romeo] need[ed] to grab these so [they were] not lying down."

### D. Romeo Flounders In the Wake of the Revelation of its Critical Supply Constraints, Selwood and Webb Are Replaced

86.     On March 30, 2021, after the market closed, Defendants shocked investors when they announced Romeo's financial results for the fourth quarter and year ended December 31, 2020.  Defendants announced that Romeo's 2020 revenue was only $9 million—$2 million, or approximately 18%, less than projected, despite Defendants touting projected income of $11 million for 2020 as late as December 10, 2020 (*i.e.*, three weeks before the end of the year).  Romeo also reported 4Q 2020 revenue of approximately $4.68 million, of which $813,000 was derived from product revenue.  Defendants revealed that despite assurances about Romeo's supply of battery cells, the Company's production had been hampered by a shortage of this key component, and consequently reduced Romeo's projected 2021 revenue from $140 million to a range of $18 to $40 million.  Webb claimed that the dramatic guidance downgrade "is based on our visibility into cells that we have secured through the end of the year."

87.     Selwood incredibly claimed during the earnings call held the same day that "the severity of quality cells shortage was *unexpected*" and it had "*increased dramatically over the*

*course of the last several weeks*." He further admitted that "*the impact to our ability to generate revenue in 2021 is significant*." However, to assure investors, Selwood simultaneously emphasized that the battery cell shortage was "temporary" and that Defendants were "confident it will not affect [Romeo's] intermediate and longer term opportunities" and were "working rigorously to secure the long term supply contracts needed to deliver solutions in a timely fashion."

88.    Webb echoed Selwood's assurance regarding Romeo's battery cell shortage stating the shortage was "short-term" and that "[w]e've negotiated long-term agreements with – we are negotiating long-term agreements with existing cell suppliers, we have developed a new relationship with novel cell chemistry maker Ecellix, and we are aggressively working to qualify high performance cells from alternative suppliers from commercial vehicle applications."

89.    When pressed by Morgan Stanley analyst, Adam Jonas, about Romeo's prior representations of having four major suppliers, related supply visibility, and managing the Company's supply-related risk, Selwood revealed that contrary to the Registration Statement, the Company relied primarily on at most two major supplier (not four), Samsung and LG Chem, for its supply of battery cells:

> Adam Jonas: I believe in your prepared remarks, you said it was in the last few weeks, maybe did I hear three or four weeks, I just kind of *want to hear how that went down when you first realized there was a serious problem with the supply that cut the revenue? Because part of the story I thought was your – you have four suppliers – four main cell suppliers*, do you whittle down through your selection process from I get you get hundreds, then ten to four? And part of the investment thesis on this was that because you had spread out these relationships across the four of the best cell suppliers in the world that we could have really managed the risk or at least had visibility on something like this. *So, I'm curious when did it first come up? And was it all four cell suppliers at the same time or is there kind of a disproportionate dependency on one or two of them?*
>
> Selwood: Hey Adam. Thanks again for joining. So, *just a quick clarification, four part numbers, not four different cell suppliers*. So, *our preferred cell suppliers that we put in the forecasts are LG and Samsung*, okay. So, I just wanted to clarify from...

90.     Adam Jonas further pressed Selwood on how Romeo could have so incorrectly estimated supply in its first quarter as a public company and how to ensure that a supply shortage does not happen again, Selwood misleadingly responded as follows:

> ADAM JONAS (MORGAN STANLEY): Okay. Because again, one of the natural questions is, *if it happens so early, right, I mean this is your very first conference call as a publicly traded Company, but a lot of folks are going to wonder how do we, how do we ensure that this doesn't happen again*?
>
> SELWOOD: Like I said, when we -- when I talk about, how do you ensure we happen again, we're well capitalized. And we have the balance sheet to support long-term agreements, with our preferred partners, which can include line investments, as well as co-investments for facilities. As you know, I know you're an expert in this, you know how these deals are structured. So now that we went public, we are going to be capitalized to do these types of deals. So, we're highly confident in our outlook from a pipeline standpoint and also we are well capitalized to execute upon our plans. *For the fact that we are in discussions for LTAs throughout 2028, shows you the vigor and confidence we have in our outlook, as well as the capital allocation necessary to lock these down long-term. So, we'll no longer be spot buying, which is what we're talking about*. It will be a structured long-term agreement from 2021 through 2028.

91.     On March 31, 2021, Morgan Stanley issued a research report in which it downgraded Romeo's target price per share from $12 to $7.  The report observed the marked departure from Defendants' prior assurances about supply, noting that "[w]hile [Morgan Stanley] expressed concerns about potential industry-wide battery shortages in the next few years, [MS] had not contemplated this risk to hit RMO in its very first quarter as a public company."

92.     On March 31, 2021, Cowen issued a research report in which it downgraded Romeo's target price per share from $18 to $12.  The report observed the marked departure from Defendants' prior assurances about battery cell supply, but acknowledged Romeo's "$544 million backlog (and LT potential of $2.2 billion) remains intact as [Romeo] is adjusting delivery schedules with customers."

93.     Also on March 31, 2021, Romeo filed a Notification of Late Filing on Form 12b-25, alerting that its Annual Report for the year ended December 31, 2020 would be delayed.

94.     Romeo filed its belated 2020 Form 10-K on April 15, 2021 (the "2020 Form 10-K"). Among other things, Romeo claimed the following about its revenue and backlog:

> *We derive, and intend to continue to derive, the majority of our revenues from the sale of our battery packs, modules, and battery management systems. As of December 31, 2020, we had a backlog (as defined below) of approximately $555 million.*

95.     Significantly, despite Selwood and Webb's assurances on March 30, 2021, that the supply shortage would not impact Romeo's backlog, the 2020 Form 10-K dramatically reduced the amount of backlog revenue expected to be recognized in 2021 by over 60%—from $59 million to be recognized by September 30, 2021 (announced as late as the January 26, 2021 Prospectus), down to a mere $23.4 million to be recognized by December 31, 2021.  The 2020 Form 10-K stated: "*The portion of our backlog as of December 31, 2020, that is expected to be recognized in the twelve-month period following December 31, 2020 is approximately $23.4 million*."

96.     Without comment, the 2020 Form 10-K quietly removed Murata and SK Innovation from Romeo's list of its major suppliers.

97.     The 2020 Form 10-K also disclosed that, contrary to Defendants' prior claims of relying on four different suppliers to supply Romeo with high quality battery cells, in fact, "[t]here are only three battery cell suppliers for cylindrical cells ('Tier 1 Suppliers') whose cells are qualified for use in electric vehicle applications" and that those three "Tier 1 Suppliers are the only source of battery cells for electric vehicle battery packs."

98.     On June 16, 2021, Romeo announced Webb would transition to a new role as Chief Strategy and Commercial Officer as of July 6, 2021 and Kerry Shiba would succeed Webb as CFO.

99.     Then, on August 6, 2021, Romeo announced its President and CEO, Selwood, would step down effective August 16, 2021—the day the Company was due to announce its 2Q 2021 results—and Susan Brennan would succeed Selwood as President and CEO.  According to the Company, Selwood—who helped to build Romeo since its founding in 2016 and who claimed

to have secured in excess of $500 million in revenue in the runup to Romeo's IPO—was stepping down "to pursue new opportunities." While Romeo did not announce Selwood's departure until August 6, 2021, the Company had begun quietly vetting his replacement at least three months earlier (in May 2021, around the time Romeo's disappointing 1Q 2021 results were announced).

100.    On August 16, 2021, after the market closed, Defendants announced Romeo's 2Q 2021 financial results. Romeo reported quarterly revenue of $926,000, missing the consensus estimate of $3.05 million by over 69.4%. According to Romeo's 2Q 2021 Form 10-Q, expected revenue recognition of the Company's backlog for the remainder of 2021 was reduced to approximately $18.9 million.

101.    The below charts reflect Romeo's backlog and revenue during the Class Period, demonstrating how even as Romeo's overall backlog grew exponentially, its backlog revenue expected to be recorded in 2021 decreased dramatically:

| Backlog as of 9/30/2020 | Backlog as of 12/31/2020 | Backlog as of 3/31/2021 | Backlog as of 6/30/2021 |
|---|---|---|---|
| $310m | $555m | $555m | $554m |

| Revenue to be recognized in the 12-month period following 9/30/2020 | Revenue to be recognized in the 12-month period following 12/31/2020[1] | Revenue to be recognized for period 04/01/2021 – 12/31/2021[2] | Revenue to be recognized for period 07/01/2021-12/31/2021[3] |
|---|---|---|---|
| $59m | $23.4m | $23.4m | $18.9m |

| Romeo's Revenues | **4Q 2020** | **1Q 2021** | **2Q 2021** |
|---|---|---|---|
| Product Revenues | $813,000 | $341,000 | $466,000 |
| Other Revenues | $3,835,000 | $713,000 | $460,000 |
| **Total Revenues** | **$4,648,000** | **$1,054,000** | **$926,000** |

---

[1] As stated in Romeo's 2020 Form 10-K, filed on April 15, 2021.

[2] As stated in Romeo's 1Q 2021 Form 10-Q, filed on April 15, 2021.

[3] As stated Romeo's 2Q 2021 Form 10-Q, filed on August 16, 2021. Conservatively assuming that the entirety of Romeo's 1Q 2021 and 2Q 2021 revenue (totaling $1.98 million) consisted of backlog revenue, this further reduction of backlog revenue expected to be recorded in 2021 of approximately $2.52 million constituted a reduction of more than 10% off the already drastically reduced figure.

102.    During the 2Q 2021 earnings call held on August 16, 2021, Defendants repeatedly highlighted the single long-term supply agreement that Romeo had finally secured with LG just one week before announcing the Company's 2Q 2021 results.  Webb explained, "we are excited to have signed a long-term agreement with a top-tier global supplier of battery cells," and that "we are actively shoring up alternative suppliers for key components, and making strategic advanced purchases for long lead time on increasingly scarce items."

103.    Newly-appointed CFO Kerry Shiba explained that with the supply agreement finally in place, Romeo was "**on the verge of a volume ramp up**" and would just now be *beginning* to ramp up sales and operating activity, stating: "For the many reasons Lauren just discussed, not the least of which is the long-term cell supply agreement, **the second half of 2021 is expected to be the beginning of a period of the ramp-up of sales and operating activity for us**."  It can be inferred from Mr. Shiba's statement that prior to August 16, 2021, Romeo saw no such ramp-up of sales and operating activity to fulfill orders due for delivery in 2021.

104.    Mr. Shiba further explained that "We believe securing our long-term cell supply agreement mitigates to some degree the wildcard of availability for our most important product component."

105.    When the call was opened for analyst questioning, analysts were predictably quick to zero in on supply.  Gabe Daoud of Cowen fired the first question, stating: "I was hoping you could start on the cell supply side.  Understand [there] is only so much you can say, but could you maybe just give us a sense of timing around additional agreements last quarter, you'd spoke about being in negotiations with I believe about 4 parties and now you have the LG agreement in hand. So, we're just curious -- another tier 1 supplier would be Samsung, if there's an update there….?" Webb responded, sharply, "We're not going to talk about specific agreements or details there[.]"

106.     In further analyst questioning, new CEO Susan Brennan (who had previously served on Romeo's board since December 2020) seemed to concede that Romeo did not previously have the "hedged" cell supply that Defendants had touted earlier in the Class Period:

> JON LOPEZ (Vertical Group):  *[N]ow that you have the cells*, are you able to comment at all on customer engagements, to what extent were customer engagements inhibited by the lack of visibility on sales?
>
> BRENNAN: We have really strong customer relationships and the cell supply challenges have had a very limited impact on our ability to attract new business. We've been very deliberate in the timing of executing commitments to both new and existing customers *as we've been working through securing the cell supply*….

107.     Then on August 17, 2021, an article on *The Motley Fool* observed, "[t]o some extent, Romeo Power has been waiting to secure a steady long-term supply of battery cells before ramping up sales and production.  *That didn't happen until last week, when the company signed a long-term deal with a major global battery maker it didn't name.  That's why it missed Wall Street's revenue estimate for the second quarter: The revenue from its ramp-up hadn't yet started to arrive*."

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT[4]

### A.     Announcement of the Business Combination on October 5, 2020

108.     The Class Period begins on October 5, 2020 when Defendants caused RMG to file with the SEC on Form 8-K a press release and investor conference call transcript announcing the Business Combination.  The October 5, 2020 press release contained the following materially false or misleading statement regarding Romeo's currently contracted revenue:

> The company has varying forms of agreements with customers, enhancing visibility into the company's future growth, including *over $300 million of currently contracted revenue*.

---

[4] All references to "Defendants" in this Section V refer to the Romeo Defendants only.

109.    During the October 5, 2020 investor conference call to discuss the Business Combination, Selwood repeated the claim that "To-date, *we have secured more than 300 million dollars in committed revenues*."

110.    The foregoing statements regarding Romeo's committed revenues (or backlog) were materially false and/or misleading because Defendants failed to disclose that: (i) Romeo did not have sufficient battery cell inventory and/or access to supply to accommodate end-user demand and ramp up production in 4Q 2020 and into 2021; (ii) Romeo's supply chain for battery cells was at material risk of shortages because Romeo relied on *ad hoc* purchases from at most *two* battery cell suppliers and the spot market to fulfill the Company's 4Q 2020 and 2021 inventory needs; and (iii) Romeo's then-existing and undisclosed supply constraints were a material hindrance to Romeo's business operations and financial performance and put Romeo's ability to convert the backlog orders into actual revenue at material risk.

### B.    The Registration Statement

111.    On October 15, 2020, Defendants caused RMG to file a registration statement on Form S-4 with the SEC (the "Registration Statement").  The Registration Statement included the following materially misleading statements regarding Romeo's contracted revenue (or "backlog"):

**Customer Backlog**

We define contracted revenue (or "*backlog*") as revenue expected to be received under our existing customer contracts from sales of battery packs, modules, battery management system software and services not yet built and delivered or provided. *As of September 30, 2020, we had a backlog of approximately $310 million, of which approximately $240 million represented the minimum revenue that would be received under such contracts to satisfy take or pay minimum order commitments*.  This compares to our contracted revenue from sales of products and services not yet built and delivered or provided of approximately $2.9 million as of September 30, 2019 (of which approximately $2.9 million represented the minimum revenue that would be received in satisfaction of take or pay minimum order commitments), and does not take into account approximately $234 million in revenue available to be earned under our most recent contract with Lion Buses that was executed subsequent to September 30, 2020 (of which approximately $234

million represents the minimum revenue that will be received in satisfaction of take or pay minimum order commitments). ***The portion of our backlog as of September 30, 2020, that is expected to be recognized in the twelve-month period following September 30, 2020 is approximately $59 million***. The remaining backlog balance of approximately $251 million is expected to be recognized between the fourth quarter of 2021 and the end of year 2025. The difference between our backlog and our minimum revenue that would be received in satisfaction of take or pay minimum order commitments reflects that ***our backlog does not represent a guarantee that our customers will complete purchases of our products and services in the quantities that we anticipate, and some of our contracts allow our customers to purchase in smaller quantities with certain minimum order penalties. All contracted revenue amounts also assume continued performance by Romeo of its contractual obligations*** and satisfaction of customary testing and quality required under each customer contract.

112.    Romeo's MD&A section in the Registration Statement included the following similarly misleading statements about Romeo's "Product revenues," stating, in relevant part:

> ***Minimum take or pay order commitments related to contracts signed through November of 2020 exceed $500 million of backlog***. While the recognition of product revenue related to certain of these module and pack contracts will not commence until after completion of the delivery of engineering and prototype services, ***we expect to recognize greater than 10% of this backlog revenue over the twelve-month period following September 30, 2020***.

113.    The foregoing statements in ¶¶111-12 regarding Romeo's backlog were materially false and/or misleading because Defendants failed to disclose that: (i) Romeo did not have sufficient battery cell inventory and/or access to supply to accommodate end-user demand and ramp up production in 4Q 2020 and into 2021; (ii) Romeo's supply chain for battery cells was at material risk of shortages because Romeo relied on *ad hoc* purchases from at most *two* battery cell suppliers and the spot market to fulfill the Company's 4Q 2020 and 2021 inventory needs; and (iii) Romeo's then-existing and undisclosed supply constraints were a material hindrance to Romeo's business operations and financial performance and put Romeo's ability to convert the backlog orders into actual revenue at material risk. Moreover, the statements that "[t]he portion of our backlog as of September 30, 2020, that is expected to be recognized in the twelve-month period following September 30, 2020 is approximately $59 million", and "we expect to recognize greater

than 10% of this backlog revenue over the twelve-month period following September 30, 2020",

and that "[a]ll contracted revenue amounts also assume continued performance by Romeo of its

contractual obligations" were false and/or misleading where Romeo failed to disclose that it then

lacked inventory and/or access to supply sufficient to fulfill the orders and meet Romeo's

contractual production obligations on the stated timeline.

114.    The Registration Statement also included the following misleading statements

regarding Romeo's battery cell suppliers:

> **Suppliers**
>
> Our products use parts that are sourced from suppliers across the world. ***We have developed close relationships with vendors of key components of our battery products, in particular battery cells***....
>
> The price we pay for cells depends on a number of factors, including material grades of chemistry selected for cell recipe, volumes, long-term commitment, logistics and shipping, and tariffs.
>
> ***Samsung***
>
> Samsung is a leading global supplier of electrical products and components. Through its supply of power cells to Romeo, Samsung currently supports the EV Program and is a candidate for stationary storage ("ESS") applications. Samsung offers cylindrical and prismatic products.
>
> ***LG Chem***
>
> LG Chem Ltd., often referred to as LG Chemical, is the largest Korean chemical company headquartered in Seoul, South Korea. LG Chem supplies Romeo with power cells, offers cell selection for non-EV Program and is an ESS candidate. LG Chem offers cylindrical and pouch products.
>
> ***Murata***
>
> Murata Manufacturing Co., Ltd. is a Japanese manufacturer of electronic components. Murata is the best in market power cell for sports cars. ***Murata supplies Romeo with power cells*** and offers cylindrical and pouch products.
>
> ***SK Innovation***
>
> SK innovation is Korea's first and largest energy chemical company. ***SK supplies Romeo with power cells*** and offers pouch products.

115.    The foregoing statements regarding Romeo's battery cell suppliers were materially

false or misleading because: (i) according to Selwood, during the Class Period Romeo relied on at

most two suppliers, not four, for its supply of high quality battery cells; (ii) the statements that "Murata supplies Romeo with power cells" and "SK supplies Romeo with power cells" were false and/or misleading where Romeo in fact relied on only LG Chem and/or Samsung for its supply of high quality battery cells, as admitted by Selwood during the March 30, 2021 conference call; and (iii) the misrepresentations and omissions relating to Romeo's suppliers materially misrepresented and concealed the extent of actual risk of supply shortages and/or actual lack of access to sufficient supply that the Company faced during the Class Period.

116.   The Registration Statement included the following misleading and incomplete "risk factor" regarding Romeo's supply of battery cells, in relevant part:

> RMG believes it is important to communicate its expectations to its stockholders. However, there may be events in the future that RMG is not able to predict accurately or over which it has no control. The risk factors and cautionary language discussed in this proxy statement/consent solicitation statement/prospectus provide examples of risks, uncertainties and events that may cause actual results to differ materially from the expectations described by RMG or Romeo in such forward-looking statements, including, among other things:
>
> - ***potential unavailability of third-party technology or battery cells that Romeo uses in its products***;

117.   The Registration Statement also included the following misleading and incomplete "risk factors" regarding Romeo's suppliers:

> **We are dependent on our suppliers to fulfill our customers' orders, and if we fail to manage our relationships effectively with, or lose the services of, these suppliers and we cannot substitute suitable alternative suppliers, our operations would be materially adversely affected.**
>
> We rely on third-party suppliers for the provision and development of many of the key components and materials used in our battery modules and packs, such as cells, electrical components, and enclosure materials. ***The inability of our suppliers to deliver necessary components of our battery products at prices and volumes, performance and specifications acceptable to us could have a material adverse effect on our business, prospects, financial condition and operating results***. While we plan to obtain components from multiple sources whenever possible, some of the components used in our vehicles may be purchased by us from a single source.  While we believe that we may be able to establish alternate supply

relationships and can obtain or engineer replacement components for our single source components, we may be unable to do so in the short term (or at all) at prices or quality levels that are favorable to us, which could have a material adverse effect on our business, prospects, financial condition and operating results.

Our third-party suppliers may not be able to meet their product specifications and performance characteristics or our desired specifications, performance and pricing, which would impact our ability to achieve our product specifications and performance characteristics as well.  Additionally, our suppliers may be unable to obtain required certifications for their products for which we plan to use or provide warranties that are necessary for our solutions.  *If we are unable to obtain components and materials used in our battery products from our suppliers or if our suppliers decide to create or supply a competing product, our business could be materially adversely affected.*

118.     The Registration Statement also included the following misleading and incomplete "risk factors" regarding potential disruptions in Romeo's supply of battery cells:

**Increases in costs, disruption of supply or shortage of any of our battery components, particularly cells, could harm our business.**

From time to time, we may experience increases in the cost or a sustained interruption in the supply or shortage of our components.  *Any such increase or supply interruption could materially and negatively impact our business, prospects, financial condition and operating results.*

* * *

*Any disruption in the supply of battery cells could temporarily disrupt production of our products until a different supplier is fully qualified* . . . .

119.     The foregoing statements regarding Romeo's "risk factors" in ¶¶116-18 were materially false and/or misleading because: (i) the "unavailability" of a sufficient supply of battery cells to fulfill customer orders during the Class Period was not a mere *potential* risk, it was an actual, ongoing event that Defendants knew had in fact disrupted production during the Class Period; (ii) given the Company's admitted long lead times to obtain battery cells and stated 16-week lead time for Romeo to produce and deliver customer orders once cells were obtained, Defendants would have known prior to the Registration Statement that Romeo did not have sufficient inventory or access to a sufficient supply of battery cells and had not yet ramped up

production to deliver orders on schedule in 2021; and (iii) by Romeo's own admissions at the end of the Class Period, due to the ongoing cell supply shortage and lack of a long-term supply agreement, the Company did not begin to ramp up production until August 2021.  Romeo's supply-related risk disclosures were further false and/or misleading to the extent that Defendants elsewhere in the Registration Statement misrepresented that Romeo relied on "close relationships" with at least four different suppliers, when, in fact, Selwood later admitted that the Company relied on—and was beholden to—*ad hoc* purchases from at most two suppliers.

120.    The Registration Statement also failed to provide material information required by Item 303 of SEC Regulation S-K ("Item 303"), 17 C.F.R. §229.303(a)(3)(ii), which mandates that securities issuers such as Romeo disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Similarly, registration statements must disclose events that the registrant knows would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i), (ii).  Here, the Registration Statement was materially false and misleading because it failed to disclose known adverse trends and/or uncertainties that Defendants were required to disclose under Item 303, including the fact that, contrary to Defendants' assurances about Romeo's "hedged" supply, Romeo did not have sufficient supply of high-quality battery cells necessary to ramp production, meet end user demand, and fulfill customer orders, and the supply shortage would, or was reasonably expected to, have a material negative impact on the Company's sales, revenues, and/or results of operations going forward.

C.      **Fox Business Interview on December 13, 2020**

121.    On December 13, 2020, Selwood participated in an interview on Fox Business. During the interview, Selwood repeated the claim about the purported value of Romeo's backlog, stating, in relevant part: "***Today we have secured 300 million in revenue*** and we have another 2.4 billion under negotiation."

122.    The foregoing statement regarding Romeo's "secured" revenue (or backlog) was materially false and/or misleading because Selwood failed to disclose that: (i) Romeo did not have sufficient battery cell inventory and/or access to supply to accommodate end-user demand and ramp up production in 2021; (ii) Romeo's supply chain for battery cells was at material risk of shortages because Romeo relied on *ad hoc* purchases from at most *two* battery cell suppliers and the spot market to fulfill the Company's 2021 inventory needs; and (iii) Romeo's then-existing and undisclosed supply constraints were a material hindrance to Romeo's business operations and financial performance and put Romeo's ability to convert the backlog orders into actual revenue at material risk.

D.      **SPACs Attack Interview on December 14, 2020**

123.    On December 17, 2020, Defendants caused Romeo to file with the SEC on Form 8-K the transcript of the interview of Selwood by SPACs Attack that took place on December 14, 2020.  During the interview, Selwood made the following false and/or misleading statements about Romeo's products and contracted revenue:

> So what I want to be clear with you about is, look, ***what we do is we take cutting edge cells, such as the ones from let's say a Panasonic, an LG, a Samsung, or even a QuantumScape***, and we use our proprietary design language from a module battery pack and battery management systems software suite and really allow those cells to shine. And that leads to market leading energy density, which is longest range, fast charging, configurability, safety, and reliability. So first and foremost, want to let you know what we do at Romeo. And that's how ***we've been able to secure $544 million in contracted revenue*** and have another $2.2 billion under advanced negotiation.

37

124.    Host Chris Katje inquired whether there was any update to Romeo's contracted revenue, to which Selwood responded:

> No, so that was a great question, Chris. There was actually an update on that amount a couple of weeks ago. We actually announced our partnership with Lion Electric. So we announced a 234 million production deal with Lion Electric, which we're extremely excited about. ***So that brought the backlog up from the 310 million from announcement to 544 million the way it currently stands now. But now we're at 544 million in committed revenue, with another 2.2 billion on the advanced negotiation***.

125.    The foregoing statements in ¶¶123-24 about Romeo's products and contracted revenue were materially false and/or misleading because Defendants failed to disclose that: (i) Romeo did not have sufficient battery cell inventory and/or access to supply to accommodate end-user demand and ramp up production in 2021; (ii) Romeo's supply chain for battery cells was at material risk of shortages because Romeo relied on *ad hoc* purchases from at most *two* battery cell suppliers and the spot market to fulfill the Company's 2021 inventory needs; and (iii) Romeo's then-existing and undisclosed supply constraints were a material hindrance to Romeo's business operations and financial performance and put Romeo's ability to convert the backlog orders into actual revenue at material risk.  Moreover, Selwood's statement about "what we do" was materially false and misleading to the extent that he misleadingly suggested that Romeo variously relied upon and obtained battery cells from at least four different suppliers when, in fact, Romeo relied upon— and was beholden to—*ad hoc* purchases from at most two suppliers.

### E.    SPACInsider Webinar on December 15, 2020

126.    On December 17, 2020, Defendants caused Romeo to file with the SEC on Form 8-K the transcript of the online webinar hosted by SPACInsider that took place on December 15, 2020.  Participants included the Individual Romeo Defendants, along with Defendants Mancini and Kassin.  The webinar consisted of prepared remarks by Mancini and Selwood and then a Q&A session for viewers to submit questions.  During the SPACInsider Webinar, Webb made the

following false and/or misleading statements in response to an inquiry about Romeo's ability to meet customer demand:

> ***Our current business plan assumes that we will fulfill all of the demand for the 1.6 billion in revenue*** out of our existing factory. ***And we have the space and the capacity here to do that.*** One of the reasons we chose this location was because we could expand incrementally to make sure that we were being smart with the capital expenditures we were making. ***So at this point we run one full line and we have the ability to put up to 10 more pack line, excuse me, module pack combinations here in order to accommodate that amount of demand.***

127.     The foregoing statements about Romeo's ability to meet customer demand were materially false and/or misleading because Webb failed to disclose that: (i) while Romeo may have had the factory capacity to meet demand, Romeo did not have sufficient battery cell inventory and/or access to supply to accommodate end-user demand and ramp up production in 2021; (ii) Romeo's supply chain for battery cells was at material risk of shortages because Romeo relied on at most *two* battery cell suppliers and the spot market to fulfill the Company's 2021 inventory needs; and (iii) Romeo's then-existing and undisclosed supply constraints were a material hindrance to Romeo's business operations and financial performance and put Romeo's ability to convert the backlog orders into actual revenue—*i.e.*, a fundamental assumption of Romeo's "business plan"—at material undisclosed risk.

128.     During the SPACInsider Webinar's Q&A session, when asked about Romeo's ability to secure enough cells to fulfill large orders, Selwood misleadingly responded as follows:

> Sure. And ***that goes back to the form factor and cell supplier agnosticism, right?*** So that's probably the least cool reason why we do it, to ***ensure that we have drop-in replacements that are already identified***.  ***So every time we talk to our customers or we do our testing, there's a primary cell, there's a secondary cell and there's a tertiary cell,*** Okay? And we've approached our relationships from a technical one, so there's technical respect between us and our suppliers from the cell level.  ***And now we're focused on securing our capacity for the long term. So I don't see any big challenges as our order book continues to grow.***

129.   Also during the webinar, a questioner attempted to drill down on **how "the company deal[s] with the tight supply of raw materials for batteries"** asking **"[d]oes the company have long-term contracts to guarantee supply?"** Selwood misleadingly responded:

> <u>**Yes.**</u> **So we're currently putting those in place. We consider this as Operation Hedge Fund and we do this all the[] way at the component level. The reason we started this is quite frankly, some of the PCBA components have anywhere from 54 week lead time to 72 week lead time. So we implemented Operations [sic] Hedge Fund program in our supply base that allows us to secure products that's needed for the long [term].**

130.   Also during the webinar, Selwood made the following additional false or misleading statements in response to an inquiry about competitive advantages with Romeo's supply chain model and material sourcing:

> So just like the configurability in our design, **our strategy's the same in a supply base**. So on a sale, like I said before, foreign practice **cell supplier agnostic**. It's the same with the raw materials and the other stuff as well. So we go for a supply base that can support our way from our clean sheet design to prototype before mass production launch. So maintaining that flexibility, again. **Every part within the bill of materials has a primary identified, which most likely have a long-term partnership with, a secondary and tertiary option just to enable flexibility as we scale up and scale down.**

131.   The foregoing statements in ¶¶128-30 about Romeo's ability to secure cells to fulfill orders, long-term supply agreements/partnerships, and materials sourcing were materially false and/or misleading because: (i) touting Romeo's supposed "cell supplier agnosticism" and claiming "I don't see any big challenges as our order book continues to grow" in response to direct questions about the adequacy of Romeo's access to sufficient supply of battery cells misrepresented and concealed that Romeo did not have sufficient battery cell inventory and/or access to supply to accommodate end-user demand and ramp up production in 2021; (ii) Romeo did not have "drop in replacements" identified and ready for use to fulfill the Company's 2021 orders, and Selwood's reference to "secondary" and "tertiary" supply options to "enable flexibility" was misleading where clearly no such secondary and tertiary options were in place;

(iii) Romeo's supply chain for battery cells was not "hedge[d]" against supply disruptions, and was instead at material risk of shortages because Selwood concealed that Romeo relied on *ad hoc* purchases from at most *two* battery cell suppliers and the spot market to fulfill the Company's 2021 inventory needs; and (iv) Romeo's then-existing and undisclosed supply constraints were a material hindrance to Romeo's business operations and financial performance and put at material risk Romeo's ability to convert the backlog orders into actual revenue.

### F.     Panic with Friends Interview on December 28, 2020

132.    On December 28, 2020, Defendants caused Romeo to file with the SEC on Form 8-K a transcript of the interview hosted by *Panic with Friends* that aired that same day. Participants included Selwood and Mancini.  During the *Panic with Friends* Interview, Selwood made the following false and/or misleading statements about Romeo's contracted revenue when asked about Romeo's customers:

> **We are not a pre-revenue company.  We have 544 million in contracted backlog revenue**, with another 2.2 billion under advance negotiation. So Howard, **we've been delivering to our customers, and we deliver to our customers on a weekly basis, right now.**

133.    The foregoing statements regarding Romeo's revenue, contracted backlog, and delivery to customers were materially false and/or misleading because Selwood failed to disclose that: (i) Romeo did not have sufficient battery cell inventory and/or access to supply to accommodate end-user demand and ramp up production in 2021; (ii) Romeo's supply chain for battery cells was at material risk of shortages because Romeo relied on *ad hoc* purchases from at most two battery cell suppliers and the spot market to fulfill the Company's 2021 inventory needs; and (iii) Romeo's then-existing and undisclosed supply constraints were a material hindrance to Romeo's business operations and financial performance and put Romeo's ability to convert the backlog orders into actual revenue at material risk.  Moreover, Selwood's statement that "we've

been delivering to our customers, and we deliver to our customers on a weekly basis, right now"

in response to a question about whether Romeo had customers was materially false and misleading

in that it suggested Romeo would be able to continue delivering on such orders to its customers,

even while Selwood knew that a material cell supply shortage was already hindering Romeo's

ability to complete and timely deliver 2021 orders.  For example, given the long lead time to obtain

battery cells and apparent lack of inventory on-hand, and with a "sixteen-week lead time to

manufacture products to meet our customers' requirements," Defendants would have known prior

to December 28, 2020 that orders to be delivered during 2021 were not being manufactured on

schedule due to the lack of cell supply.

### G.    January 2021 Prospectus

134.    On January 26, 2021, Defendants caused Romeo to file the January 2021

Prospectus on Form 424(b)(3) pursuant to the January 2021 Shelf Registration Statement.  The

January 2021 Prospectus included the following false or misleading statements regarding Romeo's

battery cell suppliers:

**Suppliers**

Our products use parts that are sourced from suppliers across the world.  ***We have
developed close relationships with vendors of key components of our battery
products, in particular battery cells*** ….

The price we pay for cells depends on a number of factors, including material
grades of chemistry selected for cell recipe, volumes, ***long-term commitment***,
logistics and shipping, and tariffs.

***Samsung***

Samsung is a leading global supplier of electrical products and
components.  Through its supply of power cells to Romeo, Samsung currently
supports the EV Program and is a candidate for stationary storage ("*ESS"*)
applications.  Samsung offers cylindrical and prismatic products.

***LG Chem***

LG Chem Ltd., often referred to as LG Chemical, is the largest Korean chemical
company headquartered in Seoul, South Korea.  LG Chem supplies Romeo with

power cells, offers cell selection for non-EV Program and is an ESS candidate. LG Chem offers cylindrical and pouch products.

*Murata*

Murata Manufacturing Co., Ltd. is a Japanese manufacturer of electronic components. Murata is the best in market power cell for sports cars. ***Murata supplies Romeo with power cells*** and offers cylindrical and pouch products.

*SK Innovation*

SK innovation is Korea's first and largest energy chemical company. ***SK supplies Romeo with power cells*** and offers pouch products.

135.    The foregoing statements regarding Romeo's battery cell suppliers were materially false or misleading because: (i) according to Selwood, during the Class Period Romeo relied on at most two suppliers, not four, for its supply of high quality battery cells; (ii) the statements that "Murata supplies Romeo with power cells" and "SK supplies Romeo with power cells" were false and/or misleading where Romeo in fact relied on only LG Chem and/or Samsung for its supply of high quality battery cells, as admitted by Selwood during the March 30, 2021 conference call; and (iii) the misrepresentations and omissions relating to Romeo's suppliers materially misrepresented and concealed the extent of actual risk of supply shortages and/or actual lack of access to sufficient supply that the Company faced during the Class Period.

136.    The January 2021 Prospectus included the following materially false or misleading statements regarding Romeo's contracted revenue (or "backlog"):

We define contracted revenue (or "backlog") as revenue expected to be received under our existing customer contracts from sales of battery packs, modules, battery management system software and services not yet built and delivered or provided. ***As of September 30, 2020, we had a backlog of approximately $310 million, of which approximately $240 million represented the minimum revenue that would be received under such contracts to satisfy take or pay minimum order commitments***. This compares to our contracted revenue from sales of products and services not yet built and delivered or provided of approximately $2.9 million as of September 30, 2019 (of which approximately $2.9 million represented the minimum revenue that would be received in satisfaction of take or pay minimum order commitments), and does not take into account approximately $234 million in revenue available to be earned under our most recent contract with Lion Buses that was executed subsequent to September 30, 2020 (of which approximately $234

43

million represents the minimum revenue that will be received in satisfaction of take or pay minimum order commitments). ***The portion of our backlog as of September 30, 2020, that is expected to be recognized in the twelve-month period following September 30, 2020 is approximately $59 million.*** The remaining backlog balance of approximately $251 million is expected to be recognized between the fourth quarter of 2021 and the end of year 2025. The difference between our backlog and our minimum revenue that would be received in satisfaction of take or pay minimum order commitments reflects that ***our backlog does not represent a guarantee that our customers will complete purchases of our products and services in the quantities that we anticipate, and some of our contracts allow our customers to purchase in smaller quantities with certain minimum order penalties. All contracted revenue amounts also assume continued performance of our contractual obligations*** and satisfaction of customary testing and quality required under each customer contract.

137.    The January 2021 Prospectus also included the following similarly materially false or misleading statements regarding Romeo's "Product revenues," stating, in relevant part:

As a result of the contract completed during April 2020 that was not subsequently replaced, we expect to report lower product revenues until we begin to produce and deliver modules and packs in accordance with our more recently signed customer supply contracts, certain of which provide for minimum take or pay minimum order commitments. ***Minimum take or pay order commitments related to contracts signed through November of 2020 exceed $500 million of backlog***. While the recognition of product revenue related to certain of these module and pack contracts will not commence until after completion of the delivery of engineering and prototype services, ***we expect to recognize greater than 10% of this backlog revenue over the twelve-month period following September 30, 2020***.

138.    The foregoing statements in ¶¶136-37 regarding Romeo's backlog were materially false and/or misleading because Defendants failed to disclose that: (i) Romeo did not have sufficient battery cell inventory and/or access to supply to accommodate end-user demand and ramp up production in 2021; (ii) Romeo's supply chain for battery cells was at material risk of shortages because Romeo relied on *ad hoc* purchases from at most two battery cell suppliers and the spot market to fulfill the Company's 2021 inventory needs; and (iii) Romeo's then-existing and undisclosed supply constraints were a material hindrance to Romeo's business operations and financial performance and put Romeo's ability to convert the backlog orders into actual revenue at material risk.  Moreover, the statements that "[t]he portion of our backlog as of September 30,

44

2020, that is expected to be recognized in the twelve-month period following September 30, 2020 is approximately $59 million", and "we expect to recognize greater than 10% of this backlog revenue over the twelve-month period following September 30, 2020", and that "[a]ll contracted revenue amounts also assume continued performance by Romeo of its contractual obligations" were false and misleading where Romeo failed to disclose that it then lacked inventory and/or access to supply sufficient to fulfill the orders and meet Romeo's contractual production obligations on the stated timeline.

139.   The January 2021 Prospectus included the following misleading and incomplete risk factor regarding Romeo's battery cell suppliers, stating, in part:

- ***potential unavailability of third-party technology or battery cells that we use in our products***;

140.   The January 2021 Prospectus also included the following misleading and incomplete "risk factors" regarding Romeo's suppliers:

**We are dependent on our suppliers to fulfill our customers' orders, and if we fail to manage our relationships effectively with, or lose the services of, these suppliers and we cannot substitute suitable alternative suppliers, our operations would be materially adversely affected.**

We rely on third-party suppliers for the provision and development of many of the key components and materials used in our battery modules and packs, such as cells, electrical components, and enclosure materials. ***The inability of our suppliers to deliver necessary components of our battery products at prices and volumes, performance and specifications acceptable to us could have a material adverse effect on our business, prospects, financial condition and operating results***. While we plan to obtain components from multiple sources whenever possible, some of the components used in our vehicles may be purchased by us from a single source. While we believe that we may be able to establish alternate supply relationships and can obtain or engineer replacement components for our single source components, we may be unable to do so in the short term (or at all) at prices or quality levels that are favorable to us, which could have a material adverse effect on our business, prospects, financial condition and operating results.

Our third-party suppliers may not be able to meet their product specifications and performance characteristics or our desired specifications, performance and pricing, which would impact our ability to achieve our product specifications and

performance characteristics as well. Additionally, our suppliers may be unable to obtain required certifications for their products for which we plan to use or provide warranties that are necessary for our solutions. *If we are unable to obtain components and materials used in our battery products from our suppliers or if our suppliers decide to create or supply a competing product, our business could be materially adversely affected.*

141.    The January 2021 Prospectus also included the following misleading and incomplete "risk factors" regarding Romeo's supply of battery cells:

**Increases in costs, disruption of supply or shortage of any of our battery components, particularly cells, could harm our business.**

From time to time, we may experience increases in the cost or a sustained interruption in the supply or shortage of our components. *Any such increase or supply interruption could materially and negatively impact our business, prospects, financial condition and operating results.* The prices for our components fluctuate depending on market conditions and global demand and *could adversely affect our business, prospects, financial condition and operating results.* For instance, we are exposed to multiple risks relating to price fluctuations for battery cells. These risks include, but are not limited to:

- the inability or unwillingness of our suppliers and their competitors to build or operate cell production facilities to supply the numbers of cells required to support the growth of the electric vehicle industry as demand for such cells increases;
- disruption in the supply of cells due to quality issues or recalls by the cell manufacturers;
- *a decrease in the number of manufacturers of cells*; and
- *an increase in the cost of raw materials.*

*Any disruption in the supply of battery cells could temporarily disrupt production of our products until a different supplier is fully qualified* . . . .

142.    The foregoing statements regarding Romeo's "risk factors" in ¶¶139-41 were materially false and/or misleading because: (i) the "unavailability" of a sufficient supply of battery cells to fulfill customer orders during the Class Period was not a mere *potential* risk, it was an *actual*, ongoing event that Defendants knew had in fact disrupted production during the Class Period; (ii) given the Company's admitted long lead times to obtain battery cells and stated 16-week lead time for Romeo to produce and deliver customer orders once cells were obtained, Defendants would have known prior to the January 2021 Prospectus that Romeo did not have

46

sufficient supply of battery cells and had not yet ramped up production to deliver orders on schedule in 2021; and (iii) by Romeo's own admissions at the end of the Class Period, due to the ongoing cell supply shortage and lack of a long-term supply agreement, the Company did not begin to ramp up production until August 2021.  Romeo's supply-related risk disclosures were further false and/or misleading to the extent that Defendants elsewhere in the January 2021 Prospectus misrepresented that Romeo relied on "close relationships" with at least four different suppliers, when, in fact, Selwood later admitted that the Company relied on—and was beholden to—*ad hoc* purchases from at most two suppliers.

143.    The January 2021 Prospectus was further materially false and misleading because it failed to disclose known adverse trends, events, and/or uncertainties that Defendants were required to disclose under Item 303, including that, contrary to Defendants' assurances about Romeo's "hedged" supply, Romeo did not have sufficient supply of high-quality battery cells necessary to ramp up production in 2021, meet end-user demand, and fulfill customer orders, and the battery cell supply shortage would, or was reasonably expected to, have a material negative impact on the Company's sales, revenues, and/or results of operations going forward.

### H.    FreightWaves Interview on February 25, 2021

144.    On February 25, 2021 Selwood participated in an online interview with Alan Adler, Detroit Bureau Chief, FreightWaves and stated:

> ADLER (FREIGHTWAVES)**:** ... I want to start out our conversation and talk a little bit about your area, which is batteries. They are critical to the growth in electric vehicles. Where do you see, *as we talk about supply chain here, where do you see the potential chinks in the supply chain*, such as we're seeing, say, with semiconductors in automobiles? Where are those potential hiccups?

> SELWOOD**:** Really two areas. So first of course are the battery cells. Just from a battery cell standpoint you know especially at Romeo, safety, reliability, and quality are nonnegotiable. We will not put anything that do not meet our are bars for success, in those regards, in the hands of our customers. So there's only quite frankly, *as of today, a few partners* that put the quality that's necessary. Especially

in the commercial vehicle industry that are really rewarding.  So ***ensuring that we have continuous access to that supply is a daily focus of ours***. So ***that's the first thing essentially***.  We will deliver as many batteries from as many cells as we get in the door. So ***that's the first thing - battery cells***. The second thing is actually you mention the semiconductor industry. One thing that we noticed almost 3 years ago was printed circuit board components, quite frankly, so anywhere from resistors to other IC chips. So ***we actually set up a program*** that's kind of tongue-in-cheek Alan called "***Operation Hedge Fund***," where on a weekly basis we look out in the open market and if there's something that we see, something that's 56-week lead time or 72-week lead time, lead times being pushed out, we actually grab it on the open market and put it on the shelves.  So those are two of the real chinks if you will. Of course the big bad in the room, battery cells….

ADLER (FREIGHTWAVES)**:** So, hedge fund is an accurate description of what you did. ***You were hedging against supply that was a pretty smart move***. So, it turns out.

SELWOOD**:** And let me expand - what we noticed again, just to - no matter how big your buy was, you know, you will have multi-billion dollar, you know, partners of ours that we're growing together and they would be indicating to us that "hey even though we spent X amount of billions last year, our lead times are consistently being pushed out" and we're there in stealth mode, and we said "hey we know that we have a great product and we'll eventually capture a big market share, ***so we need to grab these so we're not lying down." So, that's what drove it.***

145.    Selwood's response about Romeo's suppliers and potential supply chain "chinks" was materially false and misleading because: (i) Selwood's reference to "a few" supply "partners" was misleading when, in fact, Selwood himself would later admit that the Company relied on *ad hoc* purchases from, at most, two; (ii) Selwood failed to disclose that Romeo then did not have sufficient battery cell inventory and/or access to supply to accommodate end-user demand and ramp up production in 2021; and (iii) Romeo's then-existing and undisclosed supply constraints were a material hindrance to Romeo's business operations and financial performance and put Romeo's ability to convert the backlog orders into actual revenue at material risk.

I.      **4Q and Full Year 2020 Financial Results and Earnings Call on March 30,
        2021**

146.    During the March 30, 2021 earnings call to discuss 4Q and Full Year 2020 financial

results, Selwood made the following false or misleading statements when attempting to assuage

investors' concerns about Romeo's battery cell supply shortage:

> As most of you are undoubtedly aware, currently the worldwide market for battery
> sales is experiencing a significant shortage of certain high quality performance
> cells. That shortage has affected our ability to source adequate supplies of key
> battery cells critical to our specialized high density battery solutions.  As a result,
> we are making material updates to our production and revenue outlook for 2021.
>
> However, ***I want to emphasize that we see this cell shortage as temporary, and
> are confident it will not affect our intermediate and longer-term opportunities***.
>
> * * *
>
> I want to emphasize again, that the ***cell shortage we are facing in 2021 is not
> expected to have a material impact on our committed backlog***.  As reported by our
> cell suppliers, the current widespread cell shortage within the EV sector is driven
> primarily by accelerated demand, as more EV companies have secured capital in
> the last 12 months and was exacerbated by supply chain and logistics disruptions
> caused by the pandemic. While we saw accelerating demand for cells, the severity
> of quality cells ***shortage was unexpected, as has increased dramatically over the
> course of the last several weeks***.

147.    In response to direct analyst inquiry about the battery cell shortage's impact on

Romeo's backlog, Webb misleadingly responded as follows:

> SEAN MILLIGAN (WILLIAMS TRADING): . . .The shortage in the cell this year,
> in the inability to deliver power packs, does that impact any of the contracts or
> trigger anything in the contracts in the backlog?
>
> WEBB: . . . ***We don't expect any impacts to our backlog***. We're working very
> closely with our customers and working with them on adjusting the timeframes,
> and they are aware that this is an issue that affects more than just Romeo, so ***we are
> not expecting that there is any hits to the overall backlog***, just a matter of timing.

148.    The foregoing statements in ¶¶146-47 about Romeo's battery cell supply shortage

and its impact on the Company's backlog were materially false and/or misleading because: (i)

Defendants  misleadingly  allayed  investors'  concerns  by  mischaracterizing  the  shortage  as

"temporary" and assuring of Defendants' confidence that the shortage "will not affect our intermediate… opportunities" and "is not expected to have a material impact on our committed backlog," while failing to disclose that the shortage was having a clear material impact on the amount of the backlog revenue expected to be recognized during 2021 (as Defendants would admit just two weeks later on April 15, 2021, Romeo reduced the backlog revenue expected to be realized from $59 million by September 30, 2021, to just $23.4 million by the year's end); and (ii) the claims that the shortage was "unexpected" and "increased dramatically over the course of the last several weeks" were misleading where, based on Romeo's significant lead times to obtain battery cells and Romeo's 16-week lead time to manufacture and deliver customer orders by scheduled delivery dates, Defendants would have known of Romeo's lack of sufficient supply long before "the last several weeks" leading up to March 30, 2021.

**J.     2020 Form 10-K**

149.    On April 15, 2021, Defendants filed Romeo's 2020 Form 10-K with the SEC.  The 2020 Form 10-K repeated the financial results announced in the March 30, 2021 Form 8-K, and included the following false or misleading statements regarding Romeo's backlog:

> ***As of December 31, 2020, we had a backlog of approximately $555 million***. For $312 million out of the $555 million of backlog related to minimum quantity purchase commitments, if the customers do not follow through on their minimum purchase commitments, we would receive a maximum of $293 million under certain make-whole provisions included in these contracts. For the remaining $243 million of backlog related to minimum quantity purchase commitments included in these contracts, if the customers do not follow through on their minimum purchase commitments, we would seek damages through customary remedies for breach of contract. ***The portion of our backlog as of December 31, 2020, that is expected to be recognized in the twelve-month period following December 31, 2020 is approximately $23.4 million.*** The remaining backlog balance of approximately $532 million is expected to be recognized between 2022 and 2024. The difference between our backlog and our minimum revenue that would be received in satisfaction of take or pay minimum order commitments reflects that our backlog does not represent a guarantee that our customers will complete purchases of our products and services in the quantities that we anticipate, and some of our contracts allow our customers to purchase in smaller quantities with certain minimum order

penalties. Backlog includes the total value of our existing customer contracts and includes products that are within the scope of the license granted to the BorgWarner JV, based on the types of customer vehicles in which the products will be used. To the extent that those products are fulfilled by the BorgWarner JV, or pursuant to an agreement with the BorgWarner JV, we may not recognize the full amount of such contracted backlog as revenue. ***All contracted revenue amounts also assume continued performance of our contractual obligations*** and satisfaction of customary testing and quality required under each customer contract.

150.    The foregoing statements regarding Romeo's backlog were materially false and/or misleading because Defendants failed to disclose that Romeo still did not have sufficient battery cell inventory and/or access to supply to ramp up production and accommodate end-user demand in 2021.  Whereas Defendants told investors that the Company would announce its 2021 battery cell allocations in April, and then did not, a strong inference exists that Defendants knew in April 2021 that Romeo still had not secured sufficient cells to produce the remainder of 2021 backlog revenue on the stated timeline.  Moreover, the statement that "[a]ll contracted revenue amounts also assume continued performance by Romeo of its contractual obligations" failed to disclose and recklessly disregarded that Romeo then lacked sufficient inventory and/or access to supply to fulfill the orders and meet Romeo's contractual production obligations on the stated timeline.

151.    The 2020 Form 10-K also included the following misleading and incomplete "risk factor" related to Romeo's relationship with suppliers, which is repeated *verbatim* from the "risk factor" as stated in the Company's Registration Statement:

> **We are dependent on our suppliers to fulfill our customers' orders, and if we fail to manage our relationships effectively with, or lose the services of, these suppliers and we cannot substitute suitable alternative suppliers, our operations would be materially adversely affected.**
>
> We rely on third-party suppliers for the provision and development of many of the key components and materials used in our battery modules and packs, such as battery cells, electrical components, electromechanical components, mechanical components and enclosure materials. ***The inability of our suppliers to deliver necessary components of our battery products at prices and volumes, performance and specifications acceptable to us could have a material adverse effect on our business, prospects, financial condition and operating results.***

While we plan to obtain components from multiple sources whenever possible, some of the components used in our vehicles may be purchased by us from a single source. While we believe that we may be able to establish alternate supply relationships and can obtain or engineer replacement components for our single source components, we may be unable to do so in the short term (or at all) at prices or quality levels that are favorable to us, which could have a material adverse effect on our business, prospects, financial condition and operating results.

… ***If we are unable to obtain components and materials used in our battery products from our suppliers or if our suppliers decide to create or supply a competing product, our business could be materially adversely affected***.

152.    The foregoing statements regarding Romeo's "risk factor" were materially false and/or misleading because: (i) the unavailability of a sufficient supply of battery cells to fulfill customer orders during the Class Period was not a mere *potential* risk, it was an actual, ongoing event that Defendants knew had in fact disrupted production during the Class Period; (ii) whereas Defendants told investors that the Company would announce its 2021 battery cell allocations in April 2021, and then did not, a strong inference exists that Defendants knew in April 2021 that Romeo still had not secured sufficient cells to produce the remainder of 2021 backlog revenue on the stated timeline; and (iii) by Romeo's own admissions at the end of the Class Period, due to the ongoing cell supply shortage and lack of a long-term supply agreement throughout the Class Period, the Company did not even begin to ramp up production until August 2021.

153.    The 2020 Form 10-K was further materially false and misleading because it failed to disclose known adverse trend and/or uncertainties that Defendants were required to disclose under Item 303, including the fact that, contrary to Defendants' assurances about Romeo's "hedged" supply, Romeo did not have sufficient supply of high-quality battery cells necessary to ramp up production, meet end-user demand, and fulfill customer orders, and the battery cell supply shortage would, or was reasonably expected to, continue to have a material negative impact on the Company's sales, revenues, and/or results of operations going forward.

**K.      1Q 2021 Financial Results and Earnings Call on May 13, 2021**

154.    On May 13, 2021, in a press release filed on Form 8-K with the SEC, Defendants announced Romeo's 1Q 2021 financial results, reporting quarterly revenue of $1.1 million. Among other things, Defendants also announced that the Company secured a long-term agreement with PACCAR, whereby PACCAR will purchase Romeo's battery packs and battery management software for two models of heavy-duty battery-electric Peterbilt trucks in North America.  During the earnings call held the same day, Selwood made the following misleading statements about securing Romeo's battery cell supply:

> We are attacking this problem head on by broadening our engagement with battery cell providers.  We are taking key strategic steps to reduce the risk over the medium and long-term.  This has become one of the most critical issues facing our industry and we are doing everything in our power to help ease supply constraints and improve the number of qualified cells for ourselves and for the industry broadly.

> We are driving a global and holistic strategy to secure our future. We have made significant progress since our last update towards secure and adequate cell supplies.

> As we noted on our last call, *we are driving to secure cell supply over the short, medium and long-term*. We've made great strides since our last update. We are well positioned to sign an agreement shortly for multiple gigawatt hours to our long-term supply agreement with a top tier partner.

155.    During the call, analysts again pressed Defendants on their ability to secure enough battery cell supply to fulfill the PACCAR deal and other orders and to reach the Company's revenue guidance based on those orders.  For example, analyst Steven Fox asked, "in terms of the [battery cell supply] negotiations, . . . can you give us a sense for the ability to close some of these [supply deals] in the current environment?"  In response, Selwood assured the market that Romeo had been "locking down supply":

> Look, from our value partner standpoint, quite frankly battery cell providers want to work with us, . . . *What we've been doing is just ensuring our long-term outlook, locking down the supply*, as we talked about last time through 2028.  This shows our vigor and conviction in our long-term outlook and, quite frankly, our order book, especially the last deal that we announced, is very, very impressive for

our battery partners.  So ***I'm highly confident*** in our ability to bring these deals over the line.  That's what I'm saying.

156.     The foregoing statements in ¶¶154-55 about the sufficiency of Romeo's cell supply were materially false and/or misleading because: (i) it was misleading to claim that "what we've been doing is…locking down supply" and that the Company had "made great strides" to "secure cell supply in the short, medium, and long term" when Romeo in fact still did not have sufficient battery cell inventory and/or access to supply to ramp up production, accommodate end-user demand, and fulfill orders as scheduled in 2021; (ii) in an attempt to salvage investor confidence in the Company's outlook, Selwood concealed and failed to disclose the actual existence and extent of the ongoing shortage.  Indeed, whereas Defendants told investors that the Company would announce its 2021 battery cell allocations in April, and then did not, a strong inference exists that Defendants knew in April that Romeo still had not secured sufficient cells to deliver orders on schedule and produce the remainder of 2021 backlog revenue on the stated timeline.

### L.     1Q 2021 Form 10-Q

157.     On May 17, 2021, Defendants caused Romeo to file the Form 10-Q for the quarter ending March 31, 2021 (the "1Q 2021 Form 10-Q").  The 1Q 2021 Form 10-Q included the following materially false or misleading statements regarding Romeo's contracted revenue:

3. REVENUES

***As of March 31, 2021, we had executed certain contracts with customers to deliver specific battery packs, modules, and battery management system and software services. These contracts contain minimum quantity purchase requirements that are non-cancellable (other than for a breach by Romeo)***, and we have enforceable rights to pursue payments due under these contracts under make-whole provisions, or through customary remedies for breach of contract if the minimum quantities are not ordered. ***As of March 31, 2021, we had $555.1 million of unsatisfied performance obligations related to minimum quantity purchase commitments included in these contracts. For $311.9 million out of the $555.1 million of unsatisfied performance obligations related to minimum quantity purchase commitments, if the customers do not follow through on their minimum purchase commitments, we would receive a maximum of $292.5***

54

*million under certain make-whole provisions included in these contracts*. For the remaining $243.2 million of unsatisfied performance obligations related to minimum quantity purchase commitments included in these contracts, if the customers do not follow through on their minimum purchase commitments, we would seek damages through customary remedies for breach of contract. ***Of the $555.1 million of unsatisfied performance obligations as of March 31, 2021, $23.4 million is expected to be satisfied during the fiscal year ending December 31, 2021***, $442.4 million is expected to be satisfied during our fiscal years ending December 31, 2022 and 2023, and the remaining $89.3 million is expected to be satisfied thereafter.

158.    The 1Q 2021 Form 10-Q also included the following materially false or misleading statements regarding Romeo's backlog:

> ***Minimum quantity commitments related to contracts signed through March of 2021 exceed $555.1 million of backlog***. While the delivery of modules and packs and recognition of the associated product revenues under certain of these supply contracts will not commence until after completion of the delivery of engineering and prototype services, ***we expect to recognize approximately $23.4 million of this backlog revenue during the remainder of our fiscal year ending December 31, 2021.***

159.    The foregoing statements in ¶¶157-58 regarding Romeo's backlog were materially false and/or misleading because Defendants failed to disclose that Romeo still did not have sufficient battery cell inventory and/or access to supply to ramp up production, fulfill the orders, and meet Romeo's contractual production obligations on the stated timeline.  Characterizing the minimum purchase requirements as "non-cancellable (other than for a breach by Romeo)" was misleading to the extent that it presented a failure to perform by Romeo as hypothetical, when at that time Defendants knew that Romeo was currently unable to fulfill customers' orders for at least the first three quarters of 2021 on the stated timelines due to the ongoing supply shortage.

160.    The 1Q 2021 Form 10-Q was further materially false and misleading because it failed to disclose known adverse trend and/or uncertainties that Defendants were required to disclose under Item 303, including the fact that, contrary to Defendants' assurances about Romeo's "hedged" supply, Romeo did not have sufficient supply of high-quality battery cells necessary to

ramp up production, meet end-user demand, and fulfill customer orders, and the battery cell supply shortage would, or was reasonably expected to, have a material negative impact on the Company's sales, revenues, and/or results of operations going forward.

## VI.     ADDITIONAL ALLEGATIONS REGARDING DEFENDANTS' SCIENTER[5]

### A.     Individual Romeo Defendants' Knowledge and Access to Information

161.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

162.     Defendants knew or recklessly disregarded the misleading nature of the information which they caused to be disseminated to the market.  The ongoing concealment of Romeo's then-current battery cell shortage, as described in this Complaint, could not have been perpetrated over a substantial period of time, as occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Romeo Defendants.

163.     For example, Defendants, throughout the Class Period, fully appreciated Romeo's battery cell supply constraints based in part on the fact that battery cell supplies were allocated to various buyers long before they would be delivered to and available for use by the Company—sometimes several years in advance.  As explained in Romeo's 2020 Form 10-K, Defendants acknowledged that "[t]he availability and price of cylindrical cells is particularly sensitive to the

---

[5] All references to "Defendants" in this Section VI refer to the Romeo Defendants only.

demand surge, since most of the pouch and prismatic **cell supply has been allocated previously, in some cases several years in advance**."

164.     In addition, while Defendants told investors on March 30, 2021 that they would announce Romeo's 2Q 2021 battery cell allocations in April 2021, Defendants failed to do so—from which it may be inferred that Romeo was unable to secure the allocations necessary to produce (and recognize backlog revenue) in accordance with the remainder of its 2021 schedule, and had not theretofore secured the allocations necessary to support the $59 million in backlog revenue estimated for the first three quarters of the year.

165.     Moreover, even prior to the 2020 Form 10-K, Defendants were well aware of and acknowledged the extremely long lead times (up to 54- to 72-weeks) required to obtain the battery cells necessary to manufacture Romeo's products.  During the December 17, 2020 SPACInsider Webinar, when asked "**how does the company deal with the tight supply of raw materials for batteries**," Selwood responded by citing "Operation Hedge Fund" and explained "we do this all the way at the component level.  The reason we started this is quite frankly, some of the PCBA components have anywhere from **54 week lead time to 72 week lead time**.  So we implemented **Operations [sic] Hedge Fund program in our supply base that allows us to secure products that's needed for the long term**."

166.     Selwood again acknowledged the long lead times necessary to obtain necessary parts during a February 25, 2021 interview.  When asked about any "potential chinks in [Romeo's] supply chain," Selwood emphasized Romeo's "daily focus" on ensuring the Company's "continuous access" to battery cells and further assured that Romeo maintained that access to supply by again touting "Operation Hedge Fund, where on a weekly basis [Romeo] looks out on

the open market and if there's something…that's *56-week lead time or 72-week lead time*, lead time being pushed out, [Romeo] actually grab it on the open market and put it on the shelves."

167.    Romeo's long lead times to procure key components such as battery cells, and the Company's vulnerability to demand surge sensitivity, was known to Defendants throughout the Class Period.  For example, according to a former employee ("CW1"), who worked for Romeo as a senior manager of technical sales engineering during the period December 2018 through January 2021, Romeo had to place orders for battery cells well in advance and then follow through on those orders with actual purchases when the cells were ready for delivery.  But according to CW1, Romeo would often commit to suppliers that the Company would buy more cells in the following year than Romeo ended up buying.  CW1 observed that "[w]hen your volume is always changing, when you tell the sales supplier one thing and then do the other," this can "be a factor in not being able to procure [battery cells]."  In other words, suppliers would first sell to their counterparties with long-term supply agreements (or otherwise more consistent customers).  Given Defendants' acknowledgment of how sensitive the availability and price of cells were to demand surges, they, at a minimum, recklessly disregarded the impact on supply availability for Romeo's production needs when the Company purchased less battery cells than previously promised to suppliers and recklessly disregarded the risk that Romeo would not be able to obtain cells on an "ad hoc" basis when needed.

168.    Moreover, Defendants, in the Registration Statement and during the Class Period, disclosed the following about the amount of time Romeo typically takes to manufacture and deliver its products to its customers:

> Our *sales contracts typically provide for a forecast of twelve months* on the quantity of products that our customers may purchase from us. *We typically have a sixteen-week lead time to manufacture products to meet our customers' requirements once our customers place orders with us.*  To meet this delivery

deadline, *we generally make significant decisions on our production level and timing, procurement*, facility requirements, personnel needs and other resources requirements *based on our estimate in light of this forecast*, our past dealings with such customers, market conditions and other relevant factors.

169.    Thus, based on Defendants' own description of typically at least 16-week lead times for Romeo to manufacture and deliver its customers' orders, and procurement decisions that are made based on 12-month forecasts and market conditions (with a particularly tight/tough market for supply of battery cells in this case), Defendants would have known well in advance (in fact, *at least* four months in advance, but likely longer given the tight supply conditions and long lead times to obtain cells) of when order(s) were to be delivered to Romeo's customers whether Romeo had been able to procure the necessary component battery cells to fulfill those orders.

170.    In fact, Romeo's new CEO, Shiba, admitted that Romeo did not really "begin" to ramp production until August 2021, when the Company finally secured the LG supply agreement. Webb herself admitted that "there [were] many details that need[ed] to be addressed as [Romeo] *prepared to ramp* up [its] production and manufacturing capacity." Certainly, Selwood and Webb, especially in light of her own admission, knew at all relevant times during the Class Period that Romeo's factory floor was not running at the capacity required to manufacture and deliver substantial 1Q, 2Q and 3Q 2021 orders—which were supposed to total in excess of $50 million in backlog revenue (*more than 5x the Company's entire 2020 revenue*)—on schedule.

171.    Defendants were also keenly aware of the critical importance of obtaining an adequate battery cell supply to meet Romeo's customer demand and fulfill backlog orders on schedule. Just one month before Romeo shocked investors with its announcement of the purportedly "unexpected" battery cell shortage, Selwood acknowledged how critical Romeo's battery cell supply was to the core operations of the Company. During the FreightWaves Interview on February 25, 2021, Selwood claimed to closely monitor supply, which he also admitted was

critical to the core operations of the Company.  He stated "***ensuring that we have continuous access to that supply [to high-quality battery cells] is a daily focus of ours…. [T]hat's the first thing essentially.  We will deliver as many batteries from as many cells as we get in the door.  So that's the first thing – battery cells.***"

172.    Selwood, in particular, was keenly aware of issues with battery cell supply constraints based on his extensive career background in supply chain management and his work experience at Romeo, and his own admissions.  For example, the Registration Statement stated that Selwood has expertise in operations management and supplier development and even holds a master of professional studies in ***supply chain management*** (M.P.S. are degree programs designed to provide professional training in areas that require extensive technical expertise).  The Registration Statement also reported that Selwood served as VP of Engineering Operations and Global Procurement at Romeo for approximately 19 months before being promoted to COO on his way to becoming Romeo's CEO and President.  Moreover, according to a former employee ("CW1"), who worked for Romeo as a senior manager of technical sales engineering during the period December 2018 through January 2021, "Selwood was very, very involved.  He rose rank from the procurement side to CEO, and he remained very involved" with supply chain management and supplier relationships at Romeo.

173.    In addition to Selwood's reported technical expertise and institutional knowledge gained from his various roles at Romeo, Selwood's own admissions demonstrate his extensive involvement with Romeo's supply chain management.  For example, Selwood during a conference call with investors on May 13, 2021, emphasized his involvement with negotiations between Romeo and potential suppliers, stating "[a]s CEO, I want assure shareholders that ***I am personally***

*leading all of these negotiations* [for supply agreements] and I am committed to bringing them over the finish line throughout 2021."

174.    The timing of Romeo's announcements to replace both Selwood and Webb were also highly suspicious.  During Romeo's second quarter as a publicly traded company, Romeo announced that its CFO Webb would transition to a new role—Chief Strategy and Commercial Officer—effective July 6, 2021.  Webb's new role was described as development, implementation, and management of Romeo's corporate strategy and business development efforts—seemingly far removed from her previous role as Romeo's CFO that she began in January 2017.  Moreover, the Company announced on August 6, 2021—just 10 days before the Company was due to announce its 2Q 2021 results—that President and CEO Selwood, who helped build Romeo since its founding in 2016 and who claimed to have secured in excess of $500 million in revenue in the runup to Romeo's IPO, was stepping down "to pursue new opportunities."  Even more suspicious is the fact that the Company had begun vetting Selwood's replacement at least three months prior to the announcement—right around the time of the announcement of the Company's poor 1Q 2021 results in May.

175.    Finally, according to the October 5, 2020 Form 8-K, Romeo was supposed to identify on a Schedule 4.24 attached to the Form 8-K "the ten (10) largest suppliers of the Company and its Subsidiaries, taken as a whole, based on dollar amount of expenditures for the twelve (12)-month period ending on the date hereof."  It appears that RMG or Romeo did not publicly file this disclosure, contrary to the Company's statement in the Form 8-K.

### B.    Corporate Scienter and *Respondeat Superior*

176.    Each of the Individual Romeo Defendants was a high-ranking management-level employee that either (i) made the false or misleading statements alleged herein; (ii) approved the false or misleading statements alleged herein; or (iii) approved the making or issuance of the false

or misleading statements alleged herein.  In so doing, each was acting in his/her role as an executive employee and representative of Romeo.  The scienter of each of these individuals and all other management-level employees of Romeo, is therefore imputed to Defendant Romeo.

## VII.  DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS IN THE PROXY STATEMENT IN VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT

177.   On December 10, 2020, RMG filed the Proxy Statement and Prospectus with the SEC on Form 424(b)(3), which incorporated and formed part of the Registration Statement.  On December 10, 2020, the SEC declared the Registration Statement effective.

178.   The Proxy Statement and Prospectus negligently included the following false or misleading statements regarding Romeo's contracted revenue (or "backlog"):

**Customer Backlog**

We define contracted revenue (or "*backlog*") as revenue expected to be received under our existing customer contracts from sales of battery packs, modules, battery management system software and services not yet built and delivered or provided. ***As of September 30, 2020, we had a backlog of approximately $310 million, of which approximately $240 million represented the minimum revenue that would be received under such contracts to satisfy take or pay minimum order commitments***. This compares to our contracted revenue from sales of products and services not yet built and delivered or provided of approximately $2.9 million as of September 30, 2019 (of which approximately $2.9 million represented the minimum revenue that would be received in satisfaction of take or pay minimum order commitments), and does not take into account approximately $234 million in revenue available to be earned under our most recent contract with Lion Buses that was executed subsequent to September 30, 2020 (of which approximately $234 million represents the minimum revenue that will be received in satisfaction of take or pay minimum order commitments). ***The portion of our backlog as of September 30, 2020, that is expected to be recognized in the twelve-month period following September 30, 2020 is approximately $59 million***. The remaining backlog balance of approximately $251 million is expected to be recognized between the fourth quarter of 2021 and the end of year 2025. The difference between our backlog and our minimum revenue that would be received in satisfaction of take or pay minimum order commitments reflects that our backlog does not represent a guarantee that our customers will complete purchases of our products and services in the quantities that we anticipate, and some of our contracts allow our customers to purchase in smaller quantities with certain minimum order penalties. ***All contracted revenue amounts also assume continued performance by Romeo of its***

*contractual obligations and satisfaction of customary testing and quality required under each customer contract.*

179.    Romeo's MD&A section in the Proxy Statement and Prospectus also included the following misleading statements about Romeo's "Product revenues", including "backlog revenue", stating, in relevant part:

> As a result of the contract completed during April 2020 that was not subsequently replaced, Romeo expects to report lower product revenues until we begin to produce and deliver modules and packs in accordance with our more recently signed customer supply contracts, certain of which provide for minimum take or pay minimum order commitments. ***Minimum take or pay order commitments related to contracts signed through November of 2020 exceed $500 million of backlog.*** While the recognition of product revenue related to certain of these module and pack contracts will not commence until after completion of the delivery of engineering and prototype services, ***we expect to recognize greater than 10% of this backlog revenue over the twelve-month period following September 30, 2020***.

180.    The foregoing statements in ¶¶178-79 regarding Romeo's backlog and backlog revenue were materially false and/or misleading because Defendants failed to disclose that: (i) Romeo did not have sufficient battery cell inventory and/or access to supply to accommodate end-user demand and ramp up production in 4Q 2020 and into 2021; (ii) Romeo's supply chain for battery cells was at material risk of shortages because Romeo relied on *ad hoc* purchases from at most *two* battery cell suppliers and the spot market to fulfill the Company's 2021 inventory needs; and (iii) Romeo's then-existing and undisclosed supply constraints were a material hindrance to Romeo's business operations and financial performance and put Romeo's ability to convert the backlog orders into actual revenue at material risk. Moreover, the statements that "[t]he portion of our backlog as of September 30, 2020, that is expected to be recognized in the twelve-month period following September 30, 2020 is approximately $59 million", and "we expect to recognize greater than 10% of this backlog revenue over the twelve-month period following September 30, 2020", and that "[a]ll contracted revenue amounts also assume continued performance by Romeo of its contractual obligations" were false and misleading where Romeo failed to disclose that it

then lacked inventory and/or access to supply sufficient to fulfill the orders and meet Romeo's

contractual production obligations on the stated timeline.

181.    The Proxy Statement and Prospectus also negligently included the following false

or misleading statements regarding Romeo's battery cell suppliers:

**Suppliers**

Our products use parts that are sourced from suppliers across the world.  ***We have developed close relationships with vendors of key components of our battery products, in particular battery cells*** ….

The price we pay for cells depends on a number of factors, including material grades of chemistry selected for cell recipe, volumes, ***long-term commitment***, logistics and shipping, and tariffs.

***Samsung***

Samsung is a leading global supplier of electrical products and components.  Through its supply of power cells to Romeo, Samsung currently supports the EV Program and is a candidate for stationary storage ("*ESS"*) applications.  Samsung offers cylindrical and prismatic products.

***LG Chem***

LG Chem Ltd., often referred to as LG Chemical, is the largest Korean chemical company headquartered in Seoul, South Korea.  LG Chem supplies Romeo with power cells, offers cell selection for non-EV Program and is an ESS candidate. LG Chem offers cylindrical and pouch products.

***Murata***

Murata Manufacturing Co., Ltd. is a Japanese manufacturer of electronic components.  Murata is the best in market power cell for sports cars.  ***Murata supplies Romeo with power cells*** and offers cylindrical and pouch products.

***SK Innovation***

SK innovation is Korea's first and largest energy chemical company.  ***SK supplies Romeo with  power cells*** and offers pouch products.

182.    The foregoing statements regarding Romeo's battery cell suppliers were materially

false or misleading because: (i) during the Class Period Romeo relied on purchases from at most

*two* suppliers, not four, for its supply of high quality battery cells; (ii) the statements that "Murata

supplies Romeo with power cells" and "SK supplies Romeo with power cells" were false and/or

misleading where Romeo in fact relied on only LG Chem and/or Samsung for its supply of high quality battery cells; and (iii) the misrepresentations and omissions relating to Romeo's suppliers materially misrepresented the extent of actual risk of supply shortages and/or actual lack of access to sufficient supply that the Company faced during the Class Period.

183.    The Proxy Statement and Prospectus also negligently included the following misleading and incomplete risk factor regarding Romeo's battery cell suppliers, stating, in part:

> RMG believes it is important to communicate its expectations to its stockholders. However, there may be events in the future that RMG is not able to predict accurately or over which it has no control. The risk factors and cautionary language discussed in this proxy statement/consent solicitation statement/prospectus provide examples of risks, uncertainties and events that may cause actual results to differ materially from the expectations described by RMG or Romeo in such forward-looking statements, including, among other things:
>
> - ***potential unavailability of third-party technology or battery cells that Romeo uses in its products***;

184.    The Proxy Statement and Prospectus also negligently included the following misleading and incomplete "risk factors" regarding Romeo's suppliers:

> **We are dependent on our suppliers to fulfill our customers' orders, and if we fail to manage our relationships effectively with, or lose the services of, these suppliers and we cannot substitute suitable alternative suppliers, our operations would be materially adversely affected.**
>
> We rely on third-party suppliers for the provision and development of many of the key components and materials used in our battery modules and packs, such as cells, electrical components, and enclosure materials. ***The inability of our suppliers to deliver necessary components of our battery products at prices and volumes, performance and specifications acceptable to us could have a material adverse effect on our business, prospects, financial condition and operating results.*** While we plan to obtain components from multiple sources whenever possible, some of the components used in our vehicles may be purchased by us from a single source.  While we believe that we may be able to establish alternate supply relationships and can obtain or engineer replacement components for our single source components, we may be unable to do so in the short term (or at all) at prices or quality levels that are favorable to us, which could have a material adverse effect on our business, prospects, financial condition and operating results.

*…. If we are unable to obtain components and materials used in our battery products from our suppliers or if our suppliers decide to create or supply a competing product, our business could be materially adversely affected.*

185.    The Proxy Statement and Prospectus also negligently included the following misleading and incomplete "risk factors" regarding Romeo's supply of battery cells:

**Increases in costs, disruption of supply or shortage of any of our battery components, particularly cells, could harm our business.**

From time to time, we may experience increases in the cost or a sustained interruption in the supply or shortage of our components. *Any such increase or supply interruption could materially and negatively impact our business, prospects, financial condition and operating results*. The prices for our components fluctuate depending on market conditions and global demand and *could adversely affect our business, prospects, financial condition and operating results*. For instance, we are exposed to multiple risks relating to price fluctuations for battery cells. These risks include, but are not limited to:

- the inability or unwillingness of our suppliers and their competitors to build or operate cell production facilities to supply the numbers of cells required to support the growth of the electric vehicle industry as demand for such cells increases;
- disruption in the supply of cells due to quality issues or recalls by the cell manufacturers;
- a fewer number of manufacturers of cells; and
- an increase in the cost of raw materials.

*Any disruption in the supply of battery cells could temporarily disrupt production of our products until a different supplier is fully qualified….*

186.    The foregoing statements regarding Romeo's "risk factors" in ¶¶183-85 were materially false and/or misleading because: (i) the "unavailability" of a sufficient supply of battery cells to fulfill customer orders during the Class Period was not a mere *potential* risk, it was an actual, ongoing event that had in fact disrupted production during the Class Period; (ii) given the Company's long lead times to obtain battery cells and stated 16-week lead time for Romeo to produce and deliver customer orders, Defendants should have known prior to issuing the Proxy Statement and Prospectus but negligently failed to disclose that Romeo did not have sufficient

supply of battery cells and had not yet ramped up production to deliver orders due in 1Q 2021; and (iii) by Romeo's own admissions at the end of the Class Period, due to the ongoing cell supply shortage and lack of a long-term supply agreement, the Company did not begin to ramp up production until August 2021. Romeo's supply-related risk disclosures were further false and/or misleading to the extent that Defendants elsewhere in the Proxy Statement and Prospectus misrepresented that Romeo relied on "close relationships" with at least four different suppliers, when, in fact, Selwood later admitted that the Company relied on—and was beholden to—*ad hoc* purchases from at most two suppliers.

187.    The Proxy Statement and Prospectus was further materially false and misleading because it negligently failed to disclose known adverse trend and/or uncertainties that Defendants were required to disclose under Item 303, including the fact that, contrary to Defendants' assurances about Romeo's "hedged" supply, Romeo did not have sufficient supply of high-quality battery cells necessary to ramp up production, meet end-user demand, and fulfill customer orders, and the battery cell supply shortage would, or was reasonably expected to, have a material negative impact on the Company's sales, revenues, and/or results of operations going forward.

## VIII.   LOSS CAUSATION

### A.    Investors Suffered Significant Losses Due to the Materially Misleading Statements Issued During the Class Period

188.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. During the Class Period, Plaintiffs and the Class purchased Romeo securities at artificially inflated prices. The price of Romeo's securities significantly declined when the misrepresentations made to the market and/or information concerning supply shortages previously concealed from the market, and/or the effects thereof, were revealed or materialized, on March 30, 2021 and August 16, 2021, causing investors' losses.

189.    On March 30, 2021, after the market closed, Romeo issued a press release and filed a report with the SEC on Form 8-K that disclosed its financial results for the quarter and year ended December 31, 2020, and conducted a conference call with investors and analysts. Defendants shocked investors by disclosing that Romeo's production had been hampered by a shortage of battery cells and that its estimated 2021 revenue of $140 million would therefore be reduced by approximately 71-87% (to the range of $18 to $40 million).  In response to the news of the supply shortage and its impact on Romeo's revenue, Romeo's share price declined from a closing price on March 30, 2021 of $10.37 per share to close at $8.33 per share on March 31, 2021, a decline of $2.04 per share (nearly 20%), on heavier than usual volume of over 20 million shares.

190.    On August 16, 2021, after the market closed, Defendants announced Romeo's 2Q 2021 results, reporting quarterly revenue of $926,000, missing the consensus estimate of $3.05 million by over 69.4%, and quarterly losses of $(0.22) per share, missing the consensus estimate of losses of $(0.16) per share by 37.5%, thereby further revealing the materialization of the extent and impact Romeo's supply shortages.  In an August 16, 2021 analyst report, Cowen observed Romeo's "EPS miss[]" and that "revenue of $926k missed us by -31%," and observed that "timing and certainty around securing additional cells remain unknown[.]"  In response to the news and materialization of the further impact of the supply shortage, the price of Romeo's stock fell $1.06 per share, from a closing price of $5.82 per share on August 16, 2021, to close at $4.76 per share on August 17, 2021 (a drop of over 20%), on heavy trading volume of over 23 million shares.

**B.    RMG Shareholders Who Were Eligible to Vote at the December 28, 2020 Special Meeting Suffered Damages**

191.    Apart from the decline in Romeo securities caused by the corrective disclosures in Section VIII.A, *supra*, RMG shareholders who were eligible to vote on the Business Combination and/or exercise their redemption rights have also been damaged as a result of the materially false

and/or misleading statements about Romeo's operations and financial results. Had the true financial condition and operations of Romeo been known, members of the Class eligible to vote on the Business Combination would have voted against the Business Combination and/or exercised their redemption rights and received $10.18 in cash per share of RMG stock.

192.   As a result, the Business Combination would not have been approved at the December 28, 2020 special meeting and more likely than not, there would have been insufficient time for RMG to conduct another business transaction before February 12, 2021. As such, RMG would have commenced liquidation, and Plaintiffs and other members of the Class that were holding RMG stock would have received approximately $10.18 in cash for each share of RMG stock held. Instead, Plaintiffs and other members of the Class who would have received a *pro rata* distribution of assets if RMG liquidated, retained their common stock which precipitously declined in value to $4.76 per share as the true financial condition and operations of Romeo became known.

193.   It was foreseeable to Defendants that the false and/or misleading statements about, among other things, Romeo's business operations and financial condition and value: (i) would cause the members of the Class that would have otherwise received $10.18 in cash per share of RMG stock upon exercising redemption rights and/or upon liquidation, to keep their stock in lieu of receiving $10.35 in cash per share; and (ii) eventually the disclosure of the information about Romeo's business operations and financial condition would cause those members of the Class to instead receive substantially less for each share sold after August 17, 2021.

194.   As a result, Defendants' conduct proximately caused foreseeable losses to those Plaintiffs and members of the Class.

## IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

195.    The market for Romeo securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Romeo's securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Romeo's securities and market information relating to Romeo, and have been damaged thereby.

196.    During the Class Period, the artificial inflation of Romeo's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made, or caused to be made, a series of materially false and/or misleading statements about Romeo's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Romeo and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

197.    At all relevant times, the market for Romeo's securities was an efficient market for the following reason, among others:

(a)    Romeo shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Romeo filed periodic public reports with the SEC and/or the NYSE;

(c)     Romeo regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and though other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Romeo was followed by securities analysts employed by brokerage firms who wrote reports about the Company, including Morgan Stanley and Cowen & Company.

198.    As a result of the foregoing, the market for Romeo's securities promptly digested current information regarding Romeo from all publicly available sources and reflected such information in Romeo's share price.   Under these circumstances, all purchasers of Romeo's securities during the Class Period suffered similar injury through their purchase of Romeo's securities at artificially inflated prices and a presumption of reliance applies.

199.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects— information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.     PLAINTIFFS' CLASS ACTION ALLEGATIONS

200.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities other than Defendants who or which: (1) purchased or otherwise acquired the publicly traded securities of Romeo during the period October 5, 2020 through August 16, 2021, inclusive, and who were damaged thereby, seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Section 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder; and/or (2) held common stock of RMG as of December 1, 2020, eligible to vote at RMG's December 28, 2020 special meeting, seeking to pursue remedies under Section 14(a) of the Exchange Act.

201.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Romeo's securities actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.  As of December 31, 2020, Romeo had over 126 million shares of common stock outstanding, which were actively traded on the NYSE in an efficient market.

202.     Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class have sustained damages because of Defendants' unlawful activities alleged herein.  Plaintiffs have retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs.  Plaintiffs have no interests which are contrary to or in conflict with those of the Class that Plaintiffs seek to represent.

203.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

204.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)   whether Defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

(c)   whether Defendants participated directly or indirectly in the course of conduct complained of herein; and

(d)   whether the members of the Class have sustained damages and the proper measure of such damages.

205.   Individualized issues of reliance will not predominate over common issues.  The presumption of reliance applies because at all relevant times, the market for Romeo's securities was an efficient market, as alleged in ¶¶195-99, *supra*.

## XI.   NO SAFE HARBOR

206.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

73

207.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or the forward-looking statement was authorized and/or approved by an executive officer of Romeo who knew that those statements were false when made.

## XII.    CAUSES OF ACTION

**FIRST CLAIM**
**Violations of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against Romeo and the Individual Romeo Defendants**

208.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

209.    During the Class Period, Romeo Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

210.    Romeo Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Romeo's publicly traded securities during the Class Period.

211.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Romeo's publicly traded securities. Plaintiffs and the Class would not have purchased Romeo securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Romeo Defendants' misleading statements.

212.    As a direct and proximate result of Romeo Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Romeo securities during the Class Period.

**SECOND CLAIM**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Romeo Defendants**

213.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

214.    The Individual Romeo Defendants acted as controlling persons of Romeo within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Romeo Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Romeo Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other

statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

215.    In particular, the Individual Romeo Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

216.    As set forth above, Romeo and the Individual Romeo Defendants each violated Section l0(b) and Rule l0b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions each as a controlling person, the Individual Romeo Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Romeo's and the Individual Romeo Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**THIRD CLAIM**
**Violation of Section 14(a) of the Exchange Act and Rule 14a-9**
**Against All Defendants**

217.    Plaintiffs repeat and re-allege each and every allegation as set forth in ¶¶177-87, 191-94 as if fully set forth herein.

218.    The claims set forth herein do not sound in fraud and are based on negligent conduct by Defendants.

219.    The Defendants named herein violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that these Defendants solicited proxies from Plaintiffs and other members of the Class by means of a Proxy Statement that through Defendants' negligence contained statements which, at the time and in light of the circumstances under which they were made, were false and

misleading with respect to material facts, and omitted to state material facts necessary to make the statements therein not false or misleading.

220.    Plaintiffs and other members of the Class were misled by Defendants' false and misleading statements and omissions, were denied the opportunity to make an informed decision in voting on the Business Combination, and approved the Business Combination without having been advised of material facts.  Accordingly, Plaintiffs and other members of the Class did not receive their fair share of the value of the assets and business of the combined entity, suffered damages when the Company's stock price decreased, and were prevented from benefitting from a value-maximizing transaction.

**FOURTH CLAIM**
**Violation of Section 20(a) of the Exchange Act**
**Against Individual Romeo Defendants and RMG Defendants**

221.    Plaintiffs repeat and re-allege each and every allegation as set forth in ¶¶177-87 as if fully set forth herein.

222.    RMG Defendants acted as controlling persons of RMG as within the meaning of Section 20(a) of the Exchange Act as alleged herein and Individual Romeo Defendants acted as controlling persons of Romeo within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the companies' operations, these defendants had the power and authority to cause RMG and Romeo to engage in the wrongful conduct complained of herein.  These defendants were able to, and did, control directly and indirectly, the content of the Proxy Statement and Prospectus there causing the dissemination of the materially false and/or misleading statements and omissions as alleged herein.

223.    In particular, the RMG Defendants participated in meetings and conference calls, reviewed the Business Combination and all of the underlying due diligence materials, voted to

approve the Business Combination, and solicited the approval of the Business Combination through RMG's management's recommendation to vote in favor of the Business Combination, which appeared in the Proxy Statement and Prospectus.   Moreover, the Individual Romeo Defendants reviewed the Business Combination, reviewed and furnished information for inclusion in the Proxy Statement and Prospectus, and solicited the approval of the Business Combination.

224.   As set forth above, in their capacities as officers and/or directors of RMG and Romeo, these defendants participated in the misstatements and omissions set forth in ¶¶177-87 above.   Indeed, each of these defendants had access to information regarding the circumstances surrounding the Business Combination and Romeo, including the terms of the Business Combination, analysis of Romeo's operating results and financial condition, the valuation of Romeo, and the due diligence that had and had not been performed.   As a result, these defendants were individually and collectively control persons within the meaning of Section 20(a) of the Exchange Act.

225.   As set forth above in ¶¶177-87, Defendants violated Section 14(a) of the Exchange Act by their acts and omissions as alleged above.   By virtue of their positions as controlling persons, Individual Romeo Defendants and RMG Defendants are liable pursuant to Section 20(a) of the Exchange Act.   Individual Romeo Defendants and RMG Defendants were culpable participants in the violations Section 14(a) alleged in ¶¶177-87 because they failed to make a reasonable investigation and did not possess reasonable grounds for the belief that the statements in the Proxy Statement and Prospectus issued were true and free of any omissions of material fact. As detailed above, during the respective times that these defendants served as officers and/or directors of RMG and Romeo, each is responsible for the material misstatements and omissions made in the Proxy Statement and Prospectus.

226.     Plaintiffs and Class members eligible to vote on the Business Combination were denied the opportunity to make an informed decision in voting on the Business Combination and were damaged as a direct and proximate cause of the untrue statements and omissions in the Proxy Statement and Prospectus.

## XIII.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against Defendants as follows:

(a)     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XIV.  DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

September 15, 2021                              GLANCY PRONGAY & MURRAY LLP


                                               By: */s/ Gregory B. Linkh*
                                               Gregory B. Linkh (GL-0477)
                                               230 Park Ave., Suite 358
                                               New York, NY 10169
                                               Telephone: (212) 682-5340
                                               Facsimile: (212) 884-0988
                                               glinkh@glancylaw.com

Kara M. Wolke (*pro hac vice pending*)
Melissa C. Wright (*pro hac vice pending*)
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
(310) 201-9150
Email: kwolke@glancylaw.com
       mwright@glancylaw.com

*Attorneys for Plaintiffs and the Putative Class*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On September 15, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 15, 2021.

_s/ Gregory B. Linkh_____
Gregory B. Linkh