# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE ROMEO POWER INC. SECURITIES
LITIGATION

Case No. 1:21-cv-03362-LGS

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE AMENDED COMPLAINT

LATHAM & WATKINS LLP
Jeff G. Hammel
Jason C. Hegt
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
Email: jeff.hammel@lw.com
Email: jason.hegt@lw.com

Kristin N. Murphy *(pro hac vice)*
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Tel: (714) 540-1235
Fax: (714) 755-8290
Email: kristin.murphy@lw.com

*Attorneys for Defendants Romeo Power Inc.
(f/k/a RMG Acquisition Corp.), Lionel E.
Selwood, Jr., Lauren Webb, Robert S.
Mancini, Philip Kassin, D. James Carpenter,
Steven P. Buffone, W. Grant Gregory, W.
Thaddeus Miller, and Craig Broderick*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ......................................................................................................2

    A.    Romeo Develops Industry Leading Energy Storage Technology..........................2

    B.    Romeo and RMG Agree to Merge...........................................................3

    C.    Romeo Provides Prospective Financial Information and Risk Factors .................4

    D.    The Battery Cell Supply Chain Breaks Down ...........................................6

    E.    Plaintiffs File This Lawsuit...................................................................7

ARGUMENT ...........................................................................................................7

I.    THE AC FAILS TO PLEAD FACTS ESTABLISHING A SECTION 10(B)
CLAIM.............................................................................................................7

    A.    The Applicable Pleading Standards........................................................7

    B.    The AC Fails to Plead Facts Establishing That Any Statement Was False ............8

        1.    Romeo's Forward-Looking Statements Are Fully Protected By The
PSLRA Safe Harbor..................................................................9

            a.    Each of the Alleged Misstatements Was Accompanied by
Meaningful Cautionary Language ....................................10

            b.    Plaintiffs Do Not Allege Defendants Had "Actual
Knowledge" That Any Forward-Looking Statement Was
False ....................................................................11

        2.    Defendants' Statements About Romeo's Operations Were
Accurate When Made ...............................................................13

        3.    Plaintiffs Fail to Establish Any Violation of Item 303 .......................16

    C.    The AC Fails to Establish Any Inference of Scienter....................................17

        1.    The Individual Defendants' Increase in Stock Holdings
Undermines Any Inference of Scienter..........................................17

        2.    Plaintiffs Allege No Facts Establishing Conscious Misbehavior or
Recklessness .........................................................................18

        3.    The Non-Fraudulent Inference Is More Compelling ..............................22

II.    THE AC FAILS TO PLEAD FACTS ESTABLISHING A SECTION 14 CLAIM
       AND THE LAW PROHIBITS SUCH A CLAIM HERE ................................................22

       A.    The Only Court-Appointed Lead Plaintiff Lacks Standing to Bring a
             Section 14(a) Claim ...........................................................................................23

       B.    The AC Fails To Plead A Materially False Statement in the Proxy
             Statement.............................................................................................................23

       C.    The Section 14(a) Claim Is Derivative and Plaintiff Lacks Standing to
             Bring This Claim on Behalf of RMG Acquisition Corporation ...........................24

       D.    The AC Fails To Plead Loss Causation Regarding the Proxy Statement.............24

III.   THE AC FAILS TO PLEAD CONTROL PERSON CLAIMS.........................................25

CONCLUSION.................................................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) ........................................................................................19

*In re Adient plc Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)............................................................21

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004)......................................................................23

*Avon Pension Fund v. GlaxoSmithKline PLC*,
343 F. App'x 671 (2d Cir. 2009) .............................................................................18

*In re Bemis Co. Sec. Litig.*,
512 F. Supp. 3d (S.D.N.Y. 2021).......................................................................12, 13

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*,
2010 WL 148617 (S.D.N.Y. 2010)...........................................................................17

*Bond Opportunity Fund v. Unilab Corp.*,
2003 WL 21058251 (S.D.N.Y. May 9, 2003) ..........................................................25

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)......................................................................18

*Brookfield Asset Mgmt., Inc. v. Rosson*,
2021 WL 4260639 (Del. Sept. 20, 2021)..................................................................24

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010)......................................................................20

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)......................................................................................17

*In re EDAP TMS S.A. Sec. Litig.*,
2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015) (Schofield, J.) .............................8, 19

*In re Elan Corp. Sec. Litig.*,
543 F. Supp. 2d 187 (S.D.N.Y. 2008).......................................................................20

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
343 F.3d 189 (2d Cir. 2003)......................................................................................25

*Francisco v. Abengoa, S.A.*,
    481 F. Supp. 3d 179 (S.D.N.Y. 2020)........................................................................20

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008)........................................................................17

*In re Gen. Elec. Sec. Litig.*,
    844 F. App'x 385 (2d Cir. 2021) ...............................................................................17

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)........................................................................21

*Gray v. Wesco Aircraft Holdings*,
    454 F. Supp. 3d 366 (S.D.N.Y 2020)........................................................................25

*Halebian v. Berv*,
    590 F.3d 195 (2d Cir. 2009)......................................................................................24

*In re HEXO Corp. Sec. Litig.*,
    524 F. Supp. 3d 283 (S.D.N.Y. 2021)........................................................................11

*Holbrook v. Trivago N.V.*,
    2019 WL 948809 (S.D.N.Y. Feb. 26, 2019) .............................................................19

*Kalnit v. Eichler*,
    264 F. 3d 131 (2d Cir. 2001)......................................................................................19

*Lefkowitz v. Synacor, Inc.*,
    2019 WL 4053956 (S.D.N.Y. Aug. 28, 2019) (Schofield, J.) ...........................10, 12

*Local No. 38 IBEW Pension Fund v. Am. Express Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010)........................................................................20

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993).........................................................................................8

*In re MRU Holdings Sec. Litig.*,
    769 F. Supp. 2d 500 (S.D.N.Y. 2011)........................................................................18

*Newman v. Family Mgmt. Corp.*,
    748 F. Supp. 2d 299 (S.D.N.Y. 2010)........................................................................24

*In re Nielsen Holdings PLC Sec. Litig.*,
    510 F. Supp. 3d 217 (S.D.N.Y. 2021)........................................................................10

*In re Nokia OYJ (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006)........................................................................15

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000).........................................................................8, 18, 20

*Olkey v. Hyperior 1999 Term Tr., Inc.*,
   98 F.3d 2 (2d Cir. 1996)..........................................................................................11

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)...................................................................................16

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) .................................................................................16

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc.*,
   741 F. Supp. 2d 474 (S.D.N.Y. 2010).....................................................................19

*Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*,
   2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017) .......................................................19

*In re PXRE Grp., Ltd., Sec. Litig.*,
   600 F. Supp. 2d 510 (S.D.N.Y. 2009).....................................................................22

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004).................................................................................9, 25

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
   573 F.3d 98 (2d Cir. 2009)......................................................................................17

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015).......................................................................12

*Schiro v. Cemex, S.A.B. de C.V.*,
   396 F. Supp. 3d 283 (S.D.N.Y. 2019).....................................................................21

*In re Seadrill Ltd. Sec. Litig.*,
   2016 WL 3461311 (S.D.N.Y. June 20, 2016) (Schofield, J.)..................8, 10, 11, 13

*Slayton v. Am. Exp. Co.*,
   604 F.3d 758 (2d Cir. 2010).............................................................................12, 22

*In re Smith Barney Transfer Agent Litig.*,
   823 F. Supp. 2d 202 (S.D.N.Y. 2011).....................................................................23

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
   33 F. Supp. 3d 401 (S.D.N.Y. 2014).......................................................................19

*St. Clair-Hibbard v. Am. Fin. Tr., Inc.*,
   2019 WL 4601720 (S.D.N.Y. Sept. 23, 2019) (Schofield, J.) ................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................................17, 22

*Villare v. Abiomed, Inc.*,
    2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021).........................................................10

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011).....................................................................21

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
    2016 WL 2757760 (S.D.N.Y. May 11, 2016) ..........................................................20

## STATUTES

15 U.S.C.
    § 77z-2(i)(1)................................................................................................................10
    § 77z-2(c)....................................................................................................................10
    § 78u–4(b)(1)..............................................................................................................23
    § 78u–5(i)(1)(A)-(C)....................................................................................................10

§ 78u-4(b)...........................................................................................................................8
    § 78u-4(b)(2)..............................................................................................................17
    § 78u-4(b)(3)................................................................................................................8
    § 78u-4(b)(4)..............................................................................................................25
    § 78u-4 *et seq.*............................................................................................................8
    Securities Exchange Act of 1934 Section 10(b) ............................................1, 7, 8, 24

## RULES

Fed. R. Civ. P. 23.1..........................................................................................................24

## REGULATIONS

17 C.F.R. § 229.303(a)(3)(ii).............................................................................................16

## OTHER AUTHORITIES

S. Rep. No. 104-98 (1995) ..................................................................................................8

## PRELIMINARY STATEMENT

Romeo Power, Inc. ("Romeo") is an emerging company that designs and manufactures cutting-edge battery cells capable of powering trucks and buses.  There is significant demand for these batteries:  Romeo signed contracts to supply more than $500 million of them as soon as it was capable of making that many.  In December 2020, Romeo merged with a special purpose acquisition company to form a public company, in an effort to scale up its production capacity to meet that demand backlog.  Romeo's growth plan, of course, involved significant risks, including its reliance on parts suppliers.  These risks were fully and repeatedly disclosed to investors.

In 2021, in the midst of a global pandemic and historic supply chain disruptions, those risks materialized.  Romeo promptly disclosed its supply shortage to investors and reduced its financial projections, and its stock price then declined.  This case was filed within days, against Romeo and nine individuals, asserting claims for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and for alleged misrepresentations in Romeo's merger proxy statement under Section 14(a) of that statute.  This is the quintessential "fraud-by-hindsight" case that does not come close to complying with the heightened pleading standards of Rule 9(b), the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and the settled law of this Circuit.  It should be dismissed.

**No False Statement**:  Plaintiffs have pled no facts establishing that any statement was false.  Mere speculation that the supply chain issues were known earlier and that Romeo failed to disclose them does not support a claim.  In any case, nearly all of the challenged statements are forward-looking projections about Romeo's production ramp-up that are protected from liability under the PSLRA statutory "safe harbor" and established law.

**No Scienter**:  The AC does not come close to establishing any inference of "scienter" (or

1

fraudulent intent)—much less the "strong inference" mandated by the PSLRA.  None of the Individual Defendants are alleged to have sold their Romeo stock and, on the contrary, Romeo's officers actually *increased* their Romeo stock holdings during the alleged class period, which undermines scienter under black-letter law because no rational person invests more in a company they know to be a fraud.  In any case, Plaintiffs allege no facts—not one—showing that any Defendant was aware of facts contradicting a public statement at the time it was made.  Foreseeing global supply chain disruptions and that Romeo would be delayed in receiving battery cells would have involved the sort of clairvoyance that the securities laws simply do not require.

**Plaintiffs' Proxy Statement Claim Fails**:  The Section 14(a) proxy claim fails because: (1) the lead plaintiff appointed by the Court has no standing to pursue it, and the additional plaintiff who was belatedly added was not subject to any of the required vetting under the PSLRA; (2) there is no false statement in the proxy for the same reasons there were no false statements at all (the proxy contains the same statements that Plaintiffs challenge under Section 10(b)); (3) in the event there is a valid proxy statement claim (and there is not), it would be a derivative, not a direct claim, which Plaintiffs have not pled; and (4) Plaintiffs fail to plead loss causation because any alleged harm has no connection to the merger that was consummated as a result of the proxy.

The AC fails to state a claim as a matter of law and should be dismissed.

## BACKGROUND

### A.      Romeo Develops Industry Leading Energy Storage Technology

Founded in 2016, Romeo is a California-based energy storage technology company.  AC ¶¶ 36, 63.[1]  Defendant Lionel E. Selwood, Jr. is Romeo's former President and CEO.  AC ¶ 37;

---

[1] Citations to "AC" refer to the Amended Class Action Complaint (ECF No. 82).

Ex. 1,[2] Aug. 2021 Press Release at 2.  Defendant Lauren Webb is Romeo's current Chief Strategy and Commercial Officer and previously served as its CFO.  AC ¶ 39.

Romeo designs and manufactures (in Los Angeles) lithium-ion battery modules and packs for use in heavy-duty commercial vehicles like buses and trucks.  AC ¶ 63; Ex. 2, Dec. 10, 2020 Proxy Statement (the "Proxy Statement") at 155.  These battery modules and packs are made from, among other things, lithium-ion battery cells that are made around the world.  Ex. 2, Proxy Statement at 50–52.  As compared to its competitors, Romeo's batteries have greater energy density, shorter charge times, and last longer, which makes them suitable for heavy-duty vehicles. *Id*. at 155.  Prior to its merger, described below, Romeo was a privately held company.  AC ¶ 54.

### B.    Romeo and RMG Agree to Merge

RMG Acquisition Corp. ("RMG") was a special purpose acquisition company ("SPAC") formed for the purpose of "effecting a merger…[or] business combination" with certain types of companies, including those in the energy services and alternatives sector.  AC ¶ 53; Ex. 3, RMG Form S-1 at 3.[3]  RMG closed its initial public offering on February 12, 2019, and its stock began trading on the New York Stock Exchange.  AC ¶ 52.

On October 5, 2020, RMG announced it had reached a definitive agreement to merge with Romeo Systems, Inc.  AC ¶ 54.  As RMG explained, Romeo Systems "stood out as a differentiated leading battery technology company" operating in a sector it believed was "poised for unprecedented growth," and the merger would allow Romeo Systems to further expand its business

---

[2] Citations to "Ex." refer to exhibits attached to the Declaration of Jason C. Hegt, submitted herewith, along with Defendants' Request for Judicial Notice.

[3] At the time of the merger, D. James Carpenter, Robert Mancini, Philip Kassin, Steven Buffone, W. Grant Gregory, W. Thaddeus Miller, and Craig Broderick were members of RMG's board of directors.  AC ¶¶ 43–49.  Mr. Mancini also served as RMG's CEO.  *Id.* ¶ 43.  Together with Selwood and Webb, the former RMG directors are referred to as the "Individual Defendants."

and to continue to innovate and develop new products.  Ex. 4, Merger Press Release at 1. Following the completion of the merger, the combined company became known as Romeo Power, Inc. in December 2020.  Ex. 5, Closing Press Release at 1.

### C.    Romeo Provides Prospective Financial Information and Risk Factors

When RMG announced the Romeo transaction in October 2020, it published an investor presentation that included information about Romeo's revenue "backlog," (*i.e.*, customer orders waiting to be fulfilled) and certain financial projections for the next five years.  Ex. 6, Investor Presentation at 20, 42.  The presentation disclosed that Romeo had $310 million "currently under contract" and up to $2.4 billion "under advanced negotiations."  *Id.* at 20.

In December 2020, shortly before the merger, RMG filed with the SEC a Proxy Statement that provided investors with additional detail about the proposed combination between RMG and Romeo.  Ex. 2, Proxy Statement.  Among other information, the Proxy Statement disclosed that Romeo's revenue backlog had grown to "exceed $500 million" from "contracts signed through November of 2020."  *Id.* at 187.  Romeo forecasted that it would recognize $10.8 million of revenue during 2020 and $139.8 million during 2021 as it began to convert this backlog to revenue by producing and delivering batteries to customers.  *Id.* at 95.  Even for 2021, however, Romeo expressly cautioned most of this revenue to come late in the year, with $80 million of the $139.8 million (or 57%) not expected to be recognized until the last three months of 2021.  *Id.* at 95, 170.[4]

The sheer scale and pace of Romeo's projected growth made clear that this ambitious ramp-up entailed considerable risks.  These risks were spelled out in both the Registration Statement and Proxy Statement issued in connection with the merger transaction.  For example:

---

[4] *See* Ex. 2, Proxy Statement at 170 ("The portion of our backlog as of September 30, 2020, that is expected to be recognized in the twelve-month period following September 30, 2020 is approximately $59 million.").

- ***"Our limited operating history makes evaluating our business and future prospects difficult and may increase the risk of your investment.*** You must consider the risks and difficulties we face as an early stage company with a limited operating history.  If we do not successfully address these risks, our business, prospects, financial condition, and operating results will be materially and adversely harmed…. It is difficult to predict our future revenues and appropriately budget for our expenses, and we have limited insight into trends that may emerge and affect our business…"  Ex. 2, Proxy Statement at 42;[5] *see also* Ex. 7, RMG Form S-4 at 39.

- ***"We are dependent on our suppliers to fulfill our customers' orders, and if we fail to manage our relationships effectively with, or lose the services of, these suppliers and we cannot substitute suitable alternative suppliers, our operations would be materially adversely affected.*** We rely on third-party suppliers for the provision and development of many of the key components and materials used in our battery modules and packs, such as cells, electrical components, and enclosure materials. The inability of our suppliers to deliver necessary components of our battery products at prices and volumes, performance and specifications acceptable to us could have a material adverse effect on our business, prospects, financial condition and operating results.  While we plan to obtain components from multiple sources whenever possible, some of the components used in our vehicles may be purchased by us from a single source.  While we believe that we may be able to establish alternate supply relationships and can obtain or engineer replacement components for our single source components, we may be unable to do so in the short term (or at all) at prices or quality levels that are favorable to us, which could have a material adverse effect on our business, prospects, financial condition and operating results…."  Ex. 2, Proxy at 50; *see also* Ex. 7, RMG Form S-4 at 47.

- ***"Increases in costs, disruption of supply or shortage of any of our battery components, particularly cells, could harm our business.*** From time to time, we may experience increases in the cost or a sustained interruption in the supply or shortage of our components.  Any such increase or supply interruption could materially and negatively impact our business, prospects, financial condition and operating results. . . . Any disruption in the supply of battery cells could temporarily disrupt production of our products until a different supplier is fully qualified…."  Ex. 2, Proxy Statement at 50–51; *see also* Ex. 7, RMG Form S-4 at 47–48.

- ***"Our operations may be adversely affected by the coronavirus outbreak, and we face risks that could impact our business.*** In December 2019, the 2019 novel coronavirus surfaced in Wuhan, China ("COVID-19")….Our global business could be adversely affected by risks associated with public health crises and epidemics/pandemics, such COVID-19.  We rely on our production facilities, as well as third-party suppliers, in the United States, Europe and Asia, which have been significantly impacted by COVID-19….Business disruptions elsewhere in the world could also negatively affect the sources and availability of components and

---

[5] Underlined portions reflect emphasis added; ***bold and italics*** so in original.

materials that are essential to the operation of our business."  Ex. 2, Proxy Statement at 65–66; *see also* Ex. 7, RMG Form S-4 at 62–63.

These and other risks to Romeo's business were expressly disclosed to investors.

### D.     The Battery Cell Supply Chain Breaks Down

These very risks began to materialize in early 2021 as the impacts of the COVID-19 pandemic caught up with the supply chain, causing delivery disruptions and delays for numerous products, including battery cells.  Ex. 8, Q4 2020 Earnings Call Tr. at 2.  Romeo was far from alone in this.  In early 2021, others in the industry, including Lightning eMotors, Inc., Nikola Corporation, and Tesla, experienced similar disruptions, sometimes on very short notice.  *See* Ex. 9, Lightning Q2 2021 Presentation at 12 ("[Battery] [s]uppliers are not meeting committed delivery dates, sometimes with only 3 days of warning, due to cell shortages, labor shortages, and other part shortages"); Ex. 10, Cowen Mar. 31, 2021 Report at 1 ("We note that [Nikola] represents 39% of RMO backlog and lowered its guidance for 4Q21 BEV class 8 deliveries last month to 50-100 from ~600 prior"); Ex. 11, Nikola Q4 2020 Press Release at 2 (Feb. 25, 2021) ("The COVID-19 pandemic has created a disruption in the manufacturing, delivery and overall supply chain . . . which has led to critical parts shortages, including battery cells . . . ."); Ex. 9, Lightning Q2 2021 Earnings Call Tr. at 6 ("[S]upply chain issues have created temporary headwinds . . . [and] our Q2 revenue was constrained by drivetrain component deliveries..."); Ex. 12, Mar. 30, 2021 Reuters Article at 2 (quoting Tesla CEO Elon Musk:  "Demand is no problem, but near-term cell supply makes it hard to scale Semi. This limitation will be less onerous next year.").

As a result of these supply disruptions, on March 30, 2021, Romeo announced that it was reducing its projected 2021 revenue from $140 million to a range of $18 to $40 million.  AC ¶ 86.  As Romeo explained, this was merely a timing issue:  Romeo expected its revenue "backlog" (*i.e.*, pending orders) to remain unchanged and also expected the cell supply constraint to be temporary.

AC ¶ 87.  In other words, the effect was that full-scale production would be delayed until several months later than originally planned.  As the AC admits, Romeo continued negotiating long-term supply arrangements during the first half of 2021 and announced during its August 16, 2021 earnings call that it signed a long-term agreement with a top-tier supplier.  AC ¶ 102.  Romeo was simply going to make its batteries later than it had previously projected.

> ### E.     Plaintiffs File This Lawsuit

Within days of Romeo's March 30, 2021 announcement, this lawsuit was filed.  On July 15, 2021, the Court appointed Mike Castleberg as lead plaintiff.  ECF No. 69.  On September 15, 2021, Mr. Castleberg and a so-called "additional plaintiff," Joshua Cante, who was not appointed by the Court but claims to have held RMG stock at the time of the merger, filed the AC.  AC ¶ 35. The AC asserts three causes of action, all pursuant to the Securities Exchange Act of 1934:  under (1) Section 10(b) (against Romeo, Selwood, and Webb), (2) Section 14(a) (against all Defendants), and (3) Section 20(a) (against the Individual Defendants).  None states a claim as a matter of law.

## ARGUMENT

## I.     THE AC FAILS TO PLEAD FACTS ESTABLISHING A SECTION 10(B) CLAIM

> ### A.     The Applicable Pleading Standards

To plead a claim under Section 10(b), "a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."  *In re Seadrill Ltd. Sec. Litig.*, 2016 WL 3461311, at *6 (S.D.N.Y. June 20, 2016) (Schofield, J.).

Claims under Section 10(b) are subject to "stringent" pleading requirements.  *See Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).  Rule 9(b) requires that, "[i]n alleging fraud or mistake,

a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).   In the Second Circuit, plaintiffs must:   "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).   To further curb abusive securities litigation filed merely on the "announcement of bad news"—rather than "evidence of fraud"—Congress enacted the PSLRA, 15 U.S.C. § 78u-4 *et seq*. S. REP. NO. 104-98, at 4 (1995) (Conf. Rep.).   The PSLRA requires that a plaintiff must "state with particularity" (i) "each act or omission alleged to violate" Section 10(b); (ii) the "reasons why"; and (iii) "facts giving rise to a strong inference" that each defendant acted with the intent to engage in fraud (or scienter). 15 U.S.C. § 78u-4(b).   Noncompliance with these rules mandates dismissal.   15 U.S.C. § 78u-4(b)(3); *Seadrill*, 2016 WL 3461311, at *6.

## B.   The AC Fails to Plead Facts Establishing That Any Statement Was False

The crux of Plaintiffs' theory is that Romeo should have known in fall 2020 that it would later encounter a shortage of battery cells due to industry-wide supply constraints and would ultimately need to revise its prior statements about its expectations for revenue for 2021.   But there are no facts alleged in the AC suggesting that this supply chain crisis was already underway in late 2020, let alone that it was already severe enough to prevent Romeo from meeting its 2021 revenue guidance.   Plaintiffs' hindsight theory fails for this basic reason alone.   *In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *8 (S.D.N.Y. Sept. 14, 2015) (Schofield, J.) ("[S]tatements that later turned out to be untrue, are not actionable.") (internal citations omitted).

The 14 statements that Plaintiffs challenge can be divided into two broad categories:   (1) forward-looking   statements   regarding   Romeo's   planned   ramp   to   full   volume   production

(Statements 3, 4, 7, 9, 10, 12, 13, 14);[6] and/or (2) statements about Romeo's business that even Plaintiffs do not claim to be false, but which Plaintiffs nonetheless label as supposedly misleading simply because Romeo did not ultimately move into full volume production as quickly as it predicted (Statements 1, 2, 5, 6, 8, 11).  To survive dismissal, Plaintiffs "must do more" than allege that these statements were false or misleading; instead, by pleading facts "they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). The AC does not come close to meeting this threshold requirement.

### 1. Romeo's Forward-Looking Statements Are Fully Protected By The PSLRA Safe Harbor

Plaintiffs contend that Romeo's statements about the amount of revenue from its backlog that Romeo expected to recognize in 2021 were false.  For example, Plaintiffs challenge Romeo's statement that "[t]he portion of our backlog as of September 30, 2020, that is expected to be recognized in the twelve-month period following September 30, 2020 is approximately $59 million."  AC ¶ 112 (Statement 3), ¶ 136 (Statement 9), ¶ 144 (Statement 10), ¶ 178 (Statement 4); *see also id.* ¶ 149 (Statement 12), ¶ 157 (Statement 14).  Each of these is a forward-looking statement and therefore protected under the PSLRA "safe harbor."  Under that safe harbor, a statement is not actionable if "(1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading." *Lefkowitz v. Synacor, Inc.*, 2019 WL 4053956, at *9 (S.D.N.Y. Aug. 28, 2019) (Schofield, J.) ("Because the safe harbor is written in the disjunctive, a forward-looking

---

[6] "Statement [#]" refers to the statements listed in the chart submitted as Appendix A to this memorandum.  Appendix A is an organizational tool that contains (i) each challenged statement (copied verbatim from the AC), (ii) the corresponding paragraph number[s] of the AC, and (iii) a short-hand "X" mark indicating which argument(s) in this brief apply to that particular statement.

statement is protected under the safe harbor if any of the three prongs applies."); *see also* 15 U.S.C. § 77z-2(c) (safe harbor).  The safe harbor applies to eight statements here:  Statements 3, 4, 7, 9, 10, 12, 13, 14.

There is no question that these statements are forward-looking.[7]  As this Court has held, statements about "projected revenues" from an "order backlog" (such as Statement Nos. 3, 4, 9, 10, 12, and 14) "are forward looking statements that fall within the PSLRA's safe harbor." *Seadrill*, 2016 WL 3461311 at *9; *see also In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 230 (S.D.N.Y. 2021) ("Revenue forecasts are, by definition, forward-looking statements.") (citing 15 U.S.C. § 78u–5(i)(1)(A)–(C)).  The same is true of the statements that "ensuring that we have continuous access to [battery] supply is a daily focus of" the Company (Statement 10), and that the Company was "focus[ing] on securing our capacity for the long term" (Statement 7) and "driving to secure cell supply over the short, medium, and long-term" (Statement 13).  *See also Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *17 (S.D.N.Y. Sept. 21, 2021) (statement that defendants "have or will have sufficient supply of formulated drugs to meet our commercial forecast" was forward-looking statement).  Each of these forward-looking statements is subject to the safe harbor protection.

      **a.**        **Each of the Alleged Misstatements Was Accompanied by Meaningful Cautionary Language**

All of these forward-looking statements are not actionable because they were accompanied by meaningful risk disclosures and other cautionary language.  In the Second Circuit, "[i]t is

---

[7] The PSLRA defines a "forward-looking statement" as "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items," "any statement of the assumptions underlying or relating to any statement" of financial projections, and "any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer."  15 U.S.C. § 77z-2(i)(1).

undisputed that the [at-issue statements] must be read as a whole," in context of the entire disclosure, and dismissal is appropriate where the disclosures also "warn investors of exactly the risk the plaintiffs claim was not disclosed."  *See Olkey v. Hyperior 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (internal citations omitted).  As noted above, Romeo's Registration and Proxy Statements listed extensive risk factors, including that its "business could be materially adversely affected" if it were "unable to obtain components and materials used in our battery products from our suppliers," especially "cells," and that "disruption of supply or shortage of any of our battery components, particularly cells, could harm our business."  Ex. 7, RMG Form S-4 at 47–48; *see also* Ex. 2, Proxy Statement at 50–51.  The Registration Statement even warned investors that "[y]ou are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this proxy statement/consent solicitation statement/prospectus."  Ex. 7, RMG Form S-4 at 38.  As a result, none of the forward-looking statements is actionable as a matter of law.  *Seadrill*, 2016 WL 3461311, at *9 (dismissing claim where "risks from changes in governmental regulations and global political conditions" provided adequate caution for revenue projections from oil contract order backlog); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 310 (S.D.N.Y. 2021) (dismissing claim where "supply risks" and "rapidly changing environment" provided adequate caution for hopeful "supply projections").

> **b.**     **Plaintiffs Do Not Allege Defendants Had "Actual Knowledge" That Any Forward-Looking Statement Was False**

An independent basis for PSLRA safe harbor protection is that Plaintiffs do not come close to meeting the "actual knowledge" safe harbor prong.  This requires Plaintiffs to plead facts showing that each defendant *actually knew* that the forward-looking statement was false (*i.e.,* that the projection could not be achieved).  This is an extraordinary burden that Plaintiffs do not come close to meeting here.  *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 532 (S.D.N.Y. 2015) ("The

11

scienter requirement for forward-looking statements [] is stricter than for statements of current fact."); *In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d, 518, 529 (S.D.N.Y. 2021) ("Where proof of scienter is a required element, as it is in the actual knowledge prong of the statutory safe harbor, a complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.") (internal citations omitted).

Rather than plead any such facts, the AC speculates that Defendants somehow could have known that Romeo's projections were false because the supply risk "was an actual, ongoing event that Defendants knew had in fact disrupted production." AC ¶ 119. But speculation about what "must have" happened is no substitute for facts establishing that the supply risk had already "disrupted production" in December 2020 and that Defendants *actually knew* that Romeo would not be able to achieve its revenue forecasts in 2021. Dismissal is warranted for this additional reason. *See In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d at 529–30 (holding that forward-looking statements are protected under the PSLRA when "Plaintiff pleads no facts permitting a conclusion that Defendants had actual knowledge of any false or misleading information"); *Lefkowitz,* 2019 WL 4053956, at *9 (dismissing complaint for failing to "adequately plead that Defendants had actual knowledge that the financial projections were false or misleading").

Plaintiffs offer up a number of speculative theories that bear no relationship to actual knowledge. That Romeo eventually revised its guidance (AC ¶ 119) says nothing at all about what Defendants knew at the time the guidance was first issued. It is pure hindsight. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 776 (2d Cir. 2010) (fact that "losses eventually reported . . . greatly exceeded" forecast does not show actual knowledge "because the plaintiffs may not plead fraud by hindsight"); *see also In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d at 529–30. Likewise, the notion that Defendants knew that Romeo could not achieve its 2021 projections because Romeo

required 16 weeks to manufacture battery cells into battery modules and packs (AC ¶¶ 119, 133) is a red-herring.  Romeo never specified when in 2021 it would make and sell the batteries, and 16 weeks is plenty of time to build batteries over the course of a 52-week year.  To the contrary, Romeo repeatedly warned that approximately 57% of its forecasted 2021 revenues would come in the fourth quarter.  Ex. 2, Proxy Statement at 95, 170.  Simply put, Plaintiffs come nowhere close to pleading that any statement was made with "actual knowledge" that it was false.  *Seadrill*, 2016 WL 3461311, at *9 (claiming "that Defendants knew the contracts and backlog were in doubt" does not make "statements describing . . . contracts, as well as the amount of backlog" misleading); *In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d at 534.

### 2. Defendants' Statements About Romeo's Operations Were Accurate When Made

None of the remaining six statements that Plaintiffs challenge (Statements 1, 2, 5, 6, 8, and 11) concerning Romeo's operations was false or misleading.  None supports a claim.

*First*, Plaintiffs challenge statements describing Romeo's revenue "backlog" or "currently contracted revenue,"[8] but they do not actually contend that these statements did not accurately reflect Romeo's revenue backlog, and they certainly allege no facts showing that they were inaccurate.  *See, e.g.*, AC ¶ 110.  This is fatal to their claims as a matter of law.  *See Seadrill*, 2016 WL 3461311, at *11 ("The [alleged misstatements] are not actionable as they are accurate, and the Complaint does not allege otherwise.").  To the extent Plaintiffs attempt to allege that the statements are misleading because Romeo did not predict that it would not meet its original 2021

---

[8] *E.g.*, Romeo's statement that: (i) as of September 30, 2020, it "had a backlog of approximately $310 million, of which approximately $240 million represented the minimum revenue that would be received under such contracts to satisfy take or pay minimum order commitments," and (ii) this amount had grown to more than $500 million by the end of November 2020.  Statement Nos. 3, 4, 9.  *See also* Statement Nos. 1–2, 5–6, 8, 11, 12, 14.

revenue forecast (*see* AC ¶¶ 123–24, 126, 128–30, 144), this is merely a backdoor attempt to base a claim on Romeo's inability to prognosticate the future, ignores Romeo's extensive risk disclosures, and ultimately fails for the same reasons that Plaintiffs' forward-looking statement claims fail. *See* Section I.E.1, *supra.*

*Second*, Plaintiffs challenge various statements about Romeo's "proprietary design" technology,[9] the "space and the capacity" of its factory to "fulfill all of the demand for the 1.6 billion in revenue,"[10] and "Operation Hedge Fund"—a program being implemented to address supply shortage across a wide variety of components.[11] Here again, however, Plaintiffs do not allege any facts that contradict these statements. There is no fact showing that Mr. Selwood's description of Romeo's technology, including its batteries' ability to incorporate various types of power cells (Statement Nos. 6 & 7), was false. Nor are there facts that contradict Ms. Webb's description of Romeo's factory or its capability to fulfill Romeo's backlog (Statement No. 7). And Mr. Selwod's acknowledgement that "battery cells" could be a "potential chink[] in [Romeo's] supply chain," notwithstanding the company's "daily focus" on supply, made clear that many pieces of the business plan were in place (*e.g.,* technology, physical plant, and customer contracts) but some of the pieces were subject to more uncertainty—like battery cell supply. AC ¶ 144. None of this is alleged to be false. None of it can support a claim. *See In re Nokia OYJ (Nokia Corp.)*

---

[9] *E.g.*, Statement No. 6 ("[W]e take cutting edge cells . . . and we use our proprietary design language from a module battery pack and battery management systems software suite and really allow those cells to shine.").

[10] *E.g.*, Statement No. 7 ("Our current business plan assumes that we will fulfill all of the demand for the 1.6 billion in revenue out of our existing factory. And we have the space and the capacity here to do that.").

[11] *E.g.*, Statement Nos. 7, 10 (stating that the Company is "currently putting [long-term contracts] in place," which Mr. Selwood considered part of a program he called "Operation Hedge Fund" for sourcing a variety of components).

*Sec. Litig.*, 423 F. Supp. 2d 364, 393 (S.D.N.Y. 2006) ("[I]t is, of course, well settled that a complaint alleging violations of the securities laws may not rely upon statements that are true…") (internal citation and quotation marks omitted).

*Third*, Mr. Selwood's statement that Romeo is "not a pre-revenue company" is indisputably true.  Statement 8; AC ¶ 132.  Plaintiffs expressly concede that Romeo earned $8.97 million in revenue in 2020.  AC ¶¶ 8, 86.

*Fourth*, Plaintiffs assert that Romeo misrepresented the number of cell suppliers it had.  Statements 3, 4, 9.  But Defendants never represented that Romeo was receiving battery cells from "four" suppliers, as Plaintiffs suggest.  AC ¶ 114.  Instead, as Mr. Selwood clearly stated during the October 5, 2020 investor call announcing the merger, "[w]e have tested over 200 cells from ten suppliers, but have only qualified four cells to-date."  Ex. 13, Merger Announcement Tr. at 3.  Indeed, although multiple vendors could theoretically supply battery cells, Romeo's October 2020 Investor Presentation made clear that just *two* suppliers—LG Chem and Samsung—were expected to supply battery cells in the near-term.  Ex. 6, Investor Presentation at 28.   And only one (Samsung) was noted as "currently support[ing] the EV [electric vehicle] Program[.]"  Ex. 7, RMG Form S-4 at 163.  All of this was disclosed to investors.

*Fifth*, Plaintiffs take issue with statements from Romeo's March 30, 2021 earnings call, 2020 Form 10-K (published on April 15, 2021), May 13 earnings call, and Q1 2021 Form 10-Q (filed on May 17, 2021).  *See* Statements 11–14; AC ¶¶ 146–47, 149, 151, 154–55, 157–58.  These are all statements on or after March 30, 2021 about Romeo's backlog remaining unchanged and the expected duration of the cell shortage.  They are not false because the AC lacks any facts showing that Romeo's "backlog" had decreased or that the cell shortage was not a "temporary" issue, AC ¶¶ 146–47.  Indeed, the theory of Plaintiffs' case is that when Romeo revised its earnings

guidance on March 30, 2021, the market learned the "truth" about supply chain disruptions and Romeo's financial condition.  AC ¶ 189.  But Plaintiffs offer no explanation for how investors could have been misled after the "truth" was disclosed on March 30, 2021.  In any case, the cell shortage was temporary:  Plaintiffs concede that Romeo announced a long-term cell supply contract prior to its second quarter 2021 earnings call and confirmed during that call the annual revenue outlook it announced on March 30, 2021.  AC ¶¶ 25, 105.[12]

### 3.   Plaintiffs Fail to Establish Any Violation of Item 303

Plaintiffs contend that Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), because Romeo failed to disclose certain "known trends or uncertainties" that it "reasonably expect[ed]" to have a material impact on its business.  *See, e.g.*, AC ¶¶ 120, 143, 153, 160, 187.  This, too, fails as a matter of law.

Item 303 requires only the disclosure of "*known*" trends or uncertainties, but for reasons discussed above (and below), the AC contains no facts showing that any Defendant knew about the eventual supply shortage and that Romeo would not meet its projected 2021 revenue at the time of the challenged statements.  Item 303 theories are routinely rejected on this basis.  *See Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at *9 (S.D.N.Y. 2010) (rejecting Item 303 theory where plaintiffs did not "establish[] that [defendants] had actual

---

[12] Plaintiffs' attempt to characterize the August 16, 2021 earnings call as a "materialization of the further impact of the supply shortage" is a legally flawed attempt to seize on further stock price declines that bear no relation to the alleged misstatements.  AC ¶ 190.  In the Second Circuit, an event can only serve the role of a corrective disclosure if it "reveal[s] some [previously]-undisclosed fact with regard to the specific misrepresentations alleged."  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010).  It is not enough to show "that the market reacted to the purported 'impact' of the alleged fraud[.]"  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010).  While none of the challenged statements were false and all of the relevant risks were disclosed, the "materialization" of the battery supply chain problem was fully disclosed when Romeo announced 4Q20 earnings on March 30, 2021.  Plaintiffs do not allege otherwise.

knowledge of the purported trend"); *see also Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 614 (S.D.N.Y. 2008) (rejecting Item 303 theory and the argument "that pleading a trend's existence is enough to support a claim").  The same result is warranted here.

> C.      **The AC Fails to Establish Any Inference of Scienter**

The AC also fails for the independent reason that Plaintiffs do not come close to pleading the required "strong inference" of scienter—*i.e.*, an "intent to deceive, manipulate, or defraud." 15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). To meet this standard, "it is not sufficient to set out 'facts from which, if true, a reasonable person *could* infer that the defendant acted with the required intent.'"  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir. 2009).  Rather, the "strong" inference must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  In this Circuit, a strong inference of scienter may be satisfied by alleging particularized facts showing (i) *each* defendant had the "motive and opportunity to commit fraud" or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  "Recklessness" requires "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care," and "in the security fraud context . . . must approximate 'actual intent.'"  *In re Gen. Elec. Sec. Litig.*, 844 F. App'x 385, 388 (2d Cir. 2021) (citations and quotation marks omitted).  Plaintiffs fail to satisfy either scienter prong.

> 1.      **The Individual Defendants' Increase in Stock Holdings Undermines Any Inference of Scienter**

Motive and opportunity are typically shown where insiders dump company stock at high prices before bad news is disclosed and the stock price declines.  *See Novak*, 216 F.3d at 308.

When the opposite happens, and executives retain or increase their ownership of company stock, it is black-letter law that this is "wholly inconsistent with fraudulent intent." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004); *see also Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (defendants' increase of their net holdings "signals only confidence in the future of their company"); *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 516 (S.D.N.Y. 2011) (same).  That is precisely what happened here.

Plaintiffs concede that the Individual Defendants were heavily invested in Romeo stock throughout the alleged class period, and do not allege that any Defendant sold any Romeo stock. To the contrary, the two Romeo officers alleged to have made intentionally false statements ***increased their ownership positions*** during the class period and held more stock *after* the alleged corrective disclosure.  *See* Ex. 14, Stock Holdings.  Appendix B reproduces data from these public filings to display in chart-form the number of shares held by each of the Defendants on (i) December 29, 2020 and (ii) after the "truth" was revealed on March 30, 2021.  This alone thoroughly undermines any inference of scienter.  *See, e.g., In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 561 (dismissing claim because defendants' increase in holdings during class period undermined finding of scienter); *GlaxoSmithKline PLC*, 343 F. App'x at 673 (same).

### 2. Plaintiffs Allege No Facts Establishing Conscious Misbehavior or Recklessness

Where, as here, a "plaintiff has failed to demonstrate that defendants had a motive to defraud the shareholders, he must produce a stronger inference of recklessness" and "the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit v. Eichler*, 264 F. 3d 131, 142–43 (2d Cir. 2001).  The AC fails to do so.

*First*, Plaintiffs repeatedly assert that the challenged statements were false because Defendants must have known that cell supply would be insufficient to meet guidance.  *E.g.*, AC

¶¶ 165–67.   But this sort of "must have known" allegation does not establish scienter. "[D]efendants' lack of clairvoyance simply does not constitute securities fraud." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995); *In re EDAP*, 2015 WL 5326166 at \*8 ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.") (internal citations omitted); *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 426 (S.D.N.Y. 2014).   Moreover, Plaintiffs have not even tried to plead facts demonstrating that *each* defendant acted with scienter, as they must.  *See Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010).

*Second*, Romeo's robust disclosures (*see* Section I.C, *supra*) further negate any inference of scienter.   Romeo's "cascade of disclosures" and "ample cautionary language" regarding the alleged misstatements "are inconsistent with a state of mind going toward 'deliberate illegal behavior' or 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care.'"   *Holbrook v. Trivago N.V.*, 2019 WL 948809, at \*21 (S.D.N.Y. Feb. 26, 2019), *aff'd sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019); *see also Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*, 2017 WL 4403314, at \*22–23 (S.D.N.Y. Sept. 30, 2017), *aff'd sub nom. Pipefitters Union Local 537 Pension Fund v. Am. Express Co.*, 773 F. App'x 630 (2d Cir. 2019).

*Third*, the single "former employee" quoted in the AC ("CW1") offers only his personal observations about supply chain management and his general opinion that Romeo's CEO was "very, very involved" with these matters.[13]   There is no allegation that CW1 ever spoke to any

---

[13] The only allegations attributed to CW1 are that:  (i) "[w]hen your volume is always changing, when you tell the sales [*sic*] supplier one thing and then do the other," this can "be a factor in not being able to procure [battery cells]" and (ii) Mr. Selwood "was very, very involved" with "supply

Individual Defendant—which precludes any inference of scienter.  *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) ("[T]he Court cannot credit [a confidential witness] allegation" regarding scienter where "[p]laintiffs do not allege any facts indicating that [the witness] was in a position to have knowledge regarding communications with [] senior management."). In any case, confidential witness allegations must be made "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," *Novak*, 216 F.3d at 314, and the statements themselves need to be "indicative of scienter." *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010); *see also Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 203 (S.D.N.Y. 2020). But here CW1's statements are, at most, mere personal opinions about how to manage a supply chain and who was generally involved in that process at Romeo. AC ¶ 167. That does not create an inference of scienter as to any Defendant. *In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2016 WL 2757760, at *6 (S.D.N.Y. May 11, 2016) (a confidential witness's "personal view . . . simply is not enough to support a claim"); *Local No. 38 IBEW Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) ("anecdotes and conclusory statements of belief" from confidential witnesses are insufficient).

*Fourth*, to the extent Plaintiffs attempt to invoke the "core operations" theory as a substitute for specific allegations of scienter, AC ¶ 171, this strategy also fails. As an initial matter, courts in this Circuit have expressed doubts about the viability of the core operations theory under any circumstances. *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011). Further, the core operations theory can never "independently establish scienter." *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *29 (S.D.N.Y. Apr. 2, 2020). Moreover, this argument is both

---

chain management and supplier relationships at Romeo." AC ¶¶ 167, 172.

circular and conclusory because the allegation that Defendants had access to this "core information" still fails absent any factual allegations showing how or why the information to which they allegedly had access would have informed anyone that the battery cell supply chain had deteriorated to such a degree as to make Romeo's earnings guidance unachievable.  *See* Section I.B, *supra.*

*Fifth*, Plaintiffs contend that scienter can be inferred because the "timing of Romeo's announcements to replace both Selwood and Webb were also highly suspicious."  AC ¶ 174.  But this is pure speculation.  The AC pleads not one single fact suggesting that this executive transition related in any way to the alleged fraud.  *See, e.g., Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) (holding that resignations only support inference of scienter where the (i) "resignation[s are] somehow tied to the fraud alleged, [ii] the resignations somehow alerted defendants to the fraud, or [iii] the defendants' scienter was otherwise evident."); *see also Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019) ("[A] resignation can establish scienter only if the plaintiff alleges independent evidence corroborating that the employee who resigned held a culpable state of mind.").  It is, of course, unsurprising for a company that had just recently transitioned from a private to a public company to transition executives.[14]

Plaintiffs allege no facts creating even a hint of scienter.

---

[14] Indeed, that is exactly what Romeo did—hiring Susan Brennan as CEO and Kerry Shiba as CFO, each of whom has substantial public company experience.  *See* Exs. 1 & 15 (press releases announcing appointments of Brennan on August 6, 2021, and Shiba on June 16, 2021).  As Plaintiffs concede, AC ¶ 39, Ms. Webb remains Romeo's Chief Strategy and Commercial Officer, having transitioned the CFO portion of her role to Mr. Shiba in July 2021—all of which is hardly indicative of scienter.

### 3.      The Non-Fraudulent Inference Is More Compelling

When "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323.  Here, the non-fraudulent inference—*i.e.,* that Romeo simply did not predict prolonged supply chain disruptions—is the *only* reasonable inference.  As set forth above, the impacts of the COVID-19 pandemic caught up with the supply chain in early 2021, causing unexpected delivery disruptions and delays for numerous products, including battery cells.  *See supra* at 6.  Plaintiffs' theory asks the Court to draw an implausible assumption:  that Defendants foresaw these global supply chain disruptions before *anyone else* in the market, but nevertheless published unachievable earnings guidance (with no motive to do so).  This inference is wholly implausible.  *See Slayton v. Am. Exp. Co.*, 604 F.3d at 777 (affirming dismissal on scienter grounds where "inference of fraudulent intent [was] not 'at least as compelling as any opposing inference one could draw from the facts alleged'") (quoting *Tellabs*, 551 U.S. at 324); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 548 (S.D.N.Y. 2009) (dismissing on scienter grounds where non-fraudulent inference was more plausible), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009).

## II.     THE AC FAILS TO PLEAD FACTS ESTABLISHING A SECTION 14 CLAIM AND THE LAW PROHIBITS SUCH A CLAIM HERE

"To state a claim under Section 14(a) and Rule 14a-9, a plaintiff must allege that:  '(1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiff's injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.'" *St. Clair-Hibbard v. Am. Fin. Tr., Inc.*, 2019 WL 4601720, at *4 (S.D.N.Y. Sept. 23, 2019) (Schofield, J.), *aff'd*, 812 F. App'x 36 (2d Cir. 2020).  In addition, "[t]he PSLRA requires the complaint to specify each allegedly misleading statement, explain the reason (or reasons) that the statement is misleading,

and, if an allegation is made upon information and belief, all facts with particularity upon which that belief is formed." *Id.* (citing 15 U.S.C. § 78u–4(b)(1)). The Section 14(a) claim in the AC fails by every measure.

### A.      The Only Court-Appointed Lead Plaintiff Lacks Standing to Bring a Section 14(a) Claim

Following a contested lead plaintiff application process, this Court appointed Mr. Castleberg as the lead plaintiff. ECF No. 69. However, Mr. Castleberg first purchased Romeo stock on January 5, 2021, ECF No. 28-2, and he never owned RMG stock. Because he did not own stock at the time the Proxy Statement was published, he lacks standing to bring the Section 14(a) claim. *See In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 241 (S.D.N.Y. 2004) ("[O]nly shareholders who owned [company] common stock on the record date of the Merger are permitted to bring Section 14(a) claims."). Dismissal of the Section 14(a) claim is warranted for this reason alone.

Effectively conceding this defect, the AC tries to add an "additional plaintiff," Mr. Cante. AC ¶ 35. But Mr. Cante was not appointed by the Court, was not subject to the PSLRA's lead plaintiff selection process, and therefore does not represent the alleged class in any capacity. *See* ECF No. 82-1. This end-run around the Court's PSLRA lead plaintiff process should be rejected. *See, e.g., In re Smith Barney Transfer Agent Litig.*, 823 F. Supp. 2d 202 (S.D.N.Y. 2011) (rejecting unilateral addition of new plaintiff after dismissing claims brought by previously appointed lead plaintiff for lack of standing).

### B.      The AC Fails To Plead A Materially False Statement in the Proxy Statement

The Section 14(a) claim also fails as a matter of law. Every disclosure from the Proxy Statement that Plaintiffs challenge in their Section 14(a) claim is also part of their Section 10(b) claim. *Compare* Statement 4 (Proxy Statement) *with* Statements 3, 9, 12 (other challenged

statements).   For the reasons described above, Plaintiffs do not establish that any of these statements was false or misleading.  *See supra* Section I.B.

### C.    The Section 14(a) Claim Is Derivative and Plaintiffs Lack Standing to Bring This Claim on Behalf of RMG Acquisition Corporation

The Section 14(a) claim fails for yet another reason:  it is, at best, a derivative claim that Plaintiffs seek to bring as a direct claim.  There is no legal basis for this.  The claim is based on the theory that RMG stockholders were damaged because the Proxy Statement overstated the true value of Romeo (the private company) at the time of the merger, and thus the RMG shareholders "did not receive their fair share of the value of the assets and business of the combined entity." AC ¶ 220.  This is a classic "overpayment" claim, which "absent more, [is] exclusively derivative" under Delaware law (where Romeo is incorporated).  *Brookfield Asset Mgmt., Inc. v. Rosson*, 2021 WL 4260639, at *11 (Del. Sept. 20, 2021); *see also Halebian v. Berv*, 590 F.3d 195, 204 (2d Cir. 2009) (whether a claim is derivative or direct is determined by the law of the state of incorporation).

Plaintiffs have not brought a derivative claim in the AC.  Nor have they made a demand on the RMG board (as required for derivative claims), or pled that such demand would have been futile.  All of this requires dismissal of the Section 14(a) claim.  *See* Fed. R. Civ. P. 23.1; *Newman v. Family Mgmt. Corp.*, 748 F. Supp. 2d 299, 314–15 (S.D.N.Y. 2010) (holding that shareholders lack standing unless they make a demand or establish that demand should be exhausted).

### D.    The AC Fails To Plead Loss Causation Regarding the Proxy Statement

Still another reason why the Section 14(a) claim fails is that the AC does not allege facts demonstrating the Proxy Statement "caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  To survive dismissal, Plaintiffs must allege "that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was 'an essential

link' in the accomplishment of [a] transaction." *See Bond Opportunity Fund v. Unilab Corp.,* 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003) (internal citation omitted). This they cannot do.

To the extent Plaintiffs contend that the December 10, 2020 Proxy Statement caused losses when Romeo's stock price declined months later, their theory appears to be that if RMG stockholders had known the true condition of Romeo, (i) they would have voted against the business combination, (ii) RMG would then have been unable to renegotiate the transaction or identify another merger partner, and (iii) then RMG would have needed to liquidate, and then (iv) RMG's shareholders would have exercised their redemption rights to receive $10.18 per share, which is higher than Romeo's current share price. AC ¶ 220. This speculative sequence of events hardly provides Defendants "with fair notice of the causal connection between the loss and the misrepresentation." *Gray v. Wesco Aircraft Holdings*, 454 F. Supp. 3d 366, 403 (S.D.N.Y 2020). Plaintiffs' claim of loss improperly "relies on hypothes[e]s about what the parties would have done if the circumstances surrounding their transaction had been different." *Id*. (internal citations omitted); *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 198 (2d Cir. 2003). The absence of loss causation is fatal to Plaintiffs' Section 14(a) claim.

## III. THE AC FAILS TO PLEAD CONTROL PERSON CLAIMS

Because Plaintiffs fail to plead a primary violation of the Exchange Act, their derivative "control person" claims under Section 20(a) must also be dismissed. *Rombach*, 355 F.3d at 177–78.

## CONCLUSION

Defendants respectfully request that the AC be dismissed with prejudice.

Dated:  November 5, 2021

Respectfully Submitted,

**LATHAM & WATKINS LLP**

*Jeff G. Hammel*
Jeff G. Hammel
Jason C. Hegt
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
Email: jeff.hammel@lw.com
Email: jason.hegt@lw.com

Kristin N. Murphy
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Tel: (714) 540-1235
Fax: (714) 755.8290
Email: kristin.murphy@lw.com

*Attorneys for Defendants Romeo Power Inc. (f/k/a RMG Acquisition Corp.), Lionel E. Selwood, Jr., Lauren Webb, Robert S. Mancini, Philip Kassin, D. James Carpenter, Steven P. Buffone, W. Grant Gregory, W. Thaddeus Miller, and Craig Broderick*