**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE ROMEO POWER INC.
SECURITIES LITIGATION

Case No. 1:21-cv-03362-LGS

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ................................................................................ 1

II.    STATEMENT OF FACTS ...................................................................................... 3

       A.    Background of Romeo's Business and the RMG SPAC Transaction ................................ 3

       B.    Romeo Experiences a Trend of Insufficient Supply of Battery Cells in the Quarters Preceding the Class Period; As Defendants Set Out on a Media Blitz To Drum Up Support for the Business Combination, They Conceal the Shortage ................................................................ 5

       C.    The January 2021 Prospectus and Other Post-Merger Assurances ................................ 6

       D.    Romeo's Share Price Declines Precipitously as the Truth Is Revealed; Romeo Replaces Selwood as CEO and Webb as CFO .......................................................................... 6

       E.    In August 2021, Romeo Admits it Is Just Beginning to Ramp Production ....................... 7

III.   THE AC STATES CLAIMS UNDER SECTION 10(b) OF THE EXCHANGE ACT ..... 8

       A.    Elements and Pleading Standards Applicable to §10(b) ............................................. 8

       B.    The AC Alleges Actionable False or Misleading Statements and Omissions .................... 8

             1.    Romeo's Identification of Four Major Suppliers Was False and Misleading ........................................................................................ 8

             2.    Defendants' Omission of the Cell Shortage, and Claims About "Operation Hedge Fund" in Response to Supply-Related Inquiries, Were Misleading .......................................................................... 9

             3.    Defendants Had a Duty to Disclose the Known, Existing Supply Shortage and Production Delays Under Item 303 ............................................ 11

             4.    Defendants' Claims About Romeo's "Secured" Revenue Were Misleading Where At All Relevant Times During the Class Period, Romeo Lacked Sufficient Cell Supply to Ramp Production .................................................... 13

             5.    The Safe Harbor Does Not Warrant Dismissal ....................................... 14

             6.    Defendants' Assurances After the Initial Announcement of the Supply Shortage Were Materially Misleading .................................................. 17

       C.    The AC Alleges a Strong Inference of Scienter ...................................................... 18

             1.    The August 2021 Admissions by Romeo's New Executive Team Show That Romeo Never Had a Sufficient Supply of Battery Cells .......................... 18

|  | 2. | Individual Defendants' Misdirection About Cell Supply Supports Scienter ............................................................................................. 19 |
|---|---|---|
|  | 3. | Manufacturing Battery Products Was Romeo's Core Operation and Product Revenue Was Already Trending Down Significantly in 2020 ................. 20 |
|  | 4. | Romeo's Production Lead Times, and the Temporal Proximity of the Corrective Disclosure to Defendants' Statements, Support Scienter ............................ 21 |
|  | 5. | The Abrupt Replacement of Selwood and Webb Supports Scienter ........ 22 |
|  | 6. | The Lack of Insider Trading Does Not Negate Scienter ........................... 22 |
|  | 7. | Defendants Fail To Present a More Compelling Inference ...................... 23 |
| IV. | | THE AC STATES CLAIMS UNDER SECTION 14(a) OF THE EXCHANGE ACT ... 24 |
|  | A. | The Broad Remedial Purposes and Pleading Standards Applicable to §14(a)................. 24 |
|  | B. | The AC Alleges Standing Under Section 14(a)................................................................ 24 |
|  | C. | The AC Alleges False or Misleading Statements and Omissions in the Proxy................. 25 |
|  | D. | The AC Alleges §14(a) Transaction Causation and Loss Causation ............................... 26 |
| V. | | THE AC ALLEGES CONTROL PERSON LIABILITY UNDER SECTION 20(a) ...... 27 |
| VI. | | CONCLUSION................................................................................................................. 27 |

## TABLE OF AUTHORITIES

### CASES

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008) ........................................................................................ 18

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ........................................................... 11

*Baum v. Harman Int'l Indus., Inc.*,
408 F. Supp. 3d 70 (D. Conn. 2019) .................................................................... 26, 27

*Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
94 F. Supp. 3d 1035 (D. Minn. 2015) ......................................................................... 9

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*,
2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .............................................................. 12

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d, 233 (S.D.N.Y. 2012) ........................................................... 18, 24, 27

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) .................................................... *passim*

*Curran v. Freshpet, Inc.*,
2018 WL 394878 (D.N.J. Jan. 12, 2018) ...................................................... 12, 17, 26

*Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*,
2021 WL 4443258 (S.D.N.Y. Sept. 27, 2021) ........................................................... 25

*Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019) .......................................................................... 20

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
862 F. Supp. 2d 322 (S.D.N.Y. 2012) ........................................................................ 25

*Frater v. Hemispherx Biopharma, Inc.*,
996 F. Supp. 2d 335 (E.D. Pa. 2014) ......................................................................... 23

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) ........................................................................ 24

*Gray v. Wesco Aircraft Holdings, Inc.*,
454 F. Supp. 3d 366 (S.D.N.Y. 2020) ........................................................................ 27

*Hall v. The Children's Place Retail Stores, Inc.*,
  580 F. Supp. 2d 212 (S.D.N.Y. 2008)..................................................................... 14, 22

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
  422 F. Supp. 3d 821 (S.D.N.Y. 2019)........................................................................ 20

*In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*,
  2021  WL 4481215 (S.D.N.Y. Sept. 30, 2021)........................................................... 23

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005).......................................................................... 13

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
  741 F. Supp. 2d 511 (S.D.N.Y. 2010).......................................................................... 27

*In re Ashanti Goldfields Sec. Litig.*,
  2004 WL 626810 (E.D.N.Y. Mar. 30, 2004) ............................................................... 22

*In re Bank of Am. Corp. Secs., Deriv., & ERISA Litig.*,
  757 F. Supp. 2d 260 (S.D.NY. 2010)..................................................................... 24, 25

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
  2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020) ............................................................. 12

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2018 WL 2382600 (S.D.N.Y. May 24, 2018) ....................................................... 10, 15

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013).......................................................................... 16

*In re IPO Sec. Litig.*,
  214 F.R.D. 117 (S.D.N.Y. 2002) ................................................................................. 25

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013).......................................................................... 22

*In re Oxford Health Plans, Inc. Sec. Litig.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ................................................................................. 18

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)............................................................. 20

*In re Scottish Re Group Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007)......................................................................... 20

*In re Seadrill Ltd. Sec. Litig.*,
   2016 WL 3461311 (S.D.N.Y. June 20, 2016) ........................................................ 15

*In re Smith Barney Transfer Agent Litig.*,
   823 F. Supp. 2d 202 (S.D.N.Y. 2011) ................................................................... 25

*In re Tenaris S.A. Sec. Litig.*,
   493 F. Supp. 3d 143 (E.D.N.Y. 2020) ................................................................... 16

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016) ................................................................................... 19

*Inv. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ............................................................................ 19, 21

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ...................................................................... 18, 19, 23

*Mateo v. Bristow*,
   2013 WL 3863865 (S.D.N.Y. July 16, 2013) .......................................................... 8

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ......................................................................................... 8, 13

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
   761 F.3d 245 (2d Cir. 2014) ................................................................................. 10

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970) ............................................................................................ 24

*Miss. Pub. Emps' Ret. Sys. v. Boston Sci. Corp.*,
   523 F.3d 75 (1st Cir. 2008) ............................................................................. 18, 21

*Moshell v. Sasol Ltd.*,
   481 F. Supp. 3d 280 (S.D.N.Y. 2020) ................................................................... 16

*Newman v. Family Mgmt Corp.*,
   748 F. Supp. 2d 299 (S.D.N.Y. 2010) ................................................................... 25

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ............................................................................ 19, 21

*Panther Partners Inc. v. Ikanos Commc'ns., Inc.*,
   681 F.3d 114 (2d Cir. 2012) ................................................................................. 12

*Pierrelouis v. Gogo, Inc.*,
  2021 WL 1608342 (N.D. Ill. Apr. 26, 2021) ............................................................................ 22

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
  2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)........................................................... 16, 19, 21

*S.E.C. v. Conaway*,
  2006 WL 2828569 (E.D. Mich. Sept. 29, 2006)........................................................................ 20

*S.E.C. v. Gabelli*,
  653 F.3d 49 (2d Cir. 2011)......................................................................................................... 13

*S.E.C. v. Hurgin*,
  484 F. Supp. 3d 98 (S.D.N.Y. 2020)................................................................................... 14, 24

*Scantek Med., Inc. v. Sabella*,
  583 F. Supp. 2d 477 (S.D.N.Y. 2008)........................................................................................ 23

*Schwab v. E\*TRADE Fin. Corp.*,
  258 F. Supp. 3d 418 (S.D.N.Y. 2017)........................................................................................ 20

*Shah v. Zimmer Biomet Holdings, Inc.*,
  348 F. Supp. 3d 821 (N.D. Ind. 2018) ....................................................................... 12, 20, 26

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)...................................................................................... 15, 16, 17

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015)......................................................................................................... 11

*Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*,
  250 F.3d 87 (2d Cir. 2001).......................................................................................................... 27

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008)........................................................................................................ 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).................................................................................................... 17, 18, 22

*Tooley v. Donaldson*,
  845 A.2d 1031 (Del. 2004) ......................................................................................................... 25

*Turner v. ShengdaTech, Inc.*,
  2011 WL 6110438 (S.D.N.Y. Dec. 6, 2011) ............................................................................. 25

*Universal Am . Corp. v. Partners Healthcare Solutions Holdings, L.P.*,
  176 F. Supp. 3d 387 (D. Del. 2016)........................................................................................ 21

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
  2008 WL 879023 (D. Colo. Mar. 28, 2008) ............................................................................ 14

*Yannes v. SCWorx Corp.*,
  2021 WL 2555437 (S.D.N.Y. June 21, 2021) ................................................................... 14, 20

## STATUTES

15 U.S.C. § 78u–5(c)(1)(B) ........................................................................................................ 16

## RULES

Fed. R. Civ. P. 8........................................................................................................................ 24

Fed. R. Civ. P. 15...................................................................................................................... 27

Fed. R. Civ. P 12(g) .................................................................................................................... 8

## REGULATIONS

17 C.F.R. § 229.303(b)(ii) ......................................................................................................... 11

Lead Plaintiff Mike Castleberg and additional plaintiff Joshua Cante ("Plaintiffs") allege claims under §§10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934. Because Plaintiffs' Amended Class Action Complaint (ECF No. 82, the "AC") adequately alleges the elements of each claim, Defendants' motion to dismiss (ECF No. 91, the "MTD") should be denied.[1]

## I.    PRELIMINARY STATEMENT

This securities class action centers on a SPAC (special purposes acquisition company) deal by which Romeo, a manufacturer of battery products for commercial electric vehicles, became publicly-traded. The AC alleges that to secure shareholder approval of the deal and to drum up investor interest in Romeo, Defendants touted sky-high revenue growth, with Romeo's total revenues growing from just $8.5 million in 2019, to $11 million in 2020, to $140 million by the end of 2021 (Romeo's first year as a public company). To support those figures, Defendants claimed upwards of $300 million in supposedly "secured" revenues (or "backlog") and 2021 projections of product revenue growing quickly and *exponentially* from a mere $4.85 million in 2019 to ***$59 million by the end of 3Q 2021***. To record that level of growth that fast, Romeo's production would have needed to be ramped and producing at unprecedented levels. Of course, as investors would only later learn, it wasn't.

While hyping the deal and Romeo's backlog, Defendants omitted that Romeo was then-suffering from a material shortage of the most critical component of its products: battery cells. In fact, Romeo did not have anywhere close to the cells needed, and as a result production was already down significantly in the quarters preceding the Class Period. *See* Sec. III.B.3, *infra*. But instead of fairly disclosing that Romeo lacked the cells to ramp production—which, given the tight market for cells, limited suppliers, high demand, and the long lead times to obtain cells, could have been the death knell for the deal or, at least, the budding public company's stock price—Defendants concealed it and misled

---

[1] Defendants for the §10(b) claim are Romeo Power, Inc. ("Romeo"); CEO, Lionel Selwood ("Selwood"); and CFO, Lauren Webb ("Webb") (together, the "Romeo Defendants"); Defendants for the §14(a) claim are the Romeo Defendants and the directors of RMG Acquisition Corp. ("RMG") who signed the Proxy Statement. ¶¶36-49. All "¶_" citations herein are to the AC, and all capitalized terms, if not otherwise defined, have the meanings stated in the AC. Unless otherwise noted, all emphasis is added and internal citations are omitted throughout.

1

the market to believe that the cell supply was in place to achieve the projected growth. For example, when asked pointedly on December 15, 2020, about "*any issues with securing enough cells to fulfill Romeo's large orders*," Selwood assured that he *did not see "any big challenges as [Romeo's] order book continue[d] to grow*." ¶128. To shore up the message that cell supply was not a problem, Defendants cited Romeo's cell "agnosticism" and claimed that it had "drop-in replacements" (¶¶72, 77, 128), stated that Romeo obtained cells from four major tier-one suppliers, suggesting that its supply sources were diversified (¶¶73, 80), and claimed that Romeo's "Operation Hedge Fund" stocked excess cell supply to hedge against any *potential* supply disruptions (¶¶129, 144).

But just three months after the vote to approve the SPAC deal, Romeo announced 2020 results revealing an 18% revenue miss for the year and *slashed its 2021 revenue guidance downward by 71-87%* (from $140 million to just $18 to $40 million). ¶8. Remarkably, Selwood cited supposedly "unexpected" cell supply constraints as the cause, but both Selwood and Webb were quick to reassure that the shortage was "temporary" and would not impact Romeo's "intermediate" results or backlog. *Id.*; ¶¶146-47. Romeo's stock price fell by 20%, to close at $8.33 per share on March 31, 2021. ¶15.

Things only deteriorated from there. Romeo announced its 1Q 2020 results on May 13, 2021, reporting revenue of just over $1 million, missing Street consensus by 75%. In response, Romeo's stock price fell $0.21 per share, closing at $6.61 on May 13, 2021. ¶¶16, 20, 101. Romeo then replaced both Selwood as CEO and Webb as CFO. ¶¶22-23. And on August 16, 2021, Romeo announced its 2Q 2021 results, reporting revenue of just under $1 million, missing Street consensus by over 69%. ¶¶24, 101. Romeo's stock price tumbled 20%, closing at $4.76 on August 16, 2021. ¶27.

At the end of the Class Period, investors learned that Romeo had earned just *$1.62 million* in product revenue from 4Q 2020 through 2Q 2021. *See* App'x A. These three quarters—which were supposed to kick off Romeo's rocket-like trajectory to $59 million by the end of Q3 2021—fell short of the product revenue Romeo booked in 4Q 2019 *alone*. *Id.* And the reason Romeo's sales were so

dismal is that at all relevant times, Romeo lacked the cells necessary to produce orders. Significantly, on August 16, 2021, **Romeo's new executive team admitted that it had not even begun to ramp production until August 2021 because, prior to that point, it simply did not have the cells**. ¶¶103-07.

In just over eight months from the height of Defendants' hype around the SPAC deal to the end of the Class Period, Romeo's stock lost over 87.7% of its value (from $38.90 on December 28, 2020 to $4.76 on August 16, 2021), **erasing over $2.6 billion in shareholder equity**. ¶6, 27.

Defendants attempt to recast this as a fraud by hindsight case by misconstruing "Plaintiffs' theory." MTD at 8. Plaintiffs' "theory" is **not** "that Romeo should have known in fall 2020 that *it would **later** encounter a shortage of battery cells* due to industry-wide constraints[.]" *Id.* Plaintiffs' theory is that Romeo was ***already experiencing*** a material cell shortage when the Class Period began. Whether a manufacturer is actually manufacturing products is not a secret to its executives, and the facts here show Defendants knew Romeo was not meaningfully producing prior to or during the Class Period because it did not have the cells. The Court need not make a large leap to credit Plaintiffs' allegations: Romeo's executives admitted it. And while Defendants may have *hoped* cell supply would come through in time for Romeo to salvage at least some of the lofty 2021 expectations they created, they did not disclose *that* risky proposition (made riskier still by additional pandemic supply pressures) to the market, rendering any supposedly cautionary language about *hypothetical* supply shortages meaningless and itself misleading. Finally, that Selwood and Webb were granted favorable Romeo options during the Class Period as part of a lucrative compensation package in connection with the merger does not negate that they intentionally or recklessly misled investors. In sum, the facts are sufficient to state claims under §§10(b), 14(a), and 20(a). Defendants' motion should be denied.

## II.    STATEMENT OF FACTS

### A.    Background of Romeo's Business and the RMG SPAC Transaction

Romeo reports revenue in three categories: product revenue from the sale of battery products,

service revenue for engineering services related to battery products, and related party revenue from a Joint Venture with multinational automotive supplier BorgWarner, which Romeo touted as improving its access to cell supply. *See* ¶¶64-65, 78; Ex. 1[2] (Reg. Stmt.) at 179-80; App'x A.

RMG, a special purpose acquisition company ("SPAC" or "blank check" company), was formed for the purpose of entering into a merger, acquisition, or other combination. ¶¶52-53. Under its governing documents, RMG had until February 19, 2021 to acquire a target; if it were unable to do so, the money raised in its IPO ($200 million) would be released back to RMG shareholders. ¶192.

On October 5, 2020, RMG and Romeo announced they had struck a deal. ¶54. Defendants filed the Registration Statement on October 15, 2020. ¶55. On December 10, 2020, Defendants filed a Rule 424(b)(3) proxy statement (the "Proxy"), incorporated by reference into the Registration Statement. ¶56. The Proxy repeated Romeo's *exponential* growth projections: $11 million in 2020, $140 million in 2021, $412 million in 2022, and so on. ¶¶56-57. The Proxy also reiterated Romeo's $310 million in backlog revenue and that Romeo expected to recognize $59 million of that revenue by September 30, 2021—*i.e.*, by the end of the first three quarters following the merger. ¶59.[3]

To engender market confidence in Romeo's ability to actually generate this growth by completing sales on schedule, Romeo's key SEC filings (including the Registration Statement, Proxy, and January 2021 Prospectus) touted its "close relationships with vendors of key components of our battery products, in particular battery cells" and identified four (4) major suppliers from whom Romeo purportedly bought cells: Samsung, LG Chem, Murata, and SK Innovation. ¶¶73, 80, 114, 134, 181.

The Proxy invited RMG investors to solicit proxies to vote at a special meeting to be held on December 28, 2020, with record date of December 1, 2020 for the meeting. ¶57. The Proxy included

---

[2] Unless otherwise noted, all references to "Ex. __" refer to exhibits attached to the Wolke Declaration.

[3] This belies Romeo's claim that it "never specified when in 2021 it would make and sell the batteries" (MTD at 13). Further, Defendants' assertion that investors were warned that 57% of Romeo's 2021 revenue would come in 4Q 2021 (MTD at 4, 13) is wrong. Their argument incorrectly presumes the entire $140 million in annual revenue projected was to come from product revenue, ignoring service and related party revenue. *See* MTD at 4 & n.4.

a redemption right to forgo participating in the merger and instead receive $10.18 per share of RMG stock. ¶193.[4] RMG investors approved the deal on December 28, 2020. ¶¶61-62.

### B. Romeo Experiences a Trend of Insufficient Supply of Battery Cells in the Quarters Preceding the Class Period; As Defendants Set Out on a Media Blitz To Drum Up Support for the Business Combination, They Conceal the Shortage

Battery cells are a critical component of Romeo's products and were the determinative factor in its ability to meet its sales targets during the Class Period. As Selwood explained, "[w]e will deliver as many batteries from as many cells as we get in the door." ¶144. But cells had long lead times to obtain and were in particularly tight supply prior to and during the Class Period. ¶165. Indeed, cell supply is allocated by suppliers "in some cases several years in advance." ¶163. And once Romeo had all components, it took about 16 weeks (4 months) to manufacture and deliver its products. ¶168.

Prior to the Class Period, Romeo experienced a marked downward trend in product revenue during the first three quarters of 2020. After holding steady from 3Q 2019 ($1.62 million) to 4Q 2019 ($1.75 million), product revenue dropped to $1.588 million in 1Q 2020 (a 9.3% quarter-over-quarter decline), to $458,000 in 2Q 2020 (71.2% decline), to just $51,000 in 3Q 2020 (88.9% decline). *See* App'x A. Given the end of Class Period admissions that Romeo failed to ramp production prior to August 2021 because it lacked the cells (¶¶103, 107), it is logically inferred that this decline in product revenue was primarily caused by Romeo's lack of cells. *See* Sec. III.B.3 & n.13, *infra*.

But even as Romeo was failing to ramp production, Defendants concealed the cell shortage as they went on a media blitz to shore up support for the deal. For example, during a December 14, 2020 interview, Selwood announced that Romeo's secured revenues had grown to *$544 million*. ¶¶79, 123-24. On December 15, 2020, when Selwood was asked about "*any issues with securing enough cells to fulfill Romeo's large orders*," he responded that Romeo was "focused on securing [Romeo's] capacity for the *long term*" and that he *did not see "any big challenges as [Romeo's] order book*

---

[4] The reference to $10.35 per share in ¶193 is a typo; it should say $10.18.

*continue[d] to grow*"—suggesting Romeo had a sufficient cell supply to fulfill its orders at least in the near term. ¶¶76-77, 128. Selwood also touted Romeo's "Operation Hedge Fund," claiming that Romeo bought excess supply of key components, such as cells, on the open market to store them for future use, thereby hedging against the risk of supply interruption. ¶129. And finally, on December 28, 2020—the day of the RMG shareholder vote—Selwood again highlighted Romeo's "$544 million in contracted backlog revenue[,]" to emphasize that Romeo was "*not a pre-revenue company*." ¶132.

### C. The January 2021 Prospectus and Other Post-Merger Assurances

Defendants continued to tout Romeo's backlog and conceal its cell shortage in early 2021. The January 2021 Prospectus reiterated the expectation of $59 million in backlog revenue by September 30, 2021, and again cited Romeo's four cell suppliers. ¶¶80-82. On February 25, 2021—just one month before Romeo would release its first results as a public company (4Q and FY 2020)—Selwood was asked about any "potential chinks in [Romeo's] supply chain." ¶85. Selwood conceded the most critical component was cells, but said nothing of a shortage. Instead, he assured that "ensuring that we have continuous access to that [cell] supply is a daily focus of ours" and emphasized "Operation Hedge Fund," suggesting that Romeo actually had surplus cell supply. ¶¶85, 144.[5]

### D. Romeo's Share Price Declines Precipitously as the Truth Is Revealed; Romeo Replaces Selwood as CEO and Webb as CFO

On March 30, 2021, Defendants stunned investors by reporting that a supposedly "unexpected limitation on cell availability" caused Romeo to miss 2020 revenue by 18% and that Romeo's 2021 revenue estimate would be slashed by *71-87%*. ¶8. Selwood claimed the "shortage was unexpected" and had "increased dramatically over the course of the last several weeks." ¶87. Defendants attempted to reassure investors, however, with Selwood claiming Romeo's cell shortage was "temporary" and would "not affect our intermediate and longer term opportunities" (¶87) and Webb labeling it "short-

---

[5] In this regard, Selwood's statements are markedly different than other companies' statements that Defendants improperly cite regarding cell supply in early 2021. MTD at 6. *See* Plffs' Opp'n to Defs' RJN. Moreover, whether *other* companies experienced a cell shortage in early 2021 is irrelevant where Plaintiffs allege *Romeo* had an insufficient supply of cells at the start of the Class Period in October 2020.

term" and insisting that "[w]e don't expect any impacts to our backlog" (¶¶88, 147). And when pressed on "*when you first realized there was a serious problem with the supply*" because "*part of the story I thought was, you know, you have four suppliers, four main cell suppliers*," Selwood backpedaled from Romeo's previous claims of four suppliers, stating "*just a quick clarification, four part numbers, not four different cell suppliers*…our preferred cell suppliers…are LG and Samsung." ¶89.

Romeo's 2020 Form 10-K, filed on April 15, 2021, quietly removed SK Innovation and Murata from its list of suppliers. ¶96. And despite Selwood and Webb's assurances two weeks prior that the cell shortage would not impact Romeo's intermediate results or backlog, the 2020 Form 10-K drastically reduced the amount of backlog revenue expected to be recorded in 2021 *by over 60%*— from $59 million by the end of 3Q, to just $23.4 million by year-end. ¶95.

Romeo delivered another blow on May 13, 2021, reporting a mere $1 million in 1Q 2021 revenue (with only $341,000 in product revenue), missing consensus by 75%, but tempered the blow with news of a new purchase contract with PACCAR. ¶16. On June 16, 2021, Romeo announced Webb would resign as CFO. ¶98. And on August 6, 2021, Romeo announced Selwood would resign "to pursue new opportunities." ¶99. He was replaced by Romeo board member Susan Brennan. *Id*.

### E.    In August 2021, Romeo Admits it Is Just *Beginning* to Ramp Production

On August 16, 2021, Romeo announced yet another quarter hampered by a lack of cells. ¶100. Second quarter revenue of $926,000 (including product revenue of only $466,000) missed consensus of $3.05 million by over 69%, and Romeo further reduced its backlog to be recorded by the end of 2021 by nearly 20%, to just $18.9 million. *Id.* Still, Romeo's new leadership had some good news: just one week prior, Romeo finally secured cell supply (from LG) so it could now *begin* to ramp production. ¶102. Romeo's new CFO explained, thanks to the new agreement, Romeo was "*on the verge of a volume ramp up*" and "*the second half of 2021 is expected to be the beginning of a period of the ramp-up of sales and operating activity for us*." ¶103.

7

III.    **THE AC STATES CLAIMS UNDER SECTION 10(b) OF THE EXCHANGE ACT**[6]

A.     **Elements and Pleading Standards Applicable to §10(b)**

To state a claim under §10(b) and Rule 10b-5(b), a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). "Even under the PSLRA, which establishes heightened pleading requirements for securities fraud claims, the usual rules for determining motions to dismiss pertain: the well-pleaded allegations of the complaint are deemed true and all reasonable inferences are drawn in favor of the pleader." *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *8 (S.D.N.Y. Mar. 25, 2013).[7]

B.     **The AC Alleges Actionable False or Misleading Statements and Omissions**

1.     **Romeo's Identification of Four Major Suppliers Was False and Misleading**

Contrary to Defendants' claim that they "never represented that Romeo was receiving battery cells from 'four' suppliers" (MTD at 15), Romeo's key SEC filings—including the Registration Statement and January 2021 Prospectus—***clearly*** represented that it obtained cells from four suppliers. Under the heading "**Suppliers**" (bold in original), Romeo cited its "close relationships with vendors of key components of our battery products, in particular battery cells," and identified Samsung, LG, Murata, and SK Innovation as those suppliers. ¶¶73, 80, 114, 134. The filings also specifically stated that each supplied Romeo with cells: "***LG Chem supplies Romeo with power cells***"; "***Murata supplies Romeo with power cells***"; and "***SK supplies Romeo with power cells.***" *Id*.

Despite this plain language, Defendants argue that Romeo "made clear" to investors "that just *two* suppliers—LG Chem and Samsung—were expected to supply battery cells in the near-term" based on a presentation that included the logos of LG Chem and Samsung on a slide about Romeo's cell

---

[6] "Defendants" as used in this section refers to Romeo, Selwood, and Webb.

[7] Defendants challenge only falsity and scienter, and thus waived any challenge to the other elements. *See* Fed. R. Civ. P 12(g); *Mateo v. Bristow*, 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013).

science and technology. MTD at 15 (emphasis in original); Defs. Ex. 6 at 28. But featuring the logos of two suppliers with high name recognition does not negate the unambiguous statements in the SEC filings that *all four* suppliers actually supplied Romeo with cells during the Class Period.

And Defendants now further argue that "only one (Samsung)" actually then-currently supplied Romeo with cells, citing the description in the Registration Statement that "Samsung currently supports the EV Program." MTD at 15.[8] But that language certainly does not state that Samsung was the *only* supplier to the exclusion of the others, *especially* where the filings explicitly stated that LG Chem, Murata, and SK all *also* "suppl[y] Romeo with power cells" (in the present tense). ¶¶73, 80. Defendants' argument that Romeo's reliance on "only one" supplier during the Class Period "was disclosed to investors" is further belied by the fact that *analysts* clearly believed (based on Romeo's SEC filings) that it bought cells from four different suppliers, and they clearly thought it material. ¶89.

In short, Romeo falsely claimed to obtain cells from four major suppliers, no doubt to project the façade of having a robust, diversified supply chain, and those false statements are actionable.[9]

### 2. Defendants' Omission of the Cell Shortage, and Claims About "Operation Hedge Fund" in Response to Supply-Related Inquiries, Were Misleading

Selwood repeatedly downplayed any cell supply problem during the Class Period. When asked on December 15, 2020 if Selwood saw "*any issues with securing enough cells to fulfill [Romeo's] large orders*," he responded that Romeo's "cell supplier agnosticism" "ensure[d] that we have drop-in replacements" and assured "*I don't see any big challenges as our order book continues to grow*." ¶¶76-77, 128. When asked how "the company deal[s] with the tight supply of raw materials for batteries," Selwood cited "Operation Hedge Fund," explaining that because some components, like cells, had a long "54 week lead time to 72 week lead time…*we implemented Operations Hedge Fund program in our supply base that allows us to secure products that's needed for the long [term]*."

---

[8] In yet another presentation, Romeo featured the logo of only LG Chem on the same slide, contradicting the argument that it made clear to investors that "only one (Samsung)" actually supplied cells at the time. *See* Ex. 2.
[9] *Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1049 (D. Minn. 2015) (touting strength of supplier relationships as "a material competitive advantage" was misleading).

9

¶129. When asked on February 25, 2021 "where do you see the potential chinks in the supply chain," Selwood responded that "ensuring that we have continuous access to that supply [of battery cells] is a daily focus of ours" and again cited "Operation Hedge Fund" for products with long lead times, such as cells, claiming "*we actually grab it on the open market and put it on the shelves*." ¶¶85, 144. He elaborated that "*we need to grab these so we're not lying down.' So, that's what drove it*" (¶144), suggesting that Romeo had in fact purchased extra cells to hedge against *potential* supply delays.

Defendants argue that Selwood "made clear" on February 25 that battery cell supply was "subject to more uncertainty" than other aspects of Romeo's business (MTD at 14), but any ambiguity in Selwood's statement is not properly resolved in Defendants' favor on this motion; is a question for the fact-finder. And Defendants' interpretation does not appear to be the conclusion the interviewer drew from Selwood's statements. He appeared swayed by Selwood's assurances that Romeo had successfully "hedged" against a looming shortage: "*You were hedging against supply that was a pretty smart move, so it turns out*." ¶144.[10] But even if Selwood *did* "make clear" that cells were subject to more "uncertainty" on February 25, that is still misleading where the facts indicate Selwood *knew* Romeo was *at that time actually experiencing* a cell shortage that was disrupting production.[11]

When read in context, the failure to disclose Romeo's actual cell shortage and associated production delays, in response to questions about cell supply, and while touting "Operation Hedge Fund," is actionable. *See, e.g.*, *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) (reference to "pollution-preventing equipment…gave comfort to investors that reasonably effective steps were being taken to comply with applicable environmental regulations").[12]

---

[10] *See also* Ex. 3 (website post of interview: "Romeo Power CEO Lionel Selwood saw the component shortages coming for commercial vehicle batteries. *Romeo hedged by buying on the open market*.").

[11] Nearly 2/3 of the way through the quarter, Selwood would have known that 1Q 2021 deliveries were down significantly, both from the prior quarter and year-over-year. *See* App'x A. And because of Romeo's 4-month production lead times, by February 25, Selwood *also* would have known that production for 2Q 2021 deliveries remained significantly depressed.

[12] *See also In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *3, *8 (S.D.N.Y. May 24, 2018) (omission of delays and cost overruns misleading where defendants, in response to question about project

### 3. Defendants Had a Duty to Disclose the Known, Existing Supply Shortage and Production Delays Under Item 303

Item 303 of Regulation S-K imposes an affirmative duty on securities issuers to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(ii). The failure to disclose a trend under Item 303 satisfies falsity under §10(b). *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 104 (2d Cir. 2015). The facts here show Defendants knew of Romeo's cell shortage having a material unfavorable impact on sales and revenue prior to the Class Period. The below chart shows how Romeo's product revenue declined precipitously from Q4 2019 through Q3 2020, but Defendants did not disclose this trend in the Registration Statement:

| Reporting period | Q3 2019 | Q4 2019 | Q1 2020 | Q2 2020 | Q3 2020 |
|---|---|---|---|---|---|
| Product revenue | $1,618,000 | $1,750,000 | $1,588,000 | $458,000 | $51,000 |
| Percentage decline | | | 9.26% | 71.2% | 88.9% |

Instead, Defendants reported only a comparison of total 1H 2020 product revenue to total 1H 2019 (*see* Ex. 1 at F-37), which misleadingly suggested that Romeo's sales were *increasing* in 2020 when they were doing the *opposite*. In fact, product revenue was virtually non-existent in the months preceding the Class Period: Romeo recorded only $51,000 from July through September 2020.[13]

---

status, claimed they had made "good progress"); *Aeropostale*, 2013 WL 1197755, at *11 (assurances that defendants "were taking steps to get their problems behind them" when sales were likely to remain depressed were misleading); *Azar v. Yelp, Inc.*, 2018 WL 6182756, *10, *11 (N.D. Cal. Nov. 27, 2018) (claim that "fundamentals are in place and really strong" misleading in response to question about local customers where Yelp's local account churn was heightened).

[13] While Defendants may argue that they did not have final 3Q results in hand on October 15, 2020, more than two weeks had passed since the quarter's end; if not final, they knew the sales were virtually nil. And the most logical inference is that the product revenue decline was driven by a lack of cells. Defendants identified no other manufacturing or supply problems, and according to Selwood, Romeo "deliver[ed] as many batteries from as many cells as we get in the door" (¶85). While Romeo *later* disclosed a "decrease of $1.00 million" during the first three quarters of 2020, which it attributed to the completion of a large customer contract in April 2020 (*see* Ex. 4, 11/20/2020, Form S-4/A, at 187), that explanation looks more like an *ex post facto excuse* for the increasingly poor 2020 product revenue, where Romeo said nothing in the October Registration Statement about the implications of the expired contract that ended six months earlier. In any event, Defendants' citation to that contract as the reason for the overall decline only obscured the quarterly trend and suggested that any slowdown was a temporary lull that would be reversed as Romeo delivered the $59 million in orders due between September 2020 and September 2021. Finally, a single expired contract fails to explain the trend. While Romeo projected and should have booked *more* product revenue in 2020 than 2019, it booked nearly $2 million *less* (*see* App'x A)—only $1 million of which is even possibly explained by the contract that expired in 2Q. On these facts, the most credible explanation for the declining product revenue is that Romeo lacked the cells.

And by the time of the January 26, 2021 Prospectus, Defendants further knew, but did not disclose, that Romeo's 2020 product revenue was down *significantly* (40%) from the prior year—both in absolute terms and as a percentage of total revenue—when according to Defendants' projections, product revenue should have been *sky rocketing*. *See* App'x A ($2.91 million product revenue (32% of total revenue) in 2020 vs. $4.85 million product revenue (57% of total revenue) in 2019).[14]

These facts are sufficient to allege that Defendants knew of the trend of Romeo's cell shortage disrupting production and had a duty to disclose it under Item 303. The failure to do so alleges falsity under the securities laws. *Panther Partners Inc. v. Ikanos Commc'ns., Inc.*, 681 F.3d 114, 119-22 (2d Cir. 2012) (failure to disclose chip quality problems, including "the scope of the defect issue with which Ikanos was then grappling" and that company "*might* have to accept returns of a substantial" volume of chips, violated Item 303 and alleged falsity even where returns were not a certainty and company did not know whether "defect rate was 'above average'"); *In re Blue Apron Holdings, Inc. Sec. Litig.*, 2020 WL 1950783, at *6, *8-*9 (E.D.N.Y. Apr. 22, 2020) (failure to disclose delays "in opening and ramping up production" at manufacturing facility that began in early 2017 and continued through IPO in mid-2017 violated Item 303 and rendered Registration Statement misleading).[15]

---

[14] While product revenue increased in 4Q 2020 (at $813,000), it was not nearly enough to make up for the ongoing shortage and production delays, and was still down 53.5% from Romeo's 4Q 2019 product revenue ($1.75 million). It certainly was not a reversal of the trend. Notably, the cell shortage continued to depress product revenue throughout 1Q 2021 (at $341,000) and 2Q 2021 (at $466,000). *See* App'x A. And given Romeo's 4-month production lead times, Defendants knew the ongoing cell shortage was still hampering production at the time of the January 2021 Prospectus—when Romeo *should* have been producing orders on a mass scale for delivery in 2Q.

[15] *See also Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 837-39 (N.D. Ind. 2018) (Item 303 duty to disclose "systemic" quality control issues that "were completely anathema to the growth and success ZBH was telegraphing to the markets because it would be nearly impossible for ZBH to achieve those goals while fully remediating the known issues"); *Curran v. Freshpet, Inc.*, 2018 WL 394878, *4-*5, *8 (D.N.J. Jan. 12, 2018) (Item 303 gave rise to actionable omission where defendants failed to disclose that manufacturing problems threatened projected refrigerated pet food roll-out).

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010) (MTD at 16) is inapposite. There, the plaintiffs failed to allege knowledge of the "trend of delinquencies and foreclosures" and instead argued that "what Defendants did or did not know at the time of the IPO is irrelevant" to the Item 303 duty to disclose. *Id.* Here, Plaintiffs allege knowledge.

12

**4.** **Defendants' Claims About Romeo's "Secured" Revenue Were Misleading Where *At All Relevant Times During the Class Period*, Romeo Lacked Sufficient Cell Supply to Ramp Production**

As discussed above, Romeo touted a backlog of $310 million with $59 million of that revenue to be booked by September 30, 2021. ¶¶111, 136. Defendants claimed that Romeo's "secured" revenue "enhance[ed] visibility" into its growth (¶108), and, indeed, the aggressive figures signaled to investors that Romeo was ramping production and ready to begin delivering a *significant* amount of orders.[16] Defendants' omission of the shortage when touting Romeo's backlog, and in particular the $59 million to be booked by September 30, 2021, "'affirmatively creat[ed] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed],' and therefore it is actionable." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005). The backlog figures did not provide "visibility"; they were a misleading mirage because Romeo lacked the cells needed to convert the orders to sales in any meaningful way. *Matrixx*, 563 U.S. at 44 (disclosure required to make "statements made, in the light of the circumstances under which they were made, not misleading").

From the beginning of the Class Period, Romeo was not meaningfully converting orders to sales at *anywhere near* the pace necessary to fulfill $59 million in orders by the end of 3Q 2021. For Romeo to grow product revenue from just $4.85 million in 2019 to $59 million for the 12-month period ending September 30, 2021 (a more than 12x increase in its first year), common sense dictates that it would have needed to ramp production ***dramatically*** and consistently. But Romeo's end of Class Period admissions concede that production ramp never happened because Romeo lacked the cells. ¶103. This concession, and Defendants' contemporaneous knowledge that Romeo was not ramping

---

[16] Selwood also touted Romeo's "secured" revenue in interviews. ¶¶109, 121, 123 (12/17/2020, "*we've been able to secure $544 million in contracted revenue*"); ¶132 (12/28/2020, "*We are not a pre-revenue company. We have $544 million in contracted backlog revenue.*"). Defendants take Selwood's "we are not a pre-revenue company" statement out of context to argue it was not misleading because Romeo made $8.97 million in revenue in 2020. MTD at 15. Of course, Selwood was not referring to Romeo's modest 2020 revenue; he was trying to sell it as a company with ***$544 million*** in ***secured*** revenue. To tout supposedly secured revenue to hype Romeo's "visibility," without disclosing the material cell shortage that was then-delaying production, was misleading. *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011) ("so-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud."), *reversed on other grounds*, 568 U.S. 442 (2013).

13

production because it lacked the cells, is confirmed by Romeo's product revenue results during the Class Period—which were down significantly from 2019, when they should have been rising exponentially.[17] Production was *declining*. In sum, the AC alleges facts sufficient to infer that Romeo's factory floor clearly was not running at the capacity necessary to manufacture orders on the stated 2021 timeline, and Defendants knew it, rendering their statements touting Romeo's backlog misleading. *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at \*4 (S.D.N.Y. June 21, 2021) (defendants' statements touting $840 million committed purchase order of COVID test kits was actionable given problems with supplier that defendants recklessly disregarded).[18]

### 5.    The Safe Harbor Does Not Warrant Dismissal

#### (a)    The Safe Harbor Does Not Apply To Omissions

The only challenged statement even *arguably* forward-looking is Romeo's claim that it expected to book $59 million of backlog revenue by September 30, 2021. MTD at 9.[19] But the statement is rendered misleading by the *omission* of Romeo's then-existing supply shortage and associated production delays that put the target at material undisclosed risk. The safe harbor provides no protection for such omissions. *Aeropostale*, 2013 WL 1197755, at \*12 (citing cases).

#### (b)    The Safe Harbor Does Not Apply Because The Subject Statement Encompassed Representations Of Present Fact

"[I]t is well recognized that even when an allegedly false statement has both a forward looking

---

[17] Again, given Romeo's 4-month production lead time, Defendants knew during each quarter the extent to which Romeo was (or, more aptly, was not) producing orders for delivery in the next quarter.

[18] *See also S.E.C. v. Hurgin*, 484 F. Supp. 3d 98, 105, 110-12 (S.D.N.Y. 2020) ("backlog and pipeline figures" misleading because terminations of management at company's largest customer "could endanger the potential orders and revenue" from the customer); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 230 (S.D.N.Y. 2008) (statements that defendant and Disney "can grow up to 1,800 stores" were actionable in light of undisclosed problems it was having with Disney); *W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, 2008 WL 879023, at \*4, \*8-\*9 (D. Colo. Mar. 28, 2008) (claims about "the health and strength of [sales] pipeline" actionable).

[19] Romeo does not argue that their statements about its suppliers, its "hedged" supply, or its overall backlog are forward-looking. What Defendants label Statement No. 10 (¶144, "ensuring that we have continuous access to [battery cell] supply *is* a daily focus") is *not* forward looking; it is a description of Defendants' purported then-daily focus, and it was misleading for the reasons discussed in Sec. III.B.2, *supra*.

aspect **and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply**." *Chicago Bridge*, 2018 WL 2382600, at \*8; *Aeropostale*, 2013 WL 1197755, at \*12 (failure to disclose in May 2011 that unpopular designs that were likely to sell poorly were ordered through summer 2011 was not protected by safe harbor "regardless of whether the [sales forecasts] thereby rendered misleading were forward-looking."). Romeo's claims that it expected to complete $59 million in backlog orders by the end of September 2021 "encompasse[d] a representation of present fact," to wit, that Romeo had a sufficient supply of cells and was then actually manufacturing its products on the scale necessary to reach $59 million on the stated timeline, which **it clearly was not**. As in *Aeropostale*, Defendants' failure to disclose that production was stalled because Romeo lacked cells is actionable, regardless of whether the statement thereby rendered misleading (that Romeo would complete $59 million in orders by the end of Q3 2021) was forward-looking.[20]

### (c) The Statements Lacked "Meaningful" Cautionary Language

"To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton v. Am. Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010). Cautionary language must include "the major factors that the defendants faced at the time the statement was made." *Id*. at 771. Here, Romeo's supply of battery cells was a major factor, if not *the most important factor* to generating $59 million in revenue by September 30, 2021.[21] And the facts show that Romeo faced inadequate cell supply at the time of the October 15, 2020 Registration Statement, which continued at the time of the January 26, 2021 Prospectus. None of the "risk warnings" cited by

---

[20] Defendants' reliance on *In re Seadrill Ltd. Sec. Litig.*, 2016 WL 3461311, at \*9 (S.D.N.Y. June 20, 2016) is misplaced. MTD at 10. There, unlike here, the plaintiffs could not allege that the challenged statements about the expected benefits of new contracts implicated *present* facts where the regulations that ultimately disrupted the contract were enacted *after* the contracts were agreed. Also, the specific risk to the contract (relating to the annexation of Crimea by Russia) was actually disclosed.

[21] ¶144 (Selwood: "We will deliver as many batteries from as many cells as we get in the door. So **that's the first thing-battery cells**."); ¶104 (Shiba: cells are "our most important product component").

Defendants warned about that then-existing shortage (MTD at 5, 11); instead, all such warnings were misleadingly presented as *hypothetical*.[22] Warning of a hypothetical shortage while concealing the existence of the **actual shortage that was harming** Romeo's business was misleading. *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 289 (S.D.N.Y. 2020), *reconsideration denied*, 2021 WL 3174414 (S.D.N.Y. July 24, 2021) (cautionary language that project schedule "may be affected by delays or cost overruns" misleading where delays had "already transpired").[23]

Moreover, Romeo's cautionary language about hypothetical cell supply delays remained substantially the same from the October 15, 2020 Registration Statement (¶117), in the January 26, 2021 Prospectus (¶140), and through the Company's 2020 Form 10-K filed on April 15, 2021 (¶151), even as the shortage intensified and Defendants themselves *now* argue that the supply risks "began to materialize in early 2021." MTD at 6. *Slayton*, 604 F.3d at 772-73 (cautionary language not meaningful where it "remained the same even while the problem changed.").[24]

### (d)   Defendants Had Actual Knowledge Of Facts That Rendered The $59 Million Figure Misleading

Finally, the safe harbor does not apply because Defendants had actual knowledge of facts that rendered their statements misleading. 15 U.S.C. § 78u–5(c)(1)(B). The Second Circuit has held that actual knowledge precludes the safe harbor if "a reasonable person would…deem an inference that

---

[22] ¶¶117-18, 140-41 (*e.g.*, "the inability of our suppliers to deliver necessary components of our battery products . . . **could** have a material adverse effect on our business" and "disruption of supply or shortage of any of our battery components, particularly cells, **could** harm our business").

[23] *See also Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *12 (S.D.N.Y. Apr. 14, 2020) (warning that company "may" experience excess inventory misleading where plaintiffs plausibly alleged defendants already knew about inventory build); *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143 (E.D.N.Y. 2020) (hypothetical risk factors that failed to state contingent events had already occurred were actionable); *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) (warning that factors "may" affect revenue actionable where factors already had affected revenue).

[24] Further, contradicting Romeo's litigation strategy, its April 15, 2021 Form 10-K described pandemic-related supply disruptions as hypothetical and, to the extent there *was* any impact on supply, as "limited". *See* Ex. 5 at 27 ("This outbreak has resulted in the extended shutdown of certain businesses in many of these countries, which **may result in disruptions or delays to our supply chain**…."); *id.* at 55 ("To date, COVID-19 has had a **limited adverse impact on our operations** [and] **supply chains**," and instead only caused Romeo "to continue using higher cost components" and incur "higher losses on raw materials.").

the defendants (1) did not genuinely believe the [ ] statement, (2) actually knew that they had no reasonable basis for making the statement, or (3) *were aware of undisclosed facts tending to seriously undermine the accuracy of the statement*, 'cogent and at least as compelling as any opposing inference.'" *Slayton*, 604 F.3d at 775 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd. ("Tellabs II")*, 551 U.S. 308, 323 (2007)).[25] As discussed above, to attain the incredible product revenue growth projected (12x over its 2019 annual result to $59 million *by the end of 3Q 2021*), Romeo would have had to be producing at unprecedented levels *throughout* the Class Period. Romeo's low product revenue shows it was not, and the reason it was not is because Romeo lacked cells, as confirmed by its own admission that "the second half of 2021 is expected to be *the beginning of a period of the ramp-up of sales and operating activity for us*." ¶103. Thus, the AC alleges Defendants had actual knowledge of facts—*i.e.*, that due to a lack of cells, Romeo had not begun to meaningfully ramp production—that seriously undermined the projection. *Freshpet*, 2018 WL 394878, at *4 (no safe harbor where undisclosed manufacturing problems threatened projected refrigerated pet food roll-out where defendants knew company was required to replace equipment "at a faster rate than anticipated").

### 6.    Defendants' Assurances After the Initial Announcement of the Supply Shortage Were Materially Misleading

When Defendants first announced the cell shortage on March 30, 2021, they assured the market that it "will not affect our intermediate and longer-term opportunities," and "[w]e don't expect any impacts to our backlog." ¶¶146-47. And they made these assurances against the backdrop of the January 2021 Prospectus reiterating that Romeo expected to book $59 million in backlog revenue by September 30, 2021. ¶¶136-37. These statements were materially misleading because Defendants *knew* at that time that the cell shortage would undoubtedly impact Romeo's "intermediate" opportunities and ability to convert backlog to revenue. Just two weeks later, in Romeo's April 15, 2021 Form 10-K, Defendants slashed the backlog forecast by over 60%, from $59 million by the end

---

[25] Contrary to Defendants' argument (MTD at 11), actual knowledge does not mean knowledge to a certainty that a projection is impossible to meet. *Slayton*, 604 F.3d at 775.

of Q3 to just $23.4 million by the end of the year. ¶148. The shortage *indeed* impacted the backlog. *Cf. Miss. Pub. Emps' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 91 (1st Cir. 2008) (reassuring statements made a week before product recall announced actionable).

But even that reduction did not reveal the full impact of the shortage on Romeo's backlog. When Defendants announced Romeo's disappointing 2Q 2021 results on August 16, 20121 (including product revenue of just $466,000), they further reduced the backlog forecast by over 19% (to just $18.9 million by year-end).[26] These facts plausibly allege that Defendants misleadingly downplayed the supply shortage when they first announced it on March 30, 2021. *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (company misleadingly downplayed problems with computers as "not significant enough to affect profitability" and "would be remedied quickly").

### C. The AC Alleges a Strong Inference of Scienter

Scienter is alleged by facts giving rise to a strong inference that a defendant either knew "or was reckless in disregarding a substantial risk" that a statement was false or misleading. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) (*Tellabs III)*. The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs II*, 551 U.S. at 324. A complaint survives if the facts, viewed holistically, give rise to an inference of scienter that is "at least as compelling" as any nun-culpable inference. *Id.* at 314, 322-24. If the inferences are equally strong, *Tellabs II* "awards the draw to the plaintiff." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008).

#### 1. The August 2021 Admissions by Romeo's New Executive Team Show That Romeo *Never* Had a Sufficient Supply of Battery Cells

Scienter is alleged based on Romeo's admission on August 16, 2021, by its new CFO, that

---

[26] Defendants' veiled attack on loss causation (MTD at 16, n12) fails. Plaintiffs allege that Defendants continued to conceal the extent and impact of the cell shortage following March 30, 2021. When additional information about the impact of the shortage was revealed on August 16, 2021 (¶¶100, 190), Romeo's stock price fell 20%. That alleges loss causation. *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d, 233, 245 (S.D.N.Y. 2012) ("Loss causation may be adequately pleaded by alleging either a corrective disclosure…or the materialization of a concealed risk that causes a stock price decline.").

because Romeo had just *then* secured access to cells, "***the second half of 2021 is expected to be the beginning of a period of the ramp-up of sales and operating activity for us***." ¶¶103, 107.[27] This supports a strong inference that Defendants knew at all times prior to August 2021 that Romeo had not previously ramped production in any meaningful capacity during the Class Period *because it did not have the cells*, but deliberately or recklessly concealed the shortage from investors. That alleges scienter. *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (scienter alleged where "defendants knew at all relevant times that the Company had serious inventory problems that they sought to disguise").

Scienter is alleged based on Defendants' concealment of the shortage even if Defendants *hoped* cell supply would come through.[28] In fact, assuming Defendants *did* have such a hope, that further supports scienter because "then 'the benefits of concealment might [have] exceed[ed] the costs'" of disclosure. *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016).

### 2. Individual Defendants' Misdirection About Cell Supply Supports Scienter

"[T]he most powerful evidence of scienter is the content and context of [Defendants'] statements[.]" *Inst. Inv. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009). As in *Avaya*, both Selwood and Webb's misdirection and glaring omission of *any* mention of a shortage in the face of direct questioning about Romeo's cell supply and its ability to convert backlog orders bears the hallmark of deception. *E.g.* ¶¶76-78, 85, 126, 144. Selwood, in particular, consistently downplayed cell supply concerns and concealed Romeo's ongoing cell shortage, and then—when it could no longer

---

[27] *See also* ¶106 (in response to question asking about customer relationships "***now that you have the cells***," Brennan responded that "[w]e've been very deliberate in the timing of executing commitments to both new and existing customers ***as we've been working through securing the cell supply***" conceding Romeo did not have the supply to execute on those commitments earlier). These admissions are sufficient to allege the absence of cells and any meaningful production ramp prior to August 2021, which is relevant to *all* Defendants' scienter, and they are imputed to Romeo for purposes of its scienter. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008). Moreover, Brennan was in a position to know Romeo's operations even prior to taking over as CEO, having served on the board of directors since December 2020. ¶22.

[28] *Plumbers & Pipefitters*, 2020 WL 1877821, at *13 ("Although Defendants may have hoped that PSG would uncover new sources of future revenue and thus that the risk of lower future sales associated with the rising inventory would not materialize, the Fund has plausibly alleged facts that give rise to a strong inference that the decision not to disclose this information was nonetheless reckless."); *Tellabs III*, 513 F.3d at 710 (scienter alleged where a defendant "conceal[s] bad news in the hope that it will be overtaken by good news").

19

be obscured—feigned surprise, claiming the shortage was "unexpected," and blamed it entirely on the pandemic. ¶¶13, 146. This pattern suggests a conscious effort to mislead investors. *Zimmer*, 348 F. Supp. 3d at 845-46 (misleading explanation of reasons for supply shortages supported scienter); *S.E.C. v. Conaway*, 2006 WL 2828569, at *7 (E.D. Mich. Sept. 29, 2006) (CEO's creation of a "cover story" to "hide the nature, cause, and severity of the liquidity problem" supported scienter).[29]

### 3. Manufacturing Battery Products Was Romeo's Core Operation and Product Revenue Was Already Trending Down *Significantly* in 2020

Battery products were the backbone of the massive growth story Defendants sold to investors, with cells admittedly the *most important* component of that growth. ¶144 (Selwood: continuous access to cell supply is "a daily focus" and "the first thing"); ¶104 (Shiba: cells are "our most important product component"). The central importance of cells to Romeo's business, and Selwood's claim that he and Romeo focused on cell supply "daily," supports an inference that Defendants were aware of the cell shortage that had prevented Romeo from meaningfully ramping production prior to August 2021. *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 852 (S.D.N.Y. 2019); *Schwab v. E\*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 434 (S.D.N.Y. 2017).[30] Further, heading into the Class Period—*i.e.*, when Defendants were planning the SPAC deal and drafting Romeo's Registration Statement—Defendants knew Romeo's product revenue was already trending down *significantly* from 2019. App'x A; Sec. III.B.3, *supra*. The most logical inference, especially in light of Selwood's statement that Romeo "will deliver as many batteries from as many cells as we get in the door," is that the *reason* for the dismal 2020 product sales was that it

---

[29] Romeo's cell shortage did not only first arise in March 2021, as Selwood claimed (¶146)—it existed and was ongoing *throughout* the Class Period. *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007) (scienter alleged where "[t]his is not a case where plaintiffs are pleading fraud based on changed circumstances that were unforeseen by defendants at the time they made their statements. Rather, plaintiffs have cited contemporaneous circumstances…of which [defendants] were aware").

[30] *Yannes*, 2021 WL 2555437, at *5 (inferring knowledge of problems with "exceptionally important" supply contract); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *16 (S.D.N.Y. Apr. 22, 2016) ("that the alleged fraud concerned Salix's core operations …buttress[es] the allegations of scienter discussed above"); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16 (S.D.N.Y. 2019).

*was already experiencing* a material shortage of cells in 2020—and Defendants knew it.[31]

### 4.    Romeo's Production Lead Times, and the Temporal Proximity of the Corrective Disclosure to Defendants' Statements, Support Scienter

As late as the January 26, 2021 Prospectus, Defendants reiterated that Romeo expected to book $59 million in backlog revenue by September 30, 2021. ¶81. And as late as February 25, 2021, Selwood, while acknowledging that Romeo's suppliers "consistently" pushed out procurement lead times, suggested Romeo had avoided potential supply disruptions by stocking excess cell supply. ¶85. Given Romeo's 4-month production lead time, January and February 2021 should have been the *height* of Romeo's production for orders to be delivered in 2Q.[32] But production in early 2021 was *obviously* lagging: on August 16, 2021, investors learned Romeo recorded just $466,000 in product revenue in 2Q 2021 (for a total of only $1.62 million in product revenue from 4Q 2020 through 2Q 2021). Simply put, by early 2021 *at the absolute latest*, Defendants knew the factory was running at nowhere near the pace needed to reach $59 million by the end of 3Q 2021. It is implausible to suggest otherwise.

The proximity of the reiteration of the backlog guidance in the January 26, 2021 Prospectus and Selwood's February 25, 2021 statements about cell supply to the first partial disclosure of the cell shortage on March 30, 2021 supports scienter. *Avaya*, 564 F.3d at 271; *Universal Am . Corp. v. Partners Healthcare Solutions Holdings, L.P.*, 176 F. Supp. 3d 387, 395-396 (D. Del. 2016) (similar). Moreover, scienter is alleged for Webb's claim on March 30, 2021, that "[w]e don't expect any impacts to our backlog" (¶147), where Romeo slashed its backlog revenue guidance by over 60% (from $59 million by the end of 3Q to just $23.4 million by the end of 2021) just two weeks later (¶148). *Boston Sci.*, 523 F.3d at 91 (1st Cir. 2008).

---

[31] *Novak*, 216 F.3d at 308 ("[A]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of…recklessness."); *Plumbers & Pipefitters*, 2020 WL 1877821, at *13 (failure to disclose trend of inventory build supported strong inference of scienter).

[32] Romeo's 4-month production lead time similarly supports an inference that Defendants knew in September and October 2020 that production was lagging on orders due in 1Q 2021, as Romeo booked only $341,000 in product revenue in 1Q 2021—***down 79% from 1Q 2020***—when Romeo should have been producing and selling exponentially more than it had ever before. *Aeropostale*, 2013 WL 1197755, *17 (scienter alleged where "Defendants could see that sales…were poor and getting poorer.").

### 5.     The Abrupt Replacement of Selwood and Webb Supports Scienter

On August 6, 2021, just 10 days before Romeo announced its 2Q 2021 results, Selwood—who helped build Romeo since its founding in 2016 and who claimed to have secured over $544 million in revenue in the runup to the public offering (¶¶79, 123-24)—resigned "to pursue new opportunities." ¶174. But Romeo had begun vetting his replacement three months prior—*i.e.*, right around the time Romeo announced its 1Q 2021 results. ¶¶22, 99. Meanwhile, Webb was replaced in her role as CFO effective July 6, 2021. ¶¶98, 174. She went from serving as CFO for four and a half years to becoming Chief Strategy and Commercial Officer—a role far-removed from Romeo's public financial reporting. ¶¶39, 98. These resignations add to an inference of scienter. *Hall*, 580 F. Supp. 2d at 233 (resignation of CEO and auditor supported scienter).

### 6.     The Lack of Insider Trading Does Not Negate Scienter

Defendants ask the Court to ignore all of the foregoing and conclude that scienter is negated because Selwood and Webb are not alleged to have sold Romeo stock during the Class Period. MTD at 18. But it is black letter law that the absence of insider stock sales does not negate scienter. *Tellabs II*, 551 U.S. at 325.[33] Nor is Selwood and Webb's purported increase in holdings determinative of *anything*. Unlike investors, Selwood and Webb apparently did not pay for their shares and favorable options (many of which were unvested): they were granted as part of lucrative compensation packages in connection with the merger (*see* Defs. Ex. 14)—which only supports a motive to inflate the stock price. But even if Selwood and Webb paid cash for the shares, it would not negate scienter. *Pierrelouis v. Gogo, Inc.*, 2021 WL 1608342, at *8 (N.D. Ill. Apr. 26, 2021) (CEO's purchase of $100,000 in shares did not defeat scienter).[34] Further, Defendants *did* have a motive to conceal the shortage; they

---

[33] Moreover, it appears insiders were subject to a typical lock-up period preventing sales for 180 days after the merger. *See* Ex. 1 at 82; Ex. 6 (agreement with lockup provision signed by Selwood and Webb).

[34] *See also In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 320 (S.D.N.Y. 2013) (a rule that stock purchases negate scienter "would create incentive for corporate officers to insulate themselves from liability by purchasing stock merely to negate an inference of fraud"); *In re Ashanti Goldfields Sec. Litig.*, 2004 WL 626810, at *5 (E.D.N.Y. Mar. 30, 2004) (defendants' stock purchases did not negate scienter).

22

admit that the SPAC deal was necessary to scale Romeo's production capacity. MTD at 1. With the deal facing a drop dead date of February 19, 2021, Defendants had an incentive to conceal the cell shortage to ensure they could push the deal through while the RMG money was still available.[35]

### 7.  Defendants Fail To Present a *More* Compelling Inference

Plaintiffs have alleged a strong inference that Defendants recklessly or intentionally misled investors about Romeo's lack of cells delaying production during the Class Period. Romeo would have had to be ramping production dramatically and consistently to grow product revenue from $4.85 million in 2019 to ***$59 million*** by the end of September 2021. Clearly it was not, and there are sufficient facts—including Romeo's own admission—to infer that *Defendants knew it was not*. *Tellabs III*, 513 F.3d at 709 ("exceedingly unlikely" that executives did not know that they made misleading statements about anticipated sales of company's "most important products" while omitting that new "flagship" product was having "troubles that would keep it off the market for many months").

Against this backdrop, Defendants would have the Court believe that a full year into the pandemic, they were caught off-guard by an unanticipated cell shortage. Nonsense. Defendants' "pandemic" excuse is not more compelling, particularly where Plaintiffs have shown that Romeo faced a cell shortage since the *beginning* of the Class Period. That the shortage may have been exacerbated by the pandemic in March 2021 does not negate scienter; it only underscores the recklessness of Defendants' omission of the pre-existing shortage that made Romeo even more vulnerable to supply pressure. *In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*, 2021 WL 4481215, *31 (S.D.N.Y. Sept. 30, 2021) ("Defendant's failure to predict the COVID-19 pandemic is unrelated to Lehigh's actual allegations, which are that Defendant improperly concealed a change in investment strategy that left the Funds severely exposed to an increase in volatility").

---

[35] *Cf. Frater v. Hemispherx Biopharma, Inc*., 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) (motive pled where drug company "could not afford to finance an additional clinical trial…heightening its need for a lucrative stock sale."); *Scantek Med., Inc. v. Sabella*, 583 F. Supp. 2d 477, 494 (S.D.N.Y. 2008) (motive based on company's "negligible sales and need for funds").

## IV.  THE AC STATES CLAIMS UNDER SECTION 14(a) OF THE EXCHANGE ACT[36]

### A.  The Broad Remedial Purposes and Pleading Standards Applicable to §14(a)

Section 14(a) "ensur[es] *full and fair disclosure to shareholders*" so they can make "an informed choice when they are consulted on corporate transactions." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 382-85 (1970); *see also In re Bank of Am. Corp. Secs., Deriv., & ERISA Litig.*, 757 F. Supp. 2d 260, 289-90 (S.D.N.Y. 2010) (noting §14(a)'s "'*broad remedial purpose*…to ensure disclosures by corporate management in order to enable the shareholders to make an informed choice.'").

"To state a claim under Section 14(a) and Rule 14a-9, a plaintiff must allege that: '(1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiff's injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.'" *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 557 (S.D.N.Y. 2017). Plaintiffs are not required to allege scienter. Rather, Plaintiffs "must plead only that [Defendants were] negligent in connection with the merger." *Hurgin*, 484 F. Supp. 3d at 116. Finally, Section 14(a) is subject to the liberal Rule 8(a) pleading standard, requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8; *comScore*, 268 F. Supp.3d at 558. Here, the AC readily alleges all elements of a §14(a) claim under *both* the liberal Rule 8 standard and the heightened particularity of the PSLRA.

### B.  The AC Alleges Standing Under Section 14(a)

The AC alleges Mr. Cante's standing under §14(a) because he was entitled to vote on the transaction and was injured by misstatements and omissions in the Proxy. ¶35; *Bricklayers*, 866 F. Supp. 2d at 236-37 (all that is required to allege standing for §14(a) is to show that the plaintiff was "entitled to vote on [the] transaction"). Contrary to Defendants' arguments (MTD at 23), nothing about the PSLRA lead plaintiff process prohibits court-appointed lead plaintiffs from adding additional

---

[36] "Defendants" as used in this section refers to all Defendants.

plaintiffs or related claims to an amended complaint.[37] Moreover, Mr. Cante is not limited to bringing his claim derivatively. MTD at 24. Courts have long held that investors can bring such claims directly. *Bank of Am.*, 757 F. Supp. 2d at 292 (applying Delaware law to investor's claim that proxy concealed facts relating to target firm's solvency, court held that "BofA shareholders may bring both direct and derivative claims under Section 14(a)").[38] Mr. Cante has standing to bring a direct claim because "[t]here is at least a potential that [he] could show a diminution in the value of the shares that [he] held which was not due to an injury inflicted upon [RMG]." *Id.*[39]

### C. The AC Alleges False or Misleading Statements and Omissions in the Proxy

Defendants solicited approval of the Business Combination with a Proxy that negligently contained materially misleading statements and omissions about Romeo's business.

First, Defendants negligently misrepresented in the Proxy that Romeo obtained cells from *four* major tier one suppliers. ¶¶181-82. This was false. *See* Sec. III.B.1, *supra*.

Second, the claims that Romeo had a backlog of $310 million with $59 million of backlog revenue to be booked by September 30, 2021 (¶¶178-180) were misleading where at the time of the

---

[37] Courts have long recognized that additional plaintiffs may serve alongside court-appointed lead plaintiffs. *In re IPO Sec. Litig.*, 214 F.R.D. 117, 122 (S.D.N.Y. 2002) ("in order for a claim to be asserted on behalf of a putative class, only the named plaintiffs—but not necessarily the lead plaintiff—must have standing."); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322, 331-32 (S.D.N.Y. 2012) ("For each claim asserted in a class action, there must be at least one class representative (a named plaintiff or a lead plaintiff) with standing to assert that claim."). Here, where the SPAC transaction was clearly a subject of the initial complaint and PSLRA notice process, there is no reason to prevent addition of the related §14(a) claim. *Cf. Turner v. ShengdaTech, Inc.*, 2011 WL 6110438, *3 (S.D.N.Y. Dec. 6, 2011).

*In re Smith Barney Transfer Agent Litig.*, 823 F. Supp. 2d 202 (S.D.N.Y. 2011) (MTD at 24) is inapposite. There, the lead plaintiff withdrew because it was discovered he "never purchased any of the securities at issue[.]" *Id.* at 202. Given the enormity of the mistake, the court ordered new lead plaintiff motions were appropriate. *Id.* at 206.

[38] *See also Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, 2021 WL 4443258, *4 (S.D.N.Y. Sept. 27, 2021) (noting "settled rule that a shareholder has a private right of action for monetary damages under Section 14(a)").

[39] According to *Newman v. Family Mgmt Corp.*, 748 F. Supp. 2d 299, 314-15 (S.D.N.Y. 2010) (cited at MTD 24), the Delaware Supreme Court propounded a two-part test to determine whether a claim is direct or derivative: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)." *Id.* (quoting *Tooley v. Donaldson*, 845 A.2d 1031, 1033 (Del. 2004)). The answer to both questions here is *the suing stockholders*, confirming standing to bring a direct claim. As the claim is direct—*not* derivative—a demand on the board is unnecessary and irrelevant. MTD at 24.

Proxy on December 10, 2020, Romeo was not producing at anywhere *close* to the pace necessary because—as Romeo later admitted—it did not have the cells.[40] And Defendants can not avail themselves of the PSLRA safe harbor for any forward-looking aspect of the backlog revenue touted in the Proxy. As discussed in Sec. III.B.5.b, *supra*, the $59 million projection encompassed present facts, to wit, that by the time of the Proxy in December 2020, Romeo had begun to ramp production and was reasonably on the path to $59 million by September 30, 2021. Romeo's pitiful sales in 1Q and 2Q 2021 shows that no meaningful production was occurring at the time of the Proxy (because of Romeo's 4-month production lead time), and it was in fact *far* below historical levels. App'x A. Moreover, Defendants' actual knowledge of the cell shortage and resulting production delays, including Romeo's concession that it did not even *begin* to ramp production until August 2021 because it lacked the cells, renders the safe harbor inapplicable. *See* Sec. III.B.5.d, *supra*; *Freshpet*, 2018 WL 394878, *8. Finally, the Proxy negligently contained purported risk warnings that were not meaningful, and were themselves misleading because they presented as hypothetical supply-related risks that were already occurring. ¶¶183-86; Sec. III.B.5.c.; *Zimmer*, 348 F. Supp. 3d at 842.

Last, Defendants had an affirmative Item 303 duty to disclose Romeo's cell shortage and its impact on product revenue. ¶187. The failure to do so alleges falsity. *See* Sec. III.B.3, *supra*.

### D.   The AC Alleges §14(a) Transaction Causation and Loss Causation

The AC alleges both that "the proxy solicitation was an 'essential link'" in completing the deal (transaction causation) and that the alleged misstatements or omissions "caused plaintiff[s] injury" (loss causation). *Baum v. Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 79, 92 (D. Conn. 2019). First, "Defendants do not dispute that shareholder approval was required for the acquisition. As such, transaction causation is plainly met." *Id*. Second, the AC alleges that the misstatements and omissions "induced a disparity between the transaction price and the true 'investment quality' of the securities at

---

[40] *Freshpet*, 2018 WL 394878, at *7 (misleading to tout anticipated petfood rollout while omitting production problems); *Zimmer*, 348 F. Supp. 3d at 845-46 (financial guidance misleading in light of omitted quality control problems, which if remedied would bring production to a halt); *Aeropostale*, 2013 WL 1197755, at *11.

the time of transaction." *Id.* at 93 (citing *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 98 (2d Cir. 2001)). The AC alleges that Mr. Cante and similarly-situated shareholders suffered damages because, in reliance on the misleading Proxy, they retained their shares in connection with the merger (as opposed to redeeming them for $10.18 per share), only to see the value of those shares hammered as the truth about Romeo's cell shortage was revealed. ¶193. This gives Defendants fair notice of the causal connection between the alleged misstatements and omissions and the loss, and is sufficient to allege loss causation. *Bricklayers*, 866 F. Supp. 2d at 245.

Finally, Defendants' reliance on *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366 (S.D.N.Y. 2020) (MTD at 25) is misplaced. Loss causation failed in *Wesco* because the plaintiff's theory was that Wesco shareholders should have received *higher* consideration in the merger.[41] Here, Plaintiffs clearly allege "actual damages" as a result of misrepresentations and omissions in the Proxy, as Romeo's stock price dropped precipitously when the truth about its cell shortage was revealed. *Bricklayers*, 866 F. Supp. 2d at 245; *Toronto-Dominion Bank*, 250 F.3d at 97-98.

## V.  THE AC ALLEGES CONTROL PERSON LIABILITY UNDER SECTION 20(a)

Defendants do not challenge that they are control persons. MTD at 25. As the AC adequately alleges a primary violation of both §10(b) and §14(a) of the Exchange Act, the §20(a) claims should be sustained. *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010).

## VI.  CONCLUSION

Because Plaintiffs sufficiently allege violations of §§10(b), 14(a), and 20(a) of the Exchange Act, Defendants' motion should be denied. To the extent the Court grants any aspect of the motion in whole or in part, leave to amend pursuant to Fed. R. Civ. P. 15 is respectfully requested.

---

[41]  The court explained that "Plaintiff's claim for loss causation is based on the conclusory assertion that his 'shares were worth significantly more than the Merger Consideration'" and "[t]o permit Plaintiff to recover damages on the assumption that had the Company remained independent, it would have achieved the results reflected in the Initial Management Projections, thus would give him a 'windfall' wholly unrelated to the violation he claims." *Id.* at 404.

Dated: December 3, 2021                GLANCY PRONGAY & MURRAY LLP

By: */s/ Kara M. Wolke*
Kara M. Wolke (*pro hac vice)*
Melissa C. Wright (*pro hac vice)*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
(310) 201-9150
Email: kwolke@glancylaw.com
         mwright@glancylaw.com

*Attorneys for Plaintiffs and the Putative Class*

28

## PROOF OF SERVICE

I, the undersigned say: I am not a party to the above case and am over eighteen years old. On December 3, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 3, 2021.

*s/ Kara M. Wolke*

Kara M. Wolke
