**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE ROMEO POWER INC.
SECURITIES LITIGATION

Case No. 1:21-cv-03362-LGS

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND
CLASS COUNSEL**

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ..................................................................................... 1

II.     SUMMARY OF THE ALLEGATIONS ............................................................... 3

III.    THE CLASS SHOULD BE CERTIFIED............................................................. 6

        A.      Applicable Standards Favor Class Certification Of This Securities Action ........... 6

        B.      The Class Is Ascertainable And Satisfies The Requirements Of Rule 23(a).......... 6

                1.      Plaintiffs Satisfy Rule 23(a)(1): Numerosity ............................................. 7

                2.      Plaintiffs Satisfy Rule 23(a)(2): Commonality ......................................... 7

                3.      Plaintiffs Satisfy Rule 23(a)(3): Typicality................................................. 9

                4.      Plaintiffs Satisfy Rule 23(a)(3): Adequacy ............................................. 13

        C.      The Requirements Of Rule 23(b)(3), Predominance And Superiority, Are Met....... 15

                1.      Common Questions Of Law And Fact Predominate ............................... 15

                        (a)     Plaintiffs Are Entitled To A Presumption Of Reliance Under
                                *Basic* ................................................................................... 15

                                (i)     Romeo's Stock And Warrants Traded On The NYSE...... 16

                                (ii)    The *Cammer* and *Unger/Krogman* Factors Demonstrate
                                        Market Efficiency ............................................................ 17

                        (b)     Plaintiffs Are Entitled To A Presumption Of Reliance Under *Affiliated
                                Ute* ..................................................................................... 22

                        (c)     Damages Are Susceptible To A Class-Wide Methodology.......... 23

                2.      A Class Action Is Superior To Other Litigation Methods ........................ 24

IV.     CONCLUSION................................................................................................. 25

## TABLE OF AUTHORITIES

<u>CASES</u>

*Affiliated Ute Citizens of Utah v. U.S.*,
   406 U.S. 128 (1972) ................................................................................................ 2, 22

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ................................................................................................ 6, 15

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
   568 U.S. 455 (2013) .......................................................................................... 6, 15, 16

*Ashe v. Bd. of Elections in City of New York*,
   124 F.R.D. 45 (E.D.N.Y. 1989) .................................................................................. 14

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ............................................................................................... 15, 16

*Bond v. Clover Health Invs., Corp.*,
   2023 WL 1999859 (M.D. Tenn. Feb. 14, 2023) .................................................. 13, 14

*Brown v. Kelly*,
   609 F.3d 467 (2d Cir. 2010) ....................................................................................... 15

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ..................................................................... 16, 17, 19

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   310 F.R.D. 69 (S.D.N.Y. 2015) ........................................................................ 17, 18, 20

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ...................................................................................................... 24

*Dodona I, LLC v. Goldman, Sachs & Co.*,
   296 F.R.D. 261 (S.D.N.Y. 2014) .................................................................................. 6

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011) ................................................................................................ 6, 15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) .......................................................................................... 8, 16, 20

*Hicks v. Morgan Stanley & Co.*,
   2003 WL 21672085 (S.D.N.Y. July 16, 2003) ......................................................... 11

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ...................................................................... 19

*In re Aphria, Inc. Sec. Litig.*,
342 F.R.D. 199 (S.D.N.Y. 2022) ................................................................ *passim*

*In re Arakis Energy Corp. Sec. Litig.*,
1999 WL 1021819 (E.D.N.Y. Apr. 27, 1999) ........................................................ 12

*In re Barrick Gold Sec. Litig.*,
314 F.R.D. 91 (S.D.N.Y. 2016) ................................................................ 15, 23

*In re Beacon Assoc. Litig.*,
282 F.R.D. 315 (S.D.N.Y. 2012) .................................................................... 23

*In re Blech Sec. Litig.*,
187 F.R.D. 97 (S.D.N.Y. 1999) ...................................................................... 24

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) .................................................... 7, 9

*In re Dynex Capital, Inc. Sec. Litig.*,
2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ........................................................ 22

*In re Elan Corp. Sec. Litig.*,
2009 WL 1321167 (S.D.N.Y. May 11, 2009) ...................................................... 10

*In re Enron Sec. Litig.*,
206 F.R.D. 427 (S.D.Tex. 2002).................................................................... 10

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
986 F. Supp. 2d 428 (S.D.N.Y. 2013)............................................................ 22

*In re Fed. Nat. Mortg. Ass'n Sec., Deriv. & "ERISA" Litig.*,
247 F.R.D. 32 (D.D.C. 2008).......................................................................... 18

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009)...................................................................... 11, 13

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015)...................................................... 23

*In re Initial Public Offering Sec. Litig.*,
260 F.R.D. 81 (S.D.N.Y. 2009) ...................................................................... 19

*In re Interpublic Sec. Litig.*,
2003 WL 22509414 (S.D.N.Y. Nov. 6, 2003) ............................................................ 24

*In re IPO Sec. Litig.*,
214 F.R.D. 117 (S.D.N.Y. 2002) ............................................................................. 14

*In re IPO Sec. Litig.*,
227 F.R.D. 65 (S.D.N.Y. 2004) ............................................................................... 14

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ..................................................... 10, 11

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
241 F.R.D. 435 (S.D.N.Y. 2007) ............................................................................. 24

*In re Nature's Sunshine Prods. Inc. Sec. Litig.*,
251 F.R.D. 656 (D. Utah 2008) ............................................................................... 18

*In re Omnicom Grp., Inc. Sec. Litig.*,
2007 WL 1280640 (S.D.N.Y. Apr. 30, 2007) .......................................................... 12

*In re Petrobras Secs.*,
862 F.3d 250 (2d Cir. 2017) ............................................................................ *passim*

*In re Pfizer Inc. Sec. Litig.*,
282 F.R.D. 38 (S.D.N.Y. 2012) .......................................................................... 12, 15

*In re Priceline.com Inc.*,
236 F.R.D. 89 (D. Conn. 2006) ......................................................................... 10, 18

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
571 F. Supp. 2d 1315 (N.D. Ga. 2007) .................................................................... 18

*In re Smith Barney Transfer Agent Litig.*,
290 F.R.D. 42 (S.D.N.Y. 2013) ................................................................................. 6

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
2017 WL 2062985 (S.D.N.Y. May 15, 2017) ............................................................. 6

*In re Vivendi Universal, S.A. Sec. Litig.*,
634 F. Supp. 2d 352 (S.D.N.Y. 2009) ........................................................................ 8

*In re Winstar Commc'ns Sec. Litig.*,
290 F.R.D. 437 (S.D.N.Y. 2013) ............................................................................. 18

iv

*In re Xcelera.com Sec. Litig.*,
  430 F.3d 503 (1st Cir. 2005) ................................................................................ 18

*In re: Petrobras Sec. Litig.*,
  312 F.R.D. 354 (S.D.N.Y. 2016) .......................................................................... 10

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ................................................................... 17, 21

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
  967 F.2d 742 (2d Cir. 1992) ................................................................................. 22

*Malriat v. Quantumscape Corp.*,
  2022 WL 17974629 (N.D. Cal. Dec. 19, 2022) ................................................... 20

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014) ............................................................. *passim*

*Menaldi v. Och-Ziff Mgmt. Grp. LLC*,
  328 F.R.D. 86 (S.D.N.Y. 2018) ............................................................................ 11

*Pearlstein v. BlackBerry Ltd.*,
  2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ............................................... 7, 12, 14

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018) ......................................................................... 8, 11

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993) ................................................................................... 9

*Roofer's Pension Fund. v. Papa*,
  333 F.3d 66 (D.N.J. 2019) ...................................................................................... 8

*Spagnola v. Chubb Corp.*,
  264 F.R.D. 76 (S.D.N.Y. 2010) ............................................................................ 24

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016) ................................................................. 8, 15, 20

*Teachers' Ret. Sys. of Louisana v. ACLN Ltd.*,
  2004 WL 2997957 (S.D.N.Y. Dec. 27, 2004) ........................................................ 9

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
  546 F.3d 196 (2d Cir. 2008) .................................................................................. 17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ................................................................................................ 6

*Trinidad v. Breakaway Courier Sys., Inc.*,
   2007 WL 103073 (S.D.N.Y. Jan. 12, 2007) ............................................................. 9

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) ................................................................................. 17

*Villella v. Chem. and Mining Co. of Chile, Inc.*,
   333 F.R.D. 39 (S.D.N.Y. 2021) ............................................................................... 9

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ..................................................................................... 19

*Wallace v. Intralinks*,
   302 F.R.D. 310 (S.D.N.Y. 2014) ............................................................................ 23

*Wilson v. LSB Indus., Inc*.,
   2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) ........................................................ 11

## RULES

Fed. R. Civ. P. 23 ............................................................................................................. *passim*

Plaintiffs[1] respectfully submit this memorandum of law in support of their motion for class certification pursuant to Federal Rule of Civil Procedure 23, seeking: (i) certification of this case as a class action; (ii) the appointment of Plaintiffs as Class Representatives; and (iii) the appointment of Glancy Prongay & Murray LLP ("GPM") as Class Counsel.

## I.    **PRELIMINARY STATEMENT**

This action asserts claims on behalf of a putative class of investors pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 thereunder, against Defendants.[2] Now, pursuant to Fed. R. Civ. P. 23, Plaintiffs seek certification of the following Class:

> All persons and entities that purchased or otherwise acquired publicly traded securities of Romeo Power, Inc. (f/k/a RMG Acquisition Corp. ("RMG")) during the period October 5, 2020, through August 16, 2021, both dates inclusive (the "Class Period"), and were damaged thereby.[3]

The Second Circuit favors class actions in securities fraud cases, and class certification is appropriate here as the proposed Class satisfies each of the requirements of Rule 23. Romeo's securities were widely held and traded on the New York Stock Exchange ("NYSE") during the Class Period, and the Class numbers in the many thousands and its members are geographically dispersed, satisfying Rule 23(a)(1)'s numerosity requirement. The nature of the proposed Class Representatives'

---

[1] Plaintiffs and proposed Class Representatives are Michael Castleberg, Joshua Cante, Artur Chimchirian, Nathaniel Tapia, and Van Nguyen.

[2] "Defendants" are Romeo Power, Inc. (f/k/a RMG Acquisition Corp. ("RMG"), referred to herein as "Romeo" or the "Company"), Lionel E. Selwood, Jr., and Lauren Webb. References herein to Romeo include RMG, the special purpose acquisition company that was Romeo's predecessor before the completion of their Business Combination. From October 5, 2020 through the completion of the Business Combination on December 29, 2020, the Common Stock traded under the symbol RMG and Warrants traded as RMG.WS. Beginning on December 30, 2020, and through the end of the Class period on August 16, 2021, the Common Stock and Warrants traded under the symbols RMO and RMO.WT, respectively.

[3] Excluded from the Class are: (i) Defendants; (ii) current and former officers, employees, and directors of Romeo and RMG; (iii) blood relatives and household members of any person excluded under (i) or (ii); and (iv) any entities affiliated with, controlled by, or more than 10% owned by, any person or entity excluded under (i) through (iii); and (v) the legal representatives, heirs, successors, or assigns of any person or entity excluded under (i) through (iv).

1

injuries, which resulted from Defendants' common course of conduct, is identical to that of the proposed Class members such that no Class Representative suffers from a conflict of interest that would interfere with the prosecution of this action, satisfying the commonality, typicality, and adequacy requirements of Rule 23(a)(2)-(4). Moreover, proposed Class Counsel possesses the requisite experience, funding, and resources to successfully prosecute this matter as a class action, further supporting adequacy under Rule 23(a)(4).

This action also satisfies Rule 23(b)(3)'s requirements of predominance and superiority. Each of the elements of Plaintiffs' §10(b) and § 20(a) claims are susceptible to Class-wide proof based upon common facts. Not only are the questions of the falsity of Defendants' statements and their mental state in making those statements common to all Class members, the Class is entitled to a presumption of reliance based on the "fraud-on-the-market" doctrine because Romeo's securities traded in an efficient market. *See* Expert Report of Dr. Matthew Cain, Ph.D. (the "Cain Report") Secs. 4-5.[4] The Class also is entitled to a presumption of reliance pursuant to the Supreme Court's ruling in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972) ("*Affiliated Ute*") based on Defendants' concealment of material information from investors, namely, that Romeo lacked the cell supply necessary to ramp production and turn customers' orders into actual sales and revenue. Thus, any potential individual questions of reliance do not predominate over common issues. Nor do potential individual issues of damages predominate over common issues, and the calculation of damages is susceptible to Class-wide methodologies. *See* Cain Report Sec. 6.

Finally, a class action is a superior method of litigating Class members' claims because it is manageable, provides redress to investors who would otherwise be unable to pursue individual claims, and least taxes judicial resources. The motion should be granted.

---

[4] The Cain Report is attached as Exhibit 1 to the Declaration of Kara M. Wolke ("Wolke Decl.").

## II.    <u>SUMMARY OF THE ALLEGATIONS</u>

During the Class Period, Romeo described itself as "an industry leading energy storage technology company focused on designing and manufacturing lithium-ion battery modules and packs for commercial electric vehicles." Cain Report ¶13. Defendants took Romeo public via a merger with RMG in December 2020 (the "Business Combination"). SAC[5] ¶¶55, 65. RMG was a special purpose acquisition company ("SPAC")—also commonly referred to as a "blank check" company—formed for the purpose of conducting a merger, acquisition, or other combination to take a private company public. *Id.* ¶¶52-53. RMG had until February 19, 2021, to acquire a target; if unable to do so, the money raised in its IPO ($200 million) would be sent back to its shareholders. *Id.* ¶192.

The Class Period begins on October 5, 2020, when RMG and Romeo announced they had reached a definitive agreement to enter into the Business Combination, with Romeo the surviving entity. *Id.* ¶57. The release claimed Romeo had $310 million in "secured" backlog revenue. *Id.* ¶¶111-12. It also reported estimated revenue of $11 million by the end of 2020 and $140 million in 2021, Romeo's first full year as a publicly traded company. *Id.* ¶3. Romeo filed its Registration Statement on October 15, 2020, reiterating the 2020 and 2021 revenue figures and the claim of $310 million in secured revenue. *Id.* ¶114. It also claimed Romeo expected to fulfill $59 million in backlog orders by September 30, 2021—the end of its first three quarters as a public company. *Id.*

On November 25, 2020, RMG announced December 1, 2020 as the record date for stockholders eligible to vote on the Business Combination. The release stated "[u]pon closing of the transaction, the combined company will be named Romeo Power, Inc. and is expected to remain listed on the NYSE and trade under the new ticker symbol 'RMO.'"[6] By December 17, 2020, Selwood claimed backlog revenue had grown to $544 million. *Id.* ¶126. Romeo's stock price reached its Class

---

[5] "SAC" refers to the Corrected Second Amended Class Action Complaint (ECF No. 143-1, the "SAC").
[6] *See* Wolke Decl. Ex. 8 (Form 8-K and press release filed November 25, 2020); SAC ¶63.

Period (and all time) high of $34.00 per share on December 28, 2020. *Id.* ¶6. The next day, the Business Combination closed. *Id*. ¶¶64-65.

But when touting Romeo's order backlog during the Class Period, Defendants omitted that Romeo lacked the battery cells necessary to manufacture its products. *E.g.*, SAC ¶113. Relatedly, Defendants misrepresented Romeo's cell supply chain, falsely claiming that four major suppliers were supplying Romeo with cells during the Class Period. *Id.* ¶¶117, 137. Defendant Selwood also specifically, and misleadingly, assured investors that Romeo had the cells necessary to fulfill orders. For example, when asked on December 15, 2020 if he saw "any issues with securing enough cells to fulfill [Romeo's] large orders," Selwood responded that Romeo's "cell supplier agnosticism" "ensure[d] that we have drop-in replacements" and assured "I don't see any big challenges as our order book continues to grow." *Id.* ¶¶79-80, 131. When asked on February 25, 2021 about "potential chinks in the supply chain," he responded that "ensuring that we have continuous access to that supply [of battery cells] is a daily focus of ours" and cited "Operation Hedge Fund" for parts such as cells, claiming "we actually grab it on the open market and put it on the shelves." *Id.* ¶¶88, 147; *see also id.* ¶¶5, 168-69 (claiming with "Operation Hedge Fund," Romeo purchased excess supply of hard-to-obtain components to ensure it was "hedged" against potential supply disruptions). But cells were not sitting on the shelves; to the contrary, Romeo had woefully insufficient cell supply to meet its needs.

Investors were thus stunned and damaged when the truth about, and impact of, Romeo's lack of cells was partially revealed and/or materialized. First, on March 30, 2021, Defendants reported that a supposedly "unexpected limitation on cell availability" disrupted production, such that Romeo's 2020 revenue was only $8.97 million (an approximate 18% miss) and that Romeo's 2021 revenue estimate would be slashed by 71-87% (from $140mm down to $18-$40mm). SAC ¶¶8, 192. Analysts pressed for answers about the cell supply shortage because "part of the story…was, you know, you

have four suppliers, four main cell suppliers." *Id.* ¶¶9, 92. In response, Selwood admitted that Romeo did not obtain cells from four major suppliers, but instead claimed Romeo relied on two suppliers, Samsung and LG. *Id.* ¶92. Both Selwood and Webb attempted to reassure the market that the problem was temporary. *Id.* ¶149 (Selwood: "I want to emphasize that we see this cell shortage as temporary and are confident it will not affect our intermediate and longer-term opportunities."); *Id.* ¶150 (Webb: "we are not expecting that there is any hits to the overall backlog"). Still, following the news, Romeo's stock price declined $2.04/share (~20%), to close at $8.33/share on March 31, 2021. ¶¶15, 192.

After this blow, Defendants re-assured the market that Romeo's cell supply problems were temporary and production was on track. For example, on May 13, 2021, Webb reiterated Romeo's 2021 revenue guidance of $18 to $41 million (*id.* ¶18), while Selwood claimed that "[w]hat we've been doing is just ensuring our long-term outlook, locking down the supply" (*id.* ¶19). Romeo's May 17, 2021, Form 10-Q claimed it expected to record $23.4 million in backlog revenue by year-end. *Id.* ¶160. Around the same time, Romeo began quietly recruiting Selwood's replacement, undertaking a three-month vetting process before announcing that Susan Brennan would take over as CEO. *Id.* ¶22.

Then, after market hours on August 16, 2021, despite Defendants' assurances, Romeo announced yet another quarter hampered by a lack of cells. *Id.* ¶24. Second quarter revenue of just $926,000 (including a mere ***$466,000*** in product revenue) missed consensus by over 69%, and Romeo reduced its backlog revenue to be recorded by year-end to just $18.9 million. *Id.* ¶¶103-04. In response to the news, which further revealed the extent of Romeo's cell shortage, Romeo's stock price fell $1.06/share (~20%), to close at $4.76/share on August 17, 2021. *Id.* ¶¶27, 193.

On behalf of the proposed Class, Plaintiffs seek to recover the losses incurred from the false or misleading statements and omissions made by Defendants about Romeo's business—in particular, its inability to convert backlog orders to sales due to a lack of cell supply—during the Class Period.

## III.    THE CLASS SHOULD BE CERTIFIED

### A.    Applicable Standards Favor Class Certification Of This Securities Action

The Supreme Court has long recognized that securities fraud claims are well suited as class actions. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (noting predominance of common issues "is a test readily met in certain cases alleging…securities fraud").[7] Likewise, "[t]he Second Circuit has directed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to private parties and, in cases such as this that involve alleged manipulation of public markets, to maximize the benefits to the public provided by class actions." *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 266 (S.D.N.Y. 2014) (citing cases).[8]

### B.    The Class Is Ascertainable And The Requirements Of Rule 23(a) Are Met

Fed. R. Civ. P. 23(a) establishes four requisite elements for class certification:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition, to evaluate Rule 23(a)'s requirements, the Second Circuit imposes an implied requirement that the Class is ascertainable. *In re Aphria, Inc. Sec. Litig.*, 342 F.R.D. 199, 203-04 (S.D.N.Y. 2022). "The ascertainability requirement, as defined in this Circuit, asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries. This modest threshold requirement will only preclude certification if a proposed

---

[7] *See also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313-14 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement"); *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 812-13 (2011) (vacating denial of class certification); *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 464-67 (2013) (affirming certification).

[8] *See also In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45 (S.D.N.Y. 2013) ("Generally, claims alleging violations of Section 10(b) of the Exchange Act are especially amenable to class certification.") (cleaned up); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017).

class definition is indeterminate in some fundamental way." *In re Petrobras Secs.*, 862 F.3d 250, 269 (2d Cir. 2017). Ascertainability is readily established in securities fraud cases because "securities purchases identified by subject matter, timing, and location [] are clearly objective." *Aphria*, 342 F.R.D. at 205 (quoting *In re Petrobras*, 862 F.3d at 269)).

The proposed Class is ascertainable because the Class Period is clearly defined, the Class includes only those investors who purchased the publicly traded securities of Romeo during the Class Period,[9] and as such the identity of Class members can be objectively determined.

### 1.    Plaintiffs Satisfy Rule 23(a)(1): Numerosity

Rule 23(a)(1) is satisfied when a class is "so numerous that joinder of all members is impracticable." "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *7 (S.D.N.Y. Jan. 26, 2021) (cleaned up). The average weekly trading volume of Romeo's Common Stock during the Class Period was 24.11 million shares (weekly turnover of 30.23%). Cain Report ¶¶29-30. It is reasonable to conclude that thousands of geographically dispersed individuals purchased Romeo securities during the Class Period, easily satisfying numerosity. *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, *10 (S.D.N.Y. Mar. 23, 2020).

### 2.    Plaintiffs Satisfy Rule 23(a)(2): Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class." In securities class actions, this requirement is characterized as a "low hurdle" that is met "when plaintiffs allege that class members have been injured by similar material misrepresentations and omissions." *Aphria*, 342 F.R.D. at 204 (cleaned up). Plaintiffs meet this standard as all Class members were injured in a similar

---

[9] Romeo had three types of publicly traded securities during the Class Period: Common Stock, Warrants, and Options. Cain Report n.2.

manner and the allegations in the SAC raise numerous common questions, including:

(a) whether Defendants misleadingly omitted or misrepresented material facts about Romeo's business, including but not limited to Romeo's cell supply and ability to produce backlog orders;

(b) whether Defendants' failure to disclose the mounting cell shortage and production delays constituted a trend, event, or uncertainty requiring disclosure under Item 303;

(c) whether Defendants acted with scienter in making misleading statements or omissions during the Class Period;

(d) whether Romeo securities prices were artificially inflated during the Class Period; and

(e) whether Defendants' conduct as alleged caused Class members damages when relevant truths were revealed and/or risks materialized on March 30 and August 16, 2021.

In their letter brief, Defendants argue the Class Period should end on March 30, 2021, because "the alleged 'corrective disclosure' on August 16, 2021 had nothing to do with any of the alleged misrepresentations and did not have any impact on Romeo's stock price." ECF No. 141 at 3. However, "[a]t the class certification stage, courts must not inquire into the merits to determine the adequacy of a class period." *Roofer's Pension Fund. v. Papa,* 333 F.3d 66, 88 (D.N.J. 2019). Plaintiffs alleged the August 16 news of Romeo's dismal product revenue, and the impact on Romeo's overall financial performance, was both an additional corrective disclosure that further revealed the extent and magnitude of Romeo's cell shortage and a further materialization of the risk of the shortage. *E.g.,* ¶¶24, 193. Ultimately, whether loss causation is established under either or both theories is a question for the fact finder. *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F.Supp.2d 352, 366-68 (S.D.N.Y. 2009). And whatever that resolution is, it will be common to all Class members, thus supporting certification. *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 44, 46-47 (S.D.N.Y. 2018).[10]

---

[10] Defendants also incorrectly claim that the August 16 news "did not have any impact on Romeo's stock price." ECF No. 141 at 3. As an initial matter, Plaintiffs are not required to prove price impact to obtain class certification. *Strougo v. Barclays PLC*, 312 F.R.D. 307, 314 (S.D.N.Y. 2016). Even so, the impact of the August 16 news on Romeo's stock price is both alleged (SAC ¶27, price drop of 20%) and now proven with empirical evidence (Cain Report Ex. 6, statistically significant price drop on August 17). Because Romeo's share price fell a statistically significant amount following the revelation of new, fraud-related news, Defendants *cannot* show "that an alleged misrepresentation did not actually affect the market price of the stock." ECF No. 141 at 3 (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 263-64, 284 (2014) ("*Halliburton II*")).

In sum, because all Class members' claims depend on the answers to common questions, commonality is established. *Chicago Bridge*, 2020 WL 1329354, *11 ("commonality is satisfied because Plaintiffs allege the same injury and claims resulting [from] common misrepresentations and omissions concerning Defendants' business. All plaintiffs were impacted by disclosures affecting equally all market participants who transacted [the company's] stock.").

### 3.    Plaintiffs Satisfy Rule 23(a)(3): Typicality

Rule 23(a)(3) is satisfied when the claims of the representatives are "typical" of those of the Class. As with commonality, the test for typicality "is not demanding." *Villella v. Chem. and Mining Co. of Chile, Inc.*, 333 F.R.D. 39, 55 (S.D.N.Y. 2021); *Chicago Bridge*, 2020 WL 1329354, *11 (same). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993). Thus, typicality "'should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members.'" *Trinidad v. Breakaway Courier Sys., Inc*., 2007 WL 103073, at *6 (S.D.N.Y. Jan. 12, 2007).[11]

Here, each Plaintiff purchased Romeo's publicly traded securities during the Class Period at prices that were artificially inflated by Defendants' alleged omissions and misstatements and suffered damages when the truth about Romeo's lack of cell supply was partially revealed, and/or the risks thereof materialized, causing Romeo's share price to fall. *See* Wolke Decl. Exs. 2-6. Their claims are entirely typical of the Class they seek to represent. In their pre-motion letter response, Defendants raised some superficial attacks on each Plaintiff (ECF No. 141 at 2), none of which defeats typicality:

---

[11] *See also Teachers' Ret. Sys. of Louisana v. ACLN Ltd.,* 2004 WL 2997957, at *4 (S.D.N.Y. Dec. 27, 2004) ("When inquiring into the typicality requirement under Rule 23(a)(3), the focus must be on the defendants' behavior and not that of the plaintiffs.") (cleaned up).

**Mr. Castleberg.** Defendants argue that Mr. Castleberg is not typical because he purchased Romeo Warrants instead of Common Stock, citing an inapposite case, *In re Elan Corp. Sec. Litig.*, 2009 WL 1321167 (S.D.N.Y. May 11, 2009), in which the court was assessing "the most adequate plaintiff" under the PSLRA lead plaintiff appointment process, not whether a representative's claims were "typical" of other Class members under Rule 23. Here, the Court—with full knowledge that Mr. Castleberg transacted only in Warrants—already approved him to serve as the lead plaintiff, finding him to be presumptively typical and adequate. ECF No. 28-2 (PSLRA Certification showing transactions only in Warrants); ECF No. 69 (PSLRA Lead Plaintiff Order). Nothing has changed since his initial appointment as lead plaintiff to render him atypical or inadequate; to the contrary, he has faithfully discharged his role. *See* Wolke Decl. Ex. 2.

Indeed, as a purchaser of publicly traded Warrants, Mr. Castleberg can represent investors who purchased other publicly traded securities of Romeo during the Class Period. Courts consistently hold that such trivial "[f]actual differences involving the date of acquisition, ***type of securities purchased*** and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *10 (S.D.N.Y. Dec. 23, 2009) (emphasis added); *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 361 (S.D.N.Y. 2016) ("Because the same alleged misconduct drives plaintiffs' claims, regardless of whether they arise from purchases of Notes, common ADS, or preferred ADS, the interests of all members of the class are aligned."), *aff'd in part, vacated in part sub nom. In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017).[12]

Nor does Defendants' argument that Mr. Castleberg's warrants became void on April 5, 2021

---

[12] *See also In re Priceline.com Inc.*, 236 F.R.D. 89, 98-99 (D. Conn. 2006) (put option trader appropriate representative for class including common stock); *In re Enron Sec. Litig.*, 206 F.R.D. 427, 445–46 (S.D.Tex. 2002) ("[C]ourts have repeatedly concluded that stock purchasers can represent purchasers of debt instruments and vice versa in the same action.") (collecting cases).

(ECF No. 141 at 3) render him atypical. Mr. Castleberg purchased Warrants during the Class Period and continued to hold them over (and suffered damages upon), at least, the March 30, 2021 disclosure. A proposed representative need not hold over *every* alleged corrective disclosure to be typical of the class he seeks to represent. *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, *6 (S.D.N.Y. Aug. 13, 2018) ("the fact that [the plaintiff] did not hold LSB securities throughout the entire class period did not render him atypical or inadequate because his claim relies on the same alleged course of conduct and theory of liability as other class members.") (citing *Hicks v. Morgan Stanley & Co.*, 2003 WL 21672085, at *2-3 (S.D.N.Y. July 16, 2003) (same)); *Cf. In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40-41 (2d Cir. 2009) (proposed representative atypical where he did not hold over *any* alleged corrective disclosure).[13] Indeed, "'typical' does not mean 'identical'" and all Plaintiffs here "stand in the same position as other investors who purchased [Romeo] securities during the Class Period, having suffered the same type of injury (purchasing [Romeo] securities at artificially inflated prices and suffering losses when the fraud was revealed) as a result of Defendants' conduct." *Marsh & McLennan*, 2009 WL 5178546, *10.

**Mr. Cante.** Conveniently ignoring Mr. Cante's November 27, 2020, purchase of RMG shares, Defendants attack him because he purchased additional shares on April 6, 2021, after the first corrective disclosure.[14] But the law is clear that purchases after a partial disclosure do not render a plaintiff atypical. *Menaldi v. Och-Ziff Mgmt. Grp. LLC*, 328 F.R.D. 86, 92-93 (S.D.N.Y. 2018) ("that Lemond bought more stock even after the Wall Street Journal article was published does not create a conflict"); *Pirnik*, 327 F.R.D. at 43, n.2 ("that a putative class representative purchased additional

---

[13] Defendants raised the same challenge to Mr. Tapia (ECF No. 141 at 2) and it fails for the same reason. Both Mr. Castleberg and Mr. Tapia allegedly suffered damages caused by Defendants on, at least, March 30, 2021, and as such are entirely typical of the Class. That other investors have *additional* damages in connection with the later price drop on August 17, 2021, does not render Castleberg and Tapia inadequate.

[14] *See* ECF No. 82-1 (Cante PSLRA Certification); Wolke Decl. Ex. 3 at ¶2 (Cante declaration).

shares in reliance on the integrity of the market after the disclosure of corrective information has no bearing on whether or not the representative relied on the integrity of the market during the class period") (cleaned up).[15]

**Mr. Tapia, Mr. Chimchirian, and Ms. Nguyen.** Defendants complain that "none of the 'additional plaintiffs' purchased Romeo common stock before December 2020" and claim—incorrectly—that "[t]his raises questions about their reliance on earlier statements." ECF No. 141 at 2.[16] Defendants misconstrue the doctrine of class-wide reliance, which presumes in an efficient market that the inflationary impact of misstatements and omissions remains in the stock price until that inflation dissipates (or partially dissipates) upon a corrective disclosure or materialization of risk. In other words, when each Plaintiff purchased Romeo securities, they did so in reliance on Romeo's stock price, which reflected the inflationary impact of Defendants' prior statements and omissions during the Class Period. *See* Sec. III.C.1.a, *infra*.

Finally, Defendants argue—entirely without basis—that Ms. Nguyen is a "serial SPAC investor and did not rely on Defendants' alleged misstatements…." ECF No. 141 at 2. But Defendants will not be able to prove, as is required to defeat typicality, a "clear showing of an applicable unique defense" against Ms. Nguyen showing a purported lack of reliance. *In re Omnicom Grp., Inc. Sec. Litig.*, 2007 WL 1280640, *4 (S.D.N.Y. Apr. 30, 2007) ("the Second Circuit has issued a clear rule regarding reliance defenses: individual questions of reliance are generally insufficient to defeat class certification."). In sum, because Defendants' alleged Exchange Act violations impacted Plaintiffs in the same way as the Class, typicality is satisfied.

---

[15] *See also Pearlstein v. Blackberry Ltd.*, 2021 WL 253453, *9 (S.D.N.Y. Jan. 26, 2021) (purchases after a partial corrective disclosure and before final corrective disclosure did not render plaintiff atypical); *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38,46 (S.D.N.Y. 2012) (post-disclosure investments did not render plaintiff atypical) (collecting cases); *In re Arakis Energy Corp. Sec. Litig.*, 1999 WL 1021819, at *6 (E.D.N.Y. Apr. 27, 1999).

[16] Defendants seemingly include Mr. Cante in this argument but again they are wrong. Mr. Cante purchased shares on November 27, 2020. *See* ECF No. 82-1 (Cante PSLRA Certification).

### 4.    Plaintiffs Satisfy Rule 23(a)(3): Adequacy

The final requirement of Rule 23(a) is that "the class representatives…fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "In assessing this requirement, courts make two principal inquiries: whether (1) plaintiff's interests are antagonistic to the interest of other members of the class; and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Aphria*, 342 F.R.D. at 204-05 (quoting *Flag Telecom*, 574 F.3d at 35). Both prongs are satisfied here.

Plaintiffs' interests are entirely aligned with the Class. All Plaintiffs have demonstrated a commitment to pursuing this action on behalf of absent Class members. All Plaintiffs share an interest in trying to maximize any potential Class-wide recovery. And all have participated in discovery and have worked with counsel to advance the litigation for the benefit of all Class members. *See generally* Wolke Decl. Exs. 2-6. There can be no suggestion, let alone *proof*, that they have any interests that are fundamentally antagonistic to the Class, as is required to render them inadequate. *Flag Telecom*, 574 F.3d at 35 (noting "[t]he focus is on uncovering 'conflicts of interest between named parties and the class they seek to represent' and that "[i]n order to defeat a motion for certification, however, the conflict 'must be fundamental.'") (citation omitted).

In their letter brief, Defendants suggest Plaintiffs may be inadequate as a "proposed group." ECF No. 141 at 2. But Defendants cite cases analyzing the lead plaintiff appointment process under the PSLRA, which has a statutory presumption that the plaintiff or group with the largest losses is the best situated to lead the case for absent investors. Such an argument is improper here, at the class certification stage. While the PSLRA lead plaintiff process requires the court to "select the best available plaintiff from among the options presented," "that stage of these proceedings, however, is completed, leaving only Rule 23 at issue." *Bond v. Clover Health Invs., Corp.*, 2023 WL 1999859, *6

n.3 (M.D. Tenn. Feb. 14, 2023). And under Rule 23, it is "well settled" that a class representative "need not be the best of all possible plaintiffs—merely an adequate one." *Id.* at *6 (cleaned up) (citing *Ashe v. Bd. of Elections in City of New York*, 124 F.R.D. 45, 50 (E.D.N.Y. 1989)).[17]

"Moreover, as is always the case, in securities fraud class actions the best measure of whether a plaintiff will adequately represent the interests of a class is whether his lawyers are equipped to handle the matter." *BlackBerry*, 2021 WL 253453, *13. Plaintiffs retained counsel who are "are qualified, experienced and able to conduct the litigation." *Aphria*, 342 F.R.D. at 204-05. GPM has extensive experience in the field of securities litigation, and its vigorous pursuit of the Class's interests has already been demonstrated in its advancement of the Class's claims before this Court, successfully prevailing against Defendants' motion to dismiss and motion for reconsideration and conducting significant discovery. ECF No. 107 (order denying, in part, motion to dismiss), ECF No. 124 (order denying motion for reconsideration), ECF No. 139 (joint letter detailing discovery efforts to date); *see also* Wolke Decl. Ex. 7 (Firm résumé of GPM detailing qualifications and experience in securities litigation). For these reasons, and because Lead Counsel have devoted substantial time and resources to the litigation, and will continue to do so, GPM also satisfies the considerations of Rule 23(g) and should be appointed Class Counsel.

---

[17] The concern about "grouping" to amass loss size in the PSLRA lead plaintiff context does not exist at the class certification stage. This District made clear in the *IPO* litigation that the concepts of a PSLRA lead plaintiff and additional plaintiffs seeking to serve as class representatives are distinct, and that while a lead plaintiff must generally satisfy the requirements of Rule 23, additional plaintiffs and proposed class representatives need not satisfy PSLRA lead plaintiff requirements. *In re IPO Sec. Litig.*, 214 F.R.D. 117, 123-24 (S.D.N.Y. 2002) (permitting addition of named plaintiffs to seek to serve as class representatives and holding that "[t]he purpose of the lead plaintiff section of the PSLRA was never to do away with the notion of class representatives or named plaintiffs in securities class actions. Rather, the purpose was to ensure that securities litigation was investor-driven, as opposed to lawyer-driven."). *See also In re IPO Sec. Litig.*, 227 F.R.D. 65, 96-97 (S.D.N.Y. 2004) (multiple plaintiffs adequate to serve as class representatives where defendants failed to prove antagonistic interests), *vacated on other grounds by In re IPO Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006).

Here, each Plaintiff came forward to serve as a Class Representative to help serve the rights and interests of the Class—the opposite of lawyer-driven. If anything, Defendants' preliminary attacks on each Plaintiff, trying to knock them out one-by-one to defeat certification and escape liability (ECF No. 141 at 1-3), underscore why it is necessary and appropriate for multiple representatives to seek to serve the Class.

**C.    The Requirements Of Rule 23(b)(3), Predominance And Superiority, Are Met**

**1.    Common Questions Of Law And Fact Predominate**

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Predominance exists where "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010) (citation omitted). "Predominance is a test readily met in certain cases alleging securities fraud." *Amchem*, 521 U.S. at 625.

In securities fraud actions, the elements of falsity, materiality, scienter, and loss causation are subject to class-wide proof. Thus, "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *See Halliburton I*, 563 U.S. at 810.[18] In this case, reliance may be presumed on a class-wide basis under: (a) the fraud-on-the-market presumption under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and (b) the presumption of reliance applicable to omission claims under *Affiliated Ute*. Each presumption is independently sufficient for class certification, and both apply here.[19]

**(a)    Plaintiffs Are Entitled To A Presumption Of Reliance Under *Basic***

Plaintiffs are entitled to rely on the fraud-on-the-market presumption articulated by the Supreme Court in *Basic*, 485 U.S. at 241. This theory "holds that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material

---

[18] *See, e.g.*, *Amgen*, 568 U.S. at 459 (materiality "is question common to all members of the class"); *Pfizer*, 282 F.R.D. at 52 (all elements of a §10(b) claim, "other than reliance in cases that are not premised on fraud-on-the-market, are subject to class wide proof in securities litigation") (emphasis added). In addition, the Cain report demonstrates that damages can be determined by a Class-wide methodology. Cain Report Sec. 6.

[19] *See generally Strougo*, 312 F.R.D. at 312 ("The predominance requirement is typically met in securities fraud class actions by plaintiffs' invocation of one of two presumptions developed by the Supreme Court…. the '*Basic* presumption' of reliance in fraudulent misrepresentation cases, and the '*Affiliated Ute* presumption' of reliance in fraudulent omission cases."); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 101 (S.D.N.Y. 2016) (similar).

misrepresentations" and that whenever an "investor buys or sells stock at the market price, his reliance on any public material misrepresentations...may be presumed for purposes of a Rule 10b-5 action." *Halliburton II*, 573 U.S. at 268 (quoting *Basic*, 485 U.S. at 246-47); *Amgen*, 568 U.S. at 460-62.

To invoke the fraud-on-the-market presumption, a plaintiff must demonstrate: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id.* "[W]ith the exception of materiality"—which is a question of fact reserved for the jury—the elements of publicity, market efficiency and market timing "must be satisfied before class certification." *Id.* at 276. Here, there is no dispute that (i) the alleged misrepresentations in this case were publicly issued, and (ii) Plaintiffs purchased Romeo securities during the Class Period after alleged misrepresentations were made and before the ultimate revelation of the truth.[20] The final requirement, that Romeo's securities traded in an efficient market, is established in the Cain Report (Secs. 4-5). As such, Plaintiffs are entitled to the fraud-on-the-market presumption of reliance.

### (i)  Romeo's Stock And Warrants Traded On The NYSE

Romeo's Common Stock and Warrants traded on the NYSE and its Option traded on the Chicago Board Options Exchange. Cain Report ¶20. Courts routinely hold that listing on the NYSE creates a presumption that the market is efficient. *See Aphria*, 342 F.R.D. at 206 (collecting cases); *see also Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.").

---

[20] *See* ECF No. 28-2 (Castleberg Certification); ECF No. 82-1 (Cante Certification); ECF No. 135-1 (Tapia Certification); ECF No. 143-3 (Chimchirian Certification); ECF No. 135-3 (Nguyen Certification).

**(ii)    The *Cammer* and *Unger/Krogman* Factors Demonstrate Market Efficiency**

Neither the Supreme Court nor the Second Circuit has adopted a formal test for efficiency. *Petrobras*, 862 F.3d at 276. District courts in this Circuit and elsewhere, however, routinely consider the non-exhaustive factors discussed in *Cammer v. Bloom* to assess market efficiency: (1) weekly trading volume; (2) analyst coverage; (3) the existence of market makers and arbitrageurs; (4) eligibility to file an S–3 registration statement; and (5) a history of immediate movement of the stock price in response to unexpected corporate news or financial releases. *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014) (citing *Cammer*, 711 F. Supp. at 1285-87); *Petrobras*, 862 F.3d at 276 (affirming finding of market efficiency based on *Cammer* factors even where *Cammer* factor five was disputed). The *Cammer* factors "are meant to be an analytical tool to assist in the evaluation of market efficiency, not a rigid checklist." *McIntire*, 38 F. Supp. 3d at 432.[21] Courts have also considered three additional factors identified in *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) and *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001): (6) a high market cap, (7) a large float, and (8) narrow bid-ask spread; *Petrobras*, 862 F.3d at 276. A collective evaluation of these factors shows that Romeo's stock traded in an efficient market:

**1.    Romeo Had A High Average Trading Volume.** During the Class Period, Romeo's Common Stock had an average weekly trading volume of 24.11 million shares, translating to an average weekly turnover of 30.23% of shares outstanding. Cain Report ¶¶29-30. That far exceeds the 2% threshold observed by the court in *Cammer* as giving rise to a "strong presumption" of efficiency. *Cammer*, 711 F. Supp. 2d at 1286. Accordingly, Romeo's weekly trading volume supports a strong

---

[21] *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015) ("While the Second Circuit endorsed the use of the Cammer factors in *Bombardier*, it has not required their use or held that any one of them is dispositive.") (citing *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 204 n.11 (2d Cir. 2008)).

presumption that its Common Stock traded in an efficient market.[22]

**2. Romeo's Analyst Coverage Supports Efficiency.** Analyst coverage "supports a finding of market efficiency because it permits an inference that financial statements relating to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market." *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013).[23]

Here, seven separate analyst firms issued a total of 65 reports on Romeo during the Class Period, and an additional six firms—including JPM Securities and Morgan Stanley—participated in Romeo's Class Period earnings calls. Cain Report ¶¶33-34 & Ex. 3 thereto. This supports a finding of efficiency. *Winstar*, 290 F.R.D. at 446 (coverage by "at least three analysts" supported efficiency); *In re Nature's Sunshine Prods. Inc. Sec. Litig.*, 251 F.R.D. 656, 663 (D. Utah 2008) (four analysts may "weigh in favor of a finding of market efficiency"). Relatedly, information about Romeo was disseminated to the market through at least 908 news articles published during the Class Period (Cain Report ¶35) and Romeo had significant institutional investors, further supporting efficiency. *Carpenters*, 310 F.R.D. at 92 (that "information concerning Barclays was widely disseminated…through Bloomberg and other news services" supported efficiency).[24]

---

[22] As explained in the Cain Report, Romeo's Warrants and Options are derivative types of securities, whose pricing is dependent upon and derived from the price of the underlying Common Stock. As such, a showing of market efficiency as to Romeo's Common Stock extends to the pricing of the Warrants and Options. Cain Report ¶¶74-81. Indeed, courts in this Circuit and elsewhere have held that a finding of market efficiency for common stock is sufficient to demonstrate that derivative instruments such as warrants and options are likewise entitled to the presumption of reliance. *McIntire*, 38 F. Supp. 3d at 431; *Priceline.com*, 236 F.R.D. at 99; *In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1329-1330 (N.D. Ga. 2007); *In re Fed. Nat. Mortg. Ass'n Sec., Deriv. & "ERISA" Litig.*, 247 F.R.D. 32, 41-42 (D.D.C. 2008).

[23] This factor is measured by the number of analysts covering the company or by the number of reports published about the company during the relevant period. *Id.* (noting number of analysts); *McIntire*, 38 F. Supp. 3d at 431 (noting number of analyst reports).

[24] *E.g.*, *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514-15 (1st Cir. 2005) (affirming determination of market efficiency where only one analyst followed the company's stock and issued only one report during a 16 month class period, but information about the company was widely distributed through other sources, including news articles, press releases, and SEC filings, and institutional investors invested in the stock).

**3.    The Number Of Market Makers For Romeo Stock Supports Efficiency.** This factor concerns whether there are sufficient market makers and/or arbitrageurs to facilitate the efficiency of the market. *See McIntire*, 38 F. Supp. 3d at 431-32. Courts have found the fact that a security trades on the NYSE in itself sufficient to satisfy this factor.[25] But even setting that aside, Romeo at least 82 market makers and brokers providing similar activity over the Class Period, greatly exceeding the eleven market makers the *Cammer* court found to be sufficient. Cain Report ¶40.[26]

**4.    Romeo Was Eligible To File Form S-3s.** A company must meet certain float ($75 million) and other requirements to be eligible for Form S-3 registration, which allows companies to file a shortened form with the SEC to raise additional capital. Cain Report ¶¶41-42. Eligibility to file a Form S-3 registration statement is relevant to market efficiency because Form S-3 registration is "'predicated on the Commission's belief that the market operates efficiently for these companies.'" *Cammer*, 711 F. Supp. at 1284. Here, Romeo was eligible for Form S-3 registration (Cain Report ¶43), supporting a finding of market efficiency.

**5.    Romeo's Stock Price Reacted To New, Company-Specific Information.** The fifth *Cammer* factor examines whether empirical evidence demonstrates "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287. This factor often receives attention from courts because it provides direct evidence of market efficiency, whereas the other *Cammer* factors examine indirect evidence of efficiency. *See Petrobras*, 862 F.3d at 276-79; *Aphria*, 342 F.R.D. at 206 (citing *Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017), cert. denied, 138 S. Ct. 1702 (2018)). This factor,

---

[25] *See In re Initial Public Offering Sec. Litig.*, 260 F.R.D. 81, 100 (S.D.N.Y. 2009) (trading on the NYSE "provides the necessary evidence to satisfy this factor"); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (similar); Cain Report ¶¶38-40.

[26] *See Cammer*, 711 F. Supp. at 1283 n.30 (stock at issue had eleven market makers); *see also id.* at 1293 ("Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.") (cleaned up).

however, is not necessary to show efficiency, especially where, as here, the showing on the other *Cammer* factors is strong. *Petrobras*, 862 F.3d at 278 (holding direct evidence of efficiency is not required and, in showing market efficiency, "the burden is not an onerous one"); *Carpenters*, 310 F.R.D. at 83 (citing First, Second, Third, Fourth, Fifth, and Eleventh Circuit cases holding that the fifth *Cammer* factor is not necessary). That is because "[r]equiring a plaintiff to submit proof of market reactions–and to do so with an event study–ignores Supreme Court precedent as well as practical considerations." *Carpenters*, 310 F.R.D. at 84; *Malriat v. Quantumscape Corp.*, 2022 WL 17974629, at *13 (N.D. Cal. Dec. 19, 2022) (noting courts have held "[p]laintiffs may prove market efficiency without satisfying the cause-and-effect factor, which suggests that even if this factor undisputedly favored defendants, plaintiffs still may be entitled to the fraud on the market presumption") (collecting cases, quotations omitted).[27]

The Cain Report provides evidence of this factor. By performing an event study analyzing Romeo Common Stock price movements, Dr. Cain shows that Romeo's share price responded to new, Company-specific news during the Class Period. Cain Report ¶¶44-60 & Exs. 4-7 thereto. *See Halliburton II*, 573 U.S. at 280 (event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events"). As explained in the Cain Report, the event study identified a cause-and-effect relationship between the release of new, Romeo-specific information and the movement in Romeo's stock price by comparing Romeo's share price movements on "news days" against the movement that would have been expected based on analysis of a Market Index and an Industry Index. *Id.* ¶¶52-54. As explained in the Cain Report,

---

[27]*See also Aphria*, 342 F.R.D. at 206 ("Importantly, when determining whether a plaintiff has proven market efficiency, a district court should not 'view direct and indirect evidence as distinct requirements and should, instead, conduct a holistic analysis based on the totality of the evidence presented...the burden to prove market efficiency is not an onerous one.'") (citing *Petrobras*, 862 F.3d at 277-278); *Strougo*, 312 F.R.D at 319-23 & n.85 (noting that the court previously decided that the fifth *Cammer* factor was not necessary to show efficiency and "in the interim additional courts have reached the same conclusion").

50% of the news dates analyzed saw stock price movements that were statistically significant at the 95% level,[28] compared to 6.73% of the trading days with little to no news. *Id.* at ¶56. The difference between these two percentages is statistically significant at the 99% level, providing strong direct evidence of a cause-and-effect relationship between Romeo-specific news and its Common Stock price movements. *Id.* Accordingly, the fifth *Cammer* factor weighs in favor of a finding of market efficiency.

**6.  Romeo Had A Large Market Cap.** Market capitalization is the number of shares outstanding multiplied by price per share, thus representing the total value of a company's outstanding shares. During the Class Period, Romeo's market capitalization averaged $1.14 billion, and was thus sufficiently large to attract analyst and news coverage, and gain the attention of greater numbers of investors, all of which further promotes market efficiency. Cain Report ¶¶61-62; *McIntire*, 38 F. Supp. 3d at 433 (finding that a market capitalization ranging from $292 million to $585 million during the class period weighed in favor of finding an efficient market).

**7.  Romeo Had A Large Public Float.** Courts also consider public float—*i.e.*, the percentage of shares held by the public, rather than insiders and affiliates—in assessing market efficiency. *Krogman*, 202 F.R.D. at 478. Romeo's public float was considerable, representing 90.59% of all shares outstanding throughout the Class Period. Cain Report ¶67. This large public float provides further evidence that Romeo securities traded in an efficient market. *McIntire*, 38 F. Supp. 3d at 433 (public float of 31% to 43% supported a finding of market efficiency).

**8.  Romeo Had A Narrow Bid-Ask Spread.** The final *Unger/Krogman* factor is the bid-ask spread, which is the difference between the price at which market makers are offering to buy/sell the security. Cain Report ¶63. The bid-ask spread will tend to be narrow for actively traded securities where information is readily available. *Id.* Here, the bid-ask spread for Romeo Common Stock ranged

---

[28] Two additional news dates showed price movements that were statistically significant at 90% confidence, providing additional evidence consistent with market efficiency. Cain Report nn.55, 56 & Ex. 6.

21

from 0.14% to 0.41%, and averaged a mere 0.25% over the Class Period. Cain Report ¶64. This factor thus supports efficiency. *Id.* ¶65; *McIntire*, 38 F. Supp. 3d at 433 (bid-ask spread of 0.27% supported a finding of an efficient market).

In sum, the *Cammer* and *Unger/Krogman* factors strongly weigh in favor of finding that Romeo's stock and warrants traded in an efficient market.[29]

### (b)    Plaintiffs Are Entitled To A Presumption Of Reliance Under *Affiliated Ute*

Reliance may also be presumed under *Affiliated Ute*, without a showing of market efficiency, where, as here, "a plaintiff's claim is based on a defendant's failure to disclose material information." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 748 (2d Cir. 1992) (citing *Affiliated Ute*, 406 U.S. at 154) (additional citations omitted). In such circumstances, individual reliance need not be proven. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [its] decision." *Affiliated Ute*, 406 U.S. at 131. The *Affiliated Ute* doctrine arises out of the reality that "as a practical matter [reliance on an omission] is impossible to prove." *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013).

Reliance here may be presumed because Plaintiffs' claims are based on Defendants' central omission that Romeo did not have anywhere near the battery cell supply necessary to ramp production and begin filling orders. Indeed, the facts withheld—Romeo's lack of supply of this critical product component—would have been considered "important" in the decision of whether to invest in Romeo. Plaintiffs are thus entitled the *Affiliated Ute* presumption of reliance. *See In re Dynex Capital, Inc. Sec. Litig.*, 2011 WL 781215, at *7 (S.D.N.Y. Mar. 7, 2011) (applying *Affiliated Ute* presumption

---

[29] The Cain Report further discusses Romeo's high institutional ownership, the lack of auto-correlation, and the presence of Options trading as additional evidence of market efficiency. Cain Report ¶¶68-73.

since "the heart of the alleged deception is rooted not in statements, but in the fact that specific information about the quality of the collateral was withheld, and that information would have been important to a reasonable investor.").

**(c)        Damages Can Be Determined By A Class-Wide Methodology**

Courts routinely find that damages in securities cases present common questions because they can be calculated by measuring the price impact of company-specific information alleged to be a corrective disclosure on a class-wide basis. *See Barrick Gold*, 314 F.R.D. at 106 (damages issues did not defeat predominance because calculation of damages called for the application of a damages model across the entire class); *Wallace v. Intralinks*, 302 F.R.D. 310, 318 (S.D.N.Y. 2014) (fact that class members who purchased and sold at different times would be entitled to different recoveries does not defeat predominance because "[p]laintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis.").[30]

Here, damages can be calculated on a Class-wide basis in this action using the same kind of generally accepted event study methodology. Cain Report Sec. 6. Using an event study, the artificial inflation caused by false statements and omissions can be measured on a Class-wide basis by analyzing the change in the stock price caused by a corrective disclosure. *Id.* at ¶¶85-86. Once the daily levels of price inflation have been calculated throughout the Class Period, a Class member's actual trading activity can be used to mechanically calculate damages on an individual basis. *Id.* Because this methodology is consistent with the Class-wide theory of liability and allows for measurement of damages on a class-wide basis, common issues predominate. *Wallace*, 302 F.R.D. at 318 ("Plaintiff's

---

[30] *See also In re Beacon Assoc. Litig.*, 282 F.R.D. 315, 333 (S.D.N.Y. 2012) (common issues predominate even though calculation of each class member's damages will be somewhat individualized); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 WL 5613150, at *8 (S.D.N.Y. Sept. 24, 2015) ("[A]t the class certification stage, Plaintiffs must only show that their damages model 'actually measure[s] damages that result from the Class's asserted *theory* of injury.'").

proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis that conforms to its theory of liability, thus meeting the requirements of *Comcast Corp. v. Behrend*, [569 U.S. 27 (2013)]").

### 2.    A Class Action Is Superior To Other Litigation Methods

Under Rule 23(b)(3), "[s]uperiority is established when 'a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 241 F.R.D. 435, 449 (S.D.N.Y. 2007). Superiority is typically found where each individual class member's interest in the litigation is less than the anticipated cost of litigating individually. *See Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 99 (S.D.N.Y. 2010). The following factors are relevant to the superiority assessment:

> A) the class members' interests in individually controlling the prosecution…of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by…class members; C) the desirability…of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties to be encountered in managing a class action.

Fed. R. Civ. P. 23(b)(3). These factors all weigh in favor of class certification in this case.

There is no indication that members of the proposed Class would prefer to prosecute their claims individually, and Lead Counsel are unaware of any other case involving the same claims. Like most fraud cases, the case here involves alleged "economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 10 (S.D.N.Y. 1999). The litigation of separate actions "would be wasteful, and potentially result in delay and an inefficient expenditure of judicial resources." *In re Interpublic Sec. Litig.*, 2003 WL 22509414, at *4 (S.D.N.Y. Nov. 6, 2003). It would also "risk disparate results among those seeking redress." *Id.*

Finally, securities class actions like this one generally raise no unusual manageability issues. *Petrobras*, 862 F.3d at 268 ("failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule."). In sum, a class action is the superior method for the efficient adjudication of the Class's claims.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for class certification in its entirety.

Dated: March 1, 2023

By: */s/ Kara M. Wolke*
**GLANCY PRONGAY & MURRAY LLP**
Kara M. Wolke (*admitted pro hac vice*)
Melissa C. Wright (*admitted pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
kwolke@glancylaw.com
mwright@glancylaw.com

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
glinkh@glancylaw.com

*Lead Counsel for Plaintiffs and the Proposed Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007
fcruz@frankcruzlaw.com

*Additional Counsel for Plaintiffs*

25

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On March 1, 2023, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 1, 2023.


*s/ Kara M. Wolke*
Kara M. Wolke