# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | **Case No.** |
| | **1:21-cv-03362-LGS** |
| IN RE ROMEO POWER INC.<br>SECURITIES LITIGATION | **CLASS ACTION** |

**EXPERT REPORT OF MATTHEW D. CAIN, PH.D.**

**March 1, 2023**

Table of Contents

1    Qualifications and Compensation .................................................................................. 1
2    Summary of Opinions .................................................................................................... 2
3    Case Background ........................................................................................................... 3
    3.1    Overview of the Company and Allegations ................................................................ 3
    3.2    Bases for Opinions on Market Efficiency .................................................................. 5
4    Evaluation of market efficiency factors for Romeo Common Stock ............................. 9
    4.1    *Cammer* Factor 1: Average Weekly Trading Volume ................................................. 9
    4.2    *Cammer* Factor 2: Analyst Coverage ...................................................................... 11
    4.3    *Cammer* Factor 3: Market Makers .......................................................................... 13
    4.4    *Cammer* Factor 4: SEC Form S-3 Filing Eligibility ............................................... 15
    4.5    *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and
    Stock Prices .................................................................................................................. 16
    4.6    Additional Factor 1: Market Capitalization .............................................................. 22
    4.7    Additional Factor 2: Bid-Ask Spread ....................................................................... 23
    4.8    Additional Factor 3: Public Float .............................................................................. 24
    4.9    Additional Factor 4: Institutional Ownership ........................................................... 25
    4.10    Additional Factor 5: Autocorrelation ...................................................................... 26
    4.11    Additional Factor 6: Options Trading ..................................................................... 27
5    Market Efficiency for Warrants and Options .............................................................. 27
6    Ability to Calculate Damages on a Class-Wide Basis ................................................ 30
7    Conclusion .................................................................................................................. 32
Appendix A ......................................................................................................................... 34
Appendix B ......................................................................................................................... 40
Exhibit 1 .............................................................................................................................. 43
Exhibit 2 .............................................................................................................................. 44
Exhibit 3 .............................................................................................................................. 45
Exhibit 4 .............................................................................................................................. 46
Exhibit 5 .............................................................................................................................. 47
Exhibit 6 .............................................................................................................................. 48
Exhibit 7 .............................................................................................................................. 49
Exhibit 8 .............................................................................................................................. 50
Exhibit 9 .............................................................................................................................. 51
Exhibit 10a .......................................................................................................................... 52
Exhibit 10b .......................................................................................................................... 53
Exhibit 11 ............................................................................................................................ 59

# 1  QUALIFICATIONS AND COMPENSATION

1.    I hold a Ph.D. in Finance and I am a Senior Fellow at the Berkeley Center for Law and Business at the University of California, Berkeley. I teach courses, deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business. I have been engaged in academic research for approximately two decades and continue to publish in law reviews and peer-reviewed academic journals across these disciplines. My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism. Similarly, I was a fellow with the Harvard Law School Program on Corporate Governance from 2018 through 2019, where I participated in research seminars and related activities.

2.    I worked at the U.S. Securities and Exchange Commission ("SEC") as a Financial Economist between 2014 and 2018. During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, revenue recognition practices, and disclosure violations. I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research, for which I was awarded the Chairman's Award for Economic Research.

3.    Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics. Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007. Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

4.    In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached to this Report as **Appendix A**.

5.    I have published research in leading peer-reviewed finance, accounting, law, and economics journals, including the Journal of Financial Economics, Journal of Law and Economics, Journal of Accounting and Economics, Journal of Empirical Legal Studies, and Journal of Financial and Quantitative Analysis. My curriculum vitae, attached as **Appendix A**, further details my publications and previous testimony.

6.    I bill my time at a rate of $950 per hour for my work on this matter and my compensation is in no way contingent on the outcome of this case. My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention. I am being assisted by staff at Fideres Partners LLP, who have performed work under my direction. I have no financial or other interest in Fideres Partners' billings in this matter.

## 2    SUMMARY OF OPINIONS

7.    I have been asked by counsel for the Court-appointed Lead Plaintiffs in this matter to determine whether the market for Romeo Power, Inc. ("RMO"), f/k/a RMG Acquisition Corp. ("RMG") (collectively, "Romeo" or the "Company") Common Stock was efficient during the period from October 5, 2020 to August 16, 2021, inclusive (the "Class Period").[1] I was also asked to assess whether the value impact of any alleged misstatements or omissions would be reflected in Romeo's Warrants and Options prices.[2]

8.    In addition, I have been asked to opine on whether the calculation of damages on a class-

---

[1] I understand the Defendants to be Romeo Power, Inc., Lionel Selwood, and Lauren Webb (collectively, the "Defendants"). Source: Second Amended Class Action Complaint, *In re Romeo Power Inc. Securities Litigation* (S.D. New York) (the "Complaint").

[2] Publicly traded securities of Romeo during the Class Period included Common Stock, Warrants and Options.

wide basis in this matter for investors of Romeo Common Stock, Warrants, and Options during the Class Period is subject to a common methodology.

9.    The materials I have considered in forming my opinions are summarized in **Appendix B**.

10.    Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the opinion that the market for shares of Romeo's Common Stock was efficient throughout the course of the Class Period. I also conclude that the value impact of any alleged misstatements or omissions would be reflected in Romeo's Warrants and Options prices because their pricing is derivative of and dependent upon Romeo's Common Stock prices.

11.    I have also formed the opinion that Common Stock, Warrants, and Options damages in this matter can be calculated on a class-wide basis subject to a common methodology.

12.    The remainder of my report is organized as follows: **Section 3** describes the case background and the bases for the reliance requirement and the "fraud on the market" theory relating to market efficiency. **Section 4** presents my analyses of the market efficiency factors during the Class Period. **Section 5** relates market efficiency of common stock to the warrants and options markets. **Section 6** addresses how damages can be calculated on a class-wide basis subject to a common methodology. **Section 7** contains my conclusions.

## 3   CASE BACKGROUND

### 3.1   Overview of the Company and Allegations

13.    RMG was a publicly traded black check company, also known as a special purpose acquisition company ("SPAC"), formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization, or similar business combination with one or more businesses. Following the closing of its IPO on February 12, 2019, RMG's units traded on the NYSE under the symbol "RMG.U", with each unit consisting of 1 share of RMG Class A Common Stock and 1/3 of an RMG Warrant. When the Common Stock and Warrants began trading separately on April 1, 2019, they traded on the NYSE under the symbols "RMG" and "RMG.WS",

respectively.[3] On October 5, 2020, RMG and Romeo Systems, Inc. issued a press release announcing a plan to bring Romeo Systems, Inc. public via a merger with RMG. The business combination was completed on December 29, 2020, resulting in the public listing of Romeo Common Stock and Warrants under the new trading symbols "RMO" and "RMO.WT" on the NYSE on December 30, 2020. The press release described Romeo as "an industry leading energy technology company focused on designing and manufacturing lithium-ion battery modules and packs for commercial electric vehicles." It further stated that Romeo's "core product offering serves the battery electric vehicle (BEV) medium duty short haul and heavy duty long-haul trucking markets, as well as specialty trucking and buses." The press release continued, "Romeo Power is de-risking commercialization through its strategic partnerships with global leaders in vehicle component technologies…"[4]

14.   Plaintiffs allege that throughout the Class Period, Romeo was experiencing a shortage of quality battery cells, and that Defendants made reckless misrepresentations and/or failed to disclose that (a) Romeo obtained battery cells from fewer suppliers than claimed (at most, two suppliers instead of the four major suppliers claimed); (b) Romeo had insufficient battery cell supplies to meet its needs in 2020 and 2021; (c) Romeo had overstated its operational efficiency and the degree to which its supply chain was hedged against disruptions; (d) Romeo had already experienced and continued to experience supply chain disruptions that Defendants misrepresented as mere "future potential risks" during the Class Period; and (e) as a result, the foregoing would foreseeably negatively impact the Company's business and financial performance.[5]

15.   The Complaint alleges that a partial revelation of the truth occurred after market hours on March 30, 2021, when the Company issued a Press Release announcing Q4 and full year 2020 financial results and hosted an accompanying earnings call. In the earnings announcement, Defendants disclosed revenues for fiscal 2020 that were approximately 18% lower than Romeo's

---

[3] Romeo, Form 8-K, Mar. 29, 2019. Available at:
https://www.sec.gov/Archives/edgar/data/1757932/000114420419016949/tv517554_8k.htm

[4] Complaint ¶¶2; 55-70. *See also*: https://www.rmgacquisition.com/news-releases/news-release-details/romeo-power-technology-leading-provider-battery-technology.

[5] Complaint ¶7.

guidance provided to investors only three weeks prior to year-end.[6] Defendants further disclosed a significant shortfall in battery cell supplies, resulting in a significant 71% to 87% reduction in estimated 2021 revenue.[7] Defendants also allegedly disclosed that Romeo obtained battery cells from fewer suppliers than previously claimed. The Complaint also alleges that the relevant truth was further revealed after market hours on August 16, 2021, when the Company disclosed during its Q2 2021 investor earnings call that it had missed both revenue and earnings per share targets by a large margin for that quarter, representing a further materialization of the extent of Romeo's supply shortage issues.[8] As a result of Romeo's alleged wrongful acts and material omissions of fact, investors allegedly traded Romeo's Common Stock, Warrants and Options at artificially inflated or deflated prices during the Class Period.[9]

16.   **Exhibit 1** graphs the closing stock price and trading volume for Romeo's Common Stock shares throughout the Class Period.

### 3.2    Bases for Opinions on Market Efficiency

17.   I understand that Plaintiffs assert, in part, the "fraud-on-the-market" theory of class-wide reliance, positing that shareholders rely on the alleged misrepresentations or material omissions of fact made by Defendants through their effect on stock prices in an open and well-developed market. If a market is efficient, meaning that widely available public information is quickly incorporated into stock prices, then all purchasers of the stock are induced into reliance on any misrepresentations or material omissions of fact because those statements or material omissions of fact have distorted the value of each class member's purchase price. The fraud-on-the-market theory of reliance has been addressed by numerous courts over the years in relation to Section 10(b) claims, and was adopted by the U.S. Supreme Court in its *Basic* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do

---

[6] Complaint ¶¶8; 89.

[7] Complaint ¶¶8; 192.

[8] Complaint ¶¶ 24; 193.

[9] Complaint ¶191.

not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[10]

18. This theory was also reaffirmed by the Supreme Court *in Halliburton II*:

More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[11]

19. As these cases indicate, stock prices quickly incorporate the valuation effects of public statements in an open, developed, and efficient market. In finance, "semi-strong-form" market efficiency refers to a market in which publicly available information is quickly reflected in a security's market price. Thus, if a company omits important information or provides misleading information to shareholders, the stock price will become distorted and either inflated or deflated relative to the price at which the stock would trade but-for the misleading or omitted information. Thus, in an efficient market, purchasers implicitly rely on a company's misrepresentations or material omissions of fact because they are impounded into the stock price at which trades are made.

20. Courts and practitioners have argued that markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange ("NYSE") and the Nasdaq Stock Market ("NASDAQ"), should be granted a presumption of efficiency for virtually all securities traded on them.[12] The continuous reporting of trading statistics, significant trading volumes, rapid

---

[10] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

[11] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

[12] *See Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("*Cammer*"), citing Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, §8.6 (Aug.1988): "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."

information dissemination, and other exchange rules practically guarantee a liquid market for securities traded on these exchanges. The fact that Romeo's Common Stock, Warrants, and Options traded in such a well-developed market (Common Stock and Warrants under the trading symbols "RMO" and "RMO.WS" on the NYSE, and prior to the business combination, under the trading symbols "RMG" and "RMG.WT" on the NYSE, respectively; Options on the Chicago Board Options Exchange) leads to a strong presumption of market efficiency.[13]

21. Numerous academics have studied the pricing behavior of stock markets, and some have purported to identify anomalies that call into question the efficiency of markets. However, academics have generally concluded that these anomalies represent random patterns in the data, are often not scientifically reproducible or robust to different statistical modeling choices, and/or are not persistent and have been quickly eliminated by arbitrage trading. For example, Nobel Prize winner Eugene Fama summarizes market efficiency as follows:

> The recent finance literature seems to produce many long-term return anomalies. Subjected to scrutiny, however, the evidence does not suggest that market efficiency should be abandoned. Consistent with the market efficiency hypothesis that the anomalies are chance results, apparent overreaction of stock prices to information is about as common as underreaction. And post-event continuation of pre-event abnormal returns is about as frequent as post-event reversal. Most important, the long-term return anomalies are fragile. They tend to disappear with reasonable changes in the way they are measured.[14]

Similarly, Kewei Hou, Chen Xue, and Lu Zhang concluded that "[m]ost anomalies fail to replicate, falling short of the currently acceptable standards for empirical finance… In all, capital markets are more efficient than previously recognized."[15] Moreover, the existence of anomalies does not directly undermine the premise of market efficiency, as the key question at issue under the fraud-on-the-market theory of reliance pertains to whether alleged misstatements or material omissions of fact would be reflected in stock prices at a given time.

---

[13] Complaint ¶¶ 55-65.

[14] Eugene F. Fama, 1998, Market Efficiency, Long-Term Returns, and Behavioral Finance, Journal of Financial Economics 49, at 304.

[15] Kewei Hou, Chen Xue, and Lu Zhang, 2020, Replicating Anomalies, Review of Financial Studies 33, at 2071.

22.   Academic research thus provides a strong presumption for market efficiency of exchange-traded public traded securities. In addition, I understand that courts have also developed various tests that attempt to weigh in favor of or against the presumption of market efficiency. None of these tests are individually determinative of market efficiency, but when viewed as a whole they can be informative in supporting or rebutting a presumption of market efficiency in relation to the reliance element of the fraud-on-the-market theory. These factors include what courts have referred to as the *Cammer* and *Krogman*[16] factors, as well as other additional metrics.

23.   In the following section, I discuss these factors and evaluate them in relation to Romeo Common Stock. In doing so, I compare the various factors for Romeo's Common Stock: (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed published academic research.

24.   One academic study that I use for comparison purposes was published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana, which I refer to as the "MRK Study."[17] In this study, these authors examined two samples of firms. One sample included companies that lost all analyst coverage (the "MRK Sample" firms); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the analyst-covered firms (the "MRK Covered" firms), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[18] The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and

---

[16] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*").

[17] Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, Is There Life After the Complete Loss of Analyst Coverage? Accounting Review 88, at 667-705 (the "MRK Study").

[18] MRK Study at 678, 681-682.

because it maintains investor recognition for that firm's stock... Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[19]

25.  The authors describe these variables as reflective of investor interest: after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to [analyst-]covered peers."[20] Therefore, I interpret the sample of MRK Covered firms as those eliciting high investor interest and reflecting the common indicia of firms operating in efficient markets. I then compare several of Romeo's market efficiency factors to the firms in the MRK Study to assess whether Romeo's characteristics are consistent with firms operating in efficient markets. As discussed *infra*, Romeo's characteristics are consistent with the Covered firms in the MRK Study that elicit high investor interest and thus reflect common indicia of efficient markets.

26.  The following section presents my analyses and findings from the evaluation of various market efficiency factors for Romeo's Common Stock during the Class Period. As discussed *infra*, my analyses and findings on the various market efficiency factors support a conclusion that Romeo Common Stock traded in an efficient market throughout the Class Period.

## 4  EVALUATION OF MARKET EFFICIENCY FACTORS FOR ROMEO COMMON STOCK

### 4.1  *Cammer* Factor 1: Average Weekly Trading Volume

27.  Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity of a security, the more likely it is that new information will be quickly incorporated into the price of that security. Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock. Thomas and Cotter have stated that "[t]rading volume was also considered as an eligibility

---

[19] MRK Study at 667.

[20] MRK Study at 681 (footnotes omitted).

standard because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[21]

28.  Stock trading volume refers to the extent to which a firm's equity is traded among investors during a given time period. The first *Cammer* factor for stock trading volume has been defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[22]

29.  **Exhibit 2** graphs Romeo's Common Stock weekly trading volume as a fraction of shares outstanding throughout the Class Period.[23] The average weekly trading volume of Romeo's Common Stock was 30.23% of common shares outstanding over the Class Period.[24] This level of trading volume exceeds both the 1% and 2% thresholds established by the *Cammer* court. As a result, Romeo's level of stock trading volume throughout the Class Period supports the conclusion that Romeo's Common Stock traded in an efficient market throughout the Class Period.

30.  I also note that the average weekly trading volume of Romeo's Common Stock over the Class Period was 24.11 million shares. According to the authors in the MRK Study, the median weekly trading volume for the MRK Sample firms was 0.034 million shares while the median for the MRK Covered firms was 0.215 million shares weekly.[25] Romeo's average weekly trading

---

[21] Randall S. Thomas and James F. Cotter, 2000, Measuring Securities Market Efficiency in the Regulatory Setting, Law and Contemporary Problems 63, at 108.

[22] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels, *supra*).

[23] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

[24] On April 6, 2021, PACCAR, a truck manufacturing company, announced a partnership with Romeo. Following this announcement, Romeo experienced an unusually high trading volume of 162% of shares outstanding (231% for the week). *See* "PACCAR Announces Strategic Supply Partnership with Romeo Power," Apr. 6, 2021, *PACCAR*. *Available at*: https://www.paccar.com/news/current-news/2021/paccar-announces-strategic-supply-partnership-with-romeo-power/. I note that Romeo's average weekly trading volume was 27.18% of shares outstanding throughout the Class Period when excluding this outlier.

[25] MRK Study at 678 (Table 3). The median annual trading volume for MRK sample firms was 1.75 million shares. 1.75 million divided by 52 weeks is approximately 0.034 million shares. The median annual trading volume for MRK covered firms was 11.19 million shares. 11.19 million divided by 52 weeks is approximately 0.215 million shares.

volume of 24.11 million shares during the Class Period significantly exceeds that of both the median MRK Sample firms and the MRK Covered firms. This further supports the conclusion that Romeo's Common Stock traded in an efficient market throughout the Class Period.

## 4.2    *Cammer* Factor 2: Analyst Coverage

31.  An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or an industry. Analysts typically participate in company conference calls, analyst-oriented meetings and presentations, and general industry conferences, publish reports in which they may assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock. The content of analyst reports includes information that the analyst believes is important for investors. Analyst coverage can be indicative of market efficiency since research analysts ensure that new important company-specific information is disseminated to investors and thus impounded into stock prices quickly and efficiently. The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[26]

32. Coverage of a company's stock by research analysts is also reflected by analyst participation in company conference calls, company-hosted "analyst day" conferences and presentations, and general industry conferences.

33.  In **Exhibit 3**, I report the analyst coverage of Romeo over the Class Period.[27] I identified a total of 65 reports issued by analysts at 7 separate firms. This list includes reports that were produced by firms that conduct thorough and detailed research on Romeo and its industry, such as

---

[26] *Cammer*, 711 F. Supp. at 1286.

[27] I obtained analyst reports covering Romeo from Investext and Factiva. These statistics represent a lower bound of the analyst coverage of Romeo because many analyst reports are provided directly to investors but are not captured by third-party data vendors such as Investext.

Cowen and Company and BTIG. Romeo also hosted various earnings calls throughout the Class Period, and the transcripts reflect participation by analysts from large and influential financial firms such as Morgan Stanley, BTIG, and Cowen and Company.[28] This is a significant degree of analyst coverage which served to disseminate important new publicly available information to investors, including Company news, financial performance, forecasts, and analyst commentary and recommendations.

34.  This degree of analyst coverage compares favorably to that documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by I/B/E/S received no analyst coverage in a given year.[29] Charles M.C. Lee and Eric So documented that on average, firms were covered by between 0.765 and 7.614 analysts when ranking firms into deciles by the total number of analyst forecasts issued.[30] Romeo's analyst coverage is consistent with the MRK Covered firms which elicited high investor interest. The analyst coverage of Romeo during the Class Period supports the conclusion that Romeo's Common Stock traded in an efficient market throughout the Class Period.

35.  In addition to the analyst coverage documented above, investors could access information about Romeo from a variety of other sources.[31] For example, I conducted a search of press and news articles about Romeo using Factiva, a well-known provider of access to business news across a comprehensive set of publications. Factiva coverage includes Dow Jones Newswires, PR Newswire, The Wall Street Journal, Reuters, MarketWatch, Investor's Business Daily, and numerous other outlets. This search identified at least 908 articles throughout the Class Period.[32] Moreover, Romeo produced numerous filings containing Company information which were immediately disseminated to the public through the SEC's online database, EDGAR, during the Class Period. Individual and institutional investors thus had access to publicly available information about Romeo from a variety of sources during the Class Period. As a result, the analyst

---

[28] Earnings call transcripts released throughout the Class Period were obtained from Bloomberg.

[29] MRK Study at 668.

[30] Charles M.C. Lee and Eric C. So, 2017, Uncovering Expected Returns: Information in Analyst Coverage Proxies, Journal of Financial Economics 124, at 336 (see Table 1, Panel B – "COV").

[31] Investors can also receive information from online research forums, such as SeekingAlpha, which offers both free and subscription-based research reports.

[32] The articles were identified through a Factiva search including Romeo's company tag, of all available sources.

coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about Romeo supports the conclusion that Romeo's Common Stock traded in a well-developed and informationally efficient market throughout the Class Period.

### 4.3    *Cammer* Factor 3: Market Makers

36.    The third *Cammer* factor relates to securities trading outside of major exchanges, in over-the-counter markets without continuous reporting of trading volume. This factor examines market makers, which are firms that facilitate buying and selling – order flow – in a company's stock during trading hours.[33] Market makers are present on major exchanges as well as over-the-counter markets. In particular, market makers can facilitate market efficiency in an over-the-counter market because they are:

> … [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[34]

37.    In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[35]

38.    The *Cammer* court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting. However, Romeo's Common Stock traded on the NYSE throughout the Class Period. This type of large, national exchange reports volume, prices, bid-ask spreads, and other trading

---

[33] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[34] Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, Journal of Corporate Law 19, at 291.

[35] *Cammer*, 711 F. Supp. at 1293.

details which ensure that it remains well-developed, liquid, and efficient. The *Cammer* court thus stated:

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[36]

39.   I understand that courts view large, established stock exchanges with market makers (such as the NYSE and NASDAQ[37]) as being informationally efficient.[38] Moreover, I understand that courts view institutional investors as potentially providing similar benefits to market makers by supplying trading liquidity and informationally-efficient and informed trading.[39] Academic research has similarly found that institutional investors can facilitate trading liquidity. As I discuss

---

[36] *Cammer*, 711 F. Supp. at 1292.

[37] The NYSE Market Model, NYSE, available at: https://www.nyse.com/market-model: "The cornerstone of the NYSE market model is the Designated Market Maker (DMM). DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability. This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value. DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry-specific intelligence, to inform their decisions. A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery." *See also*: http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess: "NASDAQ is a unique market organization that provides a competitive trading environment and efficient, low-cost execution of orders. There are multiple market participants, including market makers, order-entry firms and electronic communications networks (ECNs) that utilize NASDAQ's trading services. Definition of a Market Maker: A market maker is a NASDAQ member firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades)."

[38] *See*, *e.g.*, *Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 572-73 (C.D. Ca. 2012) ("One defendant in *Cammer* contended that only stocks trading on the New York or American stock exchanges should be eligible for the presumption of reliance provided by the theory of fraud on the market. In rejecting that broad distinction, the court noted that 'the inquiry in an individual case remains the development of the market for that stock, and not the location where the stock trades.' But the trading location is still important, in one key sense: In an over the counter market, the number of market makers may be a particularly important measure of market efficiency…By contrast, Radient traded on the NYSE Amex during the Class Period which, as Plaintiffs' expert notes, means that it was assigned what that market now calls a Designated Market Maker" (citations omitted); *see also Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D. Ca. 2016), at 6: "The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency."

[39] *See*, *e.g.*, *In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading.") (citations omitted); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market.")

further in **Section 4.9** below, Romeo's Common Stock was widely held by institutional investors throughout the Class Period (see **Exhibit 10b**).[40]

40.   As a result, Romeo's public listing on the NYSE, a well-developed and established national exchange, satisfies the intent of this *Cammer* factor. Moreover, Romeo had at least 82 market makers and brokers providing similar activity over the Class Period,[41] greatly exceeding the 10 market makers that the court in *Cammer* held "would justify a substantial presumption" of market efficiency. In sum, Romeo easily satisfies this *Cammer* factor by virtue of the Common Stock's highly liquid and well-developed trading venue, the presence of market makers, and the widespread holdings by sophisticated institutional investors, further supporting the efficiency of the market for Romeo's Common Stock throughout the Class Period.

### 4.4   *Cammer* Factor 4: SEC Form S-3 Filing Eligibility

41.   The fourth *Cammer* factor cited by the court is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[42]

42.   Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a class of securities subject to the Exchange Act, the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, the registrant has not failed to pay any dividend

---

[40] Romeo Common Stock was held by at least 329 institutional investors at some point during the Class Period (*see* **Exhibit 10a** and **Exhibit 10b**). Institutional ownership fluctuated on a quarterly basis throughout the Class Period, from a minimum of 39.87% of shares outstanding on December 31, 2020, to a maximum of 54.66% of shares outstanding on September 30, 2021 according to data from Bloomberg and Romeo's SEC Filings. These figures represent a lower-bound estimate of institutional holdings as some institutions may not be reflected in Bloomberg's coverage.

[41] Bloomberg "RANK" function.

[42] *Cammer*, 711 F. Supp. at 1287.

or sinking fund installment on preferred stock or defaulted on any material debts or leases, the registrant has a public float of $75 million.[43, 44] The logic and intuition behind this factor as discussed by the *Cammer* court is that a company which makes timely financial filings with regulators implies that investors have ready and ample access to publicly available information about the issuer.

43. Romeo's Common Stock public float far exceeded the required $75 million threshold during the Class Period,[45] and to the best of my knowledge, RMG and RMO made all required filings with the SEC in a timely manner during the Class Period and satisfied the other S-3 eligibility requirements. In addition, Romeo filed an SEC form S-3 shortly after the Class Period, on January 26, 2022.[46] Thus, Romeo satisfies this *Cammer* Factor during the Class Period. As a result, this factor supports the efficiency of the market for Romeo Common Stock throughout the Class Period.

**4.5    *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices**

44. The fifth *Cammer* factor relates to whether a company's stock prices quickly respond to and incorporate new value-relevant information.

> The *Cammer* court held: … [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[47]

45. To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I analyzed Romeo's quarterly earnings announcements. These announcements represent a potential opportunity for the public release of new value-

---

[43] https://www.sec.gov/files/forms-3.pdf.

[44] SEC 1379, "Form S-3, Registration Statement under the Securities Act of 1933, General Instructions."

[45] Romeo's float averaged $1.16 Billion over the full Class Period; RMG's float averaged $352.27 Million from October 5, 2020 through December 29, 2020.

[46] Romeo, Form S-3, Jan. 26, 2022. Available at:

https://www.sec.gov/Archives/edgar/data/1757932/000110465922007891/tm224144d1_s3.htm

[47] *Cammer*, 711 F. Supp. at 1291.

relevant Company information to investors. One would not expect every earnings announcement to cause a significant stock price movement for a company since investors and analysts may anticipate the reported performance, or because the information may contain a mix of both positive and negative information. The mix of unanticipated results, forward guidance, executive statements, analyst interpretations of this information, and other company-specific news can cause company stock prices to move in an efficient market.

46.  I also considered the fact that other types of news or information could be more or less relevant for a given company during certain time periods, as well as the length of the Class Period in this matter. Because Romeo only hosted two earnings announcements during the Class Period, I extended the analysis period by one year past the end of the Class Period to cover all earnings announcements between the start of the Class Period and August 16, 2022 (the "Analysis Window"). Moreover, on August 1, 2022, Romeo announced that the Company would be acquired by Nikola Corp., an electric vehicle manufacturer, at a stock price premium of approximately 34%.[48] Following this announcement, and in conjunction with posting its 2Q 2022 financial results, on August 8, 2022, the Company informed investors that it would not host an earnings call and was withdrawing all previously-issued revenue guidance and outlook for 2022.[49] Given the potentially significant implications of the acquisition premium and the 2Q 2022 financial results and withdrawn guidance for investors, I include these dates in my sample of Company disclosures (collectively with the earnings announcements, the "News Days").

47.  I compared the stock returns and trading volume of Romeo's Common Stock on News Days versus those metrics on trading days that contained the least news during the Class Period (the "Least News Trading Days").[50] The Least News Trading Days provide a benchmark measurement of days in which relatively little Company-specific information was provided to the

---

[48] Nikola Corporation and Romeo, joint Press Release, Aug. 1, 2022. Available at:
https://www.sec.gov/Archives/edgar/data/1757932/000110465922084779/tm2222249d1_ex99-1.htm.

[49] Romeo, Form 8-K, Aug. 8, 2022. Available at:
https://www.sec.gov/ix?doc=/Archives/edgar/data/1757932/000175793222000048/rmo-20220808.htm.

[50] Least News Trading Days were identified as dates with no Factiva headlines or SEC filings during the Analysis Window. For purposes of considering news to identify Least News Trading Days, I ignored stories that merely identified stock price or volume movements on a given date without discussing any other information.

market. If Romeo's stock prices tend to move more significantly following News Days than on the Least News Trading Days, this would support a conclusion of market efficiency.

48. In order to study the stock price movements for Romeo on different trading days, I performed an event study.[51] A generally accepted method for performing an event study is to create a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices. Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news. Finally, as part of an event study method, an economist tests whether the deviation from expected price movements (i.e., the abnormal return) is sufficiently large compared to the usual volatility in the Company stock price return such that simple random movement can be rejected as the cause.

49. Here, I performed an event study to evaluate whether Romeo's Common Stock responded to information disclosed on the News Days. To conduct the event study, I deployed the methodologies described above that are well-established in academic literature and routinely applied and accepted in the context of securities fraud litigation.

50. In order to isolate the impact of Company-specific news on Romeo's stock price during the Class Period, I performed regression analyses to measure the relationship between Romeo's stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in Romeo's industry. By modeling how Romeo's stock price returns moved relative to an overall market index and an industry index, I could also measure its response to Company-specific news.

51. Because Romeo Systems, Inc. was not a publicly traded company prior to the start of the Class Period, I used the period from October 5, 2020 (the start of the Class Period) to December

---

[51] An event study is a standard method to analyze the impact of information on market prices that has been adopted in academic research and a wide variety of other applications. *See* A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, Journal of Economic Literature 13.

29, 2020 (60 trading days after the Class Period start, and coinciding with formal closing of the business combination of Romeo and RMG) as the Control Period to estimate a market model used to compute abnormal returns for days during this period (*i.e*., I use an in-sample Control Period). For each trading day following December 29, 2020 within the Analysis Window, I constructed a regression model using data from the prior 60 trading days ("Estimation Window").[52] To study the relationship between Romeo's stock price returns and overall market factors, I used the S&P 1500 Composite Total Return Index (the "Market Index"). The Market Index is commonly used by economists as a representation of the overall market. To study the relationship between Romeo's stock price returns and changes in industry-wide factors that would be expected to impact all stocks in Romeo's particular industry, I used the EQM Lithium and Battery Technology Index (the "Industry Index").[53]

52.  I established the relationship between the daily return of the Company stock, the daily return on the Market Index, and the daily return on the Industry Index over the Estimation Window.[54] As shown in **Exhibit 4**, the event study model revealed an evolving relation between the Company's daily returns and those of the overall stock market and industry throughout the Class Period. In other words, movements of the Market Index and the Industry Index help explain movements in Romeo's stock price. This allowed me to predict the expected daily return of the

---

[52] *See, e.g.,* Mark L. Mitchell and Jeffry M. Netter, 1994, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, *The Business Lawyer* 49, at 568 ("The market model is estimated with regression analysis. The estimation period for this market model equation typically ranges from 100 to 300 trading days preceding the event under study."); A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35, at 15 ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

[53] In its SEC Form 10-K for the fiscal year ended December 31, 2020, Romeo describes itself as a "an industry leading energy storage technology company focused on designing and manufacturing lithium-ion battery modules and packs for commercial vehicles." *See* https://www.sec.gov/Archives/edgar/data/1757932/000110465921050862/rmo-20201231x10k.htm. According to Bloomberg (MEMB function), the Industry Index had 76 constituents as of August 16, 2021.

[54] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, Journal of Economic Literature 35, at 15 ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event."); *see also* Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, Good News, Bad News, Volatility, and Betas, Journal of Finance 50, at 1597.

Company on a date once I had controlled for that day's market and industry returns. I then subtracted the predicted return from the actual return to get the "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

53.  Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in the Company stock price return. An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from my regression model. In other words, the standard deviation of errors provides a metric for how much "randomness" remains in the price movement of Romeo's Common Stock, after controlling for the Market Index and the Industry Index. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Class Period.

54.  To test for statistical significance, I calculated the t-statistic, which is the test that economists use to determine whether randomness can be rejected as the explanation for an abnormal price movement. The t-statistic measures the number of standard deviations between the actual observation and the predicted movement. It is calculated by dividing the abnormal return by the standard deviation of the errors. Probability theory suggests that under the standard assumption that abnormal returns will be normally distributed with a mean of zero in the absence of new value-relevant company-specific news, based purely on randomness, using a 95% confidence level and a sufficiently large sample size, an abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) approximately 5% of the time in the absence of new company-specific information.[55] In other words, there is a 95% chance that, barring some non-random explanation, the actual observed return will fall within 1.96 standard deviations of the predicted return.

55.  **Exhibit 6** reports the event study results of the 8 days that met the criteria I established for the identification of News Days during the Analysis Window. The columns list the market impact dates, closing stock price, log return, abnormal return from my event study, abnormal dollar change

---

[55] David I. Tabak and Frederick C. Dunbar, Materiality and Magnitude: Event Studies in the Courtroom, Litigation Services Handbook, The Role of the Financial Expert, Ch. 19 (3rd ed. 2001). The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

in stock price from my event study, the t-statistic, the p-value, statistical significance of the stock movement, and a description of the earnings announcement on each date. Overall, 4 out of 8 Romeo news announcements caused stock price movements that were statistically significant at the 95% level.[56] I compare this rate with that on the Least News Trading Days in the following exhibit.

56. **Exhibit 7** summarizes the statistical comparison of Romeo's Common Stock returns and trading volume following the 8 News Days versus these metrics as measured on the Least News Trading Days. As shown in the exhibit, 50% of the 8 earnings announcements caused stock movements that were statistically significant at the 95% level. This compares to 6.73% of the Least News Trading Days with statistically significant stock price movements. The difference between these two percentages is statistically significant at the 99% level. This provides strong evidence of a cause-and-effect relationship between information and Romeo Common Stock price movements.

57. This exhibit also shows that the average of the absolute value of abnormal returns following Romeo's 8 News Days was 13.80%. This compares to an average of only 3.60% on the Least News Trading Days. The difference between these two averages is statistically significant at the 99% level. This further supports a finding of a strong cause-and-effect relationship between information and Romeo Common Stock price movements.

58. Finally, this exhibit reports an average daily trading volume of 18.31 million shares for Romeo Common Stock following News Days. This compares to an average daily trading volume of 4.75 million shares on the Least News Trading Days. The difference between these two values is statistically significant at the 95% level, providing further evidence of the cause-and-effect relationship between information and Romeo Common Stock price movements.

59. I further noted additional evidence of a cause-and-effect relationship between new Company-specific information and Romeo Common Stock price movements during the Class Period. For example, Romeo had statistically significant (at the 95% level or better) returns on the following dates: November 25 and 27, 2020 – after announcing the record date for eligibility of

---

[56] Two additional dates are statistically significant at the 90% level. My *Cammer* Factor 5 analysis is thus conservative, as an analysis based upon the 90% level of statistical significance would also be consistent with market efficiency.

stockholders to vote on the RMG-Romeo SPAC business combination;[57] December 29, 2020 – after announcing stockholder voting approval of the SPAC business combination;[58] March 9, 2021 – after research analyst Cowen and Company initiated coverage of Romeo with an "Outperform" rating;[59] and April 6 and 7, 2021 – after the strategic supply partnership with PACCAR was announced.[60] Moreover, Romeo's Commo Stock price dropped by statistically significant amounts (at the 99% level) following each of the two alleged Corrective Disclosures: -21.78% on March 31, 2021 and -17.12% on August 17, 2021.[61]

60.   In summary, relative to other trading days, Romeo's News Days caused a greater proportion of statistically significant stock price movements, absolute levels of price changes, and increases in trading volume. This finding establishes a clear cause-and-effect relationship between new Company-specific information and Romeo Common Stock price movements. As a result, this price impact analysis supports the conclusion that Romeo's Common Stock traded in an efficient market throughout the Class Period.

## 4.6   Additional Factor 1: Market Capitalization

61.   I have also considered several additional factors beyond the five *Cammer* factors, the first of which is the total value of stock outstanding, or market capitalization. The *Cammer* court acknowledged this factor as indicative of market efficiency, holding that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."[62] Moreover, the *Krogman* court stated "[m]arket capitalization, calculated as the number of shares multiplied

---

[57] "RMG Acquisition Corp. Announces Record Date for Stockholders Eligible to Vote on Merger," Nov. 25, 2020 (3:42pm ET), *Business Wire*. This announcement came near the end of regular trading on Nov. 25; Nov. 26 was a non-trading day, so the next available full trading day was Nov. 27.

[58] "RMG Acquisition Corp. Announces Stockholder Approval of Business Combination with Romeo Systems, Inc. with No Redemptions," Dec. 28, 2020 (3:48pm ET), *Business Wire*. This announcement came near the end of regular trading on Dec. 28, and the next available full trading day was Dec. 29.

[59] "Initiating RMO at Outperform: Leader of the Pack," Mar. 8, 2021, Cowen; "Romeo Power Initiated with an Outperform at Cowen," Mar. 8, 2021 (4:17pm ET), *Theflyonthewall.com*.

[60] "PACCAR Announces Strategic Supply Partnership with Romeo Power," Apr. 6, 2021, *PACCAR*. *Available at*: https://www.paccar.com/news/current-news/2021/paccar-announces-strategic-supply-partnership-with-romeo-power/.

[61] Both of these alleged Corrective Disclosures are also earnings announcements included within the Exhibit 6 and 7 analysis. I note that my event study is designed for purposes of assessing market efficiency and is not designed to address questions relating to merits, loss causation, artificial inflation, or damages.

[62] *Cammer*, 711 F. Supp. at 1287.

by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[63] As stated previously, the MRK Study found that firms lacking analyst coverage had other indicators of trading in less developed and efficient markets, including smaller market capitalizations. The median market capitalization of the MRK Sample firms was $27.91 million.[64] By contrast, the MRK Covered firms had a median market capitalization of $243.97 million.[65] This study supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

62.  **Exhibit 8** reports Romeo's market capitalization throughout the Class Period. This market capitalization averaged $1.14 billion over the Class Period. Romeo's market capitalization exceeded that of the MRK Sample firms and the MRK Covered firms, on an inflation-adjusted basis.[66] Romeo's number of shares outstanding ranged from 23 million shares to 134 million shares during the Class Period.[67] Given that Romeo's market capitalization was higher than that of both the MRK Sample firms and the MRK Covered firms, Romeo's market capitalization on a stand-alone basis is strongly supportive of market efficiency. In addition, given Romeo's shares outstanding available for trading, its sizeable float as discussed below, and the other factors analyzed herein, the market capitalization is consistent with the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

### 4.7   Additional Factor 2: Bid-Ask Spread

63.  The *Krogman* court considered the bid-ask spread as another factor that can indicate market efficiency: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[68] The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the

---

[63] *Krogman*, 202 F.R.D. at 478.

[64] MRK Study at 678 (Table 3).

[65] MRK Study at 678 (Table 3).

[66] Source: U.S. Bureau of Labor Statistics, CPI Inflation Calculator, available at: https://www.bls.gov/data/inflation_calculator.htm (last visited February 17, 2023). $27.91 million in December 1996 represented approximately $48.14 million in November 2020; $243.97 million in December 1996 represented approximately $420.82 million in August 2021.

[67] Shares outstanding during the Class Period obtained from SEC Filings.

[68] *Krogman*, 202 F.R.D. at 478.

stock (the bid). This spread can be expressed as the difference between these prices in their quoted currency, or as a percentage – for example relative to the bid-ask midpoint. A narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally-efficient market. A wider bid-ask spread will cause investors to pay more money to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

64.   I analyzed the bid-ask spread of Romeo's Common Stock during the Class Period. **Exhibit 9** reports the monthly average bid-ask spread as a percentage of the bid-ask midpoint over this time period.[69] This spread fluctuated between 0.14% and 0.41% from October 2020 through August 2021, and averaged 0.25% over the Class Period.[70]

65.   By way of comparison, the MRK Study found that the MRK Sample firms had a median bid-ask spread of 4.55% while the MRK Covered firms had a median bid-ask spread of 1.69%.[71] Romeo's average bid-ask spread over the Class Period was lower than the median values of both the MRK Sample firms and the MRK Covered firms, indicating that investors could trade Romeo's Common Stock at very low relative cost. As a result, Romeo's bid-ask spread supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

### 4.8   Additional Factor 3: Public Float

66.   The *Krogman* court also considered the public float of a company in weighing market efficiency.[72] The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders. Even if a company has a large market capitalization, if

---

[69] I calculated the percent bid-ask spread using daily closing bid and ask quotes. Kee H. Chung and Hao Zhang, *A Simple Approximation of Intraday Spreads Using Daily Data*, 17 J. Fin. Markets, 94, Table 2 (2014). This study compared data using end-of-day prices to intraday data and documented that the spreads were very similar. *See also*: Farshid Abdi and Angelo Ranaldo, 2017, A Simple Estimation of Bid-Ask Spreads from Daily Close, High, and Low Prices, *Review of Financial Studies* 30, at p. 4439: "An *approximation* of intraday bid-ask spreads with end-of-day quotes provides accurate measures and computational savings" (citations omitted).

[70] I also examined the dates from October 2020 and August 2021 that were part of the Class Period and report them in **Exhibit 9**. The Class Period dates from October 2020 had an average bid-ask spread of 0.25% and the Class Period dates from August 2021 had an average bid-ask spread of 0.34%. I noted, however, that neither of these figures was computed using a full month of data.

[71] MRK Study at 678 (Table 3).

[72] In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

---

the majority of the equity is held by its CEO and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

67.  **Exhibit 10a** reports the shares outstanding, public float, and shares held by insiders for Romeo Common Stock during the Class Period. As shown in the exhibit, Romeo insiders held less than 10% of the Common Stock throughout the Class Period (average = 9.41%). Thus, approximately 90.59% of Romeo's shares were held by institutions and other outside investors. This large degree of public float for Romeo's Common Stock supports the conclusion that it traded in an efficient market throughout the Class Period.

### 4.9    Additional Factor 4: Institutional Ownership

68.  Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly impounded into stock prices. Thus, the presence of institutional shareholders can be an indicator of market efficiency.

69.  I also report the total institutional ownership of Romeo's Common Stock in **Exhibit 10a**, which shows that on average 329 institutions held the stock at some point during the Class Period (a full list of institutional ownership can be seen in **Exhibit 10b**). By comparison, the MRK Study found that the MRK Sample firms had a median of only 9 institutional investors while the MRK Covered firms had a median of 40 institutional investors.[73] Romeo's institutional ownership base exceeds both of these levels.[74] Thus, the significant institutional ownership base for Romeo

---

[73] MRK Study at 678 (Table 3).

[74] The number of institutions is more relevant than the percentage of shares held by institutions, as the percentage may appear low despite significant institutional presence among firms with large numbers of shares outstanding. Nonetheless, I note that the Company's percentage of shares held by institutions throughout the Class Period exceeded that of other firms that have previously been found to trade in efficient markets. *See*, *e.g*., *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 ("*Clover*"), with institutional investors holding on average 26.68% of shares outstanding during the respective class period.

Common Stock supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

### 4.10 Additional Factor 5: Autocorrelation

70.  Autocorrelation refers to an anomaly by which stock returns over a given time period are able to predict future returns. The interval over which autocorrelation is examined tends to be on a daily basis. Thus, if the stock return today predicts tomorrow's stock return with a statistically significant correlation, the returns are said to be autocorrelated. A positive autocorrelation could give rise to "momentum" trading whereby an investor would purchase (sell or short sell) stock when returns are positive (negative) in order to generate profits as the returns continue over subsequent trading days. A negative autocorrelation could give rise to "reversal" trading whereby an investor would sell or short sell (purchase) stock when returns are positive (negative) in order to capture profits when the returns reverse. Autocorrelation may occur occasionally due to random patterns in aggregate stock return data or due to consecutive news days with different types of new information being publicly released. However, if statistically significant autocorrelation in stock returns persists over a sufficient time period such as several quarters and is large enough in magnitude that a trader could earn riskless profits after trading costs, this would imply market inefficiency because publicly available information about prior stock price movements would not be fully reflected in current stock prices.

71.  I use an established methodology, *i.e.*, a regression analysis, to test for autocorrelation in Romeo's Common Stock returns.[75] This evaluates whether, from a statistical perspective, the stock return on a given day can predict the stock return on the following trading day.[76] After performing the regression to test for this pattern over the sample of trading days throughout the Class Period, if the regression produces a statistically significant result, then it becomes necessary to explore whether this pattern is sufficiently large in magnitude, consistent in direction, and persistent over time such that a trading arbitrage opportunity exists. If, however, the regression does not indicate

---

[75] I evaluate abnormal returns, the calculation of which was described in the *Cammer* factor five analysis section of this report (**Section 4.5**).

[76] Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, Liquidity and Autocorrelations in Individual Stock Returns, Journal of Finance 61, at 2367-68; Michael C. Jensen, 1978, Some Anomalous Evidence Regarding Market Efficiency, Journal of Financial Economics 6, at 95-101.

a statistically significant pattern in the stock returns, then no evidence exists of an autocorrelation anomaly.

72. **Exhibit 11** presents the results from the autocorrelation test for Romeo's Common Stock during the Class Period. The autocorrelation coefficient over the full Class Period is not statistically significant. Moreover, the quarterly autocorrelation coefficients alternate between positive and negative throughout the Class Period, indicating no consistent predictability in the Company's daily stock returns over time. The lack of a consistent and persistent autocorrelation pattern over time would thus not present an arbitrage opportunity for investors. This finding supports the conclusion that Romeo's Common Stock traded in an efficient market throughout the Class Period.

### 4.11  Additional Factor 6: Options Trading

73. Academic studies have shown that options written on company stock help to improve market depth and liquidity, investor interest, and overall market efficiency, as indicated by increases in trading volume, narrower bid-ask spreads, and improvements in transaction sizes and frequencies.[77] Thus, options trading on a company's stock can improve price discovery and support a finding of market efficiency, relative to a company without any options trading. According to Bloomberg, Romeo's Common Stock had 2,631,219 call option contracts and 595,378 put option contracts traded during the Class Period. The presence of options trading supports the conclusion that Romeo's Common Stock traded in an efficient market throughout the Class Period.

## 5  MARKET EFFICIENCY FOR WARRANTS AND OPTIONS

74. Options are derivative securities, a type of security whose value is dependent on the market price of an underlying security or asset.[78] In this case, during the Class Period, the pricing for the Romeo Options at issue was dependent on the market price of Romeo Common Stock.

75. A warrant is an option issued by a company or a financial institution, frequently pertaining

---

[77] Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, Journal of Finance 53. *See also*: Stephen A. Ross, 1976, Options and Efficiency, Quarterly Journal of Economics 90.

[78] Option valuation models, such as the Black-Scholes model, depend directly on the current underlying stock price. See, for example: John Hull, *Options, Futures and Other Derivatives*, 7th Ed., Prentice Hall, 2009, pp. 201, 291.

to the company's own common stock. A warrant is essentially a call option that gives the warrant holder the right to purchase a share of the company's stock at a pre-determined price ("strike price") on or before a fixed date ("expiration" or "maturity" date).[79] In this case, during the Class Period, the pricing for the Romeo Warrants at issue was dependent on the market price of Romeo Common Stock.

76. One major difference between call options and warrants is the exercise of a warrant requires the firm to issue a new share of stock, which increases the total shares outstanding. Exercise of a call option requires only that the writer of the call option deliver an existing share of stock to fulfill the obligation. Also, unlike call options, warrants result in a cash flow to the firm when the warrant holder pays the exercise price.[80]

77. Options and Warrants are considered "derivative" securities because their value is derived primarily based on the value of the underlying asset (*i.e.*, the common stock). The value of an option or warrant is comprised of "intrinsic" and "time value." The intrinsic value of an option or warrant is its value if the holder had to immediately decide whether to exercise it or not. The intrinsic value is calculated as the current, or spot price of the stock ("$S$") minus the exercise, or strike ("$K$") price, when an option is in-the-money, or zero if the option is at or out-of-the-money, given by $\max(S - K, 0)$. The time value refers to the portion of an option's premium that is attributable to the amount of time remaining until option expiry. Time value arises from the possibility that the stock price will favorably increase or decrease by the expiration date.

78. Prices for options and warrants are affected by six factors:

- The current (or spot) stock price, $S_0$;
- The strike price, $K$;
- The time to expiration, $T$, also denoted as $T - t$ where $T$ is the expiration date and $t$ is the current date;
- The implied volatility of the underlying stock price, $\sigma$;
- The risk-free interest rate, $r$; and

---

[79] *See, e.g.*: "Stock Warrants," Dec. 13, 2022, *Corporate Finance Institute*. *Available at*: https://corporatefinanceinstitute.com/resources/derivatives/stock-warrants/. "Stock warrants are options issued by a company that trade on an exchange and give investors the right (but not obligation) to purchase company stock at a specific price within a specified time period. When an investor exercises a warrant, they purchase the stock, and the proceeds are a source of capital for the company."

[80] *Ibid*.

- Expected dividends.

79. A wide body of academic literature has studied options pricing in relation to common stocks. For example, numerous studies have evaluated the potential for arbitrage profits to be earned from persistent mispricing opportunities between common stock and options prices, and have concluded that such opportunities do not persist in general due to the efficiency of option pricing.[81] Additionally, many studies have documented that option prices quickly begin to impound and reflect new information.[82] In summary, academic literature strongly supports the presumption that options prices quicky reflect value-relevant information that is also reflected in common stock prices.

80. Moreover, I also understand that courts have presumed that when a market for common stock is found to be informationally efficient, reliance on misstatements or omissions can be presumed for the options, since their prices are derivative of the market prices for common stock.[83]

81. As demonstrated above, Romeo Common Stock satisfied each of the efficiency factors I evaluated. Because I have concluded that Romeo Common Stock was priced efficiently and therefore reflected the value of the alleged misstatements and omissions, I also conclude that because options and warrants pricing is dependent on the stock price, the artificial inflation caused by any misrepresentations and omissions that affects the Common Stock price would translate into the value of derivative instruments such as Romeo Options and Warrants.

---

[81] *See, for example*: Galai, Dan, 1977, Tests of Market Efficiency of the Chicago Board Options Exchange, *Journal of Business* 50; Klemkosky, Robert C. and Bruce G. Resnick, 1979, Put-Call Parity and Market Efficiency, *Journal of Finance* 34; Klemkosky, Robert C. and Bruce G. Resnick, 1980, An Ex-Ante Analysis of Put-Call Parity, *Journal of Financial Economics* 8; Whaley, Robert E., 1982, On the Valuation of American Call Options on Dividend Paying Stocks: Empirical Tests, *Journal of Financial Economics* 19.

[82] *See, for example*: Patell, James M. and Mark A. Wolfson, 1981, The Ex Ante and Ex Post Effects of Quarterly Earnings Announcements Reflected in Option and Stock Prices, *Journal of Accounting Research* 19; Manaster, Steven and Richard J. Rendleman, Jr., 1982, Option Prices as Predictors of Equilibrium Stock Prices, *Journal of Finance* 37; Anthony, Joseph H., 1988, The Interrelation of Stock and Options Market Trading-Volume Data, *Journal of Finance* 43.

[83] *See, e.g.*: *In re Priceline.com Inc. Securities Litigation*, No. 3:00CV01884(DJS); *In re Scientific-Atlanta, Inc. Securities Litigation*, No. 1:01-CV-1950-RWS; and *Fannie Mae Securities Litigation*, No. 04-1639 (RJL).

## 6  ABILITY TO CALCULATE DAMAGES ON A CLASS-WIDE BASIS

82.  I have been asked by Counsel to evaluate whether per-share damages for purchasers or acquirers of Romeo's Common Stock can be assessed for all Class members under §10(b) of the Exchange Act based upon a methodology common to all class members and consistent with Lead Plaintiff's theory of liability. The "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under Section 10(b) of the Exchange Act. This approach calculates damages formulaically as the artificial inflation in the prices of Romeo securities at the time of purchase minus the artificial inflation in the prices of Romeo securities at the time of sale. If securities are not sold prior to the full revelation of the fraud, then the difference is relative to a 90-day lookback period under the Securities Litigation Reform Act of 1995 ("PSLRA").[84] This limit on damages can also be applied class-wide. I understand that this out-of-pocket methodology has been widely accepted for use across 10(b) matters.

83.  The claims process produces information necessary for the calculation of damages for each Class member, including the purchase and sale information for the security. This information is available from brokerage statements and other documentation of securities transactions. Artificial inflation is quantified for each day of the Class Period and then damages are calculated using the formula described above. As a result, the methodology for calculating damages in Section 10(b) matters such as this is well-established and formulaic across all Class members.

84.  The quantification of artificial inflation is based upon a detailed loss causation analysis. I have not been asked to perform a loss causation analysis at this time, and I understand that such analysis often incorporates information produced during discovery. Nonetheless, the method employed to calculate artificial inflation can be applied class-wide.

85.  Event studies are widely employed to calculate artificial inflation. Event studies measure security price reactions to corrective disclosures which revealed the relevant truth that was

---

[84] The PSLRA states: "in any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See* 15 U.S.C. §78u-4(e)(1).

concealed by alleged material omissions of fact and/or misrepresentations.[85,86] To the extent that reliable evidence is introduced to show that a material portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to non-fraud related factors, the impact of such "confounding information" on the price of Romeo's securities can be determined on a common, class-wide basis using various accepted methodologies. The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon additional information learned during the discovery process, and will be based on the specific set of facts and circumstances in a given case.

86.   A loss causation analysis must also document how artificial inflation evolved throughout the Class Period. This determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery. One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that inflation equaled a constant dollar amount above the correct security price over the Class Period. Alternatively, one can measure "constant percentage inflation," which assumes that each price was inflated by a constant percentage amount above the correct security price over the Class Period. In other instances, artificial inflation may have varied on a daily basis and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculation of artificial inflation is based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents. All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual class member identities or circumstances.

87.   Damages relating to Romeo's Options and Warrants can also be calculated in a similar manner utilizing the same techniques as described above. Once Romeo Common Stock's artificial inflation is estimated, the embedded inflation contributing to a Warrant or Option's price can

---

[85] In this report I conducted an event study to assist with the evaluation of market efficiency. My event study in this report was not intended to quantify artificial inflation.

[86] I note that because event studies are capable of measuring artificial inflation via back-end price impact, this methodology can back-cast artificial inflation throughout a given class period. This methodology is thus reliable in cases involving allegedly inflation-creating misrepresentations as well as inflation-maintaining misrepresentations with no front-end price impact.

change based on a number of factors. These factors include, but are not limited to, the level of the stock price in relation to the strike price, time to maturity of the contract, and volatility of the underlying stock. One can employ various options pricing methodologies, such as the widely-utilized Black-Scholes pricing model, to infer the damage quantum at the time of each Class member's purchase and sale. These models provide a way to value Options and Warrants as a function of the variables that influence option and warrant values: the strike price, time to expiration, risk-free interest rate, volatility of the underlying security, and the current market price of the underlying security. By changing the underlying price of the security in the equation to reflect the removal of the artificial inflation, one can assess how the value of the Option and Warrant would be impacted. Therefore, Options and Warrants damages in this matter can be calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

88. To summarize, I have not been asked to calculate damages in this matter. Such loss causation analysis would depend on information produced in discovery and development of the case record. Based on my experience and qualifications and my understanding of the nature of claims in this matter, I conclude that Common Stock, Options and Warrants damages in this case can, however, be calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

## 7  CONCLUSION

89.  In conclusion, based on the market efficiency factors considered by courts and in academia, upon which I conducted my analyses, it is my opinion that Romeo's Common Stock traded in an efficient market throughout the Class Period. I also conclude that the value impact of any alleged misstatements or omissions would be reflected in Romeo's Options and Warrants prices because their pricing is derivative of and dependent upon Romeo's Common Stock prices. Moreover, it is my opinion that damages in this matter can be calculated on a class-wide basis utilizing a common methodology.

I declare under penalty of perjury that the foregoing is true and correct.

*RESPECTFULLY SUBMITTED*

Matthew D. Cain, Ph.D.

**APPENDIX A**

## Matthew D. Cain, Ph.D. <span style="float:right">March 2023</span>

E-mail: mdcain@outlook.com <span style="float:right">Homepage</span>
Mobile: 574-485-8065 <span style="float:right">SSRN</span>

### Education

Ph.D., Finance, August 2007 <span style="float:right">Purdue University, West Lafayette, IN</span>
B.S., Finance, May 2001 <span style="float:right">Grove City College, Grove City, PA</span>

### Professional and Academic Experience

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

### Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics*, forthcoming.

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Presentations**
- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group

- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**: *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management*, *Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law
    LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2023
    LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2022

University of Notre Dame, Mendoza College of Business
    FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management
   MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008
   MGMT 610: Financial Management I (MBA Core), Fall: 2007

**Expert Witness Experience**

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx). Report February 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. Ny.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. Ny). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. Ny). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. Ny). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

38

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

## APPENDIX B

### Works Considered

**Court Documents:**

*Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

*Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.).

*Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989).

*Fannie Mae Securities Litigation*, No. 04-1639 (RJL).

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

*Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D. Ca. 2016).

*In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009).

*In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009).

*In re Priceline.com Inc. Securities Litigation*, No. 3:00CV01884(DJS).

*In re Scientific-Atlanta, Inc. Securities Litigation*, No. 1:01-CV-1950-RWS.

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

*Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 572-73 (C.D. Ca. 2012).

**Academic Literature:**

Abdi, Farshid and Angelo Ranaldo. A Simple Estimation of Bid-Ask Spreads from Daily Close, High, and Low Prices. *Review of Financial Studies* 30 (2017).

Anthony, Joseph H. The Interrelation of Stock and Options Market Trading-Volume Data. *The Journal of Finance* 43.4 (1988): 949-964.

Avramov, Doron, Tarun Chordia and Amit Goyal. Liquidity and Autocorrelations in Individual Stock Returns. *The Journal of Finance* 61.5 (2006): 2365-2394. Print.

Barber, Brad M., Paul A. Griffin and Baruch Lev. The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency. *Journal of Corporate Law* 19 (1993).

Braun, Phillip A., Daniel B. Nelson and Alain M. Sunier. Good News, Bad News, Volatility, and Betas. *The Journal of Finance* 50.5 (1995): 1575-1603.

Chung, Kee H. and Hao Zhang. A Simple Approximation of Intraday Spreads using Daily Data. *Journal of Financial Markets* 17 (2014): 94-120.

Fama, Eugene F. Market Efficiency, Long-Term Returns, and Behavioral Finance. *Journal of Financial Economics* 49.3 (1998): 283-306.

Galai, Dan. Tests of Market Efficiency of the Chicago Board Options Exchange. *The Journal of Business* 50.2 (1977): 167-197.

Hou, Kewei, Chen Xue, and Lu Zhang, Replicating Anomalies, *Review of Financial Studies* 33 (2020).

Hull, John C. "Option, Futures and other Derivatives." (2009).

Jensen, Michael C. Some Anomalous Evidence Regarding Market Efficiency. *Journal of Financial Economics* 6.2-3 (1978): 95-101.

Klemkosky, Robert C., and Bruce G. Resnick. An Ex Ante Analysis of Put-Call Parity. *Journal of financial Economics* 8.4 (1980): 363-378.

Klemkosky, Robert C., and Bruce G. Resnick. Put-Call Parity and Market Efficiency. *The Journal of Finance* 34.5 (1979): 1141-1155.

Kumar, Raman, Atulya Sarin, and Kuldeep Shastri, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, *Journal of Finance* 53 (1998).

Lee, Charles MC and Eric C. So. Uncovering Expected Returns: Information in Analyst Coverage Proxies. *Journal of Financial Economics* 124.2 (2017): 331-348.

MacKinlay, A. Craig. Event Studies in Economics and Finance. *Journal of Economic Literature* 35.1 (1997): 13-39.

Manaster, Steven, and Richard J. Rendleman Jr. Option Prices as Predictors of Equilibrium Stock Prices. *The Journal of Finance* 37.4 (1982): 1043-1057.

Mitchell, Mark L. and Jeffry M. Netter. The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission. *The Business Lawyer* (1994): 545-590.

Mola, Simona, P. Raghavendra Rau and Ajay Khorana. Is there Life After the Complete Loss of Analyst Coverage? *The Accounting Review* 88.2 (2013): 667-705.

Patell, James M., and Mark A. Wolfson. The Ex Ante and Ex Post Price Effects of Quarterly Earnings Announcements Reflected in Option and Stock Prices. *Journal of Accounting Research* (1981): 434-458.

Ross, Stephen A. Options and Efficiency. *The Quarterly Journal of Economics* 90.1 (1976): 75-89.

Tabak, David and Frederick Dunbar. Materiality and Magnitude: Event Studies in the Courtroom. *Litigation services handbook: The role of the financial expert* (2001): 19.1-19.22.

Thomas, Randall S. and James F. Cotter. Measuring Securities Market Efficiency in the Regulatory Setting. *Law and Contemporary Problems* 63.3 (2000): 105-122.

Whaley, Robert E. Valuation of American Call Options on Dividend-Paying Stocks: Empirical Tests. *Journal of Financial Economics* 10.1 (1982): 29-58.

**Data Sources:**

Bloomberg

Factiva

Investext

SEC Edgar

**Other:**

All other data and documents cited or referred to within this report

**EXHIBIT 1**



Data Source: Bloomberg

Note: From October 5, 2020 through December 29, 2020, price and volume data reflects RMG. After closing of the business combination on December 29, 2020, price and volume data reflects RMO.

## EXHIBIT 2



Data Sources: Bloomberg, SEC Edgar

Note: Average weekly trading volume is calculated by analyzing each group of five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period on October 5, 2020 through August 16, 2021.

## EXHIBIT 3

**Summary of Research Analyst Coverage of Romeo during the Class Period: 05-Oct-2020 to 16-Aug-2021**

| Analyst Name | Reports Issued During the Class Period |
|---|---|
| Cowen and Company | 33 |
| Stock Traders Daily Research | 13 |
| BTIG | 7 |
| BuySellSignals Research | 6 |
| ValuEngine, Inc | 3 |
| Validea | 2 |
| Streetwise Reports | 1 |
| **Total** | **65** |

| Analyst Name | Earning Call Participation During the Class Period |
|---|---|
| Banc of California | Q4 2020 |
| BTIG | Q4 2020 - Q1 2021 |
| Cowen and Company | Q4 2020 - Q1 2021 |
| Fox Advisors | Q4 2020 - Q1 2021 |
| JMP Securities | Q4 2020 |
| Morgan Stanley | Q4 2020 - Q1 2021 |
| Tuohy Brothers Investment Research | Q4 2020 - Q1 2021 |
| Williams Trading | Q4 2020 |

Data Sources: Bloomberg, Investext

45

**EXHIBIT 4**



Coefficients From Fixed and Rolling Event Study Regression for Romeo
Common Stock: 05-Oct-2020 to 16-Aug-2021

Data Source: Bloomberg

Note: These results are based on a fixed regression from October 5, 2020 through December 29, 2020 and then a rolling regression of the prior 60 trading days beginning on December 30, 2020. The regression model controls for a broad market index (S&P 1500 Total Return Index) and an industry index (EQM Lithium Battery Technology Index). Earnings announcement dates, the PACCAR partnership announcement date, and the Nikola acquisition announcement date have been excluded from the estimation.

**EXHIBIT 5**



Standard Deviation of Errors for Fixed and Rolling Event Study for Romeo
Common Stock: 05-Oct-2020 to 16-Aug-2021

Data Source: Bloomberg

Note: These results are based on a fixed regression from October 5, 2020 through December 29, 2020 and then a rolling regression of the prior 60 trading days beginning on December 30, 2020. The regression model controls for a broad market index (S&P 1500 Total Return Index) and an industry index (EQM Lithium Battery Technology Index). Earnings announcement dates, the PACCAR partnership announcement date, and the Nikola acquisition announcement date have been excluded from the estimation.

**EXHIBIT 6**

**Event Study Analysis of Romeo News Days for Romeo Common Stock**

| Date | Closing Price | Log Return | Abnormal Return | Abnormal Dollar Change | t-Stat | p-Value | Sig Level | News Day |
|---|---|---|---|---|---|---|---|---|
| 31-Mar-21 | $8.33 | -21.91% | -21.78% | -$2.03 | -3.806 | 0.000 | *** | Q4 2020 Romeo Earnings Announcement |
| 14-May-21 | $6.90 | 4.29% | 0.23% | $0.02 | 0.045 | 0.964 | | Q1 2021 Romeo Earnings Announcement |
| 17-Aug-21 | $4.76 | -20.11% | -17.12% | -$0.92 | -4.925 | 0.000 | *** | Q2 2021 Romeo Earnings Announcement |
| 16-Nov-21 | $5.23 | 16.60% | 15.66% | $0.75 | 4.008 | 0.000 | *** | Q3 2021 Romeo Earnings Announcement |
| 2-Mar-22 | $1.62 | -4.82% | -7.86% | -$0.13 | -1.589 | 0.118 | | Q4 2021 Romeo Earnings Announcement |
| 10-May-22 | $0.96 | -10.23% | -9.22% | -$0.09 | -1.790 | 0.079 | * | Q1 2022 Romeo Earnings Announcement |
| 1-Aug-22 | $0.70 | 23.84% | 24.96% | $0.16 | 3.655 | 0.001 | *** | Nikola Announces Romeo Acquisition |
| 9-Aug-22 | $0.75 | -15.36% | -13.59% | -$0.11 | -1.919 | 0.060 | * | Q2 2022 Romeo Financial Results |

Data Sources: Bloomberg, Factiva, SEC Edgar

Notes:

(1) These results are based on a fixed regression from October 5, 2020 through December 29, 2020 and then a rolling regression of the prior 60 trading days beginning on December 30, 2020. The regression model controls for a broad market index (S&P 1500 Total Return Index) and an industry index (EQM Lithium Battery Technology Index). Earnings announcement dates, the PACCAR partnership announcement date, and the Nikola acquisition announcement date have been excluded from the estimation. All listed dates represent the market impact date of the specific news type.

(2) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater. "*" Denotes statistical significance at the 90% confidence level or greater.

**EXHIBIT 7**

**Comparison of Statistical Significance and Abnormal Returns for Romeo News Days vs. Least News Trading Days During the Analysis Window for Romeo Common Stock**

| Statistic | News Days | Least News Trading Days | p-Value of Difference |
|---|---|---|---|
| N | 8 | 208 | |
| Significant Days at 95% Confidence Level | 4 | 14 | |
| % Significant Days at 95% Confidence Level | 50.00% | 6.73% | 0.002 |
| Average Absolute Abnormal Return | 13.80% | 3.60% | 0.008 |
| Average Volume (Millions) | 18.31 | 4.75 | 0.031 |

Data Sources: Bloomberg, Factiva, SEC Edgar

Note: The eight News Days are listed in the previous exhibit. Least News Dates were identified as dates with no Factiva headlines and no SEC filings during the Analysis Window. The statistical comparison of "% Significant Days at the 95% Confidence Level" is based on a Fisher's Exact test. The statistical comparisons of "Average Absolute Abnormal Return" and "Average Volume (Millions)" are based on t-tests for difference of means.

**EXHIBIT 8**



Romeo Common Stock Market Capitalization 05-Oct-2020 to 16-Aug-2021

Data Source: Bloomberg

## EXHIBIT 9



Data Source: Bloomberg

Notes:
(1) The percentage bid-ask spread was calculated as the a) the closing ask quote less the closing bid quote divided by b) the average of the bid and ask quotes.
(2) Note: October 2020 and August 2021 data are limited to the Class Period.

**EXHIBIT 10A**

## Romeo Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings

| Date | Shares Outstanding | Total Institutions Owning Stock | Insider Holdings | Short Interest | Public Float | Insider Holdings as % of Shares Outstanding | Institutional Holdings | Institutional Holdings as % of Shares Outstanding | Institutional Holdings as % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 12/31/2020 | 126,787,000 | 75 | 12,652,743 | 3,264,204 | 117,398,461 | 9.98% | 50,552,824 | 39.87% | 43.06% |
| 3/31/2021 | 126,787,000 | 106 | 12,652,743 | 12,182,555 | 126,316,812 | 9.98% | 62,880,752 | 49.60% | 49.78% |
| 6/30/2021 | 131,197,000 | 136 | 11,652,743 | 23,535,552 | 143,079,809 | 8.88% | 69,770,528 | 53.18% | 48.76% |
| 9/30/2021 | 134,057,000 | 148 | 11,786,585 | 25,219,471 | 147,489,886 | 8.79% | 73,276,659 | 54.66% | 49.68% |
| **Total Institutions over Class Period:** | | **329** | | | **Class Period Average:** | **9.41%** | | **49.33%** | **47.82%** |

Data Sources: Bloomberg, SEC Edgar

**EXHIBIT 10B**

### Institutions that Held Romeo Common Stock at Some Point During the Class Period

| | | | |
|---|---|---|---|
| 1 | Abundance Wealth Counselors LLC | 29 | Atika Capital Management LLC |
| 2 | ACCELERATE FINANCIAL TECH INC | 30 | Ausdal Financial Partners Inc |
| 3 | Addison Advisors LLC | 31 | Australia & New Zealand Banking Group Ltd |
| 4 | Advisor Group Holdings Inc | 32 | AYALON ASSET MANAGEMENT |
| 5 | Advisornet Financial Inc | 33 | Ayalon Holdings Ltd |
| 6 | Advisors Asset Management Inc | 34 | Baldwin Brothers Inc |
| 7 | Advisory Services Network LLC | 35 | Balyasny Asset Management LP |
| 8 | Alberta Investment Management Corp | 36 | Bank of America Corp |
| 9 | Allen Capital Group LLC | 37 | Bank of Montreal |
| 10 | Allspring Global Investments Holdings LLC | 38 | BANK OF NEW YORK MELLON CORP/THE |
| 11 | Allstate Corp/The | 39 | Barclays PLC |
| 12 | Alpine Global Management LLC | 40 | Basso Capital Management LP |
| 13 | ALPS Advisors Inc | 41 | Bayesian Capital Management LP |
| 14 | Alta Fundamental Advisers LLC | 42 | BBR Partners LLC |
| 15 | Alyeska Investment Group LP | 43 | Belvedere Trading LLC |
| 16 | Amalgamated Bank | 44 | Berman Capital Advisors LLC |
| 17 | American Family Insurance Co | 45 | BG INVESTMENT LUXE S.A |
| 18 | American International Group Inc | 46 | BlackRock Inc |
| 19 | Ameriprise Financial Inc | 47 | Bluefin Capital Management LLC |
| 20 | Ameritas Investment Partners Inc | 48 | Blueshift Asset Management LLC |
| 21 | Amplify Investments LLC | 49 | BNP Paribas SA |
| 22 | Angelo Gordon & Co LP | 50 | Boothbay Fund Management LLC |
| 23 | AQR Arbitrage LLC | 51 | BorgWarner Inc |
| 24 | AQR Capital Management LLC | 52 | Brinker Capital LLC |
| 25 | Aristeia Capital LLC | 53 | Bulldog Investors LLP |
| 26 | Arizona State Retirement System | 54 | Byrne Asset Management LLC |
| 27 | Arrowstreet Capital LP | 55 | CaaS Capital Management LP |
| 28 | Athos Capital Ltd | 56 | Cambridge Investment Research Advisors Inc |

| | | | |
|---|---|---|---|
| 57 | Canadian Imperial Bank of Commerce | 88 | Cypress Capital Management LLC/WY |
| 58 | Capstone Investment Advisors LLC | 89 | Daiwa Securities Group Inc |
| 59 | Captrust Financial Advisors LLC | 90 | Dark Forest Capital Management LP |
| 60 | Cary Street Partners Investment Advisory LLC | 91 | DE Shaw & Co LP |
| 61 | CASA 4 FUNDS LUX EUROPEAN ASSET | 92 | DekaBank Deutsche Girozentrale |
| 62 | Castle Creek Arbitrage LLC | 93 | Deltec Asset Management LLC |
| 63 | Cedar Mountain Advisors LLC | 94 | Deutsche Bank AG |
| 64 | Certified Advisory Corp | 95 | Diametric Capital LP |
| 65 | Cetera Financial Group Inc | 96 | Dixon Hughes Goodman Wealth Advisors LLC |
| 66 | Charles Schwab Corp/The | 97 | DNB ASA |
| 67 | CIBC Private Wealth Group LLC | 98 | DSAM Partners London Ltd |
| 68 | Citadel Advisors LLC | 99 | Edge Wealth Management LLC |
| 69 | Citigroup Inc | 100 | Electron Capital Partners LLC |
| 70 | City National Bank/Los Angeles CA | 101 | Ellevate Financial Inc |
| 71 | Claudia MP Batlle CFP R LLC | 102 | Engineers Gate Manager LP |
| 72 | Clearview Wealth Advisors LLC | 103 | Envestnet Asset Management Inc |
| 73 | Colonial River Wealth Management LLC | 104 | Equitable Holdings Inc |
| 74 | Commonwealth Equity Services LLC | 105 | Ergoteles LLC |
| 75 | Comprehensive Financial Consultants Institutional Inc | 106 | ETF Managers Group LLC |
| 76 | Concourse Financial Group Securities Inc | 107 | ETF Series Solutions |
| 77 | Connor Clark & Lunn Financial Group Ltd | 108 | Evolve Funds Group Inc |
| 78 | Consulting Group Advisory Services LLC | 109 | ExodusPoint Capital Management LP |
| 79 | Covington Capital Management | 110 | Exos Asset Management LLC |
| 80 | Cowen Inc | 111 | FIL Ltd |
| 81 | Creative Planning LLC | 112 | Fir Tree Capital Management LP |
| 82 | Credit Suisse Group AG | 113 | First Manhattan Co |
| 83 | Crossingbridge Advisors LLC | 114 | First Trust Advisors LP |
| 84 | CSS LLC | 115 | First Trust Capital Management LP |
| 85 | Cubist Systematic Strategies LLC | 116 | FlexShares Trust |
| 86 | Cutler Group LP | 117 | FMR LLC |
| 87 | CWM LLC | 118 | FNY Investment Advisers LLC |

| | | | |
|---|---|---|---|
| 119 | Formidable Asset Management LLC | 150 | Hirtle Callaghan & Co LLC |
| 120 | Fort Baker Capital Management LP | 151 | Horiszny Laurene H |
| 121 | Fortress Investment Group LLC | 152 | Howe & Rusling Inc |
| 122 | Franklin Resources Inc | 153 | HRT Financial LP |
| 123 | Future Financial Wealth Managment LLC | 154 | Hudock Inc |
| 124 | Gardner Lewis Asset Management LP | 155 | Hudson Bay Capital Management LP |
| 125 | Geneos Wealth Management Inc | 156 | Huntington National Bank/The |
| 126 | Geode Capital Management LLC | 157 | IBK Asset Management Co Ltd |
| 127 | GERTLER ERIC | 158 | IEQ Capital LLC |
| 128 | Ghisallo Capital Management LLC | 159 | IFP Advisors Inc |
| 129 | Glassman Wealth Services LLC | 160 | Independent Advisor Alliance LLC |
| 130 | Glazer Capital LLC | 161 | Insight Advisors LLC/PA |
| 131 | Global Wealth Management Investment Advisory Inc | 162 | Integrated Advisors Network LLC |
| 132 | Goldman Sachs Group Inc/The | 163 | International Assets Investment Management LLC |
| 133 | Green Square Capital LLC | 164 | Invesco Ltd |
| 134 | Ground Swell Capital LLC | 165 | Ionic Capital Management LLC |
| 135 | Group One Trading Lp/Chicago | 166 | Itau Unibanco Holding SA |
| 136 | GSA Capital Partners LLP | 167 | Jane Street Group LLC |
| 137 | Guggenheim Partners LLC | 168 | Jefferies Group LLC |
| 138 | HAP Trading LLC | 169 | JPMorgan Chase & Co |
| 139 | Harbour Investments Inc | 170 | Jump Financial LLC |
| 140 | HAREL INS INV & FIN | 171 | JW Cole Advisors Inc |
| 141 | HAREL-PIA ASSET MANAGEMENT | 172 | K2 & Associates Investment Management Inc |
| 142 | Hartford Financial Services Group Inc/The | 173 | Karpus Management Inc |
| 143 | HBK Investments LP | 174 | Kepos Capital LP |
| 144 | HBK Sorce Advisory LLC | 175 | KJ Harrison & Partners Inc |
| 145 | Healthcare of Ontario Pension Plan Trust Fund | 176 | KLP Kapitalforvaltning AS |
| 146 | Hexagon Capital Partners LLC | 177 | Knights of Columbus Asset Advisors LLC |
| 147 | HGC Investment Management Inc | 178 | Korea Investment Management Co Ltd |
| 148 | HHM Wealth Advisors LLC | 179 | Legal & General Group PLC |
| 149 | HighTower Advisors LLC | 180 | Level Financial Advisors Inc |

| | | | |
|---|---|---|---|
| 181 | Levin Capital Strategies LP | 212 | Moody Aldrich Partners LLC |
| 182 | Linden Advisors LP | 213 | Moore Capital Management LP |
| 183 | Listed Funds Trust | 214 | Morgan Stanley |
| 184 | Litman Gregory Fund Advisors LLC | 215 | Morningstar Investment Management LLC |
| 185 | LMR Partners LLP | 216 | Mutual Insurance Co of Az |
| 186 | LPL Financial LLC | 217 | National Asset Management Inc |
| 187 | Luminus Management LLC | 218 | National Bank of Canada |
| 188 | Lundmark & Co Fondforvaltning AB | 219 | Nationwide Fund Advisors |
| 189 | Luxor Capital Group LP | 220 | Natixis SA |
| 190 | Magnetar Financial LLC | 221 | NexPoint Asset Management LP |
| 191 | Man Group Ltd | 222 | Northern Trust Corp |
| 192 | Mangrove Partners | 223 | Northwestern Mutual Life Insurance Co/The |
| 193 | Manulife Financial Corp | 224 | Numeric Investors LLC |
| 194 | Marathon Trading Investment Management LLC | 225 | Old Mission Capital LLC |
| 195 | MARSHALL WACE | 226 | Olive Street Investment Advisers LLC |
| 196 | Massachusetts Mutual Life Insurance Co | 227 | Oxford Asset Management LLP |
| 197 | Meeder Asset Management Inc | 228 | Paloma Partners Management Co |
| 198 | Meitav Investment House Ltd | 229 | PanAgora Asset Management Inc |
| 199 | Mercer Global Advisors Inc | 230 | Parallel Advisors LLC |
| 200 | Mercer Global Investments Management Ltd | 231 | Parametric Portfolio Associates LLC |
| 201 | MetLife Inc | 232 | Parsons Capital Management Inc |
| 202 | MetLife Investment Management LLC | 233 | Peak6 Group LLC |
| 203 | Milestone Wealth LLC | 234 | Penserra Capital Management LLC |
| 204 | Millennium Management LLC/NY | 235 | Periscope Capital Inc |
| 205 | Mint Tower Capital Management BV | 236 | Philadelphia Financial Life Assurance Co |
| 206 | Mirae Asset Global Investments Co Ltd | 237 | Phoenix Cos Inc/The |
| 207 | MissionSquare Investments | 238 | Pictet Funds SA |
| 208 | Mitsubishi UFJ Financial Group Inc | 239 | Picton Mahoney Asset Management |
| 209 | Mizuho Financial Group Inc | 240 | PNC Financial Services Group Inc/The |
| 210 | MKC INVESTMENTS LLC | 241 | Point72 Asset Management LP |
| 211 | Monashee Investment Management LLC | 242 | Polar Asset Management Partners Inc |

| | | | |
|---|---|---|---|
| 243 | Polar Capital Partners Ltd | 274 | SEI Investments Co |
| 244 | POWER CORP OF CANADA | 275 | Seven Eight Capital LP |
| 245 | Prescott Group Capital Management LLC | 276 | SG Americas Securities LLC |
| 246 | Principal Financial Group Inc | 277 | SG3 Management LLC |
| 247 | ProFund Advisors LLC | 278 | Shaolin Capital Management LLC |
| 248 | ProShare Advisors LLC | 279 | Shufro Rose & Co LLC |
| 249 | Prudential Financial Inc | 280 | SIG HOLDING LLC |
| 250 | Quadrant Capital Group LLC | 281 | SignatureFD LLC |
| 251 | Quantbot Technologies LP | 282 | Simplex Trading LLC |
| 252 | Qube Research & Technologies Ltd | 283 | SIR Capital Management LP |
| 253 | Radcliffe Capital Management LP | 284 | SoftBank Group Corp |
| 254 | Rafferty Asset Management LLC | 285 | Squarepoint Ops LLC |
| 255 | Ratan Capital Management LP | 286 | State of California |
| 256 | Raymond James Financial Inc | 287 | State of New York |
| 257 | Renaissance Technologies LLC | 288 | State Street Corp |
| 258 | Resources Management Corp | 289 | Steward Partners Investment Advisory LLC |
| 259 | RGT Capital Management Ltd | 290 | Stifel Financial Corp |
| 260 | Rhumbline Advisers LP | 291 | Stratos Wealth Advisors LLC |
| 261 | RiverPark Advisors LLC | 292 | STRS Ohio 80th Inc |
| 262 | RMG SPONSOR LLC | 293 | Susquehanna Fundamental Investments LLC |
| 263 | Rockefeller Capital Management LP | 294 | T Rowe Price Group Inc |
| 264 | Royal Bank of Canada | 295 | Teacher Retirement System of Texas |
| 265 | Sagefield Capital LP | 296 | Teachers Insurance & Annuity Association of America |
| 266 | Samsung Life Insurance Co Ltd | 297 | Tenor Capital Management Co LP |
| 267 | Sant Matthew | 298 | TIG Advisors LLC |
| 268 | Schonfeld Strategic Advisors LLC | 299 | Timothy Partners Ltd |
| 269 | Schweizerische Nationalbank | 300 | Toroso Investments LLC/United States |
| 270 | Scopus Asset Management LP | 301 | Tower Research Capital LLC |
| 271 | Sculptor Capital Management Inc | 302 | Trexquant Investment LP |
| 272 | SeaCrest Wealth Management LLC | 303 | Two Sigma Investments LP |
| 273 | Seaport Global Asset Management LLC | 304 | Two Sigma Securities LLC |

| | | | |
|---|---|---|---|
| 305 | UBS AG | 318 | Voya Investment Management LLC |
| 306 | ULYSSES VENTURES LLC | 319 | W R Berkley Corp |
| 307 | Ursa Fund Management LLC | 320 | Walleye Trading LLC |
| 308 | US Bancorp | 321 | Water Island Capital LLC |
| 309 | Valeo Financial Advisors LLC | 322 | Weiss Asset Management LP |
| 310 | VALIC Co I | 323 | Wells Fargo & Co |
| 311 | Vanguard Group Inc/The | 324 | Williams Jones Wealth Management LLC |
| 312 | Verition Fund Management LLC | 325 | Wolverine Asset Management LLC |
| 313 | Victory Capital Management Inc | 326 | Wolverine Trading LLC |
| 314 | Virginia Retirement System | 327 | XTX Topco Ltd |
| 315 | Virtu Financial LLC | 328 | Y-Intercept Hong Kong Ltd |
| 316 | Vivaldi Capital Management LP | 329 | Zuercher Kantonalbank |
| 317 | Vontobel Holding AG | | |

Data Source: Bloomberg

**EXHIBIT 11**

## Romeo Common Stock
## Test for Autocorrelation during the Class Period

| Quarter | Coefficient on Previous Day's Abnormal Return | t-Stat | p-Value |
|---|---|---|---|
| **Q4 2020** | 0.29 | 1.65 | 0.098 |
| **Q1 2021** | 0.07 | 0.47 | 0.640 |
| **Q2 2021** | -0.24 | -1.89 | 0.058 |
| **Q3 2021** | -0.26 | -1.27 | 0.205 |
| **Class Period** | 0.02 | 0.13 | 0.893 |

Data Source: Bloomberg

Notes:
(1) For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable.
(2) For this calculation, I only considered days that are within the Class Period.