# EXHIBIT 8

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------x

IN RE ROMEO POWER, INC.   :  Case No.

SECURITIES LITIGATION     :  1:21-cv-03362-LGS

-------------------------x

Videotaped Deposition of

MICHAEL JOHN CASTLEBERG, JR.

Conducted Virtually

Wednesday, March 15, 2023

10:02 a.m. PST

Job No.: 482890

Pages: 1 - 119

Stenographically Reported by:

Burgundy B. Ryan, RPR, CSR No. 11373

---

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

LATHAM & WATKINS, LLP
By:  MORGAN E. WHITWORTH, Esquire
     KRISTIN N. MURPHY, Esquire
650 Town Center Drive
20th Floor
Costa Mesa, California 92626
714.540.1235
Morgan.Whitworth@lw.com
Kristin.Murphy@lw.com

ON BEHALF OF THE DEFENDANT:

GLANCY, PRONGAY & MURRAY, LLP
By:  KARA M. WOLKE, Esquire
     MELISSA C. WRIGHT, Esquire
1925 Century Park East
Suite 2100
Los Angeles, California 90067
310.201.9150
kwolke@glancylaw.com
mwright@glancylaw.com

ALSO PRESENT:

ALAN ROSS, Videographer
Planet Depos

---

I N D E X

PAGE

EXAMINATION BY MR. WHITWORTH................. 5

--o0o--

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 01 | Mike Castleberg's Responses and Objections to Defendants' First Set of Requests for Production of Documents | 13 |
| 02 | Mike Castleberg's Responses and Objections to Defendants' First Set of Interrogatories | 19 |
| 03 | E-Trade Brokerage Statement Dated 10/1/2020 | 31 |
| 04 | Sworn Certification of Plaintiff | 56 |
| 05 | E-Trade Brokerage Statement Dated 1/1/2021 | 58 |
| 06 | Form 8-K Dated 2/16/2021 | 72 |
| 07 | Form 8-K Dated 3/11/2021 | 75 |
| 08 | RMO US Equity Historical Values | 77 |
| 09 | E-Trade Brokerage Statement Dated 4/2021 | 83 |
| 10 | Corrected Second Amended Class Action Complaint for Violations of the Federal Securities Laws | 95 |
| 11 | Form S-4 Dated 10/15/2020 | 106 |

---

BE IT REMEMBERED that, pursuant to Notice of Taking Deposition, and on Wednesday, March 15, 2023, commencing at 10:02 a.m. PST thereof, via remote video teleconference, before me, Burgundy B. Ryan, a Certified Shorthand Reporter in and for the State of California, personally appeared

MICHAEL JOHN CASTLEBERG, JR.,

a witness called on behalf of DEFENDANTS, pursuant to all applicable sections of the Federal Rules of Civil Procedure, and who, having been first duly sworn by me to testify to the truth, was examined and testified as follows:

THE VIDEOGRAPHER:  This is Media 1 in the videotaped deposition of Michael Castleberg, in the matter of Romeo Power, Incorporated, In Re:, before the United States District Court for the Southern District of New York, Case Number 1:21-CV-3362-LGS.

Today's date is March 15, 2023, and the time on the video monitor is 10:02 a.m. Pacific.

The videographer today is Alan Ross, representing Planet Depos, and this video deposition is taking place remotely.

Would counsel please voice-identify themselves and state whom they represent?

MS. WOLKE:  Kara Wolke, along with Melissa

Transcript of Michael John Castleberg, Jr.
Conducted on March 15, 2023

---

**Page 5**

Wright, from Glancy, Prongay & Murray, representing Mike Castleberg and the proposed class.

MR. WHITWORTH:  Morgan Whitworth of Latham & Watkins, representing the Defendants.

MS. MURPHY:  Kristin Murphy of Latham & Watkins, representing the Defendants.

THE VIDEOGRAPHER:  The court reporter today is Brooke Ryan, representing Planet Depos.

Would the reporter please swear in the witness.

(Whereupon, the witness was sworn.)

COURT REPORTER:  Thank you very much.

Counsel, you may proceed.

EXAMINATION BY MORGAN WHITWORTH

Q.  Good afternoon, Mr. Castleberg.  My name's Morgan Whitworth, and I represent the defendants.

Could you state your full name for the record, please?

**A.  Michael John Castleberg, Jr.**

Q.  And where do you reside?

**A.  Chattanooga, Tennessee.**

Q.  Is that where you're taking the deposition today?

**A.  Yes.**

Q.  Have you ever had your deposition taken

---

**Page 6**

before?

**A.  No, I have not.**

Q.  I'd like to start with just a few ground rules for this deposition which are especially important because we're taking it remotely.

Please let me know if you cannot hear one of my questions or if the Internet freezes or if there are lags, delays, anything like that.

**A.  Okay.**

Q.  Given that we're taking -- given that we're taking this virtually, it's important that we pause between my questions and answers -- or between my questions and your answers.

Your attorney may object to my questions; but if that happens, you still need to answer them unless you're instructed not to.

Does that all make sense?

**A.  Yes.**

Q.  Anyone else in the room with you?

**A.  No.**

Q.  Do you -- other than the binder that my office sent, do you have any documents related to this case with you?

**A.  No.**

Q.  Did you take any notes prior to this

---

**Page 7**

deposition that you intend to use?

**A.  No.**

Q.  We'll take breaks throughout the day. Hopefully it won't -- I don't think this will go all day, but we'll try to take a break every hour or so. I -- I would ask that when we're on a break, that if you talk to your counsel, that -- excuse me -- that if you -- that you limit your discussions with your counsel and anybody else to the time when we're on a break.

The last thing I'll say is that the court reporter is taking a verbatim transcript, and so it's important for us not to talk over each other and also to provide yes or no answers as opposed to shaking your head or waving your hands or rolling your eyes or anything else you might do in response to my questions.  Understood?

**A.  Yes.**

Q.  All right.  Is there anything that would affect your ability to answer my questions truthfully today?

**A.  No.**

Q.  I know you said you've never had your deposition taken before.  Have you ever testified in a trial?

---

**Page 8**

**A.  No, I have not.**

Q.  Have you ever been a party to any other lawsuits?

**A.  No.**

Q.  Let's talk a little bit about your background.  Did you go to college?

**A.  Yes.**

Q.  Where did you go?

**A.  Southern Adventist University in Collegedale, Tennessee.**

Q.  Did you earn a degree there?

**A.  Yes.**

Q.  And what degree is that?

**A.  A bachelor's in accounting.**

Q.  Do you have any additional degrees besides that bachelor's in accounting?

**A.  No.**

Q.  Do you currently hold any professional licenses?

**A.  No.**

Q.  Did you ever hold a professional license, like a CPA or anything?

**A.  No.**

Q.  Other than professional licenses issued by states, did you -- do you hold any certifications?

---

61

but you don't have any recollection of borrowing money to trade stocks; is that right?

A. That's correct.

Q. Okay. Let's flip through and go to the page ending 0070. And just to orient you, we're now in the section of your brokerage statement for transaction history.

A. Yes.

Q. If you look at the bottom of 0070, three from the bottom, on January 5th, 2021, it looks like there were five transactions in security with the symbol RMOWS.

Do you see those?

A. Yes.

Q. And is that Romeo Power warrants?

A. It appears to be so, yes.

Q. Okay. So it looks like on January 5th, it has five transactions and then 4,247 warrants; correct?

A. It looks that way.

Q. And then if you flip to page 101, Bates ending 101 of this document, it shows transactions on January 29th, 2021, at the bottom.

Do you see one transaction for Romeo Power warrants?

62

A. Yes, I see that.

Q. 3,753?

A. Yes.

Q. You bought these warrants on -- on a public exchange; is that right?

A. Yes.

Q. But not through any sort of private agreement with Romeo or RMG?

A. Correct.

Q. At this time when you bought these warrants, were you aware that Romeo had completed a business combination with RMG on December 29th, 2020?

A. I don't remember, but it seems like something that would have been common knowledge at that point.

Q. Okay. But you don't specifically remember whether you knew that or not at the time you bought these warrants?

A. I'm sure I did. I would lean towards yes, for sure.

Q. Okay.

A. It did happen a month prior, so...

Q. Okay. Do you remember reviewing any of the SEC filings related to that transaction?

63

A. I remember it went through -- I went through some stuff, but I don't -- I don't specifically remember -- remember which ones.

Q. Okay. So we can look back at it if we need to, but in your interrogatory responses, I think you listed articles, press releases, and online interviews --

A. Uh-huh.

Q. -- as materials you reviewed about Romeo?

A. Uh-huh.

Q. Okay. I'm just trying to make sure you don't -- you don't recall specifically reviewing SEC filings; correct?

A. Correct, but a -- a caveat to that is when I'm reading a message board, people will post excerpts from the filings. And so that is -- that's one way of -- of seeing, you know, contents of some of the filings. But that's why I feel like I -- I saw -- saw a number of those things before and kind of during the purchase period, but I don't remember specifically if I -- if I went out and found them and, you know, downloaded them or whatever.

Q. Okay. So do you recall reviewing message board posts about Romeo?

A. Reviewing at that time?

64

Q. Yeah.

A. Not specific posts, but I know I was active -- actively doing that at that time with any -- with any stock that I was looking at, and so I'm sure Romeo would have been included in that.

Q. Okay. So before you would buy a stock, you would go check out the message board posts for that stock?

A. Sure.

Q. And can you remember any specific message boards that you were looking at related to Romeo?

MS. WOLKE: Objection. Asked and answered.

THE WITNESS: Not specifically, but broadly I -- I looked at -- I -- InvestorsHub. I looked at Yahoo. Probably some others that escape -- escape my memory, but I generally try to look at -- look across all the stock message boards that I can find.

By MR. WHITWORTH:

Q. And this may be kind of a chicken or the egg question, but for Romeo, do you remember whether you learned about Romeo from a message board first or whether you learned about Romeo and then researched it on a message board?

93

to any class members?

A. No.

Q. Do you have a fiduciary duty to the class members in this case?

A. Yes.

Q. Do you have an understanding of what that means?

A. It means to make sure that their -- that their interests are treated equally to my own.

Q. Have you received any payment or other monetary compensation for serving as a proposed class representative in this case?

A. Well, I got the opportunity to sit for one of these; but other than that, no.

Q. So other than priceless opportunities like that --

A. Yeah, absolutely. I could have been bored today.

Q. Well, we wouldn't want that.

To date, have you paid any money for your lawyers to represent you in this action?

A. No.

Q. Do you have any understanding of the financial arrangements that your lawyers have with respect to this action?

94

A. Vaguely. I'm assuming they're going to get paid on some sort of contingency arrangement.

Q. All right. Do you -- are you the only proposed class representative in this lawsuit?

A. No. No. There's -- there's several others.

Q. I won't quiz you on their names, but I'll just ask you, did you know Joshua Cante before you brought this lawsuit?

A. No.

Q. Did you know Nathaniel Tapia before you brought this lawsuit?

A. No.

Q. Did you know Arthur Chimchirian before you brought this lawsuit?

A. No.

Q. Did you know Van Nguyen before you brought this lawsuit?

A. No.

Q. Since bringing this lawsuit, have you met any of these individuals?

A. I think I met a couple of them -- not I think. I did. It was just a couple of them on a video call a couple of days ago briefly.

Q. Okay. I won't ask you about the content of

95

that call but -- but the timing of it. You think it was a couple of days ago?

A. Yes.

Q. Okay. And that was the first time you had spoken with any of these individuals?

A. Yes.

Q. And have you ever spoken with these individuals outside the presence of your attorneys?

A. No.

Q. So it's fair to say you were introduced to them through your attorneys?

A. Yes.

Q. All right. I'm going to introduce another exhibit. This is Tab 13 in your binder. I believe it's Exhibit 10.

(Whereupon, Castleberg Exhibit 10 was marked for identification.)

THE WITNESS: It says Exhibit A, if I'm on the right tab here.

MR. WHITWORTH: Yeah, that's the first page.

THE WITNESS: Okay. It will say Exhibit A. Okay.

By MR. WHITWORTH:

96

Q. So if you turn to the second page. And Kara is familiar with this document, but we'll wait for her to download it.

MS. WOLKE: I've got it.

By MR. WHITWORTH:

Q. Okay. It should say, "Corrected Second Amended Class Action Complaint for Violations of the Federal Securities Laws."

A. Yes.

Q. You understand this is one of the Complaints that your counsel has filed in this case on your behalf?

A. Yes.

Q. And I know this document has gone through -- or the Complaint has gone through a few different iterations, but we'll start from the beginning.

Did you review the Original Complaint in this action before it was filed?

A. Yes, I believe so.

Q. Okay. Did you review -- this is the Corrected Second Amended Class Action Complaint, which you can see in the header up top it was filed on February 24th, 2023.

Did you review this document before it was

113

believe the statement is misleading is because you think that there were already -- there was already a disruption of supply battery components when this statement was made; is that right?

A. Yes. As laid out in the Complaint yes.

Q. Okay. But you would agree that it's true that disruption of supply or shortage of battery components could harm Romeo's business?

A. As we found out, yes.

Q. All right. Let's -- let's go back to Exhibit 10, which is Tab 13 in your binder. This will be the last document we look at.

MS. WOLKE: Is that the Complaint?

MR. WHITWORTH: Yeah, that's the Complaint.

MS. WOLKE: Okay.

By MR. WHITWORTH:

Q. So this time I want to go to page 68 on the bottom, paragraph 191.

A. Okay.

Q. So before I ask you about any of the specific allegations in this section of the Complaint, is it your understanding that at some point, the alleged misrepresentations -- or the truth of the alleged misrepresentations was revealed

114

to investors?

A. Yes, that's my understanding.

Q. Okay. Do you recall which dates -- date or dates that that supposed truth was revealed?

A. No, I do not.

Q. Okay. Do you recall the information that was revealed that supposedly corrected the statements that you challenge in the complaint?

A. I do not.

Q. Okay. All right. Let's look at paragraph 192, which is on page 69 of the Second Amended Complaint. It starts, "On March 30th, 2021, after the market closed, Romeo issued a press release," you can skip ahead a little bit and the Complaint alleges, "Defendants shocked investors by disclosing that Romeo's production had been hampered by a shortage of battery cells and that its estimated 2021 revenue of 140 million would therefore be reduced by approximately 71 to 87 percent to the range of 18 to 40 million."

Do you see that?

A. Yes.

Q. Is -- do you understand that to be a disclosure that allegedly revealed that some of Romeo's statements were false or misleading?

115

MS. WOLKE: Objection. The document speaks for itself and calls for a legal conclusion.

Mike, you can answer.

THE WITNESS: In my opinion, that would probably be part of it. I -- I don't have that entire -- that entire Form 8-K in front of me, so I don't know if it covered everything or not, but I believe it was probably the beginning.

By MR. WHITWORTH:

Q. Okay. You can't think of anything -- can you think of anything before March 30th, 2021, that you believe would have revealed the truth about the statements that you challenge in the Complaint?

A. Not off the top of my head, no.

Q. Okay. The next paragraph, paragraph 193, this says, "On August 16th, 2021, after the market closed, Defendants announced Romeo's 2Q 2021 results, reporting quarterly revenue of 926,000, missing the consensus estimate of 3.05 million by over 69.4 percent, and quarterly losses of 22 cents per share, missing the consensus estimate of losses of 16 cents per share by 37.5 percent, thereby further revealing the materialization of the extent and impact of Romeo's supply shortages."

Do you understand that to be second

116

disclosure that allegedly revealed that some of Romeo's statements were false or misleading?

MS. WOLKE: Again, objection that the document speaks for itself and calls for a legal conclusion.

THE WITNESS: Yeah, that's my understanding.

By MR. WHITWORTH:

Q. And is it your understanding that both of these disclosures caused the stock price -- Romeo's stock price to decrease?

A. It would definitely appear that way, yes.

Q. Now, with respect to the August 16, 2021, disclosure that's described in paragraph 193, you no longer held any Romeo securities at that point; correct?

A. Correct.

Q. So you were not personally harmed by that disclosure?

A. No.

Q. Do you have any understanding of what new information was revealed to investors on August 16th, 2021?

MS. WOLKE: Objection. Calls for a legal conclusion and expert testimony.

117

THE WITNESS: No, I'm not -- I'm not familiar with everything that happened on that particular date.

By MR. WHITWORTH:

Q. Okay. To your knowledge, did Romeo disclose supply chain problems on March 30th, 2021?

A. With -- without being able to read that filing, I -- I couldn't -- I couldn't say.

Q. Okay. To your knowledge, did Romeo disclose that it had solved its supply chain problems between March 30, 2021, and August 16th, 2021?

A. I don't -- I don't have any knowledge of that one way or the other, no.

Q. To your knowledge, did Romeo reduce its annual guidance for 2021 on August 16th, 2021?

A. I don't know that for sure. It would seem reasonable.

Q. Okay. Are you aware of any other information not pled in the Complaint that you believe directed the alleged misrepresentations in this case?

A. No, I am not.

Q. Do you still want to serve as class

118

representative in this case?

A. Yes.

MR. WHITWORTH: Let's take five minutes. I just want to look over my notes.

THE VIDEOGRAPHER: Going off the record; 13:27.

(Recess.)

THE VIDEOGRAPHER: Back on record; 1334.

MR. WHITWORTH: Mr. Castleberg, I don't have any further questions for you at this time, but I would like to thank you for being here today.

THE WITNESS: Thank you for your time and thank you for being nice to me. I appreciate it.

MS. WOLKE: I don't have any questions. We can go off the record.

MR. WHITWORTH: Okay. Thanks, everyone.

THE VIDEOGRAPHER: Since there's nothing more, I will read us off.

This concludes the remote deposition of Mike Castleberg. We are off the record; 13:34.

(Proceedings concluded.)

---o0o---

119

CERTIFICATE OF STENOGRAPHIC REPORTER

I, BURGUNDY B. RYAN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition,

MICHAEL JOHN CASTLEBERG, JR.,

was by me duly sworn to tell the truth, the whole truth, and nothing but the truth, in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was stenographically reported by me, a disinterested person, and was thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

DATED: Friday, March 24, 2023.

_____
Burgundy B. Ryan, CSR No. 11373, RPR