# EXHIBIT 11

Transcript of Dr. Matthew Cain
Conducted on April 11, 2023

1 (1 to 4)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------x

IN RE ROMEO POWER, INC.   : Case No.

SECURITIES LITIGATION     : 1:21-cv-03362-LGS

------------------------x

Videotaped Deposition of

DR. MATTHEW CAIN

New York, New York

Tuesday, April 11, 2023

10:09 a.m.

Job No.: 482991

Pages: 1 - 109

Reported by: KIARA MILLER

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------x

IN RE ROMEO POWER, INC.   : Case No.

SECURITIES LITIGATION     : 1:21-cv-03362-LGS

------------------------x

Deposition of DR. MATTHEW CAIN at 1271 Avenue of the Americas, 33rd Floor, New York, New York, commencing at 10:09 AM, April 11, 2023, before Kiara Miller.

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFFS:

GLANCY PRONGAY & MURRAY LLP

712 5th Avenue 31st floor

New York, NY 10019

BY:   KARA WOLKE, ESQ.

MELISSA WRIGHT, ESQ.

ON BEHALF OF THE DEFENDANT:

LATHAM & WATKINS LLP

1271 Avenue of the Americas

New York, NY 10020

BY:   JASON HEGT, ESQ.

MELANGE GAVIN, ESQ.

ALSO PRESENT:

VIDEOGRAPHER, HAROLD RODRIGUEZ

VIDEOGRAPHER:  Here begins media number one in the videotaped deposition of Matthew Cain in the matter of In Re: Romeo Power, Inc., in the United States Southern District of New York, Case No. 121-CV-3362-LGS.

Today's date is April 11, 2023.  The time on the video monitor is 10:09 a.m.  The videographer today is Harold Rodriguez representing Planet Depos.  This video deposition is taking place at 1271 Avenue of the Americas, New York, New York 10020.

Will counsel please voice identify themselves and state whom they represent.

MR. HEGT:  Jason Hegt and Melange Gavin for Lathman Watkins for the defendants.

MS. WOLKE:  Kara Wolke with Melissa Wright from Glancey Prongay & Murray for the plaintiffs.

VIDEOGRAPHER:  The court

17

Q   Do you have a terminal setup at home?

A   No. I don't.

Q   It's expensive?

A   Yes, it is.

Q   So we've handed you Exhibits marked 47 and 48. Exhibit 47, is a Bloomberg print out modified to print in readable form of Romeo common stock pricing for the period October 1, 2020 to April 1, 2021. Exhibit 48, is a print out from Bloomberg for pricing of the Romeo warrants for the same period. Do you have an understanding from your experience of what PX means?

A   My recollection is that is the price.

Q   Okay. Looking at these two documents, do you have any reason to doubt that these are accurate print outs from Bloomberg for these two securities --

MS. WOLKE: Objection.

Q   And again you can use the exhibits to your report if you feel like you need to reference the prices to confirm?

18

MS. WOLKE: Objection. Foundation.

A   Well, I don't believe that I have any warrant pricing in any of my exhibits there's no real way for me to evaluate the accuracy of the warrant prices. In terms of the common stock I can take a quick look at a few selected prices. I guess since this only goes through April 1, 2021 I really only check one of the prices. So one of the prices seems to match on the common stock.

Q   Well, take my representation this is accurately from Bloomberg I'm sure your counsel will let us know if it's not. I take from your comment a minute or two ago, did you even look at the warrant pricing when you were preparing this report?

A   I don't recall looking at the warrants pricing.

Q   So I take it then you also did not evaluate whether there were any days where the pricing of Romeo common stock and Romeo warrants moved in opposite directions; is that right?

MS. WOLKE: Object to form.

19

A   That's not an analysis that I have undertaken at this point in time.

Q   Did you compare the pricing of Romeo warrants and Romeo common stock to determine whether there were any anomalous moves between the two securities?

A   What do you mean by anomalous?

Q   Let me turn the question around to you. You said the derivative references the common stock, right?

A   Yes.

Q   So presumably there is an expected correlation between the movements and the derivative instrument and the common stock?

MS. WOLKE: Object to form.

A   Well, I would say that in my experience you often do see movements in the same direction, but there can be times when they move in opposite directions because of those six inputs that we looked at in terms of the, for example, the Black-Scholes pricing model.

Q   What about not just directionally, but the magnitude of the movements relative to one another?

20

A   Well, typically we would expect different magnitudes of movements because, for example, the price impacts can be magnified in the options because of the leverage that's inherent. But, again, it depends on all of these inputs and the magnitudes can be very different, depending on the extent to which an option is in the money or out of the money and the timed expiration, implied volatility and these other factors.

Q   You asked me to define anomalous, but, again, I'm going to ask you, since it's not my set of opinions, is there no set of movement relative movement between the two securities that you would have considered anomalous?

MS. WOLKE: Object to form.

A   Again, I think you're asking about some sort of analysis that I've not actually undertaken. So if you're asking sort of hypothetically in terms of how do these things tend to move, typically, like I said earlier, there is a correlation in the movements, but there can be times when they

Transcript of Dr. Matthew Cain

Conducted on April 11, 2023

**25**

trading volume for the options, and yet those options prices do not change at all and remain the same. That would be maybe one example that would be atypical in terms of your question.

To the extent that all these other factors would imply based on the timed expiration that we would still expect that pricing would show up in the option, given the timing of the acquisition announcement, for example.

Q   Let's look at some specific examples.

So looking at Exhibit 47, which is the common stock data and Exhibit 48, which is the warrants data.  Let's focus on the day over day change from October 20, 2020 to October 21, 2021.

So focusing on the common stock. On October 20, Romeo common stock closed at $10.27, and on the next day it closed at $10.29.

Do you see that?

A   Yes.

Q   Roughly flat or a slight increase;

**26**

is that right?

A   Yeah.  Like a two cent increase.

Q   And on October 20, the warrants closed at $1.57, and on the next day they closed at $1.32; is that right?

A   Yes.

Q   Do you know why the price of the Romeo warrants dropped but the common stock increased slightly?

MS. WOLKE:  Object to form. Foundation.

MR. HEGT:  I agree there's no foundation.

A   Again, like I said, earlier I have not conducted this type of analysis you're asking me about.  But I would point you back to those six bullet points to point out that there are a lot of factors that drive the pricing of derivative securities, such as implied volatility and interest rates and other factors that one would want to look at when attempting to study derivative pricing.

Q   I take it you didn't analyze the number of days on which there was a directional mismatch between the movement of

**27**

the price of Romeo common stock and Romeo warrants, right?

MS. WOLKE:  Objection.  Vague.

Q   Do you understand when I say directional mismatch, what I mean?

A   I don't know if you mean that they moved in different directions or that you're trying to imply that that's somehow an invalid movement because they are moving in different directions.

Q   I'm not implying anything.  I'm just doing math.  So I'm asking you when, I say directional mismatch, I mean the price of one security went up and the price of the other went down.

So my question to you is, just to confirm, did you do any analysis to confirm or to assess the number of days on which there was a directional mismatch in the movement of these two securities?

A   No.  That's not an analysis that I've undertaken at this point.

Q   Okay.  Let's do to one more day. Let's look at March 11, 2021.  And looking at the common stock in Exhibit 47, the stock

**28**

price rises from $11.70 to the next day $13.47.

Do you see that?

A   Yes.

Q   That's an increase of about 15 percent?

A   Okay.

Q   Turning to the warrants in Exhibit 48, the price of the warrants rose over that same period from 86 cents to $2.34.

Do you see that?

A   Yes.

Q   And that's an increase of, check my math, but I think it's about 170 percent.

A   Okay.

Q   Does that sound right to you?

MS. WOLKE:  Objection.

Q   I'm not asking you percentages. I'm asking if you see the numbers on the page.

A   It seems like that would make sense.

Q   Okay.  Do you have any understanding, sitting here today, of why the price of the warrants rose so much more

29

significantly than the price of the stock?

MS. WOLKE: Object to form. Foundation.

A Well, like I said earlier, I have not taken an analysis of the warrant pricing on a day-by-day basis. But as I also explained earlier, price changes for common stock can be greatly magnified in derivative securities, such as options or warrants. But, again, I have not undertaken a specific analysis of all the inputs to a Black-Scholes pricing model on the warrants on this date.

Q When did the warrants on which you're offering an opinion here expire?

A I don't recall off the top of my head when those were redeemed.

Q Do you think you discussed it in your report?

A I don't recall having anything in my report.

Q What was the strike price or the exercise price on the warrants?

A My recollection that it was somewhere in the ballpark of $10 or $11 per

30

share. But I'd have to go back and review the underlying data to refresh my recollection.

Q So you're close, it was 11.50. So focusing on the dates that we just were discussing, the March 11. The Verizon stock price from 11.70 to 13.47, help me understand, thinking about the exercise price, what would the impact be on the price of the warrants?

MS. WOLKE: Objection. Vague.

Q Let me ask it a different way. Would you expect there to be a movement in the price of the warrants when the common stock clears by a significant hurdle the exercise price on the warrants?

MS. WOLKE: Object to form. Incomplete hypothetical.

A Well, I think it would depend on all of the other inputs to that Black-Scholes pricing, such as implied volatility. But I think the way we would talk about the derivative, such as the warrants and the options in terms of whether they were out of the money or in the money.

31

When a derivative security moves to being in the money, then it's more likely that there's going to be a positive payoff from the ability to exercise that option. So if we're talking about a strike price of $11.50 and the stock price rises up above that strike price and the derivative like the option of the warrant is, we would say it's in money. Therefore, there's that potential for a larger payoff in terms of being able to exercise the derivative.

Q And is that why I think you said earlier you might not expect proportional movements, there would sometimes be, I don't want to put words in your mouth, but when something is either in the money or out of the money, you might see the price of the derivative instrument jump fairly significantly or decline fairly significantly?

A Well, I think the reason that the price changes and the common stock can be magnified in the derivatives is sort of a leverage impact, but also there are other factors, like implied volatility and whether

32

it's in the money or out of the money. So I do think that the short -- the answer is yes, that is one of the reasons that the price change for an option or a warrant can differ from the underlying stock price change. The extent to which the option is in the money, for example, if an option is very far out of the money, you could have a large change in stock price, but the option may still be very far out of the money, but it doesn't really have a significant affect on the probability of a payoff for an option that's way out of the money, just as one example.

Q And then another factor would be how close we are to the redemption date?

A Right. Sort of the timed expiration or redemption date, the length of time within which payoff could materialize.

Q Because even it moves into the money today, if the time for redemption is significant, there is a chance it could fall out of the money?

MS. WOLKE: Object to form.

A That's one possibility, yes.

37

and answered.

MR. HEGT: I'm sorry. Did you mention the word Packer at all in your last answer if so I missed it.

MS. WOLKE: You're talking about this --

BY MR. HEGT:

Q   You can answer.

A   So again, my reason for adding that footnote was seeing that there was an outlier in Exhibit 2 and I looked through the Factiva news for any information that could explain the large spike in trading volume on that day. And I came across a number of headlines that talked about that in the Factiva news outlet that's what I'm explaining in footnote 24.

Q   What process did you use to conclude that it was the Packer information that lead to the unusually high trading volume you identify?

A   So I did not set out to conduct an analysis of what exactly caused this spike in trading volume. But rather to gain an understanding of this spike in trading

38

volume, this outlier date. So I reviewed the Factiva headlines I saw a number of them talking about this Packer strategic partnership that's just what I put in footnote 24. But I have not ruled out the possibility that there could have been contributing factors to the spike in the trading volume or to extent that was an outlier in trading volume.

(Whereupon, Form 8-K Romeo Power Inc. was marked as Exhibit 49 for identification as of this date.)

Q   We've handed you a document marked Exhibit 49, this is a form 8K that Romeo filed with the SEC.

You noted in your report you reviewed Romeo's SEC filings, but didn't specify which one. Do you think you reviewed this one?

A   I don't recall reviewing this one in particular.

Q   So this is a press release this Exhibit 49, extending the deadline by which holders of Romeo warrants could exercise

39

their warrants and extending the deadline until 5:00 p.m. on April 5; is that right?

A   Yes.

Q   That's the day before the anomalous on usually high trading volume day we were just discussing?

A   No. I think we were discussing April 6.

Q   Is April 5 the day before April 6?

A   Sorry, I was looking at the day of the press release March 11, 2021.

Q   Just to clean this up. This is a press release dated March 11, 2021, right?

A   Yes.

Q   It is extending until April 5th to deadline the exercise Romeo Power warrants, right?

A   Yes.

Q   And April 5 is the day before "unusually high trading volume" that we were just discussing from footnote 24?

A   Yes. That's right.

Q   Did you consider at all the impact of exercise of warrants on the "unusually high trading volume" you identified in your

40

report?

A   No. This wasn't something that I looked at in terms of what's listed in footnote 24.

Q   Exercising a warrant is equivalent to purchasing the stock, right?

A   I believe that it is similar, but I believe it's different from purchasing a stock on the open market because I believe exercising a warrant purchases the stock directly from the company and results in a cash infusion into the company.

Q   What impact does the exercise of a warrants have on company stock price?

MS. WOLKE: Object to form.

A   I don't think that it would necessarily have a significant impact on a company's stock price, but there could be times when it may. So I don't think I would have an opinion in terms of the general opinion about people exercising a warrants always having a certain impact on the stock price.

Q   Did you look in this case about whether a significant number of warrants

Transcript of Dr. Matthew Cain
Conducted on April 11, 2023

were exercised?

A  No. That was not part of the analysis here.

Q  But that's a knowable fact, right?

A  I think ex-post that information would likely be reported in SEC filings. I don't know the extent to which that's reported in terms of realtime underlying data that would underlie the analyses in this report.

Q  Did you look for example at the company's 10K to determine what their float was as of 12-31-2020?

A  I did get shares outstanding number from the SEC filings. So that would off the top of my head I don't have memorized which of those filings whether it was the 10K from that one. I'm typically focusing on changes in the shares outstanding.

Q  And you understand that the company published a proxy in April of 2021 shortly after the warrants were exercised, did you look there to determine what the float was as of that point in time?

A  Again, I'd have to go back to the underlying data to see which SEC filings I used for the shares outstanding figures.

Q  Sitting here today you don't recall undertaking any effort to determine any significant number of warrants were exercised and changed the float?

MS. WOLKE:  Object to form.

A  Again, I was concerned with getting accurate numbers in terms of the float or shares outstanding, my concern or focus was not asking on whether the underlying source of that came from warrant exercises.

Q  Understood. I'm not challenging the accuracy of any of the numbers in your report. I'm asking whether sitting here today you have any recollection of attempting to learn whether there was change in the float due to the exercise of warrants?

MS. WOLKE:  Object to form.

A  Again, my focus was just on looking at the change in the float, but not the underlying drivers including whether

that came from the exercise of warrants.

Q  You -- one of the opinions you offer here is that there is a way to determine damages on a class wide basis for the holders of common stock warrants and options, right?

A  Yes.

Q  Presumably it's not the same method for holders of each of those securities, correct?

A  No. Actually it is the same method. It's the out-of-pocket method.

Q  At that very high level, but presumably the actual calculation and the actual modeling will be different for each security; is that right?

A  Well, no --

Q  -- withdrawn.
Are you going to run a Black-Scholes model for holders of common stock?

A  No. I would not --

Q  Why not?

A  -- employ the Black-Scholes model for common stock. Because the method of calculating our official inflation ribbon which is the input out-of-pocket method, is to the use the output of the event study and apply that output in some manner, such as constant dollar, constant percentage back casting, construct a daily ribbon of artificial inflation in the stock price over the four class period.

Q  For holders of options and warrants you will need to use a Black-Scholes or other model to determine the price impact of the alleged misstatements?

A  That's typically how we do it, is typically using the output of that event study on the common stock and feeding that into the Black-Scholes model to construct the similar ribbons for the different option series and warrants on each day during the class period.

Q  I understand you do it as all broadly similar, but there are some different steps for each security. I'm trying to understand the full scope of different steps that you're going to have to

Transcript of Dr. Matthew Cain
Conducted on April 11, 2023

12 (45 to 48)

45

do for each security.

A   Okay.

Q   So focusing just on warrants and options, are you going to run the exact same model for all holders of all options and all warrants?

A   So again, I guess the way I would describe it is that it is the same methodology of the out-of-pocket method, but that implementing that methodology requires constructing the inflation ribbon each day for each security, and so that calculation is done on every single day for every single security based on the dynamics of that security and the dynamic for each date.  For example, the options and warrants you can feed that into the Black-Scholes model for each different option series with timed expiration and all of the other inputs in order to construct the artificial inflation ribbon.

Q   I think you're answering a slightly different question.  I'm not asking you about the methodology.  I understand you're going to use the quote

46

"out-of-pocket" methodology for all securities, I'm asking about the model you used to actually do the calculation.  Do you understand the difference?

MS. WOLKE:  Asked and answered.

A   Again, I think the model is connected to the methodology I think those two things are interconnected.

Q   Sure but do you understand the difference in the way I'm using the terms?

A   I believe so and I think I've answered your question.

Q   So have you created the model that you're going to use for this case methodology?

A   I have not actually carried out any sort of damages calculation I've done it in other cases, but that takes place at the loss causation, merits phase of a case.

Q   And again, I'm not asking about the methodologies.  I'm not asking about your intent to use the out-of-pocket method I'm asking about the actual model used to calculate damages for each security.

47

Sitting here today have you determined what any of the inputs would be to your model for options?

MS. WOLKE:  Objection.  Vague.  Asked and answered.

A   Yes.  So as I explained earlier the inputs typically starts with the event study or the event studies around the corrected disclosures to get an abnormal return on the stock price and then that feeds into a Black-Scholes model that you would put in those other inputs, like, the timed expiration and risk free rate things like that.

Q   Appreciate that answer.  Those are the categories, have you determined the numerical values of any of your inputs?

A   Again, I have not actually calculated the actual damage amount at this point in time.

MS. WOLKE:  Jason, is this an okay time for a break?

MR. HEGT:  Sure.

VIDEOGRAPHER:  Standby going off the record at 11:07 a.m.

48

(Whereupon, a recess was taken from 11:07 AM to 11:23 AM.)

VIDEOGRAPHER:  We are now back on the record.  The time is now 11:23 a.m.

BY MR. HEGT:

Q   Okay.  Dr. Cain, welcome back.  I'd like to turn to the damages in your report which is Exhibit 46, so that begins on paragraph 42 and runs to paragraph 48.  Before the break we were speaking about the difference between methodology and a model, do you remember that discussion?

A   Yes.

MS. WOLKE:  Jason, real quick paragraph 42 is S3 filing eligibility, I just want to make sure we're at the same --

THE WITNESS:  I think you meant 82.  I think you meant 82 to 88.

MR. HEGT:  Sorry.

MS. WOLKE:  Okay.

Q   So to be clear we're talking about, thank you for that.  We're talking

49

paragraphs 82 to 88 of Exhibit 46.

MS. WOLKE: Okay.

Q   And so before the break we were talking about the difference between methodology and the model, do you remember that discussion?

A   Yes.

Q   In paragraph 88 you say that you have not been asked to calculate damages in this matter, right?

A   Right.

Q   You would use a model, not a methodology, you would use both a model and a methodology to calculate damages, right?

A   I guess to the extent that you would differentiate the out-of-pocket method as being a methodology and then an event study model, for example, that would be one way to describe those two elements.

Q   Because you need something more than what's here to calculate damages?

A   Well, I think this is a description of the process, but like we said earlier I've not actually executed on this at this point in time, so you would

50

definitely need an entire loss causation analysis.

Q   You refer to this as a description of the process. In the tree you used this almost identical description of the process in almost every case in which you've offered an opinion in the securities class action recently?

A   I think in basically every market efficiency report in which I've talked about the ability to calculate damages I've put forward the out-of-pocket methodology and so that methodology is the same regardless of the case and regardless of the identities of the class members. But the key difference from case to case is really what I refer to in the first sentence of paragraph 82, which is really the end of that sentence whether this can be done in the a methodology that's consistent with plaintiff's theory of liability. So that's really referring back the section three of the report here where I summarize the allegations in the case, the alleged corrected disclosures, and I consider whether there's an economic

51

coherence such that this methodology would be appropriate, and able to be carried out in a way that's common across class members given the allegations of the case.

So there's certainly very important element here that is unique and differs across every single case in which I describe the methodology here.

Q   But you've offered the same opinion verbatim in a number of cases, regardless of the types of securities that are at issue, right?

MS. WOLKE: Object to form.

Q   Let's look.

(Whereupon, Expert Report of Matthew Cain Re: 2U, Inc. Securities Class Action was marked as Exhibit 50 for identification as of this date.)

Q   Sir, you've been handed a copy of your report in the matter called In Re: 2U Securities Class Action. It's marked Exhibit 50.

Do you remember who retained you in this case?

52

A   I believe the retention may have been through the Global Economics Group, but I don't recall, off the top of my head, the identity of counsel.

Q   Okay. Can you turn to paragraph 71 of your report in the 2U case.

And looking at paragraphs 71 to 76, and comparing them to paragraphs 82 to 88 in your report in this case, do you see any differences other than changing the name of the parties?

A   Within this section, again, each one is referring back to other sections of the report that are certainly different, but within these paragraphs that describe the out of pocket methodology, those are the methodology remains across cases and, therefore, my description remains the same.

Q   Can you show me where in this report you refer -- in Exhibit 50, you refer back to another section in this report?

A   Sure. That's at the end of the first sentence of paragraph 71, where it refers to plaintiff's theory of liability, which would be summarized in Section 3A. So

Transcript of Dr. Matthew Cain
Conducted on April 11, 2023

14 (53 to 56)

**53**

that would be paragraphs 12 through 14.

Q   Which you accepted as true for purposes of this report, correct?  You didn't do of your own independent analysis on that theory, right?

You didn't review any documents to determine whether it was accurate or not, right?

A   I did not.  Right.  I did not take it upon myself to evaluate the accuracy of the allegations, but certainly to consider the economic coherence of the allegations.

Q   So the difference from report to report is just what the different plaintiff's law firm asks you to assume?

A   Well, I think it's more than that. I do review the complaint and the alleged corrective disclosures and the nature of those.  So I don't just -- I'm not just putting down here in section three that I've been asked to assume all of this, but rather I've considered the economic coherence of the allegations and the corrective disclosures.

Q   Do you understand the complaint to

**54**

be the plaintiff's allegations in the case?

A   We're talking about 2U or are we --

Q   Any case.

A   Any case.  So, in general, I do think that the complaint is the starting point for the allegations.  There have been times when I've also considered like a ruling motion to dismiss order.

So I understand that the nature of the allegations can evolve throughout the course of a case as discovery progresses, but I do agree that the complaint is typically the starting point.

(Whereupon, Expert Report of Matthew Cain Re: Luis Torres Class Action Case was marked as Exhibit 51 for identification as of this date.)

Q   Sir, the court reporter has handed you a document marked Exhibit 51, which is a copy of your report.  In a case captioned Torres V Berry Corporation.

Do you remember that case?

A   Yes.

**55**

Q   Do you know who retained you there?

A   For that case, I worked with also with Fideras who supported me on this case. I believe that the law firm was Pomerantz on that case.

Q   I'll give you a minute to review, but directing your attention to paragraphs 75 through 83, that's your opinion in the Berry case regarding damages.

Other than changing the names of the parties involved, can you tell me whether there are any differences between your opinion in paragraph 75 to 83 of the Berry case, and paragraph 82 to 88 of this case?

MS. WOLKE:  Objection.  The documents speak for themselves.

A   I think there's two differences. Again, one would be referring back to section three in the nature of the allegations in the Berry case, which I considered in putting forth the methodology.

And also the second difference would be that the Berry case had Section 11

**56**

claims, so I summarized a methodology that's -- that addresses the Section 11 calculations within this Berry report.

Q   You can put that aside.

(Whereupon, Expert Report of Matthew Cain Re: CBL & Associates Properties, Inc. Securities Litigation was marked as Exhibit 52 for identification as of this date.)

Q   Sir, you've been handed a document marked Exhibit 52, which is a copy of your report in a matter called, In Re: CBL & Associates Properties, Inc.

Do you know who retained you in that matter?

A   My retention was, again, through Fideras.  And I believe counsel may have been Pomerantz on that case.

Q   I'll direct you to your opinion in the CBL matter at Exhibit 52 regarding damages that appears in paragraphs 144 to 150.

Other than changing the names of the parties involved, can you identify for

57

any me any differences between your conclusions in paragraphs 144 to 150 of the CBL case, and your conclusions in paragraphs 82 to 88 of this case involving Romeo Power?

MS. WOLKE: Objection. The documents speak for themselves.

A   I think a couple of differences would be, again, referring back to the plaintiff's theory of liability and CBL, which is different, I considered those differences in forming the opinions.

Also, you can see in paragraph 149 for CBL, I don't believe that options or warrants were involved in CBL, but there were also damages relating to preferred stock and senior notes in CBL. Those would be the main differences.

Q   So we agree, so I think the take away here, right, regardless of the securities at issue or the theory of liability, your opinion remains the same?

A   I don't think that was my response.

Q   Okay. You can put that document aside.

58

(Whereupon, Expert Report of Matthew Cain Re: Quantumscape Securities Class Action Litigation was marked as Exhibit 53 for identification as of this date.)

Q   All right. Sir, you've been handed a document marked Exhibit 53. That is your report in Quantum Scape.

Do you remember who retained you in this case?

A   I believe that retention was through Global Economics Group. And that counsel I believe was Levi & Korsinsky.

Q   Looking at your opinion in paragraphs 81 to 87, and comparing them to paragraphs 82 to 86, were your ultimate opinions in the Quantumscape case any different than your opinions in the Romeo Power case?

MS. WOLKE: Objection. Vague and the documents speak for themselves.

A   I think in both cases I did conclude that damages could be calculated on

59

a class wide basis in a manner that's consistent with plaintiff's theory of liability.

Q   You can put that document aside. Let's go back to your report in this case which was Exhibit 46.

If you turn to paragraph seven, if you would, on page two. And the first sentence there says:

"I have been asked by counsel for the court appointed lead plaintiffs in this matter to determine" -- and then the sentence goes on.

Who are the lead plaintiffs?

A   Those are named in the early part of the complaint in this case, but I don't have their identities memorized.

Q   Did the court appoint more than one lead plaintiff here?

A   My recollection is that there were multiple plaintiffs listed in the complaint, but that's the extent of my recollection, off the top of my head.

Q   Do you know whether the court appointed -- do you have an understanding of

60

what the term lead plaintiff, capital L, capital P, means?

A   I've probably very rudimentary understanding.

Q   Go ahead and tell me what your understanding is.

A   Likely not a perfect legal understanding. My very basic rudimentary understanding would be these are the shareholder investor, investors or shareholders who are essentially leading the lawsuit or the litigation representing the class in the litigation.

Q   Okay. And what lead you to the conclusion that multiple such individuals or entities were appointed by the court here?

MS. WOLKE: Objection. Misstates testimony.

Q   Well, let me ask you this: Based on what you've written, do you have an understanding about whether there are one or more than one plaintiff who are appointed by the court as lead plaintiff?

MS. WOLKE: Objection. Asked and answered.

Transcript of Dr. Matthew Cain
Conducted on April 11, 2023

61

A   Ultimately, I don't recall off the top of my head, what the progression was from the point in time of the actual complaint with multiple individuals who are named in the complaint to where we are today. I have a vague recollection of a conversation with counsel referring to one individual plaintiff, but I don't recall their identity, off the top of my head.

Q   And is that who you're talking about here, that's all I'm trying to figure out, who are we talking about in this first sentence?

MS. WOLKE: Objection. Vague. As counsel, who is the counsel?

MR. HEGT: Counsel for blank.

Q   What is your understanding of what -- what did you mean when you wrote, "I have been asked by counsel for the court appointed lead plaintiffs"?

So I'm just asking, the phrase court appointed lead plaintiffs, who is that? Who are you talking about there?

MS. WOLKE: Objection. Asked and answered.

62

A   Yeah. Basically, I'm really referring to counsel that I worked with and interacted with. I did not Interact with any individual plaintiff within the case. I'm really referring to counsel and this case.

Q   So you're not -- I understand. I'm not asking you about counsel. I understand who your counsel is. I'm asking you about the phrase you wrote that follows counsel, counsel for "the court appointed lead plaintiffs." What did you mean when you wrote that phrase?

MS. WOLKE: Objection. Asked and answered.

A   So, again, my goal here is just to be pointing to the identity of counsel, the counsel that the court has appointed to represent the plaintiffs in this case.

Q   So you didn't have any particular individual in mind when you wrote that?

A   Correct.

Q   Let's go to paragraph 86 in your report. And, again, we talked earlier about the difference between a methodology and a

63

model. And so I'm going to focus on that again here in this paragraph.

Looking at your third sentence, you say:

"One frequent method for modeling the evolution of inflation is to assume constant dollar inflation."

Then in the fifth sentence, you say, "Alternatively, one can measure constant percentage inflation."

Do you see those two sentences?

A   Yes.

Q   And then in the next sentence it says:

"In other instances, artificial inflation may have varied on a daily basis and could evolve throughout the class period based on a timing of specific information or statements."

So is it fair to say there are three different potential approaches discussed here for measuring inflation?

A   Yes.

Q   Do you have a, to make this easier, a name you'd like me to use for the

64

third one, a variable approach, if I use that, we understand what I'm referring to?

A   Yes.

Q   So we're talking about constant dollar inflation, constant percentage inflation, and the variable approach, right?

A   Right.

Q   Have you decided which of those three to use in this case?

MS. WOLKE: Objection. Beyond the scope of his report.

A   Not at this point in time.

Q   Is it possible that one method may be more favorable to one plaintiff and less favorable to others?

MS. WOLKE: Objection. Incomplete hypothetical and beyond the scope.

A   That's not really something I've formed an opinion on at this point in time. Although, having said that, I don't -- it's difficult for me to envision how any of these methodologies would favor one plaintiff over another plaintiff. I guess when I think through the three

Transcript of Dr. Matthew Cain
Conducted on April 11, 2023

**69**

Q   But Mr. Tapia would benefit most from a model that had inflation dissipating in that March 30, correct?

MS. WOLKE:  Objection. Incomplete hypothetical.  Outside the scope of this report.

A   I'm not really able to asses that off the top of my head without running an analysis.

Q   We can agree that since he didn't hold any securities over the August disclosure inflation had dissipated on that day surely he couldn't recover from that, right?

A   Assuming for example, like a constant dollar methodology, then he would not recover damages on their artificial inflation that was dissipated in August of 2021.

(Whereupon, Sworn Certification of Plaintiff Romeo Power, Inc. (Michael Castleberg) was previously marked as Exhibit 4.)

Q   Giving you a document that's previously been marked Exhibit 4, this is a

**70**

sworn certification from the one only court appointed lead plaintiff Mike Castleberg. Have you seen this document before?

A   No.  I don't believe so.

Q   Take a minute to review.  At the top he notes that he purchased -- only purchases listed so take this sworn certification at its word, RMOWS, what does that ticker mean to you?

A   I believe this is referring to the warrants in Romeo Power.

Q   That's right.  Do you know what date these warrants became void?

MS. WOLKE:  Objection. Foundation.

A   That's not something that I have memorized off the top of my head.

Q   Did you examine that in forming -- withdrawn.

What is you general understanding of a value of a derivative instrument after it expires?

MS. WOLKE:  Objection. Incomplete hypothetical.

A   If we're talking, for example,

**71**

like a stock option like a call option of a stock, typically if it expires in the money then the value would be the difference between the strike price and the closing common stock price.  If it expires out of the money, then it's typically zero and it expires worthless.

Q   And so here with regard to the securities at issue in this case, what's your understanding of a value of an unexercised warrant?

A   At what point -- at the point in time of expiration.

Q   At the point of expiration, thank you.

A   I'd have to go back and read up on the -- the structure of the warrants but those may expire essentially worthless if they're unexercised, but I would want to check because sometimes brokerages will automatically exercise unexercised securities at the time of expiration in order to retain the value in those.

Q   Let me help you out.  Go back to Exhibit 49 if you would.

**72**

A   Okay.

Q   This is the form 8K that Romeo filed with the SEC attaching a press release as Exhibit 99.1, directing your attention to the third paragraph, the final sentence of that paragraph.  You can -- could you read the sentence for me?

A   "Any such public warrants that remained unexercised following 5:00 p.m. New York City time on April 5, 2021 will be void and no longer exercisable in the holders of those public warrants will be entitled to receive only the redemption price of one cent per warrant."

Q   So again I don't know whether you, I can't remember your testimony about whether you looked at this, but setting that aside and returning to my question, what is the value of an unexercised warrant in this case at expiration?

A   This one seems to indicate that the unexercised warrants would be entitled to receive only one cent per warrant on the redemption date.

Q   When constructing a class wide

77

anyone who also elected not to redeem.

Q   Okay.  Is it also going to include people who purchased redeemed, and sold at a profit?

A   Purchased redeemed and sold.

MS. WOLKE:  Same objections.

A   So the methodology here is flexible enough to accommodate date any of these sort of hypothetical scenarios.  But I'm not able to tell you and this applies to really any hypothetical's, I'm not able to tell you what their actual damages are because actual damages under certain scenarios may be zero, for example, if someone has a profit.  But certainly you can plug in all of these hypothetical's into the methodology and it will produce a damage amount for any of these scenarios.  And then you can look at whether there's any sort of statutory limitations if they had an actual profit or if we have to adjust for the 90 day look back price or things like that.

Q   I'm not asking you about any one individuals actual damages.  I'm asking you broadly speaking about the group of people

78

that held warrants and then made the decision on or before April 5 to redeem or not.  So looking at those individuals, let's focus on people who made the decision to redeem.  An individual who makes a decision to redeem, what's your understanding of what they received in exchanged?

MS. WOLKE:  Objection.
Incomplete hypothetical.  And beyond the scope of this report.

Q   You didn't look at what an individual, do you have any understanding of what the warrants were?

A   Sure.

Q   So I think that's --

A   So I think my understanding is that that would give someone the right to purchase the stock for $11.50.

Q   Right.

A   And they would obviously then receive a share of stock for each $11.50 that they had paid.

Q   Is your model going to award artificial inflation both on the warrant and then the common stock that they received as

79

of April 5?

A   Well, the model is capable of looking at artificial inflation for both the warrants and the common stock.  Then if what you're trying to get at if someone has a gain on one component, for example, the redemption process that can be offset against the loss on the warrant side, for example.  There's the potential to offset for gains.  That can be done even if someone just buys and sells shares of stock at different points in time they may have some losses and some gains, and so the court can decide whether to do offsetting of gains, for example.

Q   But you haven't yet decided whether to do any offsetting, for example, for gains on redemption?

A   Right.  I have not done any of these actual calculations at this point in time.

Q   Okay.  And again just looking at the two corrective disclosures.  So I think you said earlier that the corrective disclosures were on March 30 and August 16;

80

is that right?

A   Right.  I think after hours on both of those, but yes.

Q   Company was based in California before market hours would have been painful for earnings calls?

A   Right, right.

Q   The -- so looking at this Exhibit 4.

A   My Exhibit 4.

Q   No, no, sorry.  Thank you for clarifying Exhibit 4 in the deposition Mr. Castleberg's little trading history, trading certification.

A   Okay.

Q   All of his transactions are in warrant and before March 30, right?

A   Yes.

Q   Okay.  And there's no sales listed on here, but do you have any understanding of what happened to these securities as of April 5 at 5:00 p.m.?

MS. WOLKE:  Objection.
Foundation.

A   I don't see any information about

81

that on the page here.

Q   In light of what we looked at in Exhibit 49 and understanding that these are all warrants, do you have any understanding of how the warrants functioned, does that inform your assessment of what happened to these securities as of April 5th at 5:00 p.m. eastern?

A   If they were not sold and if that was the cutoff for the redemption then Exhibit 49 would imply that you would get one cent per warrant.

Q   So like Mr. Tapia -- Mr. Castleberg also would prefer a model where as much artificial inflation as possible was dissipated in the March 30 disclosure relative to the August disclosure; is that right?

MS. WOLKE:  Object to form.

A   I have no idea what any individual would prefer.

Q   If all of the artificial inflation was dissipated in the August disclosure, Mr. Castleberg would not recover anything, right?

82

MS. WOLKE:  Incomplete hypothetical.

A   If there was no change in artificial inflation from January 5th, 2021 through April 6th, 2021, then the out-of-pocket methodology would have the same level of artificial inflation on both the buy and sell or redemption dates and therefore the calculated damages would be zero under that scenario.

Q   And just to make sure I'm understanding that, that's the inverse of what I was asking which is the only way if which he recovers is if there is a change in artificial inflation in that period, i.e. after the March 30 announcement --

MS. WOLKE:  Objection.

Q   Am I understanding you correctly?

MS. WOLKE:  Asked and answered.

A   The -- right.  The only way that you end up with positive damages is if there's a change in artificial inflation before the redemption date.

(Whereupon, Sworn Certification

83

of Plaintiff Romeo Power, Inc. (Van Nguyen) was previously marked as Exhibit 34.)

Q   So we've handed you something marked, premarked as Exhibit 34, this is a certification from Ms. Van Win.  Have you seen this before?

A   I don't believe so.

Q   She's got two accounts here so if you need take as much time as you need to look at it.  But I can also give you a summary.

A   Okay.

Q   Totaling up her two accounts she purchased roughly 1700 shares before March 30 of 2021.  And 1500 shares after March 30, 2021, and again feel free to eyeball, you can get your calculator, you can do whatever you'd like to check that.

A   Okay.

Q   So that's a roughly even split about 54 percent were before March 30 and 46 percent were after.  Based on this certification it doesn't look like she sold any shares, but tell me if you see any sales

84

listed here on Exhibit 34?

A   No.  I don't.

Q   Okay.  Focusing on the shares of stock that were purchased after March 30 of 2021, for this individual to recover damages on those shares there would need to be artificial inflation that was still in the stock at that point in time; is that right?

A   Yes.

Q   So if the artificial inflation was completely dissipated on March 30, she would not be able to recover on those 46 percent or so that were purchased after that date?

MS. WOLKE:  Objection. Incomplete hypothetical.

A   I believe that is correct.

VIDEOGRAPHER:  You have five minutes left on the video.

MR. HEGT:  Great timing.  Why don't we go off the record.

VIDEOGRAPHER:  Stand by, please.  Going off the record at 12:19 p.m.

(Whereupon, a recess was taken from 12:19 PM to 12:46 PM.)

Transcript of Dr. Matthew Cain
Conducted on April 11, 2023

A   So I typically use SEC Edgar for a few different things. So that would include getting data on shares outstanding to understand the changes in the shares outstanding for the company over time.

I also will look at Edgar in the context of, for example, earnings announcements. Like you see listed in Exhibit 6 and some additional announcements. Making sure that I understand the timing of what information comes out, post results.

I typically look at the annual report for looking to see whether company compares itself to a certain industry. I might use that as the basis for the industry index and the event study.

So I think that would -- maybe double checking the insider holdings on occasions. Those would be the primary things I would look at in terms of for a report like this.

Q   Okay. I think we talked earlier about documents from the case. Is it fair to say you did not review any documents produced by the defendants in the case -- or let me ask it a different way.

Is it fair to say you did not review any internal documents from the defendants?

A   I think that's fair, yes.

Q   So in terms of your evaluations in the case, you did work to get an understanding of the -- I think you said the theory, I'm paraphrasing, but the plaintiff's theory of the case, that came from the complaint and any other sources?

A   Sure. Yeah. So I definitely start with the complaint. I'll look to see whether any additional court documents that could limit or narrow the scope of the allegations within the complaint. But also looking at the allegations and the alleged corrective disclosures.

I do recall reviewing the press releases and the earnings call transcripts on at least the two alleged corrective disclosures. That's all that really comes to mind in terms of that aspect of plaintiff's theory of liability.

Q   Other than evaluating plaintiff's allegations, have you yourself formed a conclusion as to whether any of the defendants made any misstatements in this matter?

MS. WOLKE:  Objection. Foundation. Beyond the scope of his report.

A   No. That's outside the scope of my reviews.

Q   And have you formed yourself any conclusion about whether or when any such misstatements were revealed to the market?

MS. WOLKE:  Same objections.

A   No. I've not done a complete analysis of the information environment to determine the nature of the timing or content of corrective information.

Q   In your market efficiency analysis you refer to something called the MRK study.

Do you remember that?

A   Yes.

Q   How did you choose the MRK study as a point of comparison?

A   It's a study that I've used for the purpose of having some benchmarks, to compare that Cameron Crogman (phonetic) factors against. And it's a study that I've used in all of my market efficiency reports. And the rational for that is that for some of the Cameron Crogman factors the courts have given explicit benchmarks to use for evaluation. But for some of those factors, the courts have not given explicit benchmarks.

So when I approached my first market efficiency analysis, I did a search within the literature to try to come up with a reasonable academic study or multiple studies to use for benchmarks, particularly for those factors that did not have any specific guidance or benchmarks from the courts.

Q   Focusing on the companies that were included in the benchmark in the MRK study, do you know how those firms were selected?

A   Well, they've got two samples. They talked about the sort of analyst covered firms, and then sample firms that do not have any analyst coverage. And those