EXHIBIT 3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------x

IN RE ROMEO POWER, INC.    :   Case No.

SECURITIES LITIGATION      :   1:21-cv-03362-LGS

-------------------------x


Videotaped Deposition of

NATHANIEL TAPIA

Conducted Virtually

Wednesday, March 29, 2023

10:18 a.m. PST


Job No.: 482892

Pages: 1 - 83

Stenographically Reported by:

Burgundy B. Ryan, RPR, CSR No. 11373

Transcript of Nathaniel Tapia
Conducted on March 29, 2023                    11

deposition.

What did you do to prepare for today?

A.    Really nothing.

Q.    Did you meet with anyone?

A.    I met with my lawyer.

Q.    Who -- which one?

A.    Melissa.

Q.    Okay.  How long did you meet with Melissa?

A.    Maybe an hour.

Q.    And just once?

A.    Yes.

Q.    When did you guys meet?

A.    Yesterday.

Q.    Did you review any documents with Melissa?

A.    Yes.

Q.    Did any of those documents refresh your -- excuse me -- refresh your recollection about the issues in this case?

A.    It was pretty much the -- the Complaint.

Q.    So pretty much, but did you review any other documents?

A.    No.

Q.    And how much time did you spend reviewing

10:25:22
10:25:24
10:25:30
10:25:32
10:25:36
10:25:40
10:25:42
10:25:44
10:25:46
10:25:48
10:25:51
10:25:53
10:25:54
10:25:57
10:26:00
10:26:01
10:26:05
10:26:08
10:26:11
10:26:13
10:26:19
10:26:25
10:26:27
10:26:31
10:26:33

the Complaint? — 10:26:36

A. It was the whole time. Well, I would say 45 minutes. — 10:26:39 / 10:26:46

Q. Did you decide what to review? — 10:26:51

A. Well, I asked questions, yes. — 10:26:53

Q. And had you seen the Complaint before yesterday? — 10:26:56 / 10:26:58

A. Yes. — 10:26:59

Q. And you don't have the Complaint in front of you today; right? — 10:27:04 / 10:27:06

A. Right. — 10:27:08

Q. Okay. Did you talk to anyone other than your lawyers about this deposition? — 10:27:09 / 10:27:10

A. No. — 10:27:12

Q. Have you ever discussed this case with anyone other than your lawyers? — 10:27:17 / 10:27:19

A. No. — 10:27:20

Q. So you provided some discovery in this litigation, so let's take a look at that. The first exhibit I'll put up, which is Exhibit 20 -- do you guys see that in the link? — 10:27:21 / 10:27:24 / 10:27:27 / 10:27:37

MS. WOLKE: No. — 10:27:44

It should appear in the chat; right? In the -- in the chat bar? — 10:27:49 / 10:27:51

THE VIDEOGRAPHER: Would you like to go off — 10:28:01

Q.   Do you know what sort of customers Romeo has?

MS. WOLKE:  Objection.  Vague as to time period.

THE WITNESS:  At that time they were EV -- EV companies.

By MS. O'HARA:

Q.   And did you know when you invested any of the names of Romeo's management team?

A.   As in the CEO/CFO and so forth?

Q.   Yes.

A.   Yes.

Q.   Do you know what they are now?

A.   Well, at the time it was Lionel.

Q.   And do you know what his position was with the company?

A.   CEO.

Q.   Do you recall anything that was particularly attractive about RMG as an investment before you purchased the stock?

MS. WOLKE:  Objection.  Vague.

THE WITNESS:  The backorder that was claimed and the battery production rate that they claimed to be accelerating towards.

By MS. O'HARA:

11:30:48
11:30:51
11:30:51
11:30:54
11:30:57
11:31:04
11:31:09
11:31:09
11:31:12
11:31:15
11:31:21
11:31:21
11:31:24
11:31:27
11:31:32
11:31:34
11:31:35
11:31:42
11:31:43
11:31:49
11:31:51
11:31:55
11:31:57
11:32:05
11:32:16

Transcript of Nathaniel Tapia
Conducted on March 29, 2023                                43

Q.   Do you recall any details about those claims?

A.   They said that they had sufficient suppliers of battery cells, that they were -- had enough -- a big enough warehouse to ramp up production to meet the production requirements.

Q.   And did you review any other information about competitors in the EV industry?

A.   As in other -- other battery producers?

Q.   Yeah.  Sure.

A.   Yes.

Q.   Do you remember which competitors or other battery producers you looked at?

A.   I believe it was Quantum Scape.  Yeah, it was Quantum Scape.  And -- that's the one that I remember off the top of my head.

Q.   So looking back at this Fidelity account statement, your next transactions in RMG appeared to be on December 11th.  Do you see that?

A.   December 11th bought, yes.

Q.   Okay.  So --

A.   Well --

Q.   So the first transactions -- sorry.  Go ahead.

A.   December 11th bought, yes.  Okay.

11:32:16
11:32:19
11:32:22
11:32:26
11:32:32
11:32:37
11:32:46
11:32:47
11:32:53
11:33:00
11:33:02
11:33:05
11:33:08
11:33:10
11:33:17
11:33:26
11:33:31
11:33:34
11:33:38
11:33:44
11:33:47
11:33:49
11:33:50
11:33:52
11:33:52

Q.    So you were added as an additional plaintiff in this case when the Second Amended Complaint was filed.  Does that sound familiar?

A.    Yes.

Q.    And without revealing any -- the content of your communications with your lawyers, how did you come to be a part of this lawsuit?

A.    I seeked legal -- legal representation.

Q.    Can you explain?

MS. WOLKE:  Objection.  Asked and answered. I believe he already testified to how he found our law firm.

By MS. O'HARA:

Q.    Okay.  So did you -- do you recall when that was?

A.    2021.

Q.    Pardon?  2021?

A.    Yes.

Q.    Why did you decide to join -- or why did you decide to seek representation at that time?

A.    Because of Romeo's fraudulent activity.

Q.    Are you referring to the claims in this case?

A.    Correct.

Q.    Can you explain what the basis of this

11:51:09
11:51:11
11:51:13
11:51:16
11:51:19
11:51:22
11:51:24
11:51:29
11:51:38
11:51:41
11:51:43
11:51:46
11:51:49
11:51:49
11:51:52
11:52:01
11:52:04
11:52:07
11:52:10
11:52:15
11:52:22
11:52:32
11:52:35
11:52:36
11:52:37

lawsuit is?    11:52:40

A.    Romeo had said to have sufficient supplier or suppliers of cells to be able to manufacture their -- their batteries that were backordered.    11:52:44 11:52:52 11:53:01

Q.    Are there any other allegations that you know of?    11:53:12 11:53:14

A.    Along with them saying that they would have a certain amount of revenue by quarter 3, I believe it was like 55, 59 million, and then that all trickles down to the basis.    11:53:20 11:53:25 11:53:28 11:53:33

Q.    What do you mean by "the basis?"    11:53:38

A.    Well, they needed cells in order to even make any revenue and -- which the -- they didn't have the supplier.    11:53:40 11:53:44 11:53:49

Q.    Are there any particular public filings or documents that you can identify where Romeo made these representations?    11:53:54 11:53:57 11:54:03

A.    Can you say that again, please?    11:54:08

Q.    Are there any particular SEC filings or documents that you can identify where Romeo made these representations?    11:54:10 11:54:14 11:54:17

A.    Not that I can recall.    11:54:20

Q.    When was the first time you communicated with counsel on this case?    11:54:27 11:54:31

MS. WOLKE:    Objection.    Asked and    11:54:33

Transcript of Nathaniel Tapia
Conducted on March 29, 2023                    63

you know whether they had already investigated the            12:01:38

securities act claims against Romeo?                          12:01:42

    A.    Can you repeat that?                                12:01:47

          MS. WOLKE:  Objection.  Foundation.                 12:01:49

By MS. O'HARA:                                                12:01:52

    Q.    Before -- before you engaged Glancy --             12:01:52

    A.    Okay.                                                12:01:54

    Q.    -- do you know whether they had already            12:01:54

investigated the claims at issue in this case?                12:01:56

    A.    I believe they did because they had                12:02:02

already -- I had already seen their -- the way I              12:02:04

found them was because of the Romeo class action             12:02:10

lawsuit.                                                      12:02:14

    Q.    And you are seeking now to represent a             12:02:25

class of investors and claims against Romeo;                  12:02:27

right?                                                        12:02:31

    A.    Yes.                                                 12:02:33

    Q.    What is your understanding of what it means        12:02:34

to represent a class of investors?                            12:02:36

    A.    I and a selected few that is trying to             12:02:44

recuperate my and their money and have the best              12:02:48

interest at hand for the group.                               12:02:51

    Q.    What is your understanding of the duties as        12:02:58

a class representative?                                        12:03:00

    A.    To accelerate the case and to make                 12:03:02

Transcript of Nathaniel Tapia
Conducted on March 29, 2023                                    64

decisions -- to make financial decisions for the    12:03:11
group.    12:03:17

Q.    Do you know what a fiduciary duty is?    12:03:21

A.    I believe it's the same as what you just    12:03:25
asked me what my duties were.    12:03:28

Q.    Do you understand that as a class    12:03:39
representative you have to fairly and adequately    12:03:40
represent other members of the class?    12:03:43

A.    Yeah.    12:03:45

Q.    And what is your understanding of the class    12:03:47
that you are asking to represent?    12:03:49

A.    Common Romeo Power stock purchasers that    12:03:53
have lost money due to Romeo's lies and fraudulent    12:04:00
activities.    12:04:05

Q.    Do you know the class period at issue?    12:04:07

A.    October to August.  So October 2021 or --    12:04:09
October to August.  So it's October -- yeah,    12:04:20
October -- sorry -- October 2020 to August 2021.    12:04:28

Q.    Do you know whether your attorneys talked    12:04:40
to any other investors in the class?    12:04:41

A.    Investors in the class other than    12:04:46
representatives?    12:04:48

Q.    Anyone in the class?    12:04:50

A.    The representatives, of course.    12:04:55

Q.    Do you know who the representatives are?    12:04:58