# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE ROMEO POWER INC. SECURITIES LITIGATION | Case No. 1:21-cv-03362-LGS<br><br>Honorable Lorna G. Schofield |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION

**TABLE OF CONTENTS**

I.  PRELIMINARY STATEMENT.................................................................................... 1

II.  FACTUAL AND PROCEDURAL BACKGROUND OF THE LITIGATION .................. 4

III.  ARGUMENT.......................................................................................................... 4

    A.  The Standards For Final Approval Under Rule 23(e) And *Grinell* ......................... 4

    B.  The Settlement Is Fair, Reasonable, And Adequate In Light Of The Rule 23(e)(2) Factors And The Remaining *Grinnell* Factors........................................................ 6

        1.  Rule 23(e)(2)(A): Plaintiffs And Counsel Adequately Represented The Settlement Class ................................................................................... 6

        2.  Rule 23(e)(2)(B): The Settlement Is The Result Of Arm's-Length Negotiations ...................................................................................... 7

        3.  Rule 23(e)(2)(C): The Settlement Is An Excellent Result In Light Of The Benefits Of The Settlement And The Risks Of Continued Litigation ........ 8

            (a)  Complexity, Expense And Duration Of Litigation ......................... 9

            (b)  Risks Of Establishing Liability And Damages .............................. 9

            (c)  Risk Of Maintaining Class Action Status ................................... 13

            (d)  Range Of Reasonableness In Light Of The Best Possible Recovery And Attendant Risks Of Litigation .............................................. 13

        4.  Rule 23(e)(2)(C)(ii)-(iv)........................................................................... 14

        5.  The Settlement Treats All Members Of The Settlement Class Equitably Relative To Each Other.......................................................................... 16

        6.  The Remaining *Grinnell* Factors Weigh In Favor Of Final Approval...... 17

IV.  THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED ........................... 19

V.  THE NOTICE PROGRAM SATISFIES RULE 23 AND DUE PROCESS ...................... 19

VI.  THE PLAN OF ALLOCATION IS FAIR AND REASONABLE................................. 20

VII.  CONCLUSION................................................................................................... 25

i

# TABLE OF AUTHORITIES

<u>CASES</u>

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    222 F.3d 52 (2d Cir. 2000)............................................................................................... 6

*Beach v. JPMorgan Chase Bank, N.A.*,
    2020 WL 6114545 (S.D.N.Y. Oct. 7, 2020) ............................................................ 5

*Becker v. Bank of New York Mellon Trust Co., N.A.*,
    2018 WL 6727820 (E.D. Pa. Dec. 21, 2018)........................................................... 15

*Chatelain v. Prudential-Bache Sec., Inc.*,
    805 F. Supp. 209 (S.D.N.Y. 1992) .................................................................. 13, 14

*Christine Asia Co., Ltd. v. Yun Ma*,
    2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ......................................... 11, 16, 21, 25

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)............................................................................... 5, 8

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001)................................................................................... 7

*Dura Pharms., Inc., v. Broudo*,
    544 U.S. 336 (2005)........................................................................................... 11

*Fishoff v. Coty Inc.*,
    2010 WL 305358 (S.D.N.Y. Jan. 25, 2010) ........................................................... 11

*Gross v. GFI Grp., Inc.*,
    784 F. App'x. 27 (2d Cir. 2019) .......................................................................... 10

*In re "Agent Orange" Prod. Liab. Litig.*,
    597 F. Supp. 740 (E.D.N.Y. 1984) ....................................................................... 13

*In re Advanced Battery Techs., Inc. Secs. Litig.*,
    298 F.R.D. 171 (S.D.N.Y. 2014) .......................................................................... 20

*In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*,
    909 F. Supp. 2d 259 (S.D.N.Y. 2012).............................................................. 8, 18

*In re Citigroup, Inc. Sec. Litig.*,
    965 F. Supp. 2d 369 (S.D.N.Y. 2013)................................................................... 16

*In re Facebook, Inc. IPO Sec. and Derivative Litig.*,
  2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015) ................................................................. 12

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009) ......................................................................................... 11

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
  279 F.R.D. 151 (S.D.N.Y. 2011) .................................................................................. 8

*In re Global Crossing Sec. and ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. Nov. 24, 2004) ................................................................. 13

*In re GSE Bonds Antitrust Litig.*,
  414 F. Supp. 3d 686 (S.D.N.Y. 2019) ............................................................... 8, 9, 13

*In re IMAX Sec. Litig.*,
  283 F.R.D. 178 (S.D.N.Y. 2012) ................................................................................ 21

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
  2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ...................................................... 12, 21

*In re Marsh ERISA Litig.*,
  265 F.R.D. 128 (S.D.N.Y. 2010) ................................................................................ 17

*In re Mut. Funds Inv. Litig.*,
  2010 WL 2342413 (D. Md. May 19, 2010) ................................................................ 20

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) .................................................................................. 7

*In re Patriot Nat'l, Inc. Sec. Litig.*,
  828 Fed. Appx. 760 (2d Cir. 2020) .............................................................................. 6

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
  330 F.R.D. 11 (E.D.N.Y. 2019) .................................................................................... 5

*In re Romeo Power Inc. Sec. Litig.*,
  2022 WL 1806303 (S.D.N.Y. June 2, 2022) ................................................................ 2

*In re Romeo Power Inc. Sec. Litig.*,
  2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022) .............................................................. 3

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005) ........................................................................ 21

iii

*Jones v. Singing River Health Servs. Found.*,
    865 F.3d 285 (5th Cir. 2017) ................................................................................. 7

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)............................................................... 17, 19

*Morris v. Affinity Health Plan, Inc.*,
    859 F. Supp. 2d 611 (S.D.N.Y. 2012)................................................................... 7

*Teachers' Retirement Sys. of La. v. A.C.L.N., Ltd.*,
    2004 WL 1087261 (S.D.N.Y. May 14, 2004) ......................................................... 19

*Too v. Rockwell Medical, Inc.*,
    2020 WL 1023435 (E.D.N.Y. Feb. 26, 2020)........................................................ 25

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005).............................................................................. 6, 17

<u>RULES</u>

Fed. R. Civ. P. 23 ............................................................................................. *passim*

In accordance with Rule 23(e)(2) of the Federal Rules of Civil Procedure, Court-appointed lead plaintiff Mike Castleberg ("Lead Plaintiff") and additional named plaintiffs Joshua Cante, Nathaniel Tapia, Artur Chimchirian, and Van Nguyen (collectively, with Lead Plaintiff, "Plaintiffs"), on behalf of themselves and the Settlement Class, respectfully submit this memorandum in support of their unopposed motion for: (i) final approval of the proposed Settlement resolving the above-captioned action (the "Action"); and (ii) approval of the proposed plan of allocation of the proceeds of the Net Settlement Fund.[1]

## I.    PRELIMINARY STATEMENT

After approximately three years of hard-fought litigation, the Parties have agreed to settle all claims in the Action in exchange for a non-reversionary, all cash payment of $14.9 million (the "Settlement Amount") for the benefit of the Settlement Class.  This is an excellent result for the Settlement Class, and it was secured in a procedurally fair manner.

Substantively, the Settlement represents a recovery of approximately 6.7% of the ***maximum potential*** recoverable damages related to the pending claims.  This is more than three times greater than the 1.8% median recovery of estimated damages in securities class actions settled in 2023 and, as discussed below, significantly higher than the median recovery of cases with similar estimated damages.  *See* Ex. 7-C (Edward Flores and Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review, at 26 (Fig. 22) (NERA Jan. 24, 2024) ("NERA Report") (median recovery in securities class actions in 2023 was approximately

---

[1] All capitalized terms, unless otherwise defined herein, have the same meaning as set forth in the Stipulation and Agreement of Settlement dated December 7, 2023 (the "Stipulation") (ECF No. 191-1), or the concurrently-filed Declaration of Gregory B. Linkh in support of: (I) Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Linkh Declaration").  Citations herein to "¶__" and "Ex. __" refer, respectively, to paragraphs in, and exhibits to, the Linkh Declaration.

1.8% of estimated damages).  The fairness and adequacy of the recovery is even more evident when it is juxtaposed against the risks of continued litigation and the limited financial resources available to settle the case.  In short, the risks were high and the Directors and Officers ("D&O") insurance coverage, which is the sole source of money available to fund a settlement, was rapidly depleting as a result of the simultaneous litigation of several lawsuits.  *See* ¶63.

Moreover, the process by which the Settlement was obtained evidences a lack of collusion amongst the Parties and supports a finding of procedural fairness.  By the time the Settlement was reached, Plaintiffs and their counsel were well informed about the strengths and weaknesses of the claims and Individual Defendants' defenses.  Prior to reaching the Settlement, Lead Counsel, *inter alia*:

- litigated a contested motion for consolidation and appointment of Mike Castleberg as lead plaintiff pursuant to the PSLRA;

- conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) filings with the U.S. Securities and Exchange Commission ("SEC") by Romeo Power, Inc. ("Romeo" or the "Company") and RMG Acquisition Corp. ("RMG"), (ii) public reports, blog posts, research reports prepared by securities and financial analysts, online interviews with Romeo and RMG executives, and news articles concerning Romeo and RMG, (iii) investor call transcripts related to Romeo and RMG, (iv) press releases published by and regarding Romeo and RMG; (b) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, numerous interviews of former Company employees and other sources of relevant information; (c) working with an accounting expert to analyze Romeo's Settlement Class Period financial results; and (d) working with a damages and loss causation expert to analyze Romeo's stock price movements;

- utilized the foregoing comprehensive investigation and additional research to draft and file the detailed 79-page (226-paragraph) Amended Class Action Complaint for Violations of the Federal Securities Laws (the "FAC"), which included, among other things: (a) evidence from a confidential witness obtained by Lead Counsel's private investigator; (b) an expanded class period; (c) additional false statements; (d) new theories concerning the falsity behind defendants' statements; and (e) an added count under Section 14(a) of the Exchange Act (ECF No. 82);

- researched, drafted, and filed an opposition to defendants' motion to dismiss the FAC, after which the Court denied defendants' motion in part (ECF 107 ("MTD Order")); *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303 (S.D.N.Y. June 2, 2022);

2

- researched, drafted, and filed an opposition to the motion for reconsideration and/or clarification of the Court's MTD Order filed by the Individual Defendants and Romeo, which the Court denied in its entirety (ECF No. 124; *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022);

- engaged in substantial discovery, which entailed, *inter alia*: (a) exchanging initial disclosures; (b) negotiating a protective order and ESI protocol, both of which were subsequently entered by the Court; (c) serving two sets of requests for production of documents, one set of interrogatories, and one set of requests for admissions; (d) responding to one set of requests for production of documents (including the production of approximately 6,298 pages of documents), one set of interrogatories to each Plaintiff and a second set of interrogatories to all Plaintiffs; (e) serving eight subpoenas *duces tecum* on various third parties, including Romeo's purported battery cell suppliers; (f) conducting a targeted review and analysis of the approximately 2,227,554 pages of documents produced by Defendants and third parties; (g) defending the depositions of Lead Plaintiff and the four other named plaintiffs; and (h) meeting and conferring with Defendants' counsel regarding various discovery issues;

- engaged in a full-day, in-person mediation session in New York overseen by a highly experienced third-party mediator, former federal district court judge Layn Phillips, which involved an exchange of written submissions concerning the facts of the case, liability, and damages, and did not result in a settlement agreement at that time;

- retained and consulted with bankruptcy counsel after Romeo commenced an "assignment for the benefit of creditors" proceeding (the "ABC Proceeding")—the state court functional equivalent of a bankruptcy—and filed a class claim in the ABC Proceeding;

- fully briefed Plaintiffs' motion for class certification, a process that entailed, *inter alia*: (a) filing an opening brief, together with the expert report of Dr. Matthew Cain regarding market efficiency (ECF Nos. 147-149); (b) defending the depositions of each of the five proposed class representatives and Plaintiffs' market efficiency expert; and (c) filing a reply brief and opposition to Defendants' letter motion requesting leave to file a sur-reply; and

- participated in another full-day, in-person mediation with Judge Phillips in Newport Beach, California, before which the Parties exchanged supplemental mediation statements and exhibits on the issues of liability and damages, that culminated in Judge Phillips presenting a mediator's recommendation that the Action be settled for $14,900,000, which the Parties accepted.  ¶8.

The Settlement is, therefore, the result of arm's-length negotiations, conducted by informed

and experienced counsel, in conjunction with an experienced neutral.

As discussed in greater detail below and in the Linkh Declaration, Plaintiffs and Lead

Counsel believe that the proposed Settlement meets the standards for final approval and is in the

3

best interests of the Settlement Class. Accordingly, Plaintiffs respectfully request that the Court grant the Settlement final approval.

Plaintiffs also move for approval of the proposed Plan of Allocation of the Net Settlement Fund. The Plan of Allocation was developed in conjunction with Plaintiffs' consulting damages expert and is designed to distribute the proceeds of the Net Settlement Fund fairly and equitably to Settlement Class Members. No Settlement Class Member is favored over another under the proposed Plan; rather, all Settlement Class Members—including Plaintiffs—are treated in the same manner. *See* Ex. 1-E. The Plan of Allocation is, therefore, fair and reasonable and, as such, it too should be approved.

## II.    FACTUAL AND PROCEDURAL BACKGROUND OF THE LITIGATION

The Linkh Declaration is an integral part of this submission and, for the sake of brevity, the Court is respectfully referred to it for a detailed description of, *inter alia*: the factual background and procedural history of the Action, and the nature of the claims asserted (¶¶15-20); the negotiations leading to the Settlement (¶¶46-48); the risks and uncertainties of continued litigation (¶¶51-65); and the terms of the Plan of Allocation of the Net Settlement Fund (¶¶81-93).

## III.    ARGUMENT

### A.    The Standards For Final Approval Under Rule 23(e) And *Grinell*

Rule 23(e) provides that the Court should grant final approval to a class action settlement if it is "fair, reasonable, and adequate."[2] Fed. R. Civ. P. 23(e)(2). Rule 23(e)(2)—which governs final approval—requires courts to consider the following questions in determining whether a proposed settlement is fair, reasonable, and adequate:

(A)    have the class representatives and class counsel adequately represented the class;

---

[2] Unless otherwise noted, all emphasis is added, and internal citations and quotation marks are omitted.

4

(B)    was the proposal negotiated at arm's length;
(C)    is the relief provided for the class adequate, taking into account:
    (i)    the costs, risks, and delay of trial and appeal;
    (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
    (iii)    the terms of any proposed award of attorneys' fees, including timing of payment; and
    (iv)    any agreement required to be identified under Rule 23(e)(3); and
(D)    does the proposal treat class members equitable relative to each other.

Factors (A) and (B) "identify matters . . . described as procedural concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement," while factors (C) and (D) "focus on . . . a substantive review of the terms of the proposed settlement" (*i.e.*, "[t]he relief that the settlement is expected to provide to class members"). Advisory Committee Notes to 2018 Amendments (324 F.R.D. 904, at 919).

These factors are not, however, exclusive. The four factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by the courts, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Advisory Committee Notes to 2018 Amendments (324 F.R.D. 904, at 919); *see also In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019) (Rule 23(e)(2) factors "add to, rather than displace, the *Grinnell* factors"). The Second Circuit's *Grinnell* factors (certain of which overlap with Rule 23(e)(2)) are, therefore, still relevant:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974); *see also Beach v. JPMorgan*

5

*Chase Bank, N.A.*, 2020 WL 6114545 (S.D.N.Y. Oct. 7, 2020) (evaluating settlement based on factors set forth in Fed. R. Civ. P. 23(e)(2) and *Grinnell*). As set forth below, the proposed Settlement satisfies the criteria for final approval under the Rule 23(e)(2) factors, as well as the relevant, non-duplicative *Grinnell* factors.

  **B.**  **The Settlement Is Fair, Reasonable, And Adequate In Light Of The Rule 23(e)(2) Factors And The Remaining *Grinnell* Factors**

    **1.**  **Rule 23(e)(2)(A): Plaintiffs And Counsel Adequately Represented The Settlement Class**

Fed. R. Civ. P. 23(e)(2)(A) requires the Court to consider whether the "class representatives and class counsel have adequately represented the class." In assessing adequacy, "the primary factors are whether the class representatives have any 'interests antagonistic to the interests of other class members' and whether the representatives 'have an interest in vigorously pursuing the claims of the class.'" *In re Patriot Nat'l, Inc. Sec. Litig.*, 828 Fed. Appx. 760, 764 (2d Cir. 2020) (citing cases); *see also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) ("Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.").[3]

First, Plaintiffs' claims are typical of and coextensive with the Settlement Class's claims, and they have no antagonistic interests. Plaintiffs have suffered substantial losses as a result of Defendants' allegedly wrongful conduct, and their interest in obtaining the largest possible recovery is, therefore, aligned with other Settlement Class Members. *See Patriot*, 828 Fed. Appx. at 764 (finding adequacy where "lead plaintiffs were sufficiently motivated to recover as much as

---

[3] *Accord Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 106-07 (2d Cir. 2005) ("Adequate representation of a particular claim is established mainly by showing an alignment of interests between class members, not by proving vigorous pursuit of that claim.").

possible for each class member"). In addition, Plaintiffs diligently oversaw, and significantly contributed to, the Action by, *inter alia*: overseeing the litigation and regularly communicating with Lead Counsel; responding to document requests and interrogatories, producing documents, and sitting for deposition; and participating in settlement discussions with Lead Counsel. *See* Ex. 2, at ¶¶3-6; Ex. 3, at ¶¶3-6; Ex. 4, at ¶¶3-6; Ex. 5, at ¶¶3-6; Ex. 6, at ¶¶3-6.

Second, Plaintiffs retained counsel who are highly experienced in securities litigation, and who have a long and successful track record of representing investors in such cases. *See* Ex. 9 (Glancy Prongay & Murray LLP ("GPM") firm résumé). As noted above, Lead Counsel vigorously prosecuted the Settlement Class's claims, and the Parties were acutely aware of the strengths and weaknesses of the case prior to settling the Action. *See*, *supra*, Sec. I (detailing Lead Counsel's extensive investigation, briefing on the motions to dismiss, reconsideration and class certification, significant discovery efforts, and hard-fought mediation efforts); *see also In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998) (courts consistently give "'great weight' . . . to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.").

### 2. Rule 23(e)(2)(B): The Settlement Is The Result Of Arm's-Length Negotiations

Rule 23(e)(2)(B) evaluates whether the proposed settlement "was negotiated at arm's length." FED. R. CIV. P. 23(e)(2)(B). In conducting this analysis, courts recognize that a "mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001); *see also Jones v. Singing River Health Servs. Found.,* 865 F.3d 285, 295 (5th Cir. 2017) ("[t]he involvement of 'an experienced and well-known' mediator 'is also a strong indicator of procedural fairness.'" quoting *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 618

7

(S.D.N.Y. 2012)).

Here, as detailed above (Sec. I, *supra*), the Parties' settlement negotiations were mediated by former federal judge Layn R. Phillips through two formal mediation sessions that ultimately culminated in the Parties' accepting Judge Phillips' recommendation to settle the Action for $14,900,000. The arm's-length nature of the settlement negotiations, and the involvement of a mediator with substantial experience mediating complex securities class actions, supports the conclusion that the Settlement is fair and was achieved free of collusion. *See In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (finding a settlement fair where the parties engaged in "arm's length negotiations," including mediation before "retired federal judge Layn R. Phillips, an experienced and well-regarded mediator of complex securities cases").[4]

### 3. Rule 23(e)(2)(C): The Settlement Is An Excellent Result In Light Of The Benefits Of The Settlement And The Risks Of Continued Litigation

Under Rule 23(e)(2)(C), the Court must also consider whether "the relief provided for the class is adequate, taking into account … the costs, risks, and delay of trial and appeal" along with other relevant factors. FED. R. CIV. P. 23(e)(2)(C).[5] Each supports final approval.

---

[4] *See also In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011) (finding settlement "procedurally fair" where it "was the product of prolonged, arm's-length negotiation, including as facilitated by a respected mediator"—Judge Phillips).

[5] Rule 23(e)(2)(C)(i) essentially incorporates six of the *Grinnell* factors: complexity, expense, and likely duration of the litigation (first factor); risks of establishing liability and damages (fourth and fifth factors); risks of maintaining class action status through trial (sixth factor); and range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation (eighth and ninth factors). *See Grinnell*, 495 F.2d at 463; *see also In re GSE Bonds Antitrust Litig*., 414 F. Supp. 3d 686, 693 (S.D.N.Y. 2019) ("This inquiry overlaps significantly with a number of *Grinnell* factors, which help guide the Court's application of Rule 23(e)(2)(C)(i).").

### (a)    Complexity, Expense And Duration Of Litigation

This Action involved alleged violations of the federal securities laws, and Plaintiffs and Lead Counsel believe the claims asserted have merit.  They acknowledge, however, the expense and duration of continued proceedings necessary to pursue their claims against the Individual Defendants through trial and appeals, as well as the substantial risks they would face in establishing liability, loss causation, and damages (as discussed below).  Assuming Plaintiffs' claims were certified under Rule 23 (and not successfully reversed on a Rule 23(f) interlocutory appeal), and survived summary judgment, litigating the Action through trial and post-trial appeals would have undoubtedly been a long and expensive endeavor.  Additionally, Plaintiffs' ability to collect any potential judgment was severely impacted by the commencement of an ABC Proceeding for Romeo's remaining assets during the pendency of this case.  This development—along with the Individual Defendants' lack of meaningful assets—limited any recovery for the Settlement Class to the available D&O insurance coverage, which was rapidly depleting.  Were the litigation to continue, a potential recovery—if any—would occur years from now, substantially delaying payment to the Settlement Class.  *GSE*, 414 F. Supp. 3d at 693 ("even if plaintiffs were to prevail at trial, post-trial motions and the potential for appeal could prevent the class members from obtaining any recovery for several years, if at all").  By contrast, the Settlement provides an immediate and substantial recovery for the Settlement Class, without exposing the Settlement Class to the risk, expense, and delay of continued litigation.

### (b)    Risks Of Establishing Liability And Damages

In considering these factors, "a court should balance the benefits afforded the Class, including immediacy and certainty of recovery, against the continuing risks of litigation."  *Id.* at 694.  While Lead Counsel believes Plaintiffs' claims have merit, they also recognize substantial

9

obstacles to proving liability and class-wide damages. When compared to the certainty of the significant benefit conferred by the Settlement, these risks militate against further litigation and weigh heavily in favor of final approval.

**Establishing Liability:** Despite successfully surviving the pleading stage, Plaintiffs still need to *prove* their case. While Plaintiffs strongly believe the evidence supports their version of events, a jury may nevertheless agree with the Individual Defendants' narrative of the case. Indeed, the Individual Defendants argued at the pleading stage, and would continue to argue at summary judgment and/or trial, that they made no actionable misrepresentations under the federal securities laws, including that: (i) there was no previously-known supply chain crisis preventing the Company from meeting its stated revenue guidance, and the mere fact Romeo was unable to obtain the full volume production as anticipated does not constitute falsity; (ii) the statements about Romeo's ability to fulfill its backlog were accurate at the time they were made and the supply issues were unforeseeable and only temporary; (iii) the Company's forward-looking statements concerning Romeo's backlog were protected by the PSLRA safe harbor; and (iv) alleged misstatements about the number of cell suppliers was not actually false, because Romeo was technically working with each of the four suppliers. Surviving a motion to dismiss and even summary judgment motion on the issue of falsity does not necessarily mean the statement(s) will survive later scrutiny. *See Gross v. GFI Grp., Inc.*, 784 F. App'x. 27, 28 (2d Cir. 2019) (affirming grant of summary judgment against plaintiffs in securities fraud class action on the alternative ground that Defendant's "statement did not, as a matter of law, amount to a material misrepresentation or omission actionable under section 10(b)," despite Judge Pauley twice finding the statement actionable).

The Individual Defendants would also likely contest scienter, arguing that both Individual

Defendants *increased* their Romeo stock holdings during the class period. The Individual Defendants would further challenge scienter by arguing that a non-fraudulent inference—that the unforeseeable shortage of supplies and operations disruptions were a direct impact of the COVID-19 pandemic—was more plausible. While Plaintiffs believe that they could establish scienter after the development of the evidentiary record, they also recognize that the Individual "Defendants would have marshalled substantial evidence in opposition" and that "[p]roving scienter is hard to do." *Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *12 (S.D.N.Y. Oct. 16, 2019); *see also Fishoff v. Coty Inc.*, 2010 WL 305358, at *2 (S.D.N.Y. Jan. 25, 2010) ("the element of scienter is often the most difficult and controversial aspect of a securities fraud claim.") *aff'd*, 634 F.3d 647 (2d Cir. 2011).

**Loss Causation and Damages:** Even if Plaintiffs established liability, they faced significant challenges to proving loss causation and damages. *See Dura Pharms., Inc., v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear "the burden of proving that the defendant's misrepresentations caused the loss for which the plaintiff seeks to recover"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) ("It is well-established that plaintiffs alleging claims under Section 10(b) of the '34 Act must prove loss causation."). For example, the Individual Defendants argued in their opposition to Plaintiffs' motion to class certification that the class period should end on March 31, 2021, because, according to them, the truth of the alleged fraud was revealed on this date. ECF No. 156, at 11-14. Had this argument prevailed, potential class-wide damages would have been reduced from over $221 million to approximately $164.7 million. The Individual Defendants also asserted that the class period started too soon because Plaintiffs lacked standing to bring claims related to alleged misstatements made before the December 29, 2020 merger as they were not "purchasers" of Romeo Systems, Inc. (*i.e.*, pre-merger

11

Romeo) stock (*see id*. at 9-11; ECF 163), and would have no have no doubt made disaggregation arguments with respect to the March 30, 2021 alleged corrective disclosure.  ¶¶52-62.

Of course, to resolve all disputed issues regarding damages and loss causation, the Parties would have relied on expert testimony.  This creates further litigation risk because Plaintiffs could not be certain whether a jury would accept the view of their experts or of the well-qualified experts that the Individual Defendants would no doubt present at trial.  *See In re Facebook, Inc. IPO Sec. and Derivative Litig.*, 2015 WL 6971424, at *5 (S.D.N.Y. Nov. 9, 2015) ("[D]amages would be subject to a battle of the experts, with the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount Plaintiffs' losses. Under such circumstances, a settlement is generally favored over continued litigation."); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *6 (S.D.N.Y. Dec. 23, 2009) ("If there is anything in the world that is uncertain when a case like [a securities class action] is taken to trial, it is what the jury will come up with as a number for damages.").

**Additional Considerations:**  Even if Plaintiffs prevailed on class certification (discussed below) and survived a motion for summary judgment, which was not guaranteed, there is a significant risk that they would not be able to prove their case before a jury.  In this complex securities litigation relating to matters such as: (a) technical issues concerning battery cell supply, and (b) supply chain logistics in the middle of the COVID-19 pandemic, there is a risk that a jury would not understand Plaintiffs' theories of the case and the theories' intersection with economic and statistical analyses that undergird causation and damages issues. ¶58.  This risk is compounded by the fact that Plaintiffs would be forced to tell their story to the jury through incriminating documents and adverse witnesses.  Conversely, the Individual Defendants would testify themselves, and would obtain testimony from other witnesses who are likely to be supportive.

### (c)    Risk Of Maintaining Class Action Status

At the time the Settlement was reached, the Individual Defendants had already challenged Plaintiffs' motion for class certification.  While Plaintiffs and Lead Counsel are confident that the Settlement Class meets the requirements for certification (*see* ECF Nos. 147-49, 157-58), a class had not yet been certified, and Plaintiffs were aware that there was a risk the Court could disagree with their arguments.  *See In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 460 (S.D.N.Y. Nov. 24, 2004) ("Were these cases not to settle, defendants might contest class certification on various grounds, thereby creating appreciable risk to the class members' potential for recovery.").

Moreover, even if the Court were to certify a class, there is always a risk that it could be decertified at a later stage in the proceedings.  *See Chatelain v. Prudential-Bache Sec., Inc*., 805 F. Supp. 209, 214 (S.D.N.Y. 1992) ("Even if certified, the class would face the risk of decertification.").  Thus, the risks and uncertainty surrounding class certification also support approval of the Settlement.  *See GSE*, 414 F. Supp. 3d at 694 ("Although the risk of maintaining a class through trial is present in [every] class action . . . this factor [nevertheless] weighs in favor of settlement where it is likely that defendants would oppose class certification if the case were to be litigated.").

### (d)    Range Of Reasonableness In Light Of The Best Possible Recovery And Attendant Risks Of Litigation

The adequacy of the amount offered in settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987).  Here, the proposed Settlement provides a cash payment of $14.9 million for the benefit of the Settlement Class.  This is an outstanding result

in light of the significant risks of continued litigation. Plaintiffs' damages expert estimates that *if* the Court certified the proposed class period, *if* Plaintiffs fully prevailed on all their claims at summary judgment and after a jury trial, and *if* the Court and jury accepted Plaintiffs' damages theory—*i.e.*, Plaintiffs' **best-case scenario**—the total **maximum** damages **potentially** available in this Action would be approximately $221.7 million. However, as detailed in Sec. III.B.3(b), *supra*, the Individual Defendants argued in their opposition to the motion for class certification (and would have likely continued to argue at summary judgment and trial) that the class period should end with the first corrective disclosure on March 30, 2021. If the trier of fact found this argument persuasive, it would have significantly reduced Plaintiffs' potential recovery to approximately $164.7 million. Thus, the $14.9 million Settlement represents a recovery of between 6.7% to 9.0% of maximum potential damages. Such a recovery is: (i) well above the 1.8% median recovery in securities class actions settled in 2023; and (ii) nearly **two and half to three times** higher than the 2.7-2.9% median recovery in securities cases with similar damages that settled between January 2014 and December 2023. *See* Ex. 7-C (NERA Report, at 26 (Fig. 22) (median recovery in securities class actions in 2023 was approximately 1.8% of estimated damages); at 25, Fig. 21 (median recovery for securities class actions that settled between January 2014 and December 2023 was 2.9% for cases with estimated damages between $100-$199 million and 2.7% for those with estimated damages of $200-$399 million)).

### 4.    Rule 23(e)(2)(C)(ii)-(iv)

Under Rule 23(e)(2)(C), courts also must consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment"; and "any agreement required to be identified under

14

Rule 23(e)(3)." FED. R. CIV. P. 23(e)(2)(C)(ii)-(iv).  Each of these factors supports final approval of the Settlement.

**Rule 23(e)(2)(C)(ii):** The method for processing Settlement Class Members' claims and distributing relief includes well-established, effective procedures for processing claims and distributing the Net Settlement Fund.  Here, Epiq Class Action & Claims Solutions, Inc., the Claims Administrator selected by Lead Counsel and approved by the Court (*see* ECF No. 197, ¶7), will process claims under the guidance of Lead Counsel, allow claimants an opportunity to cure any claim deficiencies or request the Court to review their claim denial, and, lastly, mail or wire Authorized Claimants their *pro rata* share of the Net Settlement Fund (per the Plan of Allocation) after Court approval.  Claims processing, like the method proposed here, is standard in securities class action settlements.  It has been long found to be effective, as well as necessary, insofar as neither Plaintiffs nor Defendants possess the individual investor trading data required for a claims-free process to distribute the Net Settlement Fund.  *See Becker v. Bank of New York Mellon Trust Co., N.A.*, 2018 WL 6727820, at \*7 (E.D. Pa. Dec. 21, 2018) (holding that "[t]he requirement that class members submit documentation to substantiate their holdings of the bonds as of the record date will facilitate the filing of legitimate claims, yet is not overly demanding given the range of permissible documentation.").[6]

**Rule 23(e)(2)(C)(iii):** Lead Counsel disclosed in the Postcard Notice and Notice that it would be applying for a percentage of the common fund fee award in an amount not to exceed 33⅓% as compensation the services rendered to the Settlement Class.  Lead Counsel is, however, only seeking an attorneys' fee of 30% of the Settlement Fund (which, by definition, includes

---

[6] This is not a claims-made settlement. If the Settlement is approved, neither the Individual Defendants nor their insurance carriers will have any right to the return of a portion of the Settlement based on the number or value of the claims submitted. *See* Stipulation, ¶13.

interest earned on the Settlement Amount).  A requested fee of 30% is reasonable in light of the work performed and the results obtained.  It is also consistent with awards in similar complex class action cases.  *See In re Ubiquiti Networks, Inc. Sec. Litig.*, No. 18-cv-01620 (VM), ECF No. 49 at 6 (S.D.N.Y. Mar. 27, 2020) (awarding 33.3% of $15 million settlement, where settlement was reached prior to the filing of a motion to dismiss) (Ex. 11).  More importantly, approval of the requested attorneys' fees is separate from approval of the Settlement, and the Settlement may not be terminated based on any ruling with respect to attorneys' fees.  *See* Stipulation, ¶16.

**Rule 23(e)(2)(C)(iv):** The Parties entered into a confidential agreement pursuant to which the Individual Defendants may terminate the Settlement if Settlement Class Members who collectively purchased a specific percentage of Romeo common stock outstanding as of August 16, 2021, properly elect to exclude themselves from the Settlement Class in accordance with the requirements for requesting exclusion provided in the Notice.  "This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement." *Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at \*15 (S.D.N.Y. Oct. 16, 2019).

**5.    The Settlement Treats All Members Of The Settlement Class Equitably Relative To Each Other**

Rule 23(e)(2)(D) requires courts to evaluate whether the settlement treats class members equitably relative to one another. The Settlement easily satisfies this standard. Under the proposed Plan of Allocation, summarized in ¶¶55-57 of the Notice (Ex. 1-B) and set forth in full on the Settlement Website (Ex. 1 at ¶17), each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund.  Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.  Courts have repeatedly approved similar plans.  *See In re Citigroup, Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 386-

87 (S.D.N.Y. 2013); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145-46 (S.D.N.Y. 2010).

### 6.   The Remaining *Grinnell* Factors Weigh In Favor Of Final Approval

*Grinnell* also outlined several factors that are not co-extensive with Rule 23(e)(2)'s new factors.  These factors, viewed in light of the Rule 23(e)(2) factors identified above, also support final approval.

**The Reaction of the Settlement Class:**  The second *Grinnell* factor—the reaction of the class—overlaps with Rules 23(c)(2)(B)(vi), on the opportunity for exclusion, and 23(e)(5)(A), on the opportunity to object.  As required by Rule 23(c)(2)(B)(vi) and (e)(5)(A), the Settlement affords Settlement Class Members the opportunity to request exclusion from, or object to, the Settlement.  Ex. 1-B (Notice) at ¶¶59-62, 65-71.  In total, as of May 28, 2024, 238,737 potential Settlement Class Members and nominees were mailed the Postcard Notice or the Notice and Claim Form (collectively, the "Notice Package").  Ex. 1 (Declaration of Melissa Mejia Regarding: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; (C) Report on Claims Received to Date; and (D) Report on Requests for Exclusion Received to Date ("Mejia Decl.")), ¶¶3-10.  To date, only a single request for exclusion has been received, and no objections have been filed with the Court.  ¶5.[7]  The Settlement Class's extremely positive reaction strongly supports final approval of the Settlement.  *See, e.g.*, *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) ("It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy."); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.").

---

[7] The deadline to request exclusion from, or to object to any aspect of, the Settlement is June 19, 2024.  If any objections or opt-outs are received after the date of this filing, they will be addressed on reply.

17

**The Stage of the Proceedings and the Amount of Discovery Completed**: The third *Grinnell* factor examines "whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement." *Bear Stearns*, 909 F. Supp. 2d at 267. Here, by the time the Settlement was reached, Plaintiffs had, among other things: opposed a motion to dismiss and a motion for reconsideration; engaged in extensive discovery; researched and drafted Plaintiffs' motion for class certification and their reply in further support thereof; and engaged in an unsuccessful mediation, followed more than four months later by a second mediation overseen by Judge Phillips. ¶¶12-48. Thus, Plaintiffs and their counsel had sufficient information to evaluate the strengths and weaknesses of the case at the time of settlement. There can be no question that this factor supports final approval. *See Bear Stearns,* 909 F. Supp. 2d at 267 (parties had requisite knowledge to "gauge the strengths and weaknesses of their claims and the adequacy of the settlement" where they "conducted extensive investigations, obtained and reviewed millions of pages of documents, and briefed and litigated a number of significant legal issues").

**The Ability of Defendants to Withstand a Greater Judgment**: Defendants ability to withstand a greater judgment (*Grinnell* factor seven) weighs heavily in favor of final approval. As noted above, the Company's assets were subject to an ABC Proceeding and the Individual Defendants have limited personal resources, leaving the satisfaction of a judgment limited to the available D&O insurance coverage, which was also targeted by several other litigations. ¶63. Given the significant time required to get to trial and resolve all appeals in this Action, there is simply no guarantee that the proceeds from the wasting insurance policies would be sufficient to cover a larger award than the Settlement if the litigation were to continue. Under these

circumstances, the ability to pay strongly militates in favor of final approval. *See Maley*, 186 F. Supp. 2d at 365 (approving settlement where the individual defendants' D&O insurance "would be significantly depleted by defense costs"); *Teachers' Retirement Sys. of La. v. A.C.L.N., Ltd.*, 2004 WL 1087261, at *4 (S.D.N.Y. May 14, 2004) (approving settlement where, "[g]iven that the insurance policy was a 'wasting' asset that would be used to pay the defense costs of the four firms representing the Settling Defendants, it was clear that even if Plaintiffs were able to establish Settling Defendants' liability at trial and even if the jury accepted Plaintiffs' damage analyses, by that point the only meaningful source of recovery, the insurance policy, would in all likelihood have been substantially reduced or exhausted").

* * *

Accordingly, the aforementioned factors heavily favor final approval of the Settlement.

## IV.    THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED

The Court's January 30, 2024 Preliminary Approval Order certified the Settlement Class for settlement purposes only under Fed. R. Civ. P. 23(a) and (b)(3). *See* ECF No. 197, ¶¶1-3. There have been no changes to alter the propriety of class certification for settlement purposes. Thus, for the reasons stated in Plaintiffs' Preliminary Approval Motion (*see* ECF No. 190, at Sec. IV.B), Plaintiffs respectfully request that the Court affirm its determinations in the Preliminary Approval Order certifying the Settlement Class under Rules 23(a) and (b)(3).

## V.    THE NOTICE PROGRAM SATISFIES RULE 23 AND DUE PROCESS

The Court approved the proposed notice program in the Preliminary Approval Order (*see* ECF No. 197, ¶¶7-10), and Plaintiffs executed the notice program in accordance with the provisions therein. ¶¶68-80. Notice was given to potential Settlement Class Members via mail,

19

the Settlement Website (www.RomeoPowerSecuritiesSettlement.com), and publication.[8]  Mejia Decl. at ¶¶3-10, 12, 17.  As of May 28, 2024, either a copy of the Postcard Notice, or the Notice Package, was timely mailed to 238,737 potential Settlement Class Members or their nominees.  *Id*. at ¶10.

On February 12, 2024, the Court-approved Summary Notice was published in *Investors' Business Daily* and transmitted once over the *PR Newswire*.  Mejia Decl. ¶12 & Ex. 1-D. The published Summary Notice clearly and concisely provided information concerning the Settlement and the means to obtain a copy of the Notice. *See id*.

Finally, the Claims Administrator posted the Notice, Claim Form, Stipulation, Amended Complaint, Plan of Allocation, and other relevant documents online at the Settlement Website, and provided a toll-free telephone number for Settlement Class Members to call with any questions concerning the Settlement.  *Id*. at ¶¶13-19.  Courts routinely find that comparable notice programs meet the requirements of due process and Rule 23.  *See In re Advanced Battery Techs., Inc. Secs. Litig.*, 298 F.R.D. 171, 182-83 n.3 (S.D.N.Y. 2014) (collecting cases and stating that "[t]he use of a combination of a mailed postcard directing class members to a more detailed online notice has been approved by courts"); *In re Mut. Funds Inv. Litig.*, 2010 WL 2342413, at *6-7 (D. Md. May 19, 2010) (approving combination of postcard notice, summary notice, and detailed notice available online as "the best notice practical").

## VI.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

"To warrant approval, the plan of allocation must also meet the standards by which the

---

[8] The Settlement Website was established on February 12, 2024. Ex. 1 (Mejia Decl.) at ¶16.  From this website, potential Settlement Class Members can, *inter alia*, download copies of the Notice, Claim Form, Preliminary Approval Order, and Proposed Plan of Allocation, as well as submit claims online.  *Id*. at ¶¶16-17.

settlement was scrutinized – namely, it must be fair and adequate." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005). "As numerous courts have held, a plan of allocation need not be perfect." *Christine Asia*, 2019 WL 5257534, at *15. Rather, "[w]hen formulated by competent and experienced counsel, a plan for allocation of net settlement proceeds need have only a reasonable, rational basis." *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012); *see also Christine Asia,* 2019 WL 5257534, at 15‑16. Thus, "[i]n determining whether a plan of allocation is fair, courts look largely to the opinion of counsel." *Marsh & McLennan*, 2009 WL 5178546, at *13.

The proposed Plan of Allocation, developed by one of Plaintiffs' economic expert consultants working in conjunction with Lead Counsel, is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act, and reflects an assessment of the damages that Plaintiffs contend could have been recovered under the theories of liability and damages asserted in the Action.[9]  More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation that the prices of Romeo Securities were artificially inflated during the Settlement Class Period due to Defendants' alleged materially false and misleading statements and omissions.[10]  Plaintiffs allege that corrective disclosures removed the artificial inflation from the prices of the Romeo Securities on March 31, 2021 and August 17, 2021 (the "Corrective Disclosure Dates").[11]  *See* Ex. 1-E (Plan of Allocation) ¶5.  At the time of the first Corrective

---

[9] The Plan of Allocation is summarized in the Notice (*see* Ex. 1-B (Notice) at ¶¶55-57), and posted as a separate document in full on the Settlement Website.  *See* Ex. 1, ¶17, & Ex. 1-E (Plan of Allocation).

[10] The following definitions are used in the Stipulation, Notice, Plan of Allocation and here. "Romeo Securities" means, collectively, publicly traded: (i) RMG Class A common stock or Romeo common stock (collectively, "Romeo Common Stock"); (ii) RMG warrants or Romeo warrants (collectively, "Romeo Warrants"); and (iii) RMG units ("RMG Units").

[11] The alleged corrective disclosures were made after the market closed on March 30, 2021 and

Disclosure Date, the only Romeo Securities that remained outstanding were Romeo Common Stock and Romeo Warrants.[12]

Plaintiffs' consulting damages expert reviewed publicly available information regarding Romeo and performed statistical analyses of the price movements of Romeo Securities relative to the price performance of market and peer indices during the Settlement Class Period. From this data, she calculated the alleged artificial inflation by isolating the losses in Romeo Securities that resulted from the alleged violations of the federal securities laws, eliminating losses attributable to market factors, industry factors, or alleged Company-specific factors unrelated to the alleged violations of law. The amount of artificial inflation in Romeo Common Stock and Romeo Warrants on each day of the Settlement Class Period is set forth in Table 1 in the Plan of Allocation. *See* Ex. 1-E (Plan of Allocation) at ¶6.

Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for (i) each share of Romeo Common Stock purchased or otherwise acquired during the Settlement Class

---

August 16, 2021.

[12] Prior to the December 29, 2020 business combination between RMG and Romeo (the "Business Combination"), RMG's Class A common stock, warrants and units were listed on the New York Stock Exchange (the "NYSE") under the symbols RMG, RMG.WT, and RMG.UT, respectively. Upon the closing of the Business Combination, the Company's common stock and warrants were listed on the NYSE under the symbols RMO and RMO.WT, respectively. All then-issued and outstanding RMG Units automatically separated into their component securities. The Company did not have publicly traded units following the Business Combination.

On April 5, 2021, all outstanding publicly traded Romeo Warrants were redeemed. The Romeo Warrants could be exercised until April 5, 2021 to purchase shares of Romeo Common Stock, at the exercise price of $11.50 per share. After 5:00 pm on April 5, 2021, any publicly trade Romeo Warrants that remained unexercised were void and no longer exercisable, and holders of Romeo Warrants received the redemption price of $0.01 per warrant.

After the Settlement Class Period, on October 14, 2022, Nikola completed its acquisition of Romeo, and the Company's common stock ceased trading and was no longer listed on the NYSE.

Period (including shares acquired through the exercise of a Romeo Warrant or publicly traded option, and shares acquired through the separation of RMG Units purchased during the Settlement Class Period), and (ii) each Romeo Warrant purchased or otherwise acquired during the Settlement Class Period (including warrants acquired through the separation of RMG Units purchased during the Settlement Class Period). *Id.* at ¶¶9-10. The calculation of a Recognized Loss Amount will depend upon several factors, including when the securities were purchased or otherwise acquired during the Settlement Class Period, and in what amounts, and whether those securities were sold (or, for the Romeo Warrants, exercised or redeemed), and if sold, when they were sold, and for what amounts. The Recognized Loss Amount is not intended to estimate the amount a Settlement Class Member might have been able to recover after a trial, nor to estimate the amount that will be paid to Authorized Claimants pursuant to the Settlement. *Id.* at ¶2. The Recognized Loss Amount is the basis upon which the Net Settlement Fund will be proportionately allocated to the Authorized Claimants. *Id.*

In general, the Recognized Loss for Romeo Common Stock purchased or acquired during the Settlement Class Period will be the lesser of: (i) the estimated artificial inflation on the date of acquisition minus the estimated artificial inflation on the date of sale; or (ii) the actual purchase price minus the sale price if sold.[13] *Id.* at ¶9. The Recognized Loss for Romeo Warrants purchased

---

[13] With respect to Romeo Common Stock purchased or sold through the exercise of a Romeo Warrant or publicly traded option, the purchase/sale date of the stock is the exercise date of the warrant/option and the purchase/sale price of the stock is the exercise price of the warrant/option. RMG Units purchased during the Settlement Class Period that were subsequently separated into their component securities prior to or in connection with the Business Combination (*i.e.*, separated into one share of Romeo Common Stock and one-third of a Romeo Warrant per RMG Unit), are treated as (i) a sale of such RMG Units on the date of separation at a per-unit sale price equal to the closing price of the RMG Units on the date of separation, plus (ii) a purchase of the component securities received upon the separation of such RMG Units at a per-security purchase price equal to the closing price of each component security received on the date of separation.

or acquired during the Settlement Class Period will be the lesser of: (i) the estimated artificial inflation on the date of acquisition minus the estimated artificial inflation on the date of sale; or (ii) the actual purchase price minus the sale price if sold, or the redemption price if redeemed, or the closing price of the Romeo Warrants on the date of exercise if exercised. *Id*. at ¶10. For a Settlement Class Member to have a Recognized Loss under the Plan of Allocation, the Romeo Securities must have been purchased or acquired during the Settlement Class Period and held at the opening of trading on at least one of the Corrective Disclosure Dates. *Id*. at ¶¶5-6. The Recognized Loss calculation also incorporates the "90-day look back" provision of the PSLRA. *See id.* at ¶7.

The sum of a Claimant's Recognized Loss for all Romeo Securities is the Claimant's "Recognized Claim," and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims, subject to a $10 *de minimis* provision. *See id.* at ¶¶11, 23. More precisely, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *Id*. at ¶23. If a Claimant has an overall market *gain* with respect to his, her, or its transactions in Romeo Securities during the relevant period, the Claimant is not entitled to recover under the Plan of Allocation. *Id*. at ¶¶21-22.

If any funds remain after an initial distribution to Authorized Claimants, as a result of uncashed or returned checks or other reasons, subsequent distributions will be conducted as long as they are cost effective. *Id.* at ¶24. At such time as it is determined that the re-distribution of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance will be contributed to non-sectarian, not-for-profit organization(s), to be recommended by Lead Counsel

and approved by the Court.  *Id.*

Lead Counsel believes the Plan of Allocation will result in a fair and equitable distribution of the Settlement proceeds among Settlement Class Members who submit valid claims.  *See Too v. Rockwell Medical, Inc.*, 2020 WL 1023435, at *1 (E.D.N.Y. Feb. 26, 2020) (approving substantially similar plan of allocation); *Christine Asia*, 2019 WL 5257534, at *15-16 (same).  To date, no objections to the Plan of Allocation have been filed on this Court's docket.  ¶93. Accordingly, Plaintiffs respectfully request that the Court approve the proposed Plan of Allocation

## VII.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate, and certify the Settlement Class for the purposes of settlement.[14]

Dated: June 5, 2024                                          **GLANCY PRONGAY & MURRAY LLP**

                                                             By: */s/ Gregory B. Linkh*
                                                             Gregory B. Linkh
                                                             230 Park Avenue, Suite 358
                                                             New York, New York 10169
                                                             Telephone:  (212) 682-5340
                                                             Email:  glinkh@glancylaw.com

                                                             -and-

---

[14] A proposed Final Judgment and Order of Dismissal with Prejudice and a proposed Order Approving Plan of Allocation will be submitted with Plaintiffs' reply papers on July 3, 2024, after the deadline for objecting to the motion and requesting exclusion from the Settlement Class has passed.

**GLANCY PRONGAY & MURRAY LLP**
Kara M. Wolke (admitted *pro hac vice)*
Melissa C. Wright (admitted *pro hac vice)*
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Email: kwolke@glancylaw.com
         mwright@glancylaw.com

*Attorneys for Plaintiffs and the Proposed
Settlement Class*

26

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed with the Clerk of

Court via the CM/ECF system, which will send Notice of such filing to all counsel of record.


Dated: June 5, 2024                    */s/ Gregory B. Linkh*
                                       Gregory B. Linkh

27