**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ROMEO POWER INC. SECURITIES LITIGATION | Case No. 1:21-cv-03362-LGS<br><br>Honorable Lorna G. Schofield |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S**
**MOTION FOR AN AWARD OF ATTORNEYS' FEES AND**
**REIMBURSEMENT OF LITIGATION EXPENSES**

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ...................................................................... 1

II.    INTRODUCTION ......................................................................................... 1

III.   ARGUMENT ................................................................................................ 6

      A.    The Common Fund Doctrine Applies To The Settlement .................................... 6

      B.    The Court Should Award A Reasonable Percentage Of The Common Fund ......... 7

      C.    The *Goldberger* Factors Confirm The Requested Fee Is Fair And Reasonable ..... 9

            1.    Comparison To Court-Approved Fees In Other Class Action Common Fund Settlements .......................................................................... 10

                    (a)    The Applicable Baseline Fee Is 30% ............................... 10

                    (b)    The Requested Fee Will Not Result In A Windfall To Lead Counsel .............................................................. 12

                    (c)    The Magnitude And Complexity Of The Case Support The Requested Fee ................................................. 13

            2.    Analysis Of Risk, Result And Policy Considerations .............................. 15

                    (a)    The Risk Of Litigation Supports The Baseline Fee .......... 15

                    (b)    The Quality Of Representation Supports The Baseline Fee ................................................................... 19

                    (c)    Policy Considerations Support The Baseline Fee ............. 20

            3.    The Lodestar "Cross-Check" Strongly Supports The Reasonableness Of The Requested Fee ................................................................. 21

      D.    Lead Counsel's Expenses Are Reasonable And Were Necessarily Incurred To Achieve The Benefit Obtained ........................................................... 23

      E.    Plaintiffs Should Be Granted PSLRA Awards ...................................... 24

IV.   CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

<u>CASES</u>

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) ........................................................................................ 2

*Asare v. Change Group of New York, Inc.*,
  2013 WL 6144764 (S.D.N.Y. Nov. 18, 2013)........................................................................ 23

*Athale v. Sinotech Energy Ltd.*,
  2013 WL 11310686 (S.D.N.Y. Sept. 4, 2013)...................................................................... 22

*Avon Pension Fund v. GlaxoSmithKline PLC*,
  343 F. App'x 671 (2d Cir. 2009) ................................................................................... 18

*Bell v. Pension Comm. of ATH Holding Co., LLC*,
  2019 WL 4193376 (S.D. Ind. Sept. 4, 2019) ...................................................................... 6

*Bellifemine v. Sanofi-Aventis U.S. LLC*,
  2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010)......................................................................... 8

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980).................................................................................................. 6

*Burns v. Falconstor Software, Inc.*,
  2014 WL 12917621 (E.D.N.Y. Apr. 10, 2014) .................................................................... 22

*City of Birmingham Ret. and Relief Sys. v. Credit Suisse Grp. AG*,
  2020 WL 7413926 (S.D.N.Y. Dec. 17, 2020) ................................................................ *passim*

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)........................................................................................ 16

*City of Providence v. Aeropostale, Inc.*,
  2014 WL 1883494 (S.D.N.Y. May 9, 2014) ....................................................................... 15

*Davis v. J.P. Morgan Chase & Co.*,
  827 F. Supp. 2d 172 (W.D.N.Y. 2011) ........................................................................ 8, 22

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) ....................................................................................... 2

*Goldberger v. Integrated Res., Inc.*,
  209 F.3d 43 (2d Cir. 2000)..................................................................................... *passim*

*Gross v. GFI Grp., Inc.*,
    784 Fed. App'x. 27 (2d Cir. Sept. 13 2019) .............................................................. 16

*Guevoura Fund Ltd. v. Sillerman*,
    2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) .................................................... 23, 24

*Hicks v. Morgan Stanley & Co.*,
    2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ........................................................ 6, 9

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
    2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)............................................................... 13

*In re Apple Comput. Sec. Litig.*,
    1991 WL 238298 (N.D. Cal. Sept. 6, 1991) ............................................................... 2

*In re Bank of Am. Corp, Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
    772 F.3d 125 (2d Cir. 2014).................................................................................... 25

*In re Bisys Sec. Litig.*,
    2007 WL 2049726 (S.D.N.Y July 16, 2007) ........................................................... 22

*In re Bristol-Myers Squibb Sec. Litig.*,
    361 F. Supp. 2d 229 (S.D.N.Y. 2005)........................................................................ 8

*In re CarLotz, Inc. Sec. Litig.*,
    2023 WL 2744064 (S.D.N.Y. Mar. 31, 2023) ......................................................... 14

*In re Centurylink Sales Practices and Sec. Litig.*,
    2021 WL 3080960 (D. Minn. July 21, 2021) ........................................................... 18

*In re Colgate-Palmolive Co. ERISA Litig.*,
    36 F. Supp. 3d 344 (S.D.N.Y. July 8, 2014).................................................. 9, 12, 22

*In re Comverse Tech., Inc. Sec. Litig.*,
    2010 WL 2653354 (E.D.N.Y. June 24, 2010) .................................................... 16, 22

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    80 F. Supp. 3d 838 (N.D. Ill. 2015) ................................................................... 15, 17

*In re Elan Sec. Litig.*,
    385 F. Supp. 2d 363 (S.D.N.Y. 2005)...................................................................... 22

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
    2007 WL 2230177 (S.D.N.Y. July 27, 2007) ............................................................ 8

iii

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015) ...................................................................... 5, 23

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ......................................................... 16, 21, 23, 25

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
2018 WL 5839691 (S.D.N.Y. Nov. 8, 2018) ...................................................................... 9, 12

*In re Giant Interactive Group, Inc. Sec. Litig.*,
279 F.R.D. 151 (S.D.N.Y. Nov. 2, 2011) ................................................................................ 16

*In re Gilat Satellite Networks, Ltd.*,
2007 WL 2743675 (E.D.N.Y. Sept. 18, 2007) ........................................................................ 18

*In re Global Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) .................................................................................. 16, 22, 24

*In re Hi-Crush Partners L.P. Sec. Litig.*,
2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ........................................................................ 21

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
194 F.R.D. 166 (E.D. Pa. 2000) .............................................................................................. 13

*In re Indep. Energy Holdings PLC Sec. Litig.*,
302 F. Supp. 2d 180 (S.D.N.Y. 2003) ............................................................................... 23, 24

*In re Interpublic Sec. Litig.*,
2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004) ......................................................................... 23

*In re Lottery.com, Inc. Sec. Litig.*,
2024 WL 454298 (S.D.N.Y. Feb. 6, 2024) ............................................................................... 2

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ........................................................................ 25

*In re Ocean Power Tech., Inc., Sec. Litig.*,
2016 WL 6778218 (D.N.J. Nov. 15, 2016) ............................................................................... 2

*In re Qudian Inc. Sec. Litig.*,
2021 WL 2328437 (S.D.N.Y. June 8, 2021) ........................................................................... 25

*In re Rite Aid Corp. Sec. Litig.*,
396 F.3d 294 (3d Cir. 2005) ...................................................................................................... 8

*In re Romeo Power Inc. Sec. Litig.*,
  2022 WL 1806303 (S.D.N.Y. June 2, 2022) ................................................................... 3

*In re Romeo Power Inc. Sec. Litig.*,
  2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022) ................................................................ 3

*In re Schering-Plough Corp. Enhance Sec. Litig.*,
  2013 WL 5505744 (D.N.J. Oct. 1, 2013) ..................................................................... 18

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2020 WL 4196468 (S.D.N.Y. July 21, 2020) ............................................... 20, 24, 25

*In re Telik, Inc. Sec. Litig.*,
  576 F. Supp. 2d 570 (S.D.N.Y. Sept. 10, 2008) ........................................................... 5

*In re Veeco Instruments Inc. Sec. Litig.*,
  2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) .......................................... 6, 19, 20, 25

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005) .......................................................................... 8

*In re Xcel Energy, Inc., Sec., Deriv. & ERISA Litig.*,
  364 F. Supp. 2d 980 (D. Minn. 2005) .................................................................. 18, 25

*Johnson v. Brennan*,
  2011 WL 4357376 (S.D.N.Y. Sept. 16, 2011) ............................................................. 8

*La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*,
  2009 WL 4730185 (D.N.J. Dec. 4, 2009) ................................................................... 13

*Lea v. TAL Educ. Grp.*,
  2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021) ...................................................... 13, 22

*Leach v. NBC Universal Media, LLC*,
  2017 WL 10435878 (S.D.N.Y. Aug. 24, 2017) .......................................................... 23

*LeBlanc-Sternberg v. Fletcher*,
  143 F.3d 748 (2d Cir. 1998) ......................................................................................... 21

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002) .................................................... 7, 9, 20, 22

*Meredith Corp. v. SESAC, LLC*,
  87 F. Supp. 3d 650 (S.D.N.Y. 2015) .......................................................................... 17

v

*Mild v. PPG Indus., Inc.*,
  2019 WL 3345714 (C.D. Cal. July 25, 2019)....................................................................... 20

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970)............................................................................................................. 7

*Monzon v. 103W77 Partners, LLC*,
  2015 WL 993038 (S.D.N.Y. 2015)....................................................................................... 7

*Moses v. New York Times Co.*,
  79 F.4th 235 (2d Cir. 2023) ............................................................................................... 24

*Robbins v. Koger Props., Inc.*,
  116 F.3d 1441 (11th Cir. 1997) ........................................................................................... 2

*Schwartz v. TXU Corp.*,
  2005 WL 3148350 (N.D. Tex. Nov. 8, 2005)..................................................................... 18

*Shapiro v. JPMorgan Chase & Co.*,
  2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) .................................................................... 15

*Silverman v. Motorola Sols., Inc.*,
  739 F.3d 956 (7th Cir. 2013) ............................................................................................... 2

*Silverman v. Motorola, Inc.*,
  2012 WL 1597388 (N.D. Ill. May 7, 2012) ....................................................................... 17

*Taft v. Ackermans*,
  2007 WL 414493 (S.D.N.Y. Jan. 31, 2007) ................................................................. 13, 19

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
  2004 WL 1087261 (S.D.N.Y. May 14, 2004) .................................................................... 16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)........................................................................................................... 21

*Varljen v. H.J. Meyers & Co., Inc.*,
  2000 WL 1683656 n.2 (S.D.N.Y. Nov. 8, 2000)................................................................ 24

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005).................................................................................... 7, 8, 21, 22

STATUTES

15 U.S.C. § 78u-4(a)(4) ................................................................................................ 2, 24

15 U.S.C. § 78u-4(a)(6) ..................................................................................................... 8

15 U.S.C. §§ 78u-4(b)(1)-(b)(2)(A), and (b)(3)(B) ......................................................... 2

OTHER AUTHORITIES

Attorneys' Fees in Class Actions: 2009-2013,
    92 N.Y.U. Law Review 937 (2017).................................................................. 10, 11, 12, 23

## I.    PRELIMINARY STATEMENT

Court-appointed lead counsel, Glancy Prongay & Murray LLP ("GPM" or "Lead Counsel")[1], respectfully submits this memorandum of law in support of its Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses.

## II.    INTRODUCTION[2]

Lead Counsel have succeeded in obtaining a $14,900,000 non-reversionary, all cash, settlement (the "Settlement") for the benefit of the Settlement Class in the above-captioned action (the "Action").  This is an extremely favorable outcome in the face of substantial risks, and is the result of Lead Counsel's vigorous, persistent, and skilled efforts.  Lead Counsel now respectfully moves this Court for an award of attorneys' fees in the amount of 30% of the Settlement Fund (*i.e.*, $4,470,000, plus interest at the same rate as the Settlement Fund), and reimbursement of $475,341.74 in Litigation Expenses.  The Litigation Expenses consist of $395,341.74 in out-of-pocket costs incurred by Lead Counsel while prosecuting the Action, and an aggregate of $80,000 to Court-appointed Lead Plaintiff Mike Castleberg ($20,000), and additional named plaintiffs Joshua Cante, Nathaniel Tapia, Artur Chimchirian, and Van Nguyen ($15,000 each) (together with Lead Plaintiff, "Plaintiffs") for reimbursement of the reasonable costs (including the cost of time spent) incurred in prosecuting the

---

[1] Unless otherwise defined, all capitalized terms herein have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated December 7, 2023 (the "Stipulation," ECF No. 191-1), or the concurrently-filed Declaration of Gregory B. Linkh in Support of: (I) Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Linkh Declaration").  All citations to "¶ __" and "Ex. __" in this memorandum refers, respectively, to paragraphs in, and Exhibits to, the Linkh Declaration.  Unless otherwise noted, all internal citations and quotations have been omitted and emphasis has been added.

[2] The Linkh Declaration is an integral part of this submission and, for the sake of brevity, the Court is respectfully referred to it for a discussion of, *inter alia*, the Action's history; nature of the claims asserted; negotiations leading to the Settlement; risks and uncertainties of continued litigation; a summary of the services Lead Counsel provided for the benefit of the Settlement Class; and additional information on the factors that support the fee and expense application, including the lodestar cross-check.

Action on behalf of the Settlement Class pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(4).

Achieving the Settlement was not easy.  Defendants were represented by highly skilled litigators, and Lead Counsel faced numerous hurdles and risks from the outset, including the PSLRA's heightened pleading standards and automatic stay of discovery, the high cost of experts and investigators needed to litigate a complex securities fraud case, and a substantial risk of non-payment. *See* 15 U.S.C. §§ 78u-4(b)(1)-(b)(2)(A), and (b)(3)(B).  These are not idle risks.  "To be successful, a securities class action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action."  *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 235 (5th Cir. 2009) (O'Connor, J., by designation).  As a result, a significant number of cases are dismissed at the pleading stage.[3]

Nor do the risks end at the pleading stage.  Even when a plaintiff is successful at trial, payment is far from guaranteed.[4]  Thus, there was a significant possibility that the case would yield little or no recovery after many years of costly litigation.  *See Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (observing that "Defendants prevail outright in many securities suits."); *In re Ocean Power Tech., Inc., Sec. Litig.*, 2016 WL 6778218, at *28 (D.N.J. Nov. 15, 2016) ("The risk of

---

[3] *See* Ex. 7-C (Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* (NERA Jan. 23, 2024) ("NERA Report") at p. 15-16 (Fig. 14) (finding motion to dismissed filed in 96% of securities class action lawsuits, with a decision reached in 73% of the cases, and stating that "[a]mong the cases where a decision was reached, 60% were granted (with or without prejudice) while 40% were denied either in part or in full"); *see also In re Lottery.com, Inc. Sec. Litig.*, 2024 WL 454298, at *37 (S.D.N.Y. Feb. 6, 2024) (Rochon, J.) (dismissing securities class action complaint with leave to amend where GPM is lead counsel).

[4] *See, e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing jury verdict awarding investors $2.46 billion on loss causation and damages grounds, and remanding for new trial on these issues), *reh'g denied* (July 1, 2015); *In re Apple Comput. Sec. Litig.*, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) (vacating $100 million jury verdict on post-trial motions); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict for plaintiffs).

non-payment is especially high in securities class actions, as they are notably difficult and notoriously uncertain.").

Despite facing long odds, Lead Counsel vigorously pursued this case for approximately three years—working 6,150.25 hours and advancing $395,341.74 in out-of-pocket expenses, all on a fully contingent basis. *See* ¶¶8, 12-51. Among other things, Lead Counsel:

- drafted and litigated a contested motion for consolidation and appointment of lead plaintiff pursuant to the PSLRA;

- conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) filings with the U.S. Securities and Exchange Commission ("SEC") by Romeo Power, Inc. ("Romeo" or the "Company") and RMG Acquisition Corp. ("RMG"), (ii) public reports, blog posts, research reports prepared by securities and financial analysts, online interviews with Romeo and RMG executives, and news articles concerning Romeo and RMG, (iii) investor call transcripts related to Romeo and RMG, (iv) press releases published by and regarding Romeo and RMG; (b) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, numerous interviews of former Company employees and other sources of relevant information; (c) consulting and working with an accounting expert to analyze Romeo's Settlement Class Period financial results; and (d) working with a damages and loss causation expert to analyze Romeo's stock price movements;

- utilized the foregoing comprehensive investigation and additional research to draft and file the detailed 79-page (226-paragraph) Amended Class Action Complaint for Violations of the Federal Securities Laws (the "FAC"), which included, among other things: (a) evidence from a confidential witness obtained by Lead Counsel's private investigator; (b) an expanded class period; (c) additional false statements; (d) new theories concerning the falsity behind Defendants' statements; and (e) an added count under Section 14(a) of the Exchange Act (ECF No. 82);

- researched, drafted, and filed an opposition to defendants' motion to dismiss the FAC, after which the Court denied defendants' motion in part (ECF 107 ("MTD Order"); *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303 (S.D.N.Y. June 2, 2022);

- researched, drafted, and filed an opposition to the motion for reconsideration and/or clarification of the Court's MTD Order filed by the Individual Defendants and Romeo, which the Court denied in its entirety (ECF No. 124; *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022);

- engaged in substantial discovery, which entailed, *inter alia*: (a) exchanging initial disclosures; (b) negotiating a protective order and ESI protocol, both of which were subsequently entered by the Court; (c) serving two sets of requests for production of documents, one set of interrogatories, and one set of requests for admissions; (d) responding to one set of requests for production of documents (including the production of approximately 6,298 pages of documents), one set of interrogatories to each

3

Plaintiff and a second set of interrogatories to all Plaintiffs; € serving eight subpoenas *duces tecum* on various third parties, including Romeo's purported battery cell suppliers; (f) conducting a targeted review and analysis of the approximately 2,227,554 pages of documents produced by Defendants and third parties; (g) defending the depositions of Lead Plaintiff and the four other named plaintiffs; and (h) meeting and conferring with Defendants' counsel regarding various discovery issues;

- engaged in a full-day, in-person mediation session in New York overseen by a highly experienced third-party mediator, former federal district court judge Layn Phillips, which involved an exchange of written submissions concerning the facts of the case, liability, and damages, and did not result in a settlement agreement at that time;

- fully briefed Plaintiffs' motion for class certification, a process that entailed, *inter alia*: (a) filing an opening brief, together with the expert report of Dr. Matthew Cain regarding market efficiency (ECF Nos. 147-149); (b) defending the depositions of each of the five proposed class representatives and Plaintiffs' market efficiency expert; and (c) filing a reply brief and opposition to Defendants' letter motion requesting leave to file a sur-reply;

- retained and consulted with bankruptcy counsel after Romeo commenced an "assignment for the benefit of creditors" proceeding (the "ABC Proceeding")—the state court functional equivalent of a bankruptcy—and filed a class claim in the ABC Proceeding;

- participated in another full-day, in-person mediation with Judge Phillips in Newport Beach, California, before which the Parties exchanged supplemental mediation statements and exhibits on the issues of liability and damages, that culminated in Judge Phillips presenting a mediator's recommendation that the Action be settled for $14,900,000, which the Parties accepted;

- negotiated a detailed confidential Term Sheet with Individual Defendants' counsel, which was executed on or about August 8, 2023;

- worked with a consulting damages expert to craft a plan of allocation that treats Plaintiffs and all other members of the proposed Settlement Class fairly;

- prepared the initial draft, and negotiated the terms, of the Stipulation (including the exhibits thereto) and the Supplemental Agreement;

- drafted the preliminary approval motion and supporting papers and appeared at the telephonic preliminary approval hearing;

- revised the notice documents as requested by the Court and worked with the Court appointed Claims Administrator to provide notice to the Settlement Class; and

- drafted the motion for final approval and supporting papers. ¶8.

Moreover, the legal work related to the Settlement will not end with the Court's approval of the proposed Settlement. Additional hours and resources will be expended assisting Settlement Class Members with their Claim Forms, responding to Settlement Class Members' inquiries, shepherding the claims process to conclusion and filing a distribution motion. No additional compensation will be

sought for this work. *See In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 2015 WL 6971424, at \*10 (S.D.N.Y. Nov. 9, 2015) ("Considering that the work in this matter is not yet concluded for Plaintiffs' counsel who will necessarily need to oversee the claims process, respond to inquiries, and assist Class Members in submitting their Proof of Claims, the time and labor expended by counsel in this matter support a conclusion that a 33% fee award in this matter is reasonable.").

As compensation for Lead Counsel's significant efforts and achievements on behalf of the Settlement Class, Lead Counsel respectfully requests a fee award in the amount of 30% of the Settlement Fund. The requested fee is equal to the relevant median percentage awards in complex class litigation according to empirical studies. *See infra* at § III.C.1.(a). The reasonableness of the request is further confirmed by a lodestar cross-check. In fact, the requested fee represents a multiplier of 1.17 on Lead Counsel's lodestar, which is well within the range of multipliers typically awarded in class actions with substantial contingency risks such as this one (and below the mean multiplier in securities class actions). *See Ernst v. Dish Network, LLC*, Case No. 1:12-cv-08794-LGS, ECF No. 237, slip op. at ¶16 (S.D.N.Y. Nov. 13, 2015) (finding "2.57 multiplier" to be "within the range awarded by courts throughout the country.") (Ex. 10); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 590 (S.D.N.Y. Sept. 10, 2008) ("In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court."); *see also infra* at III.C.3.

Lead Counsel also seek reimbursement of $395,341.74 in out-of-pocket litigation expenses incurred by Lead Counsel in prosecuting this Action. *See* ¶¶111-17. The expenses are reasonable in amount, primarily for consultation with experts, and were necessarily incurred in the successful prosecution of the Action. Accordingly, they should be approved.

Finally, Lead Counsel respectfully requests PSLRA awards in the aggregate amount of $80,000 to compensate Plaintiffs for the time and effort they have expended on behalf of the Settlement Class.

Each Plaintiff, *inter alia*, reviewed the pleadings and briefs filed in the Action, as well as significant court orders; regularly communicated with Lead Counsel about the litigation and the strengths and weaknesses of the case; responded to discovery and sat for deposition; were involved in settlement negotiations; and, after extensive discussions with Lead Counsel, authorized settlement of the case. Ex. 2, at ¶5; Ex. 3, at ¶5; Ex. 4, at ¶5; Ex. 5, at ¶5; Ex. 6, at ¶5. But for their "commitment to pursuing these claims, the successful recovery for the Class would not have been possible." *Bell v. Pension Comm. of ATH Holding Co., LLC*, 2019 WL 4193376, at \*6 (S.D. Ind. Sept. 4, 2019).

For all the reasons set forth herein, and in the Linkh Declaration, Lead Counsel respectfully requests that the Court award attorneys' fees of 30% of the Settlement Fund, approve reimbursement of $395,341.74 in out-of-pocket litigation expenses, and grant PSLRA awards in the aggregate amount of $80,000.

## III.    ARGUMENT

### A.    The Common Fund Doctrine Applies To The Settlement

The Supreme Court and the Second Circuit have long recognized that attorneys whose efforts create a "common fund" are entitled to a reasonable attorneys' fee from that fund. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). "The rationale for the doctrine is an equitable one: it prevents unjust enrichment of those benefitting from a lawsuit without contributing to its cost." *Id.* at 47; *see also In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at \*2 (S.D.N.Y. Nov. 7, 2007). Awarding reasonable attorneys' fees from a common fund also serves an important policy goal: it encourages "skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons," and thus discourages "future misconduct of a similar nature." *Id.*; *see also Hicks v. Morgan Stanley & Co.*, 2005 WL 2757792, at \*9 (S.D.N.Y. Oct. 24, 2005).

6

For the common fund doctrine to apply, "the applicant's efforts must confer a 'substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread costs proportionately among them,' an award of attorneys' fees must operate to shift the costs of litigation to that group." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 393-94 (1970)). All of these elements are present here. Lead Counsel's efforts conferred a substantial benefit—$14.9 million in cash—on an ascertainable class. In addition, a fee award from the common fund will equitably shift the costs of litigation to the group benefitting from the Settlement, *i.e.*, the Settlement Class. The Court should, therefore, award attorneys' fees from the Settlement Fund. *See Maley*, 186 F. Supp. 2d 369.

**B.      The Court Should Award A Reasonable Percentage Of The Common Fund**

In the Second Circuit, "both the lodestar and the percentage of the fund methods are available to district judges in calculating attorneys' fees." *Goldberger*, 209 F.3d at 50. However, "[t]he trend in the Second Circuit is to use the percentage of the fund method in common fund cases like this one, as it directly aligns the interests of the class and its counsel, mimics the compensation system actually used by individual clients to compensate their attorneys, provides a powerful incentive for the efficient prosecution and early resolution of litigation, and preserves judicial resources." *Monzon v. 103W77 Partners, LLC*, 2015 WL 993038, at *2 (S.D.N.Y. 2015); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("The trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation."). The percentage-of-the-fund method is also supported by the PSLRA, which states that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages

7

and prejudgment interest actually paid to the class." 15 U.S.C. § 78u-4(a)(6).[5] The lodestar method, by contrast, "create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits." *Wal-Mart*, 396 F.3d at 121.

Use of the percentage method does not, however, render the lodestar irrelevant. Rather, part of the reasonableness inquiry is a comparison of the lodestar to the fee awarded pursuant to the percentage of the fund method "[a]s a 'cross-check.'" *Wal-Mart*, 396 F.3d at 123 (quoting *Goldberger*, 209 F.3d at 50). "[W]here [the lodestar method is] used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50. "Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case[,]" (*id.*), or "[t]he district courts … may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005); *see also Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 184 (W.D.N.Y. 2011); *Johnson v. Brennan*, 2011 WL 4357376, at *14-15 (S.D.N.Y. Sept. 16, 2011).

In sum, the weight of authority suggests that the Court should use the percentage-of-recovery method, with a lodestar cross-check, in determining a reasonable attorneys' fee. *See Bellifemine v. Sanofi-Aventis U.S. LLC*, 2010 WL 3119374, at *6 (S.D.N.Y. Aug. 6, 2010) ("applying a lodestar 'cross-check'"); *In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d 229, 233 (S.D.N.Y. 2005) ("Typically, courts utilize the percentage method and then 'cross-check' the adequacy of the resulting fee by applying the lodestar method."); *Hicks*, 2005 WL 2757792, at *10.

---

[5] *See also In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *16 (S.D.N.Y. July 27, 2007) ("[T]he PSLRA implicitly supports the use of the percentage of the fund method."); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005) ("apply[ing] the percentage method" due, at least in part, to "the PSLRA's express contemplation that the percentage method will be used to calculate attorneys' fees in securities fraud class actions").

**C.        The *Goldberger* Factors Confirm The Requested Fee Is Fair And Reasonable**

The Second Circuit has set forth the following criteria that courts should consider when reviewing a request for attorneys' fees in a common fund case:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50.  In application, this Court has "adopt[ed] the three-step approach set forth in *Colgate-Palmolive*."  *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2018 WL 5839691, at *2 (S.D.N.Y. Nov. 8, 2018) ("*Forex*") (Schofield, J.) (citing *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 348 (S.D.N.Y. July 8, 2014)).

First, the Court "determine[s] a baseline reasonable fee by reference to other common fund settlements of a similar size, complexity and subject matter."  *Forex*, 2018 WL 5839691, at *2.  "This analysis considers three of the *Goldberger* factors: (1) the requested fee in relation to the settlement, (2) whether to award a lower percentage of a higher settlement amount under a 'sliding scale' approach in order to avoid a windfall to Lead Counsel and (3) the magnitude and complexity of the case."  *City of Birmingham Ret. and Relief Sys. v. Credit Suisse Grp. AG*, 2020 WL 7413926, at *2 (S.D.N.Y. Dec. 17, 2020) (Schofield, J.).  Next, the Court makes "any necessary adjustments to the baseline fee based on the *Goldberger* factors of risk, quality of representation and other public policy concerns."  *Forex*, 2018 WL 5839691, at *2.  "The final step is to apply the lodestar method as a cross-check, which addresses the final *Goldberger* factor -- the time and labor expended by counsel."  *City of Birmingham*, 2020 WL 7413926, at *2.  Based on this analysis, a reasonable baseline fee in this case is 30%, which requires no further adjustment.  *See Maley*, 186 F. Supp. 2d at 370 (finding a one-third fee request of settlement fund valued at $11.5 million "falls comfortably within the range of fees typically awarded in securities class actions").

9

      1.      **Comparison To Court-Approved Fees In Other Class Action Common Fund Settlements**

      (a)      **The Applicable Baseline Fee Is 30%**

According to data compiled by NERA Economic Consulting, for securities class actions settled between 1996 and 2023 (*i.e.*, for all settled cases in NERA's database since the passage of the PSLRA), with a gross settlement value ranging from $10 million to $25 million, the median of plaintiffs' attorneys' fees as a percentage of settlement value was 30%. *See* Ex. 7 (Declaration of Edward Flores of NERA Economic Consulting) at ¶13. While the median plaintiffs' attorneys' fees as a percentage of settlement value for securities class actions with a gross settlement value ranging from $10 million to $25 million was slightly lower for the period 2014 to 2023, at 27.5% (*see* NERA Report at 29 (Fig. 25)), it should be noted that the settlement amount in this case is in the lower-third of that range. According to NERA's data, when examining 87 securities class actions settled in this District between 1996 and 2023 with a settlement value ranging from $10-20 million—which more closely captures settlements of a similar size to the $14.9 million settlement amount in this case—the median of plaintiffs' attorneys' fees as a percentage of settlement value was 30%. Ex. 7 (Flores Decl.) at ¶15. And examining more recent data, the median fee percentage (30%) remained the same when examining fee awards in $10-$20 million settlements in this District in just the last five years. *Id.* Thus, applying a baseline fee award of 30% is not only consistent with the data collected by NERA Economic Consulting since the passage of the PSLRA in 1995, it aligns with recent fee awards in similarly-sized settlements in this District in the last five years.

A study by Professors Theodore Eisenberg, Geoffrey Miller and Roy Germano of 458 reported class action settlements from state and federal courts around the country during the five years from 2009 to 2013 yielded similar results. *See* Theodore Eisenberg, Geoffrey Miller and Roy Germano, Attorneys' Fees in Class Actions: 2009-2013, 92 N.Y.U. Law Review 937 (2017) ("Eisenberg &

Miller"). That study finds that for 116 settlements from the Second Circuit, the mean fee was 28% and the median fee was 30%. *Id.* at 951, Table 3. For the 78 settlements from the Southern District of New York, the mean fee was 27% and the median fee was 31%. *Id.* at 950, Table 2.

While certain of these figures are higher or lower than the 30% median fee percentage reported by NERA, Lead Counsel respectfully submits that the data reported by NERA is more relevant and appropriate for the purpose of establishing an applicable baseline in this case. Of the 458 settlements in the data set used by Eisenberg & Miller (for the years 2009 through 2013), only 74 involved securities class actions. *Id.* at 940, 951. In contrast, NERA's data set solely includes securities class actions and spans more than three decades.[6] For just the years 2014 through 2023, NERA identified 835 securities class action settlements,[7] more than 11 times the number of securities class action settlements in the data set used by Eisenberg & Miller. Thus, NERA's data set is both more robust and more relevant than the data set used by Eisenberg & Miller.

In addition, while Eisenberg & Miller broke down certain of their data by case type and size of settlement, they did not separately break down securities class action settlements by size.[8] This is an important limitation of the Eisenberg & Miller study. As discussed *infra*, securities class actions are riskier and more complex than other types of class actions, a reality that is reflected by the fact that

---

[6]  *See* https://www.nera.com/insights/publications/2024/recent-trends-in-securities-class-action-litigation--2023-full-y.html (last visited May 17, 2024) (noting that NERA relies on a "proprietary database of securities class actions, which spans more than three decades").

[7] *See* NERA Report at 13, Figure 11. Notably, this number does not include settlements that solely involved the resolution of merger objections or unregistered crypto securities cases, which NERA counted separately. *See id.*

[8] For all securities class action settlements in the Eisenberg & Miller study (irrespective of settlement size), the mean fee was 23% and the median fee was 25%. *See* Eisenberg & Miller, 92 N.Y.U. Law Review at 952, Table 4. For all settlements between $12 million and $23.4 million (irrespective of case type), the mean fee percentage was approximately 25.5%. *Id.* at 948, Figure 5. Importantly, however, Eisenberg & Miller did not report the mean or median fee for securities class action settlements between $12 million and $23.4 million.

the average lodestar multiplier in securities class action settlements is meaningfully higher than that in almost every other type of class action.[9]  Moreover, as this Court has recognized, the size of the settlement matters in establishing an appropriate baseline fee, as there is an inverse relationship between the size of the settlement and fee percentage.  *See In re Colgate-Palmolive*, 36 F. Supp. 3d at 349.  Thus, in determining an appropriate baseline fee, the most relevant comparables are settlements of the same case type with a similar settlement size.  *See Forex*, 2018 WL 5839691, at *2 (court should "determine a baseline reasonable fee by reference to other common fund settlements of a *similar size, complexity and subject matter*").  Accordingly, the Court should use NERA's median fee percentage for post-PSLRA securities class action settlements between $10 million to $20 million—30%—as the baseline fee in this case.[10]

### (b)    The Requested Fee Will Not Result In A Windfall To Lead Counsel

As demonstrated above, the requested attorneys' fee of 30% of the Settlement Fund is the same as the median fee percentage awarded in similar-sized securities class actions settled between 1996 and 2023 analyzed by NERA (*see* Ex. 7 at ¶13), and the median 30% fee percentage in the 116 class action settlements from the Second Circuit analyzed by Eisenberg & Miller (*see* Eisenberg & Miller, 92 N.Y.U. Law Review at 951, Table 3); and below the 31% median fee for the 78 class action settlements from the Southern District of New York surveyed by Eisenberg & Miller (*id.* at 950, Table

---

[9] According to Eisenberg & Miller, the mean lodestar multiplier for securities class action settlements is 1.79.  *See* Eisenberg & Miller, 92 N.Y.U. Law Review at 963-65, Table 12.  The only case types in Eisenberg & Miller's data set with a higher mean multiplier had tiny sample sizes:  Health Care cases (mean multiplier of 4.61 based on 2 cases) and Truth in Lending Act cases (mean multiplier of 1.94 based on 2 cases).  *See id.*

[10] In addition, Lead Counsel respectfully submits that "[e]xamining median values, which are less sensitive to outliers than the mean," provides a better basis for setting a baseline number.  Eisenberg & Miller, 92 N.Y.U. Law Review at 949.  The NERA Report presents only median values for fee percentages.

2).  Accordingly, the requested fee will not result in a windfall to Lead Counsel.[11]  *See Taft v. Ackermans*, 2007 WL 414493, at \*10 (S.D.N.Y. Jan. 31, 2007) ("Thirty percent of a larger settlement fund could constitute a windfall; however, a settlement fund of this size does not create such an issue. The requested fee is reasonable in relation to the [$15.175 million] settlement amount.").[12]

        **(c)**      **The Magnitude And Complexity Of The Case Support The Requested Fee**

Courts have repeatedly recognized the "notorious complexity" of securities class action litigation.  *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 2006 WL 903236, at \*8 (S.D.N.Y. Apr. 6, 2006); *Lea v. TAL Educ. Grp.*, 2021 WL 5578665, at \*9 (S.D.N.Y. Nov. 30, 2021) ("Class action suits have a well-deserved reputation as being most complex, and securities class actions are notably difficult and notoriously uncertain to litigate."); *La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, 2009 WL 4730185, at \*8 (D.N.J. Dec. 4, 2009) ("securities class actions are inherently complex").  Moreover, "securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA," and other changes in the law.  *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000); *see also AOL Time Warner*, 2006 WL 903236, at \*9 ("[T]he legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages.").

---

[11] The Notice informed the Settlement Class that Lead Counsel would apply for an attorneys' fee award of up to 33⅓% of the Settlement Fund (which by definition includes accrued interest).  Lead Counsel is, however, only seeking an attorneys' fee of 30% of the Settlement Fund.

[12] *See also In re Ubiquiti Networks, Inc. Sec. Litig.*, No. 18-cv-01620 (VM), ECF No. 49 at 6 (S.D.N.Y. Mar. 27, 2020) (awarding 33.3% of $15 million settlement, where settlement was reached prior to the filing of a motion to dismiss) (Ex. 11); *In re L.G. Philips LCD Co. Sec. Litig.*, No. 1:07-cv-00909-RJS, ECF No. 82, slip op. at ¶3 (S.D.N.Y. Mar. 17, 2011) (awarding 30% of $18 million, representing a multiplier of 3.17, where settlement was reached while motion to dismiss was pending) (Ex. 12); *In re Am. Express Fin. Advisors Sec. Litig.*, No. 04 Civ. 1773 (DAB), ECF No. 170, slip op. at ¶16 (S.D.N.Y. July 18, 2007) (awarding 27% of $100 million, where settlement was reached while motion to dismiss was pending) (Ex. 13).

Here, in addition to facing the heightened pleading standard and automatic discovery stay of the PSLRA—which can be problematic in the best of times as demonstrated by the high dismissal rate of securities class actions (*see supra* n.3)—Plaintiffs also had to deal with the fact that this case involved: (i) a SPAC transaction; (ii) pre- and post-merger misrepresentations; (iii) five different securities (RMG units, RMG Class A common stock, RMG warrants, Romeo common stock, and Romeo warrants);[13] (iv) a bankrupt company; and (v) a defense that almost every potential juror could relate to and understand. ¶¶56-63.  For example, in opposing class certification, Defendants argued, *inter alia*, that Plaintiffs lacked standing to bring claims related to alleged misstatements made before the December 29, 2020 merger, and that the proposed class period started too early because Plaintiffs were not "purchasers" of Romeo Systems, Inc. (*i.e.*, pre-merger Romeo) stock. *See* ECF Nos. 156 & 163.  While not unheard of, this type of legal argument certainly added to the complexity of, and risk to, the case. *See In re CarLotz, Inc. Sec. Litig.*, 2023 WL 2744064 (S.D.N.Y. Mar. 31, 2023) (dismissing securities case following de-SPAC transaction where "Plaintiffs thus lack standing to challenge any statements made by Pre-Merger CarLotz about Pre-Merger CarLotz.").

Moreover, one of Defendants' primary defenses—unforeseen supply chain issues related to the COVID-19 pandemic—involves issues that are well-known, extensively reported on, and will have negatively impacted virtually every member of the potential jury pool. ¶56.  The simplicity of this defense from the Defendants' perspective only added to the complexity of proving Plaintiffs' case. Indeed, COVID-related supply chain problems are not an esoteric, isolated or underreported issue. Defendants' and their experts, in an attempt to demonstrate that the Individual Defendants did not commit fraud, would be able to point to many other companies that were negatively impacted by the pandemic, and each and every member of the jury would understand this defense.  Defendants, in fact,

---

[13] *See* Plan of Allocation (Ex. 1-E) for evidence of complexity based on number of securities as issue.

had already done so.  *See* ECF No. 91 (Memo in Support of MTD), at p. 6 (stating that "[i]n early 2021, others in the industry, including Lightning eMotors, Inc., Nikola Corporation, and Tesla, experienced similar disruptions, sometimes on very short notice" and citing sources).

The magnitude of this Action was similarly unquestionable: this was a hard-fought, expensive, multi-year litigation, with many millions of dollars of damages at stake, and it required considerable skill and resources to litigate.  As such, the magnitude and complexity of the litigation support the requested fee.  *See City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *16 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015) ("[T]he complex and multifaceted subject matter involved in a securities class action such as this supports the fee request.").

### 2. Analysis Of Risk, Result And Policy Considerations

"The next step is to consider three additional *Goldberger* factors—the risk of the litigation, the quality of representation and any remaining policy considerations—and determine whether this case is so exceptional in any of those areas that a departure from awards in similar cases is warranted." *City of Birmingham*, 2020 WL 7413926, at *3.

### (a) The Risk Of Litigation Supports The Baseline Fee

"[T]he risk of success [is] perhaps the foremost factor to be considered in determining" a reasonable award of attorneys' fees. *Goldberger*, 209 F.3d at 54; *see also Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *21 (S.D.N.Y. Mar. 24, 2014) ("The Second Circuit long ago recognized that courts should consider the risks associated with lawyers undertaking a case on a contingent fee basis."); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 80 F. Supp. 3d 838, 847-48 (N.D. Ill. 2015) ("When determining the reasonableness of a fee request, courts put a fair amount of emphasis on the severity of the risk (read: financial risk) that class counsel assumed in undertaking the lawsuit."). This is because "[n]o one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his

15

services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974). In applying this factor, "'litigation risk must be measured as of when the case is filed,' rather than with the hindsight benefit of subsequent events." *Global Crossing*, 225 F.R.D. at 467 (quoting *Goldberger*, 209 F.3d at 55). The many risks that Lead Counsel faced in prosecuting this suit more than justify the requested 30% fee. *See, e.g.*, ¶¶52-65.

Numerous courts recognize that "class actions confront even more substantial risks than other forms of litigation[,]"*Comverse*, 2010 WL 2653354, at *5, and "[s]ecurities class actions such as this are notably difficult and notoriously uncertain." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *27 (S.D.N.Y. 2010).[14] This case was no exception. From the outset, Lead Counsel understood they were embarking on a complex, expensive, and potentially lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, "plaintiffs' counsel were obligated to assure that sufficient attorney and para-professional resources were dedicated to the prosecution of the Action; counsel also faced the responsibility of advancing litigation and overhead expenses on this case for [approximately three] years." *In re Giant Interactive Group, Inc. Sec. Litig.,* 279 F.R.D. 151, 164 (S.D.N.Y. Nov. 2, 2011). Indeed, "[u]nlike counsel for Defendants, who are paid substantial hourly rates and reimbursed for their expenses on a regular basis, [Lead Counsel] have not been compensated for any time or expenses since this case began [approximately three] years ago." *Flag Telecom*, 2010 WL 4537550, at *27. Lead Counsel's commitment was substantial (*i.e.*, $3,827,986.50 in lodestar and $395,341.74 in out-of-pocket hard costs), and had they not obtained a recovery, it could have all been lost. *See Gross*

---

[14] *See also Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004) ("Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation.").

*v. GFI Grp., Inc.*, 784 Fed. App'x. 27, 28 (2d Cir. Sept. 13 2019) (affirming grant of summary judgment against plaintiff in securities fraud class action where GPM served as one of Lead Plaintiff's counsel, resulting in loss of millions of dollars in time and hundreds of thousands of dollars of hard costs); *see also* ¶97 (lodestar), ¶112 (expenses).  To put it bluntly, complex litigation is not risk free, and this case was not a slam dunk.[15]

"One proxy for assessing risk is whether the litigation followed on the heels of some prior criminal or civil proceeding involving the same parties or subject matter." *Dairy Farmers*, 80 F. Supp. 3d at 848.  "This inquiry provides insight into whether class counsel benefitted from the work of others, which acts a red flag for judges assessing fee petitions." *Id.*  In the instant case, no civil or criminal charges have been filed by the SEC or DOJ—even as of today.[16]  Rather, "Plaintiffs' counsel (and their teams and experts) were truly the authors of the favorable outcome for the class." *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 670 (S.D.N.Y. 2015).[17]

Another indicia of risk is whether there has been a restatement, which did not exist here.  When companies restate their financials, they are admitting a material misstatement of their financial

---

[15] For a discussion of the litigation, and thus contingency fee, risks inherent in this case, the Court is respectfully referred to the concurrently filed Final Approval Memorandum and Linkh Declaration. *See* Final Approval Memorandum § III.B.3.; Linkh Decl. ¶¶52-65.  While Lead Counsel believes those risks are important in assessing a reasonable attorneys' fee, for the sake of brevity, and in line with this Court's prior attorneys' fee rulings, this section focuses on what made this Action riskier than other securities class actions. *See City of Birmingham*, 2020 WL 7413926, at *3 ("[G]reater risks undertaken by counsel who accept a case on a contingent fee basis support a higher settlement percentage.").

[16] The SEC opened an investigation into various issues at Romeo several years ago, however, the government has not released any information concerning that investigation and the information provided to the public by Romeo has been extremely vague.  To date, the investigation has not resulted in indictments or criminal or civil penalties.

[17] *See also Silverman v. Motorola, Inc.*, 2012 WL 1597388, at *3 (N.D. Ill. May 7, 2012) (fee request supported by fact that "there were no governmental investigations or prosecutions related to the alleged fraud upon which Class Counsel could rest their theory of the case.  Rather, they investigated the facts and developed their theory of liability from scratch, involving significant time and expense.").

reporting.  A case predicated on a restatement is, therefore, less risky because the misstatement and materiality elements of a securities fraud claim are already met.  *See In re Schering-Plough Corp. Enhance Sec. Litig.*, 2013 WL 5505744 at \*30 (D.N.J. Oct. 1, 2013) (granting fee request where the case was the antithesis of cases where liability is virtually certain due to a financial restatement); *Schwartz v. TXU Corp.*, 2005 WL 3148350, at \*29 (N.D. Tex. Nov. 8, 2005) ("From the outset, this post-PSLRA action was an especially difficult and highly uncertain securities case, which did not involve restatement of TXU's previously issued financial statements or any other acknowledgments of wrongdoing.").

Moreover, the risk of proving scienter was heightened in this case because Plaintiffs could not show motive through insider trading; rather, the Individual Defendants asserted that they increased their ownership positions in Romeo Stock during the class period and held more stock after the first alleged corrective disclosure.  *See* ECF No. 91, at pp. 17-18; *see also In re Gilat Satellite Networks, Ltd.*, 2007 WL 2743675, at \*11 (E.D.N.Y. Sept. 18,2007) ("Establishing scienter is a difficult burden to meet and proving it will be especially challenging in this case where, apparently, neither the individual defendants nor any other Gilat executive profited from their Gilat investments."); *Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (defendants' increase of their net holdings "signals only confidence in the future of their company").

In short, "[t]his case lacked several strong facts that often support liability (and large settlement valuations) and provide a roadmap for proving fraud, such as suspected insider trading, a corporate restatement, or a companion SEC or DOJ investigation." *In re Centurylink Sales Practices and Sec. Litig.*, 2021 WL 3080960, at \*9 (D. Minn. July 21, 2021).  Consequently, this factor militates in favor of the requested fee.  *See Xcel Energy*, 364 F. Supp. 2d at 995 (noting that attorney fee request was supported by fact that the "case did not benefit from meaningful governmental investigations" and that

18

it did not involve a "a restatement of financials, or any allegations whatsoever of insider trading.").

**(b)    The Quality Of Representation Supports The Baseline Fee**

"To determine the 'quality of the representation,' courts review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *Taft v. Ackermans*, 2007 WL 414493, at \*10 (S.D.N.Y. Jan. 31, 2007); *see also Veeco*, 2007 WL 4115808, at \*7.  Both factors point to the same conclusion—a 30% fee award is reasonable under the circumstances.

The proposed Settlement is an outstanding result considering the significant risks of continued litigation.  Plaintiffs' damages expert estimates that *if* the Court certified the proposed class period, *if* Plaintiffs fully prevailed on all their claims at summary judgment and after a jury trial, and *if* the Court and jury accepted Plaintiffs' damages theory—*i.e.*, Plaintiffs' *best-case scenario*—the total *maximum* damages *potentially* available in this Action would be approximately $221.7 million. However, as detailed in Final Approval Memorandum (Sec. III.B.3(b)), the Linkh Declaration (¶¶52-65) and above, the Individual Defendants had credible arguments with respect to the disclosure dates and the propriety of the class period that they asserted at class certification, and would no doubt continue to assert at summary judgment and trial.  If, for instance, the trier of fact found that the second alleged disclosure date (August 16, 2021) was not applicable, as the Individual Defendants argued when opposing Plaintiffs' motion for class certification, Plaintiffs' potential recovery would have been reduced to approximately $164.7 million. ¶66. Thus, the $14.9 million Settlement represents a recovery of 6.7% to 9.0% of maximum potential damages.  Such a recovery is: (i) well above the 1.8% median recovery in securities class actions settled in 2023; and (ii) nearly *two and half to three times* higher than the 2.7-2.9% median recovery in securities cases with similar damages that settled between January 2014 and December 2023. *See* Ex. 7-C (NERA Report, at 26 (Fig. 22) (median recovery in securities class actions in 2023 was approximately 1.8% of estimated damages); at 25 (Fig. 21) (median recovery for securities class actions settled between January 2014 and December 2023 was 2.9% for cases with

estimated damages between $100-$199 million and 2.7% for those with estimated damages of $200-$399 million)).

Moreover, Lead Counsel's significant experience in prosecuting securities class action claims, vigorous representation, and commitment to providing the Settlement Class with the best possible representation were major factors in obtaining the exceptional result. *See* Ex. 9 (GPM firm résumé); *see also Mild v. PPG Indus., Inc.*, 2019 WL 3345714, at *3 (C.D. Cal. July 25, 2019) (GPM lawyers "are highly experienced in securities litigation and have vigorously prosecuted the Settlement Class's claims by expending significant time and effort on the case."). Indeed, "[n]ot only did [Lead] Counsel's skill and expertise contribute to the favorable settlement for the class, it contributed to the overall efficiency of the case." *Veeco*, 2007 WL 4115808, at *7.

Finally, "Courts have recognized that the quality of the opposition should also be taken into consideration in assessing the quality of the counsel's performance." *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *20 (S.D.N.Y. July 21, 2020). Here, Defendants were represented by Latham & Watkins, LLP, a prestigious and well-respect law firm with a substantial securities class action litigation practice, whose lawyers tenaciously represented the interests of their clients throughout this Action. ¶108. Notwithstanding this formidable opposition, Lead Counsel's thorough investigation, ability to present a strong case, and demonstrated willingness to vigorously prosecute the Action, ultimately resulted in the favorable Settlement. *Id.* Consequently, this factor militates in favor of the requested fee. *See Veeco*, 2007 WL 4115808, at *7 ("That Plaintiffs' Counsel was able to obtain a substantial settlement from these Defendants confirms the quality of Plaintiffs' Counsel's representation … and is a factor in determining the reasonableness of the fee request.").

### (c)    Policy Considerations Support The Baseline Fee

"In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered." *Del Global*, 186 F. Supp. 2d at 373. This is because

private actions such as this one serve to further the objective of the federal securities laws to protect investors. Indeed, the Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC)." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). If the "important public policy [of enforcing the securities laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook." *Flag Telecom*, 2010 WL 4537550, at *29.

Here, Lead Counsel invested substantial amounts of time and money vigorously pursuing allegedly serious wrongdoing by a public enterprise, and they did so on a fully contingent basis. Accordingly, public policy considerations favor Lead Counsel's 30% fee request. *See City of Birmingham*, 2020 WL 7413926, at *2 ("Protecting investors from fraudulent or misleading investments serves the public interest, and Lead Counsel's fees should reflect the important goal of 'serv[ing] as an inducement for lawyers to make similar efforts in the future.'") (quoting *Wal-Mart*, 396 F.3d at 96) (alteration in the original).

### 3. The Lodestar "Cross-Check" Strongly Supports The Reasonableness Of The Requested Fee

A lodestar "cross-check" confirms the reasonableness of the requested fee award. *See Goldberger*, 209 F.3d at 50. The "lodestar" is calculated by multiplying the number of hours expended on the litigation by each particular attorney or paralegal by their current reasonable and customary hourly rate, and totaling the amounts for all time-keepers.[18] Additionally, "[u]nder the lodestar method

---

[18] "[T]he use of current rates to calculate the lodestar figure has been endorsed repeatedly by the Supreme Court, the Second Circuit and district courts within the Second Circuit as a means of accounting for the delay in payment inherent in class actions and for inflation." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at *15 (S.D.N.Y. Dec. 19, 2014); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) ("[C]urrent rates, rather than historical rates, should be

of fee computation, a multiplier is typically applied to the lodestar." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004). "The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *In re Comverse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *5 (E.D.N.Y. June 24, 2010) ("Where ... counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar.").

Here, Lead Counsel (including attorneys, paralegals, and professional support staff) devoted a total of 6,150.25 hours to the prosecution of the Action, resulting in a lodestar of $3,827,986.50. ¶97.[19] Based on a 30% fee (equal to $4,470,000), Lead Counsel's lodestar of yields a multiplier of 1.17. This multiplier is well within the range of multipliers commonly awarded in securities class actions and other complex litigation. *See Wal-Mart*, 396 F.3d at 123 (upholding multiplier of 3.5 as reasonable on appeal); *Maley*, 186 F. Supp. 2d at 369 (awarding fee equal to a 4.65 multiplier, which was "well within the range awarded by courts in this Circuit and courts throughout the country"); *Burns v. Falconstor Software, Inc.*, 2014 WL 12917621, at *10 (E.D.N.Y. Apr. 10, 2014) (finding fee award of 33.3% "reasonable" based on cross-check multiplier of 4.75); *In re Bisys Sec. Litig.*, 2007 WL 2049726, at *3 (S.D.N.Y July 16, 2007) (finding a 2.99 multiplier "falls well within the parameters set in this district and elsewhere"); *Davis*, 827 F. Supp. 2d at 185 (awarding fee representing a multiplier of 5.3, which was "not atypical" in similar cases); *In re Elan Sec. Litig.,* 385 F. Supp. 2d 363, 376 (S.D.N.Y. 2005) (awarding multiplier of 3.47 in light of an early settlement).[20] Moreover,

---

applied in order to compensate for the delay in payment.").

[19] Lead Counsel's rates range from $925 to $1,195 for partners, and $395 to $750 for non-partners (¶98), and "are comparable to peer plaintiffs and defense-side law firms litigating matters of similar magnitude." *TAL Educ. Grp.*, 2021 WL 5578665, at *12 (approving GPM's *2021* rates of $600 to $995 for partners, and $500 to $750 for associates); *see also* Ex. 8 (chart of rates charged by peer plaintiff and defense counsel in complex litigation).

[20] *See also Colgate-Palmolive*, 36 F. Supp. 3d at 353 (awarding fee representing a multiplier of 5.2,

"[t]he fact that Class Counsel's fee award will not only compensate them for time and effort already expended, but for the time that they will be required to spend administering the settlement going forward, also supports their fee request." *Leach v. NBC Universal Media, LLC*, 2017 WL 10435878, at ¶49 (S.D.N.Y. Aug. 24, 2017); *see also Facebook,* 2015 WL 6971424, at *10.

Additionally, the 1.17 multiplier in this case is lower than the 1.79 mean multiplier for securities class actions identified by Eisenberg & Miller. *See* Eisenberg & Miller, 92 N.Y.U. Law Review at 965, Table 12. Thus, if anything, the lodestar cross-check in this case could warrant "a modest upward adjustment in the fee percentage," *City of Birmingham*, 2020 WL 7413926, at *4, but Lead Counsel only requests a fee of 30%.

In sum, Lead Counsel's requested fee award is well within the range of what courts in this and other Circuits regularly award in class actions such as this one, whether calculated as a percentage of the fund or in relation to Lead Counsel's lodestar.

## D.    Lead Counsel's Expenses Are Reasonable And Were Necessarily Incurred To Achieve The Benefit Obtained

"It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class." *Flag Telecom*, 2010 WL 4537550, at *30; *see also In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003) ("Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were 'incidental and necessary to the representation' of those clients.").

---

which was "large, but not unreasonable."); *Athale v. Sinotech Energy Ltd.*, 2013 WL 11310686, at *8 (S.D.N.Y. Sept. 4, 2013) (finding that courts routinely award lodestar multipliers of "between four and five"); *Guevoura Fund Ltd. Sillerman*, 2019 WL 6889901, at *18 (S.D.N.Y. Dec. 18, 2019) ("multipliers of between three and four times … have been routinely awarded in this Circuit."); *In re Interpublic Sec. Litig.*, 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 26, 2004) ("In recent years multipliers of between 3 and 4.5 have been common in federal securities cases."); *Asare v. Change Group of New York, Inc.*, 2013 WL 6144764, at *19 (S.D.N.Y. Nov. 18, 2013) ("Typically, courts use multipliers of 2 to 6 times the lodestar.").

Here, Lead Counsel incurred at total of $395,341.74 in out-of-pocket litigation expenses. ¶112. The expenses, and a categorization thereof, are attested to in the Linkh Declaration. *Id*. These expenses include, among others: (a) expert fees; (b) deposition costs; (c) on-line legal and factual research; (d) document management and hosting; (e) mediation fees; (f) travel costs; and (g) private investigator charges. ¶¶115-17. These expenses were critical to Plaintiffs' success in achieving the proposed Settlement, are reasonable in amount, and are customary and necessary expenses for a complex securities action. *See Signet Jewelers*, 2020 WL 4196468, at \*22. As such, they should be reimbursed. *Global Crossing*, 225 F.R.D. at 468 ("The expenses incurred – which include investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review – are the type for which 'the paying, arms' length market' reimburses attorneys. For this reason, they are properly chargeable to the Settlement fund.").

### E.    Plaintiffs Should Be Granted PSLRA Awards

In connection with its request for reimbursement of Litigation Expenses, Lead Counsel also respectfully requests PSLRA awards to Plaintiffs in the aggregate amount of $80,000 ($20,000 to Lead Plaintiff and $15,000 to each of the other four named Plaintiffs) for time spent prosecuting the Action. 15 U.S.C. § 78u-4(a)(4). "Court[s] have found that the PSLRA permits courts to award lead plaintiffs in federal securities actions reimbursement for their time devoted to participating in and directing the litigation on behalf of the class." *Guevoura*, 2019 WL 6889901, at \*22. Reimbursement of such costs are allowed because they "encourage[] participation of plaintiffs in the active supervision of their counsel." *Varljen v. H.J. Meyers & Co., Inc.*, 2000 WL 1683656, at \*5 n.2 (S.D.N.Y. Nov. 8, 2000).[21]

---

[21] *See also Moses v. New York Times Co*., 79 F.4th 235, 245 (2d Cir. 2023) (noting that class representatives "play an active role in the litigation – often providing the background information that forms the basis of the lawsuit, engaging in fact discovery, and devoting considerable time and effort into the settlement process[.]").

Here, each Plaintiff, *inter alia*, reviewed the pleadings and briefs filed in the Action, as well as court orders; regularly communicated with Lead Counsel about the litigation and the strengths and weaknesses of the case; responded to discovery and sat for deposition; were involved in settlement negotiations; and, after extensive discussions with Lead Counsel, authorized settlement of the case. *See* Ex. 2, at ¶¶3-6; Ex. 3, at ¶¶3-6; Ex. 4, at ¶¶3-6; Ex. 5, at ¶¶3-6; Ex. 6, at ¶¶3-6; *see also* Linkh Decl., ¶¶118-19. These are "precisely the types of activities that support awarding reimbursement of expenses to class representatives" (*see In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *21 (S.D.N.Y. Dec. 23, 2009)), and the amounts requested are consistent with awards in other complex cases. *See In re XL Fleet Corp. Sec. Litig.*, No. 1:21-cv-0200-JLR, ECF No. 198 (S.D.N.Y. April 30, 2024) (granting PSLRA award of $25,000 to Lead Plaintiff and awards of $15,000 to each of the other four Named Plaintiffs).[22] Consequently, Lead Counsel respectfully requests that the Court approve the awards.

## IV.    CONCLUSION

For the foregoing reasons, Lead Counsel respectfully requests that the Court grant the motion.

---

[22] *See also Veeco*, 2007 WL 4115808, at *12 (awarding lead plaintiff approximately $15,900 of $5.5 million settlement for time spent supervising litigation, and characterizing such awards as "routine" in this Circuit); *In re Bank of Am. Corp, Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 772 F.3d 125, 133 (2d Cir. 2014) (affirming award of over $450,000 to representative plaintiffs for time spent by their employees on the action); *Flag Telecom*, 2010 WL 4537550, at *31 (approving award of $100,000 to Lead Plaintiff for time spent on the litigation); *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *24 (S.D.N.Y. July 21, 2020) (collecting cases and awarding $25,410 to lead plaintiff); *In re Virgin Mobile USA IPO Litig.*, No. 07-cv-5619 (SDW), ECF No. 146 at ¶19 (D.N.J. Dec. 8, 2010) (PSLRA awards to co-lead plaintiffs of $29,370, $29,205, $30,000, and $25,245 respectively, for a combined total of $113,820) (Ex. 14); *In re Xcel Energy, Inc., Sec., Deriv. & ERISA Litig.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) ($100,000 collectively awarded to lead plaintiff group as reimbursement); *In re Qudian Inc. Sec. Litig.*, 2021 WL 2328437, at *2 (S.D.N.Y. June 8, 2021) (awarding lead plaintiff $25,000, and class representative $12,500).

25

Dated: June 5, 2024                    **GLANCY PRONGAY & MURRAY LLP**

                                       By:  */s/ Gregory B. Linkh*
                                       Gregory B. Linkh
                                       230 Park Avenue, Suite 358
                                       New York, New York 10169
                                       Telephone:  (212) 682-5340
                                       Email:  glinkh@glancylaw.com

                                       -and-

                                       **GLANCY PRONGAY & MURRAY LLP**
                                       Kara M. Wolke (admitted *pro hac vice)*
                                       Melissa C. Wright (admitted *pro hac vice)*
                                       1925 Century Park East, Suite 2100
                                       Los Angeles, California 90067
                                       Telephone: (310) 201-9150
                                       Email: kwolke@glancylaw.com
                                                mwright@glancylaw.com

                                       *Attorneys for Plaintiffs and the Proposed Settlement Class*

26

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed with the Clerk of

Court via the CM/ECF system, which will send Notice of such filing to all counsel of record.


Dated: June 5, 2024                              */s/ Gregory B. Linkh*
                                                  Gregory B. Linkh

27