**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ROMEO POWER INC. SECURITIES LITIGATION | Case No. 1:21-cv-03362-LGS |

**DECLARATION OF GREGORY B. LINKH IN SUPPORT OF: (I) PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF <u>LITIGATION EXPENSES</u>**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 2

II.   PROCEDURAL HISTORY/DISCOVERY ......................................................... 6

      A.    Initial Complaint and the Lead Plaintiff Process ...................................... 6

      B.    Amended Pleadings, and Defendants' Motion to Dismiss and Motion for
            Reconsideration and/or Clarification ........................................................ 7

      C.    Fact Discovery .......................................................................................... 8

      D.    Class Certification ................................................................................... 11

      E.    ABC Proceedings and Withdrawal of Romeo's Counsel ........................ 12

      F.    Settlement Negotiations ........................................................................... 12

      G.    Preliminary Approval of the Settlement .................................................. 13

III.  THE RISKS OF CONTINUED LITIGATION ................................................. 13

      A.    Risks Faced In Obtaining And Maintaining Class Action Status ............ 14

      B.    Risks To Proving Liability ...................................................................... 15

      C.    Risks to Proving Damages ....................................................................... 16

      D.    Risks Regarding The Financial Health Of Romeo .................................. 18

      E.    Other Risks, Including Trial And Appeals ............................................... 19

      F.    The Settlement Is Reasonable In Light Of The Potential Recovery ........ 19

IV.   PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL
      ORDER REQUIRING THE NOTICE PROGRAM ........................................... 20

V.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ........... 24

VI.   LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT
      OF LITIGATION EXPENSES ......................................................................... 28

      A.    The Fee Application ................................................................................. 29

            1.    The Outcome Achieved is the Result of the Significant Time and Labor
                  that Lead Counsel Devoted to the Action ...................................... 30

2.    The Significant Risks Borne by Lead Counsel ........................................ 32

3.    The Experience And Expertise Of Lead Counsel And The Standing And Caliber of Defendants' Counsel ................................................................ 34

4.    Public Policy Interests, Including The Need To Ensure The Availability Of Experienced Counsel In High-Risk Contingent Securities Cases ....... 35

5.    The Reaction Of The Settlement Class Supports Lead Counsel's Fee Request ...................................................................................................... 35

B.    Reimbursement Of The Requested Litigation Expenses Is Fair And Reasonable 36

VII.    CONCLUSION .......................................................................................................... 39

**TABLE OF EXHIBITS TO DECLARATION**

| Exhibit No. | Description |
|:---:|:---|
| 1 | Declaration of Melissa Mejia Regarding: (A) Mailing of Postcard Notice; (B) Publication of Summary Notice; (C) Report on Claims Received to Date; and (D) Report on Requests for Exclusion Received to Date |
| 2 | Declaration Of Lead Plaintiff Mike Castleberg In Support Of: (1) Plaintiffs' Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (2) Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses |
| 3 | Declaration Of Named Plaintiff Joshua Cante In Support Of: (1) Plaintiffs' Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (2) Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses |
| 4 | Declaration Of Named Plaintiff Nathaniel Tapia In Support Of: (1) Plaintiffs' Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (2) Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses |
| 5 | Declaration Of Named Plaintiff Artur Chimchirian In Support Of: (1) Plaintiffs' Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (2) Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses |
| 6 | Declaration Of Named Plaintiff Van Nguyen In Support Of: (1) Plaintiffs' Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (2) Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses |
| 7 | Declaration of Edward Flores from NERA Economic Consulting |
| 8 | Chart of Peer Law Firm Billing Rates |
| 9 | GPM firm resume |
| 10 | *Ernst v. Dish Network, LLC*, Case No. 1:12-cv-08794-LGS, ECF No. 237 (S.D.N.Y. Nov. 13, 2015) |
| 11 | *In re Ubiquiti Networks, Inc. Sec. Litig.*, No. 18-cv-01620 (VM), ECF No. 49 (S.D.N.Y. Mar. 27, 2020) |
| 12 | *In re L.G. Philips LCD Co. Sec. Litig.*, No. 1:07-cv-00909-RJS, ECF No. 82 (S.D.N.Y. Mar. 17, 2011) |
| 13 | *In re Am. Express Fin. Advisors Sec. Litig.*, No. 04 Civ. 1773 (DAB), ECF No. 170 (S.D.N.Y. July 18, 2007) |
| 14 | *In re Virgin Mobile USA IPO Litig.*, No. 07-5619 (SDW), ECF No. 146 (D.N.J. Dec. 8, 2010) |

I, Gregory B. Linkh, declare as follows:

1.    I am a partner at Glancy Prongay & Murray LLP ("GPM" or "Lead Counsel"), Court-appointed Lead Counsel for lead plaintiff Mike Castleberg ("Lead Plaintiff") and additional named plaintiffs Joshua Cante, Nathaniel Tapia, Artur Chimchirian, and Van Nguyen (collectively, with Lead Plaintiff, "Plaintiffs"), in the above-captioned action (the "Action").[1] I am admitted to practice in this District. I have personal knowledge of the facts stated herein and, if called upon as a witness, I could and would testify competently thereto.

2.    I respectfully submit this declaration, together with the attached exhibits, in support of Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation and the concurrently filed memorandum in support thereof ("Final Approval Motion"). As set forth in the Final Approval Motion, Plaintiffs seek final approval of the $14,900,000 Settlement for the benefit of the Settlement Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members.

3.    I also respectfully submit this declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and the concurrently filed memorandum in support thereof ("Attorneys' Fee Motion"). As set forth in the Attorneys' Fee Motion, Lead Counsel seeks an award of attorneys' fees in the amount of 30% of the Settlement Fund (which, by definition, includes interest accrued thereon), and reimbursement of Litigation Expenses in the total amount of $475,341.74, which includes Lead Counsel's out-of-pocket litigation costs of $395,341.74, and awards of $20,000 to Lead Plaintiff and $15,000 to each of the other four named plaintiffs pursuant to the Private Securities Litigation Reform Act of

---

[1] All capitalized terms, unless otherwise defined herein, have the same meaning as set forth in the Stipulation and Agreement of Settlement dated December 7, 2023 (the "Stipulation"). ECF No. 191-1.

1995 ("PSLRA") for their costs, including for time spent, incurred in connection with their representation of the Settlement Class.

4.    The Court preliminarily approved the proposed Settlement by Order dated January 30, 2024 (the "Preliminary Approval Order"), and therein directed notice of the Settlement to be disseminated to the Settlement Class. *See* ECF No. 197. Pursuant to the Preliminary Approval Order, Epiq Class Action & Claims Solutions, Inc. ("Epiq"), the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by mail and by publication. The details of the notice program are set forth in the Declaration of Melissa Mejia Regarding: (A) Mailing of Postcard Notice; (B) Publication of Summary Notice; (C) Report on Claims Received to Date; and (D) Report on Requests for Exclusion Received to Date ("Mejia Decl."), a true and correct copy of which is attached hereto as Exhibit 1.

5.    In total, notice of the Settlement has been disseminated to 238,737 potential Settlement Class Members and their nominees, and thus far, only one request for exclusion has been received by the Claims Administrator and no objections have been filed with the Court. *See* Mejia Decl., ¶¶10, 20.

## I.    INTRODUCTION

6.    This is a securities class action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act. On July 15, 2021, the Court appointed Mike Castleberg as Lead Plaintiff and approved his selection of GPM to serve as Lead Counsel. ECF No. 69. At the time of settlement, the operative complaint (the Second Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 135, the "SAC")), asserted claims against Romeo Power, Inc.

("Romeo" or the "Company"), Romeo's former CEO Lionel Selwood, Jr., and Romeo's former CFO Lauren Webb (the latter two are collectively the "Individual Defendants").[2]

7.      The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $14,900,000 (the "Settlement Amount") for the benefit of the Settlement Class. For the reasons set forth herein, I believe the proposed Settlement represents a fair and adequate result for the Settlement Class considering the case's procedural posture, ability to pay issues, and the significant risks of continued litigation.

8.      As explained in greater detail herein, this Settlement was reached only after a comprehensive inquiry into the merits of the claims alleged and the likely damages that could be recovered by the Settlement Class. Among other things, Lead Counsel:

- drafted and litigated a contested motion for consolidation and appointment of lead plaintiff pursuant to the PSLRA;

- conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) filings with the U.S. Securities and Exchange Commission ("SEC") by Romeo and RMG Acquisition Corp. ("RMG"), (ii) public reports, blog posts, research reports prepared by securities and financial analysts, online interviews with Romeo and RMG executives, and news articles concerning Romeo and RMG, (iii) investor call transcripts related to Romeo and RMG, (iv) press releases published by and regarding Romeo and RMG; (b) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, numerous interviews of former Company employees and other sources of relevant information; (c) consulting and working with an accounting expert to analyze Romeo's Settlement Class Period financial results; and (d) working with a damages and loss causation expert to analyze Romeo's stock price movements;

- utilized the foregoing comprehensive investigation and additional research to draft and file the detailed 79-page (226-paragraph) FAC, which included, among other things: (a) evidence from a confidential witness obtained by Lead Counsel's private

---

[2] The Court's June 2, 2022, Opinion and Order ("MTD Order") granted in part, and denied in part, defendants' motion to dismiss Plaintiffs' Amended Class Action Complaint for Violations of the Federal Securities Laws (the "FAC"). *See* ECF No. 107; *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303 (S.D.N.Y. June 2, 2022). More specifically, the MTD Order dismissed claims brought under Section 14(a) of the Exchange Act, as well as Section 20(a) claims against Robert S. Mancini, D. James Carpenter, Philip Kassin, Steven P. Buffone, W. Grant Gregory, W. Thaddeus Miller, and Craig Broderick.

3

investigator; (b) an expanded class period; (c) additional false statements; (d) new theories concerning the falsity behind Defendants' statements; and (e) an added count under Section 14(a) of the Exchange Act;

- researched, drafted, and filed an opposition to defendants' motion to dismiss the FAC, after which the Court denied defendants' motion in part (ECF 107; *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303 (S.D.N.Y. June 2, 2022);

- researched, drafted, and filed an opposition to the motion for reconsideration and/or clarification of the Court's MTD Order filed by the Individual Defendants and Romeo, which the Court denied in its entirety (ECF No. 124; *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022);

- engaged in substantial discovery, which entailed, *inter alia*: (a) exchanging initial disclosures; (b) negotiating a protective order and ESI protocol, both of which were subsequently entered by the Court; (c) serving two sets of requests for production of documents, one set of interrogatories, and one set of requests for admissions; (d) responding to one set of requests for production of documents (including the production of approximately 6,298 pages of documents), one set of interrogatories to each Plaintiff and a second set of interrogatories to all Plaintiffs; (e) serving eight subpoenas *duces tecum* on various third parties, including Romeo's purported battery cell suppliers; (f) conducting a targeted review and analysis of the approximately 2,227,554 pages of documents produced by Defendants and third parties; (g) defending the depositions of Lead Plaintiff and the four other named plaintiffs; and (h) meeting and conferring with Defendants' counsel regarding various discovery issues;

- engaged in a full-day, in-person mediation session in New York overseen by a highly experienced third-party mediator, former federal district court judge Layn Phillips, which involved an exchange of written submissions concerning the facts of the case, liability, and damages, and did not result in a settlement agreement at that time;

- fully briefed Plaintiffs' motion for class certification, a process that entailed, *inter alia*: (a) filing an opening brief, together with the expert report of Dr. Matthew Cain regarding market efficiency (ECF Nos. 147-49); (b) defending the depositions of each of the five proposed class representatives and Plaintiffs' market efficiency expert; and (c) filing a reply brief and opposition to Defendants' letter motion requesting leave to file a sur-reply;

- retained and consulted with bankruptcy counsel after Romeo commenced an "assignment for the benefit of creditors" proceeding (the "ABC Proceeding")—the state court functional equivalent of a bankruptcy—and filed a class claim in the ABC Proceeding;

- participated in another full-day, in-person mediation with Judge Phillips in Newport Beach, California, before which the Parties exchanged supplemental mediation statements and exhibits on the issues of liability and damages, that culminated in Judge Phillips presenting a mediator's recommendation that the Action be settled for $14,900,000, which the Parties accepted;

- negotiated a detailed confidential Term Sheet with the Individual Defendants' counsel,

4

which was executed on or about August 8, 2023;

- worked with a consulting damages expert to craft a plan of allocation that treats Plaintiffs and all other members of the proposed Settlement Class fairly;

- prepared the initial draft, and negotiated the terms, of the Stipulation (including the exhibits thereto) and the Supplemental Agreement;

- drafted the preliminary approval motion and supporting papers and appeared at the telephonic preliminary approval hearing;

- revised the notice documents as requested by the Court and worked with the Court appointed Claims Administrator to provide notice to the Settlement Class; and

- drafted the motion for final approval and supporting papers.

9. Based on the foregoing efforts, Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents an extremely favorable outcome for the Settlement Class and is in the best interests of its members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Plaintiffs and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

10. In addition to seeking final approval of the Settlement, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Plaintiffs' consulting damages expert. The Plan of Allocation provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.

11. Finally, Lead Counsel seeks approval of the request for attorneys' fees and reimbursement of Litigation Expenses as set forth in the Attorneys' Fee Motion. As discussed in

detail in the Attorneys' Fee Motion, the requested 30% fee is within the range of percentage awards granted by courts in this Circuit and throughout the country in comparable securities class actions. Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and warranted in light of the extent and quality of the work performed and the substantial result achieved. Likewise, the requested out-of-pocket litigation costs of $395,341.74, and the requested reimbursement of costs pursuant to the PSLRA, including lost wages and time, in the aggregate amount of $80,000 to Plaintiffs, are also fair and reasonable. Accordingly, for the reasons set forth in the Attorneys' Fee Motion and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for attorneys' fees and reimbursement of Litigation Expenses should be approved.

## II.    PROCEDURAL HISTORY/DISCOVERY

### A.    Initial Complaint and the Lead Plaintiff Process

12.    On March 8, 2021, plaintiff Travis Nichols commenced an action in this Court styled *Nichols v. Romeo Power, Inc.. et al.*, Case No. 21-cv-3362 (S.D.N.Y.). ECF No. 12. On May 6, 2021, plaintiff Victor J. Toner commenced an action styled *Toner v. Romeo Power, Inc.. et al.*, Case No. 21-cv-4058 (S.D.N.Y.).

13.    Movant Mike Castleberg filed a motion for appointment of Lead Plaintiff on June 15, 2021, with GPM as his choice of to serve as lead counsel. ECF No. 25. Mr. Castleberg submitted further briefing on June 28, 2021, ECF No. 58, and submitted a letter to the Court on July13, 2021. ECF No. 63.

14.    After a contested leadership process, on July 15, 2021, the Court consolidated the *Nichols* and *Toner* cases, appointed Mike Castleberg as Lead Plaintiff, and approved his selection of GPM to serve as Lead Counsel. ECF No. 69.

6

### B.   Amended Pleadings, and Defendants' Motion to Dismiss and Motion for Reconsideration and/or Clarification

15.    Following its appointment as Lead Counsel, GPM conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) filings with the U.S. Securities and Exchange Commission ("SEC") by Romeo and RMG, (ii) public reports, blog posts, research reports prepared by securities and financial analysts, online interviews with Romeo and RMG executives, and news articles concerning Romeo and RMG, (iii) investor call transcripts related to Romeo and RMG, (iv) press releases published by and regarding Romeo and RMG; (b) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, numerous interviews of former Company employees and other sources of relevant information; (c) working with an accounting expert to analyze Romeo's Settlement Class Period financial results; and (d) working with a damages and loss causation expert to analyze Romeo's stock price movements.

16.    On August 15, 2021, Lead Plaintiff and additional named plaintiff Joshua Cante filed the 79-page (226-paragraph) FAC. ECF No. 82. Lead Counsel bolstered the initial complaints with, among other things: (a) evidence from a confidential witness obtained by Lead Counsel's private investigator; (b) an expanded class period; (c) additional false statements; (d) new theories concerning the falsity behind Defendants' statements; and (e) an added count under Section 14(a) of the Exchange Act.

17.    On November 5, 2021, defendants moved to dismiss the FAC. ECF No. 90. On December 3, 2021, Plaintiffs opposed this motion, arguing that the FAC: (a) alleged actionable false or misleading statement and omissions, (b) alleged a strong inference of scienter; (c) stated actionable claims under Section 14(a) of the Exchange Act; and (d) adequately pled control person liability. ECF No. 96. Defendants replied on December 17, 2021. ECF No. 100. On June 2, 2022,

7

the Court granted in part, and denied in part, defendants' motion. ECF No. 107; *In re Romeo Power Inc.. Sec. Litig.*, 2022 WL 1806303 (S.D.N.Y. June 2, 2022). The Section 14(a) claim, and the Section 20(a) claim based on the Section 14(a) claim were dismissed, but the Section 10(b) claim against Romeo, Selwood, and Webb survived, as well as the Section 20(a) claim based on the surviving 10(b) claim.

18.     On July 14, 2022, the remaining Defendants filed an answer to the Amended Complaint. ECF No. 118.

19.     On June 16, 2022, Defendants Romeo, Selwood, and Webb (hereinafter, collectively, Defendants") moved for reconsideration and/or clarification of the MTD Order. ECF No. 111. Defendants argued that the court, in denying the motion to dismiss, erred in considering only one group of misstatements, and not the other two. Plaintiffs opposed this motion, ECF No. 117, and the Court denied this motion in its entirety on August 25, 2022. ECF No. 124; *In re Romeo Power Inc.. Sec. Litig.*, 2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022).

20.     On January 5, 2023, Plaintiffs filed a letter requesting a pre-motion conference with the Court to seek leave to file a motion to add other named plaintiffs in the Action. ECF No. 131. On that same day, the Court directed Plaintiffs to file a second amended complaint naming the additional plaintiffs. ECF No. 132. On January 17, 2023, Plaintiffs filed the SAC, which was substantively similar to the FAC, but added named plaintiffs Nathaniel Tapia, Artur Chimchirian, and Van Nguyen. ECF No. 135. Defendants answered the SAC. ECF No. 137.

C.     **Fact Discovery**

21.     Following the denial of the motion to dismiss, the Parties initiated discovery. On June 24, 2022, the Court entered, with modifications, the Parties' proposed Civil Case

8

Management Plan and Scheduling Order. ECF No. 115. This Case Management Plan and Scheduling Order was amended on January 5, 2023. ECF No. 133.

22.     On July 21, 2022, the Parties filed proposed stipulations regarding ESI and a protective order. ECF Nos. 119, 120. These stipulations were so ordered on July 22, 2022. ECF Nos. 121, 122.

23.     On July 7 and 8, 2022, the Parties exchanged initial disclosures.

24.     On July 8, 2022, Plaintiffs propounded their first set of requests for production of documents. The Defendants served their responses and objections to Plaintiffs' requests for production of documents on August 8, 2022. Pursuant to these requests, as well as requests to third parties, approximately 2,227,554 pages of documents were produced to Plaintiffs.  Lead Counsel conducted targeted review and analyses of these documents.

25.     On August 19, 2022, the Defendants propounded their first set of requests for production of documents on Plaintiffs. Plaintiffs served their responses and objections to the requests for production of documents on September 26, 2022. Pursuant to these requests, as well as requests to the additional named plaintiffs, Plaintiffs produced 6,298 documents.

26.     On November 14, 2022, Defendants propounded their first set of interrogatories on Plaintiffs. Plaintiffs served responses and objections to the first set of interrogatories on December 14, 2022.

27.     On December 9, 2022, Plaintiffs served a notice of deposition pursuant to Rule 30(b)(6) on Romeo. Romeo served objections to the topics identified in the notice on January 3, 2023. The Parties agreed to defer the Rule 30(b)(6) deposition of Romeo until after the mediation scheduled for March 23, 2023. Prior to the mediation, the Parties also discussed the names and/or

9

job titles of witnesses Plaintiffs may be interested in deposing, but did not schedule any depositions at that time in light of the pending mediation.

28. On December 19, 2022, Plaintiffs served a subpoena for inspection of premises on Romeo. Romeo served objections to the subpoena on January 3, 2023.

29. On December 21, 2022, Plaintiffs served Defendants with notices of subpoenas for three third parties to this Action.

30. On December 29, 2022, Defendants served notices of depositions for plaintiffs Mike Castleberg and Joshua Cante.

31. On January 13, 2023, Defendants propounded their first set of requests for production of documents and their first set of interrogatories on plaintiffs Nathaniel Tapia, Artur Chimchirian, and Van Nguyen.

32. On February 28, 2023, Defendants served notices of depositions for Plaintiffs Nathaniel Tapia, Artur Chimchirian, and Van Nguyen, as well as amended deposition notices for Plaintiff Mike Castleberg and Joshua Cante. Each of these Plaintiffs were deposed.

33. On May 4, May 11, May 17, and May 22, 2023, counsel for Plaintiffs contacted counsel for Defendants in an attempt to meet and confer regarding the 30(b)(6) deposition. During that time, defense counsel represented that they were attempting to resolve the matters regarding their ongoing representation of Romeo.

34. On May 24, 2023, defense counsel met and conferred with Lead Counsel, and informed Lead Counsel that Latham & Watkins LLP ("Latham") anticipated withdrawing as counsel for Romeo. Later that day, Latham filed a motion for leave to withdraw from representing Romeo.

35.     On May 26, 2023 Plaintiffs served a second set of requests for production, a first set of interrogatories, and a first set of requests for admission on all Defendants. Plaintiffs served these requests on Latham and on the Chief Legal Officer of Nikola Corporation, the then parent company of Romeo.

36.     On June 13, June 16, June 19, and June 28, 2023, Plaintiffs noticed depositions for several former Romeo employees. Counsel for the Parties had been in communication regarding the scheduling of these depositions, however, due to the uncertainty of whether Romeo would retain new counsel (*see infra*) the Parties had not scheduled these depositions at the time of settlement.

### D.     Class Certification

37.     On February 10, 2023, Plaintiffs filed their pre-motion conference letter regarding class certification. ECF No. 140. On February 16, 2023, the Court so-ordered the Parties' stipulated class certification briefing schedule. ECF No. 142. On March 1, 2023, Plaintiffs filed their motion for class certification and related documents. ECF Nos. 147-49.

38.     This motion included the expert report of Dr. Matthew Cain, who performed detailed statistical analyses to demonstrate that: (a) Romeo stock traded in an efficient market throughout the putative class period: and (b) damages could be calculated using a common class-wide methodology. ECF No. 149-2.

39.     Defendants took the Deposition of Dr. Cain on April 11, 2023. On April 19, 2023, the Defendants filed their opposition to Plaintiffs' class certification motion. ECF No. 156. On May 3, 2023, Plaintiffs filed their reply in further support of class certification. ECF Nos. 157-58. This motion had not been decided by the time the settlement was reached.

### E.     ABC Proceedings and Withdrawal of Romeo's Counsel

40.     On June 6, 2023, the Court granted Latham's motion to withdraw from representing Romeo, and ordered Romeo to retain new counsel and appear no later than June 30, 2023. ECF No. 173. No new counsel appeared for Romeo by the Court-ordered deadline.

41.     On June 30, 2023, Romeo's insolvency counsel informed Latham that Romeo has commenced an "assignment for the benefit of creditors" proceeding (the "ABC Proceeding"), which is functionally the state court equivalent of a bankruptcy. Thereafter, Lead Counsel retained and consulted with bankruptcy counsel.  Among other things, Lead Counsel filed a class claim in the ABC Proceeding.[3]

42.     On July 3, 2024, the Parties sent a joint status letter to the Court which, *inter alia*, informed the court of the ABC Proceeding. ECF No. 174.

43.     On July 10, 2023, the Court ordered that new counsel for Romeo appear by July 31, 2023. ECF No. 175. No such counsel ever appeared.

44.     On August 2, 2023, the Court instructed Plaintiffs to obtain a certificate of default against Romeo, and to meet-and-confer to determine the appropriate time to move for default judgment. ECF No. 179.

45.     On August 21, 2023, the Clerk's Certificate of Default against Romeo was filed.  ECF No. 186.

### F.     Settlement Negotiations

46.     On March 23, 2023, Lead Counsel and counsel for Defendants participated in a full-day private mediation session before former federal district court judge Layn Phillips, in

---

[3] Based on my understanding, it is unlikely that the class claim filed in the ABC Proceeding will result in additional funds for the Settlement Class, but if it does, those funds will be distributed to the proposed Settlement Class on a pro rata basis in accordance with the proposed Plan of Allocation.

12

Latham's New York offices. In advance of that session, the Parties exchanged, and provided to Judge Phillips, detailed mediation statements and exhibits, which addressed the issues of both liability and damages. This mediation session did not result in an agreement to settle.

47. On August 8, 2023, the Parties engaged in a second full-day mediation session before Judge Phillips in Newport Beach, California. Prior thereto, the Parties exchanged supplemental mediation statements and exhibits, which addressed the issues of both liability and damages, as well as the financial position of the Romeo. This mediation culminated in Judge Phillips presenting a mediator's recommendation that the Action be settled for $14,900,000, which the Parties accepted.

48. The Parties thereafter memorialized the substantive terms of the settlement in a confidential Term Sheet, executed on or about August 8, 2023, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers. The Stipulation was executed on December 7, 2023. ECF No. 191-1.

**G.      Preliminary Approval of the Settlement**

49. On December 8, 2023, Plaintiffs filed their Unopposed Motion for Preliminary Approval of Class Action Settlement.  ECF No. 190.

50. On January 10, 2024, this Court held a telephonic hearing concerning the Motion for Preliminary Approval.

51. On January 30, 2024, the Court issued the Preliminary Approval Order.  ECF No. 197.

**III.    THE RISKS OF CONTINUED LITIGATION**

51. The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $14.9 million. As explained more fully below,

there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals.

### A.      Risks Faced In Obtaining And Maintaining Class Action Status

52.      At the time the Settlement was reached, Plaintiffs' motion for class certification was fully briefed. While Lead Counsel researched and analyzed class certification and is confident that the Court would have certified the proposed class, Plaintiffs bear the burden of proof on class certification, and Defendants raised numerous arguments challenging the propriety of class certification. Among other things, Defendants argued that each of the proposed class representatives were neither typical nor an adequate representative, and that the proposed class period was not appropriate. *See* ECF No. 156.

53.      Moreover, even if Plaintiffs' successfully obtained class certification, Defendants could have sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery. Certification of the Settlement Class Period (*i.e.*, October 5, 2020 – August 16, 2021, inclusive) was, by no means, a forgone conclusion.

54.      Additionally, a relatively recent ruling by the United States Supreme Court has made obtaining class certification for Plaintiffs more difficult. In *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113 (2021), the Supreme Court held, in part, that when defendants are seeking to rebut the presumption of reliance established under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), as modified by *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014), courts may consider the generic nature of an alleged misrepresentation as evidence of lack of price impact. More specifically, courts are directed to consider "*all* record

evidence relevant to price impact" at the class certification stage. *Goldman Sachs Grp.*, 594 U.S. at 122-124 (emphasis in the original). "Price impact" was, in fact, one of the arguments Defendants raised in opposing class certification.  *See* ECF 156, at 13-14, n. 6.

**B.      Risks To Proving Liability**

55.      In addition to the hurdle of obtaining and maintaining class action status, Plaintiffs and Lead Counsel faced numerous additional risks at summary judgment and trial, including establishing Defendants' liability. Defendants forcefully argued in their motions to dismiss—and undoubtedly would have continued to argue at summary judgment and/or trial—that Plaintiffs could not establish the required elements of their Exchange Act claims.

56.      First, Defendants would continue to assert that they made no actionable misrepresentations under the federal securities laws. Among other things, Defendants would continue to argue that: (a) there was no previously-known supply chain crisis preventing the Company from meeting its stated revenue guidance, and the mere fact Romeo was unable to obtain the full volume production as anticipated does not constitute falsity; (b) the statements about Romeo's ability to fulfill its backlog were accurate at the time they were made and the supply issues were unforeseeable and only temporary; (c) the Company's forward-looking statements concerning Romeo's backlog were protected by the PSLRA safe harbor; and (d) alleged misstatements about the number of cell suppliers was not actually false because Romeo was technically working with each of the four suppliers.

57.      The Individual Defendants would also likely contest scienter, arguing that both Individual Defendants ***increased*** their Romeo stock holdings during the class period. The Individual Defendants would further challenge scienter by arguing that a non-fraudulent

15

inference—that the unforeseeable shortage of supplies and operations disruptions were a direct impact of the COVID-19 pandemic—was more plausible.

58.    Even if Plaintiffs' claims survived a motion for summary judgment, which was not guaranteed, there is a significant risk that they would not be able to prove their case before a jury. In this complex securities litigation relating to matters such as: (a) technical issues concerning battery cell supply; and (b) supply chain logistics in the middle of the COVID-19 pandemic, there is a risk that a jury would not understand Plaintiffs' theories of the case and the theories' intersection with economic and statistical analyses that undergird causation and damages issues. This is compounded by the fact that Plaintiffs would be forced to tell their story to the jury through Defendants' documents and adverse witnesses. Conversely, Defendants would be able to obtain testimony from the Individual Defendants themselves, as well as many other witnesses who may support Defendants' narrative.

### C.    Risks to Proving Damages

59.    Even if Plaintiffs were successful in establishing liability, they would still face substantial risks in establishing damages on a class wide basis. Here, Plaintiffs alleged two disclosure dates: (a) March 30, 2021 (when Romeo reported that a supposedly "unexpected limitation on cell availability" caused Romeo to miss 2020 revenue by 18%, that Romeo's 2021 revenue estimate would be slashed by 71-87% and that Romeo only had two, not four battery cell suppliers); and (b) August 16, 2021 (when Romeo announced yet another quarter hampered by a lack of cells, second quarter revenue 69% below consensus estimates, and a backlog reduction of nearly 20%).

60.    Defendants would have no doubt contested each of these corrective disclosures. For example, in their opposition to class certification, Defendants argued that "the proposed Class

16

Period is too long" because Romeo did "did not disclose any new information related to the alleged misstatements on August 16, 2021"; that "[a]t most, the August 16, 2021 announcement informed the market that Romeo's supply situation remains the same"; and that "this did not 'correct' anything." ECF No. 156 at 2, 12. Thus, according to Defendants, "the Class Period should end after the alleged disclosure on March 30, 2021" (*id*. at 2); and, by extension, Plaintiffs could not have suffered any damages as the result of August 16, 2021, disclosures. *See* ECF No. 91 (Defendants' Mot. to Dismiss), p.16 n.12 ("Plaintiffs' attempt to characterize the August 16, 2021 earnings call as a 'materialization of the further impact of the supply shortage' is a legally flawed attempt to seize on further stock price declines that bear no relation to the alleged misstatements."). Had Defendants prevailed on this argument, class wide damages would have been reduced from reduced from over $221 million to approximately $164.7 million, or possibly even less once Defendants' expert weighed in.

61.     Defendants would have also challenged the alleged March 30, 2021, corrective disclosure. In this regard, Plaintiffs believe Defendants would have argued, among other things, that much of the stock price drop on March 30th was attributed to confounding factors other than the alleged fraud. For example, on March 30th, Defendants: (a) reported 2020 revenue of only $8.97 million, falling short by more than $2 million (approximately 18%) of Romeo's $11 million projection; (b) disclosed that Romeo's production had been hampered by "a significant shortfall" in the supply of battery cells and that its estimated 2021 revenue would thus be reduced by approximately 71-87% (from $140 million down to a range of only $18 to $40 million); and (c) admitted that Romeo had two, not four, battery suppliers. *See* SAC, ¶¶8-10, 89-93. While Plaintiffs believe that these three disclosures were all intertwined and the cause of the stock price decline, Defendants would no doubt argue that they weren't, and that some or all of the March 31,

17

2021 drop was due, not to the alleged fraud, but to the ongoing supply chain impacts of the COVID-19 pandemic.  In support of this argument, Defendants would present evidence that "others in the industry, including Lightning eMotors, Inc., Nikola Corporation, and Tesla, experienced similar disruptions, sometimes on very short notice." ECF No. 91 at p.6 (citing, *inter alia*, Ex. 9, Lightning Q2 2021 Presentation at 12 ("[Battery] [s]uppliers are not meeting committed delivery dates, sometimes with only 3 days of warning, due to cell shortages, labor shortages, and other part shortages").

62.    If the trier of fact was to accept Defendants' arguments, it would be Plaintiffs' burden to disaggregate the corrective disclosures from purportedly non-relevant information (*see In re Flag Telecom Holdings, Ltd. Sec. Litig*., 574 F.3d 29, 36 (2d Cir. 2009)).  This creates additional risk because, like all damages issues, the trier of fact would have had to decide them based on expert testimony.

### D.    Risks Regarding The Financial Health Of Romeo

63.    Even if Plaintiffs were to overcome Defendants' loss causation and damages arguments and prevail at trial, such a victory would not have guaranteed the Settlement Class an ultimate recovery larger than $14.9 million.  The June 2023 ABC Proceeding on behalf of Romeo made the Company insolvent, and the Individual Defendants lacked the financial resources to fund a materially larger settlement. As such, any recovery would have been, practically speaking, limited to funds that could be obtained from the D&O policies. The funds from these policies were likely to shrink rapidly due to further litigation of this case and others, including an SEC investigation, and derivative action. If the Action did not settle when it did, it is likely that much, or all, of the remaining insurance proceeds would be eaten up by Defendants' Counsel's fees and/or settlement proceeds for the other actions.

### E.   Other Risks, Including Trial And Appeals

64.   Plaintiffs would have had to prevail at several stages of litigation, each of which would present significant risks. Lead Counsel knows from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured. For instance, in 2018, I personally, along with several other GPM attorneys, were lead trial counsel in a six-week antitrust jury trial in the Northern District of California. After five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs, the jury ruled for defendants. *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.). Put another way, complex litigation is uncertain, and success in cases like this one is never guaranteed.

65.   Even if Plaintiffs succeeded in proving all elements of their case at trial and obtained a jury verdict, Defendants would almost certainly have appealed. An appeal not only would have renewed risks faced by Plaintiffs—as Defendants would have reasserted their arguments summarized above—but also would have resulted in significant additional delay and increased litigation costs. Given these significant litigation risks, Plaintiffs and Lead Counsel believes the Settlement represents an excellent result for the Settlement Class.

### F.   The Settlement Is Reasonable In Light Of The Potential Recovery

66.   In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable considering the potential recovery of available damages.  Plaintiffs' damages expert estimates that *if* the Court certified the proposed class period, *if* Plaintiffs fully prevailed on all their claims at summary judgment and after a jury trial, and *if* the Court and jury accepted Plaintiffs' damages theory—*i.e.*, Plaintiffs' ***best-case scenario***—the total ***maximum*** damages

19

*potentially* available in this Action would be approximately $221.7 million. However, as detailed above, the Individual Defendants had several arguments with respect to the alleged corrective disclosure dates that had been asserted in their opposition to Plaintiffs' motion for class certification, and that would have no doubt been asserted at summary judgment and trial.  If, for example, the trier of fact found that the August 16, 2021, disclosure date was not applicable—as argued in Defendants' opposition to Plaintiffs' motion for class certification, Plaintiffs' potential damages would have been reduced to approximately $164.7 million.  Thus, the $14.9 million Settlement represents a recovery of 6.7% ($14.9/$221.7) to 9.0% ($14.9/$164.7) of maximum potential damages.  Such a recovery is: (i) well above the 1.8% median recovery in securities class actions settled in 2023; and (ii) nearly *two and half to three times* higher than the 2.7-2.9% median recovery in securities cases with similar damages that settled between January 2014 and December 2023.  *See* Ex. 7-C (NERA Report, at 26 (Fig. 22) (median recovery in securities class actions in 2023 was approximately 1.8% of estimated damages); at 25, Fig. 21 (median recovery for securities class actions that settled between January 2014 and December 2023 was 2.9% for cases with estimated damages between $100-$199 million and 2.7% for those with estimated damages of $200-$399 million)).

## IV.     PLAINTIFFS'  COMPLIANCE  WITH  THE  COURT'S  PRELIMINARY APPROVAL ORDER REQUIRING THE NOTICE PROGRAM

68.    The Preliminary Approval Order directed that the postcard notice highlighting key information regarding the proposed Settlement (the "Postcard Notice") be disseminated to the Settlement Class, in addition to the online posting of the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and Proof of Claim and

20

Release Form (the "Claim Form"), and the publication of the Summary Notice.[4] ECF No. 197. The Preliminary Approval Order also set a deadline of June 19, 2024 (21 calendar days prior to the final fairness hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Attorneys' Fee Motion or to request exclusion from the Settlement Class and set a final fairness hearing date of July 10, 2024 (the "Settlement Hearing").

69.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed Epiq, the Court-approved Claims Administrator, to begin disseminating copies of the Postcard Notice and publish the Summary Notice. Contemporaneously with the mailing of the Postcard Notice, Lead Counsel instructed Epiq to post downloadable copies of the Notice and Claim Form online at www.RomeoPowerSecuritiesSettlement.com (the "Settlement Website"). Upon request, Epiq mailed copies of the Notice and/or Claim Form to Settlement Class Members and will continue to do so until the deadline to submit a Claim Form has passed.

70.    The Postcard Notice directed Settlement Class Members to the Settlement Website to obtain additional information on the Settlement, including how to file a claim and access to downloadable versions of the Notice and Claim Form. The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of a Settlement Class Member's right to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Attorneys' Fee Motion, or to exclude themselves from the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund, and for reimbursement of Litigation

---

[4] Copies of the Postcard Notice, Notice and Claim Form are attached as Exhibits 1-A, 1-B, 1-C to the Mejia Declaration.

Expenses in an amount not to exceed $566,000, which may include an application for reimbursement of the reasonable costs and expenses incurred by Plaintiffs related to their representation of the Settlement Class in an aggregate amount not to exceed $80,000. Ex. 1-B (Notice), ¶58.

71.     On January 11, 2024, Epiq received files from Lead Counsel containing the names and addresses of potential Settlement Class Members from Romeo's transfer agent. Additionally, on January 17, 2024, Epiq received from Lead Counsel, the names and addresses of Romeo shareholders who contacted Lead Counsel during the pendency of this Action. Mejia Decl., at ¶3.

72.     Epiq maintains and updates an internal list of the largest and most common banks, brokers, and other nominees ("Broker Mailing Database"). At the time of the initial mailing, Epiq's internal broker list contained 991 mailing records.

73.     On February 28, 2024, Epiq caused the Postcard Notice to be sent by first class mail to the combined 1,295 addresses whose mailing records were contained in the Broker Mailing Database, or were provided by Lead Counsel. *Id.* at ¶5.

74.     Through May 29, 2024, Epiq mailed an additional 61,994 Postcard Notices to potential members of the Settlement Class based on requests received from individuals, entities, or nominees requesting that Postcard Notices be mailed to such persons or entities. Epiq also mailed another 181,721 unaddressed Postcard Notices to nominees that requested Postcard Notices for forwarding to their customers. Each mailing request was responded to in a timely manner, and Epiq will continue to respond timely to any additional requests received. *Id.* at ¶7.

75.     As of May 28, 2024, an aggregate of 245,010 Postcard Notices have been disseminated to potential Settlement Class Members and nominees by first-class mail. In addition, Epiq has re-mailed 951 Postcard Notices to persons whose original mailing was returned by the

22

U.S. Postal Service and for whom updated addresses were obtained through the U.S. Postal Service National Change of Address database.  As of May 28, 2024, a total of 6,435 Postcard Notices remain undeliverable. *Id.* at ¶8.

76.    In sum, not including the 6,435 Postcard Notices that remain undeliverable, as of May 28, 2024, a total of 238,737 Postcard Notices and Notices and Proof of Claim Forms have been disseminated to potential Settlement Class Members and nominees by first-class mail. *Id.* at ¶10.

77.    On February 12, 2024, in accordance with the Preliminary Approval Order, Epiq caused the Summary Notice to be published in INVESTOR'S BUSINESS DAILY and to be transmitted once over the PR NEWSWIRE. *Id.* at ¶12, and Ex. 1-D (copies of publication confirmations).

78.    Lead Counsel also caused Epiq to establish the Settlement Website, which became operational on February 12, 2024, and maintained a toll-free telephone number to provide Settlement Class Members with information concerning the Settlement.  At the Settlement Website, Settlement Class Members can submit a claim online, and review or download copies of the Notice, Claim Form, Plan of Allocation, Stipulation, Preliminary Approval Order, and the SAC.  Mejia Decl. at ¶¶13-17.

79.    As of May 28, 2024, Epiq has received a total of 1,013 calls to the toll-free number, all promptly responded to, and there have been 16,699 unique visitors to the Settlement Website. Mejia Decl. at ¶¶15, 18.

80.    The deadline for Settlement Class Members to object to the Settlement, Plan of Allocation, and/or to the Attorneys' Fee Motion, or to request exclusion from the Settlement Class is June 19, 2024. To date, only one request for exclusion have been received. *Id.* at ¶20, Ex. 1-F. Epiq will file a supplemental affidavit after the June 19, 2024, opt-out deadline addressing whether

any additional requests for exclusion have been received. In addition, to date, no objections to the Settlement or the Plan of Allocation have been entered on this Court's docket or have otherwise been received by Lead Counsel. Lead Counsel will file reply papers by July 3, 2024, that will address any objections that may be received.

## V.  ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

81.  Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $14.9 million Settlement Amount, plus interest earned thereon less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court (which may include reimbursement to Plaintiffs for costs and expenses incurred in representing the Settlement Class); and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information postmarked no later than May 29, 2024. *See id.*, Ex. 1-B (Notice), p. 3 & ¶44. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court. *Id.* at ¶46.

82.  The proposed Plan of Allocation is summarized in the Notice (*see* Ex. 1-B, at ¶¶55-57), and posted as a separate document in full on the Settlement Website.  *See* Ex. 1-E (Plan of Allocation). The objective of the Plan of Allocation is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a proximate result of the alleged violations of the Exchange Act, as opposed to losses caused by market, industry.

83.  The Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act and reflects an assessment of the damages that Plaintiffs contend could have been recovered under the theories of liability and damages asserted in the Action. More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation

that the prices of Romeo securities were artificially inflated during Settlement Class Period due to Defendants' alleged materially false and misleading statements and omissions.

84.    Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *Id.* at ¶23.

85.    The proposed Plan of Allocation, developed by one of Plaintiffs' economic expert consultants working in conjunction with Lead Counsel, is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act, and reflects an assessment of the damages that Plaintiffs contend could have been recovered under the theories of liability and damages asserted in the Action.  More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation that the prices of Romeo Securities were artificially inflated during the Settlement Class Period due to Defendants' alleged materially false and misleading statements and omissions.  Plaintiffs allege that corrective disclosures removed the artificial inflation in the prices of Romeo Securities on March 31, 2021 and August 17, 2021 (the "Corrective Disclosure Dates").[5] *See* Ex. 1-E (Plan of Allocation), ¶5.  At the time of the first Corrective Disclosure Date, the only Romeo Securities that remained outstanding were Romeo Common Stock and Romeo Warrants.

86.    Plaintiffs' consulting damages expert reviewed publicly available information regarding Romeo and performed statistical analyses of the price movements of Romeo Securities relative to the price performance of market and peer indices during the Settlement Class Period.

---

[5] The alleged corrective disclosures were made after the market closed on March 30, 2021 and August 16, 2021.

From this data, she calculated the alleged artificial inflation by isolating the losses in Romeo Securities that resulted from the alleged violations of the federal securities laws, eliminating losses attributable to market factors, industry factors, or alleged Company-specific factors unrelated to the alleged violations of law.  The amount of artificial inflation in Romeo Common Stock and Romeo Warrants on each day of the Settlement Class Period is set forth in Table 1 in the Plan of Allocation. *See* Ex. 1-E (Plan of Allocation) at ¶6.

87.     Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for (a) each share of Romeo Common Stock purchased or otherwise acquired during the Settlement Class Period (including shares acquired through the exercise of a Romeo Warrant or publicly traded option, and shares acquired through the separation of RMG Units purchased during the Settlement Class Period), and (b) each Romeo Warrant purchased or otherwise acquired during the Settlement Class Period (including warrants acquired through the separation of RMG Units purchased during the Settlement Class Period).  *Id*. at ¶¶9, 10.  The calculation of a Recognized Loss Amount will depend upon several factors, including when the securities were purchased or otherwise acquired during the Settlement Class Period, and in what amounts, and whether those securities were sold (or, for the Romeo Warrants, exercised or redeemed), and if sold, when they were sold, and for what amounts.  The Recognized Loss Amount is not intended to estimate the amount a Settlement Class Member might have been able to recover after a trial, nor to estimate the amount that will be paid to Authorized Claimants pursuant to the Settlement.  *Id*. at ¶2.  The Recognized Loss Amount is the basis upon which the Net Settlement Fund will be proportionately allocated to the Authorized Claimants.  *Id*.

88.     In general, the Recognized Loss for Romeo Common Stock purchased or acquired during the Settlement Class Period will be the lesser of: (a) the estimated artificial inflation on the

date of acquisition minus the estimated artificial inflation on the date of sale; or (b) the actual purchase price minus the sale price if sold. *Id.* at ¶9. The Recognized Loss for Romeo Warrants purchased or acquired during the Settlement Class Period will be the lesser of: (a) the estimated artificial inflation on the date of acquisition minus the estimated artificial inflation on the date of sale; or (b) the actual purchase price minus the sale price if sold, or the redemption price if redeemed, or the closing price of the Romeo Warrants on the date of exercise if exercised. *Id.* at ¶10. For a Settlement Class Member to have a Recognized Loss under the Plan of Allocation, the Romeo Securities must have been purchased or acquired during the Settlement Class Period and held at the opening of trading on at least one of the Corrective Disclosure Dates. *Id.* at ¶5. The Recognized Loss calculation also incorporates the "90-day look back" provision of the PSLRA. *See id.* at ¶7.

89.     The sum of a Claimant's Recognized Loss for all Romeo Securities is the Claimant's "Recognized Claim," and the Net Settlement Fund will be allocated to Authorized Claimants on a pro rata basis based on the relative size of their Recognized Claims, subject to a $10 de minimis provision. *See id.* at ¶23. More precisely, an Authorized Claimant's pro rata share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *Id.* If a Claimant has an overall market gain with respect to his, her, or its transactions in Romeo Securities during the relevant period, the Claimant is not entitled to recover under the Plan of Allocation. *Id.* at ¶21.

90.     If any funds remain after an initial distribution to Authorized Claimants, as a result of uncashed or returned checks or other reasons, subsequent distributions will be conducted as long as they are cost effective. *Id.* at ¶24. At such time as it is determined that the re-distribution

27

of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance will be contributed to non-sectarian, not-for-profit organization(s), to be recommended by Lead Counsel and approved by the Court. *Id*.

91.    If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant. *Id*. at ¶23. Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose prorated payments are $10.00 or greater. *Id*. In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost-prohibitive.

92.    In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in Romeo Securities that were attributable to the conduct alleged in the Second Amended Complaint. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

93.    To date, no objections to the proposed Plan of Allocation have been received or filed on the Court's docket.

## VI.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

94.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying for a fee award of 30% of the Settlement Fund (or $4,470,000, plus interest earned at the same rate as the Settlement Fund). Lead Counsel also request reimbursement of Litigation Expenses in the amount of $475,341.74, which includes $395,341.74 in out-of-pocket expenses that Lead Counsel incurred in connection with the prosecution of the Action, and an aggregate of $80,000 to the Lead Plaintiff and the four other named Plaintiffs for their costs, including for time spent, incurred in connection with their representation of the Settlement Class.

The total Litigation Expense amount of $475,341.74 is well below the maximum expense amount of $566,000 set forth in the Notice. The legal authorities supporting a 30% fee award are set forth in the accompanying Attorneys' Fee Motion, which is being filed contemporaneously herewith. The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

### A.    The Fee Application

95.    Lead Counsel is applying for a percentage-of-the-common-fund fee award as compensation for services rendered on behalf of the Settlement Class. As set forth in the accompanying Attorneys' Fee Motion, the percentage method is the best method for determining a fair attorneys' fee award, because unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class in achieving the maximum recovery. The lawyers are motivated to achieve maximum recovery in the shortest amount of time required under the circumstances. This paradigm minimizes unnecessary drain on the Court's resources. Notably, the percentage-of-the-fund method has been recognized as appropriate by the Supreme Court and the Second Circuit for cases of this nature.

96.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is fair and reasonable and should be approved. As discussed in the Attorneys' Fee Motion, a 30% fee award is well within the range of percentages awarded in securities class actions with comparable settlements in this Circuit.

### 1. The Outcome Achieved is the Result of the Significant Time and Labor that Lead Counsel Devoted to the Action

97.      GPM's total lodestar is $3,827,986.50,[6] consisting of $3,726,218.50 for attorney time and $101,768.00 for professional support staff time.  The following chart ("Lodestar Chart") sets forth the amount of time GPM attorneys and professional support staff billed from inception of the Action through and including May 23, 2024, and the lodestar calculation for those individuals based on GPM's current billing rates:

| TIMEKEEPER/CASE | STATUS | HOURS | RATE | LODESTAR |
|---|---|---:|---:|---:|
| **ATTORNEYS:** | | | | |
| Robert Prongay | Partner | 91.60 | 1,050.00 | 96,180.00 |
| Joseph Cohen | Partner | 99.10 | 1,195.00 | 118,424.50 |
| Kara Wolke | Partner | 716.30 | 1,050.00 | 752,115.00 |
| Greg Linkh | Partner | 152.80 | 1,095.00 | 167,316.00 |
| Leanne Heine | Partner | 21.50 | 925.00 | 19,887.50 |
| Melissa Wright | Senior Counsel | 907.20 | 750.00 | 680,400.00 |
| Pavithra Rajesh | Senior Counsel | 16.40 | 625.00 | 10,250.00 |
| Christopher Del Valle | Associate | 794.30 | 650.00 | 516,295.00 |
| Rebecca Dawson | Associate | 35.20 | 475.00 | 16,720.00 |
| Ani Setian | Associate | 65.10 | 395.00 | 25,714.50 |
| Sandra Hung | Staff Attorney | 989.80 | 450.00 | 445,410.00 |
| Lisa Holman | Staff Attorney | 1,756.40 | 450.00 | 790,380.00 |
| Fernanda D. Galbes | Staff Attorney | 36.50 | 425.00 | 15,512.50 |
| Peter Rabinov | Staff Attorney | 181.30 | 395.00 | 71,613.50 |
| **TOTAL ATTORNEY** | **TOTAL** | **5,863.50** | | **3,726,218.50** |
| **PARALEGALS:** | | | | |
| Harry Kharadjian | Senior Paralegal | 70.25 | 350.00 | 24,587.50 |
| Paul Harrigan | Senior Paralegal | 47.10 | 325.00 | 15,307.50 |
| Amir Soleimanpour | Law Clerk | 17.60 | 325.00 | 5,720.00 |
| John D. Belanger | Research Analyst | 55.20 | 365.00 | 20,148.00 |
| Michaela Ligman | Research Analyst | 43.90 | 400.00 | 17,560.00 |
| Gabrielle Zavaleta | Research Analyst | 52.70 | 350.00 | 18,445.00 |
| **TOTAL PARALEGAL** | **TOTAL** | **286.75** | | **101,768.00** |
| **TOTAL LODESTAR** | **TOTAL** | **6,150.25** | | **3,827,986.50** |

---

[6] The lodestar figure contains only the time of GPM attorneys and professional staff that billed more than ten hours to the Action.

98.     The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted by other Courts, including in the Second Circuit in the context of a lodestar cross-check in other securities litigation. *See Lea v. Tal Education Group*, 2021 WL 5578665, at *12 (S.D.N.Y. Nov. 30, 2021) (finding GPM's *2021* rates of "$600 to $995 for partners, and $500 to $750 for associates … comparable to peer plaintiffs and defense-side law firms litigating matters of similar magnitude" (citation omitted)); *In re Akazoo S.A. Sec. Litig.*, 2022 WL 14915812, at *2 (E.D.N.Y. Oct. 7, 2022) (awarding 33⅓% of the Settlement Fund and noting lodestar); *In re Eros International PLC Sec. Litig.*, 2023 WL 8519091, at *2 (D.N.J. Nov. 28, 2023) (same).  Additionally, Lead Counsel's rates (ranging from $925-1,195 per hour for partners, $395-750 per hour for non-partners) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude. *See* Ex. 8 (Peer Law Firm Billing Rates).

99.     The Lodestar Chart was prepared from contemporaneous daily time records regularly prepared and maintained by GPM.  Time expended on the Attorneys' Fee Motion has not been included in the lodestar.  Nor does the lodestar include any of the time that will be spent preparing for and attending the final approval hearing, overseeing the claims administration process, responding to Settlement Class Members inquiries, and briefing the Motion for Class Distribution Order.  No additional compensation will be sought for this work.

100.     The requested fee amount of 30% of the Settlement Fund equals $4,470,000 (plus interest earned at the same rate as the Settlement Fund), which equates to a multiplier of 1.17 on Lead Counsel's lodestar.  I respectfully submit that the 1.17 multiplier is fair and reasonable based on, *inter alia*, the risks of the litigation, the quality of the representation, and the results obtained. As discussed in further detail in the Attorneys' Fee Motion, the requested multiplier is well-within

31

the range of fee multipliers often awarded in comparable securities class actions and in other complex litigation involving significant contingency fee risk in this Circuit.

101.    As detailed above, throughout this case, Lead Counsel devoted substantial time to the prosecution of the Action. I personally devoted substantial time to this case and either oversaw or was personally involved in drafting or reviewing and editing of many of the pleadings, court filings, meditation statements, and other correspondence prepared on behalf of Plaintiffs, and was intimately involved in settlement negotiations. Other experienced attorneys were involved with drafting, reviewing and/or editing pleadings, court filings, various discovery-related materials, and the mediation submissions, communicated with Plaintiffs, the mediation process, negotiating the terms of the Stipulation, and other matters. More junior attorneys, staff attorneys and paralegals also worked on matters appropriate to their skill and experience level. Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

102.    I respectfully submit that given the time and labor invested in this case by Lead Counsel, the requested fee is reasonable under either a percentage-of-the-fund or lodestar analysis and should be approved.

### 2.    The Significant Risks Borne by Lead Counsel

103.    This prosecution was undertaken by Lead Counsel on an *entirely* contingent-fee basis. From the outset, this Action was an especially difficult and highly uncertain securities case. There was no guarantee that Lead Counsel would ever be compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and that the considerable

litigation costs required by a case like this one were covered. With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel has received no compensation for its work during approximately three years of litigation and has incurred $395,341.74 in hard out-of-pocket litigation-related expenses in prosecuting the Action.

104.    Additionally, Plaintiffs and Lead Counsel developed and then alleged the Exchange Act claims without information gained through subpoena power and hindered by the PSLRA's automatic discovery stay.

105.    Moreover, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured. Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement. *See supra*, ¶64; *see also Gross v. GFI Group, Inc.*, 784 Fed. App'x. 27, 28 (2d Cir. Sept. 13, 2019) (affirming grant of summary judgment against plaintiffs in securities fraud class action where GPM served as one of lead plaintiff's counsel following approximately five years of hard-fought, fully contingent litigation on the alternative ground that defendant's "statement did not, as a matter of law, amount to a material misrepresentation or omission actionable under section 10(b)," despite Judge Pauley twice finding the statement actionable). On the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint, overcome summary judgment, win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

106.    Lead Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class. In circumstances

such as these, and in consideration of the hard work and the result achieved, I respectfully submit that the requested fee is reasonable and should be approved.

### 3. The Experience And Expertise Of Lead Counsel And The Standing And Caliber of Defendants' Counsel

107.    As demonstrated by the firm résumé attached hereto as Exhibit 9, GPM consists of highly experienced and skilled lawyers that focus their practices on securities and other class action litigation. Indeed, Lead Counsel has substantial experience in litigating securities fraud class actions and have negotiated scores of other class settlements, which have been approved by courts throughout the country. Lead Counsel enjoys a well-deserved reputation for skill and success in the prosecution and favorable resolution of securities class actions and other complex civil matters. I believe Lead Counsel's experience added valuable leverage in the settlement negotiations.

108.    Additionally, the quality of the work performed by Lead Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Latham & Watkins LLP, a prestigious and well-respected defense firm that vigorously and ably defended the Action. In the face of this experienced and formidable opposition, Lead Counsel was able to develop a case that was sufficiently strong to nonetheless persuade the Individual Defendants to settle the case on terms that were highly favorable to the Settlement Class.

### 4. Public Policy Interests, Including The Need To Ensure The Availability Of Experienced Counsel In High-Risk Contingent Securities Cases

109. Courts consistently recognize that it is in the public interest to have experienced and able counsel to enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly large investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a particular securities class action. Relatedly, it is long-recognized public policy that settlement is to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements on behalf of litigants who—absent the class action mechanism—would be economically unable to prosecute such actions.

### 5. The Reaction Of The Settlement Class Supports Lead Counsel's Fee Request

110. As noted above, notice has been provided to 238,737 potential Settlement Class Members or their nominees informing them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund. Mejia Decl. ¶10, Exs. 1-A (Postcard Notice), 1-B (Notice). In addition, the Court-approved Summary Notice has been published in INVESTOR'S BUSINESS DAILY and transmitted over the PR NEWSWIRE. Mejia Decl. at ¶12, Ex. 1-D (confirmation of Summary Notice publication). To date, no objections to the maximum potential attorneys' fees request set forth in the Postcard Notice or Notice have been received or entered on this Court's docket. Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers to be filed by July 3, 2024.

**B.**    **Reimbursement Of The Requested Litigation Expenses Is Fair And Reasonable**

111.    Lead Counsel seeks a total of $475,341.74 in Litigation Expenses to be paid from the Settlement Fund. This amount includes: $395,341.74 in out-of-pocket expenses reasonably and necessarily incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action; as well as an aggregate award of $80,000 to Lead Plaintiff and the four class representatives, pursuant to the PSLRA (15 U.S.C. § 78u-4(a)(4)), for time spent prosecuting the Action on behalf of the Settlement Class.

112.    The following is a breakdown by category of all out-of-pocket expenses incurred by Lead Counsel:

| CATEGORY OF EXPENSE | AMOUNT PAID |
|---|---|
| Courier And Special Postage | 565.48 |
| Court Filing Fees | 800.00 |
| Deposition Vendor Charges (Transcripts, Video Services) | 6,800.34 |
| E-Discovery Vendor Charges | 31,372.94 |
| Experts - Accounting | 6,577.00 |
| Experts - Bankruptcy Counsel | 19,544.29 |
| Experts - Econometrics (Market Efficiency, Loss Causation, Damages, Plan of Allocation) | 229,909.20 |
| Mediators | 40,582.50 |
| Online Research | 16,304.80 |
| Photoimaging | 275.95 |
| Plaintiffs' Deposition Expenses (Travel, Lodging, Meals) | 3,552.95 |
| Private Investigator Fees | 11,110.43 |
| Service Of Process | 4,309.21 |
| Travel Airfare | 8,230.31 |
| Travel Auto/Train | 2,301.44 |
| Travel Hotel | 12,364.41 |
| Travel Meals | 635.91 |
| Video Conferencing | 104.58 |
| GRAND TOTAL | 395,341.74 |

36

113.    The Postcard Notice and Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $566,000. The total amount requested by Lead Counsel and Plaintiffs, $475,341.74 (inclusive of $80,000 PSLRA awards to Plaintiffs), falls well below the $566,000 that Settlement Class Members were advised could be sought. To date, no objections have been raised as to the maximum amount of expenses set forth in the Postcard Notice and Notice. If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in its reply papers.

114.    From the beginning of the case, Lead Counsel were aware that they might not recover their out-of-pocket expenses. Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of funds advanced to prosecute this Action. Accordingly, Lead Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

115.    The largest component of expenses, $256,030.49 or approximately 64.8% of the total out-of-pocket expenses, was expended on the retention of experts in the fields of accounting, bankruptcy, market efficiency, loss causation and damages. These experts were consulted at different points throughout the litigation on a variety of topics, including: (a) preparation of the FAC; (b) market efficiency in the context of Plaintiffs' motion for class certification; (c) settlement negotiation; (d) Romeo's ABC Proceeding; and (e) the proposed Plan of Allocation.

116.    Additionally, Lead Counsel paid:

(a)    $40,582.50 in mediation fees to Judge Phillips for the services Judge Phillips provided in connection with the mediation and subsequent negotiations of

37

the Settlement, which is approximately 10.3% of the total out-of-pocket expenses incurred; and

      (b)    $31,372.94 for hosting a large document database, which is approximately 7.9% of the total expenses out-of-pocket incurred.

117.    The other litigation expenses for which Lead Counsel seeks reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These litigation expenses included, among other things, court fees, service of process costs, postage and delivery expenses, private investigator expenses, travel expenses, and the cost of on-line factual and legal research.

118.    Finally, each of the Plaintiffs were highly involved in the litigation and communicated regularly with Lead Counsel. Each made themselves freely available to perform their representative functions, including often speaking and emailing with Lead Counsel. The tasks performed by them in executing their duties and responsibilities as Plaintiffs in this Action included, among others: (a) reviewing the relevant court papers in the case; (b) communicating with Lead Counsel via email and telephone about case developments and litigation strategy; (c) providing documents and responses to Defendants' discovery requests; (d) preparing and sitting for deposition; (e) preparing for the mediation sessions, including discussing with Lead Counsel the Parties' mediation statements, as well as mediation strategy; (f) considering the mediator's recommendation, conferring with counsel, and ultimately approving the Settlement; and (g) communicating with Counsel regarding the process of finalizing the Settlement.  A true and correct copy of each Declaration attesting to these facts is attached hereto as Exhibits 2-6.

119.    Based on the forgoing, Lead Counsel respectfully requests that the Court award $20,000 to Lead Plaintiff Castleberg, and $15,000 to each of the other four named Plaintiffs—

Cante, Nguyen, Chimchirian, and Tapia—for the time they have dedicated to this case on behalf of the Settlement Class.

120.   To date, no objections to the Litigation Expenses have been filed on the Court's docket. In my opinion, the Litigation Expenses incurred by Lead Counsel and Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, I respectfully submit that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VII.   CONCLUSION

124.   In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Motion, I respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and the proposed Plan of Allocation should be approved as fair and reasonable. I further submit that the requested fee in the amount of 30% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of $475,341.74 in Litigation Expenses, including PSLRA reimbursement of $20,000 to Lead Plaintiff Castleberg, and $15,000 to each of the other four named Plaintiffs—Cante, Nguyen, Chimchirian, and Tapia—should also be approved.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed this 5th day of June 2024, in Brooklyn, New York.

*/s/ Gregory B. Linkh*
Gregory B. Linkh

39

## PROOF OF SERVICE

I hereby certify that on this 5th day of June, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.


/s/ Gregory B. Linkh
Gregory B. Linkh

40